DSS:EMN/AH/DAL/SPN/KDE/BDM
F.#2015R00747

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 20 2015 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JEFFREY WEBB,
EDUARDO LI,
JULIO ROCHA,
COSTAS TAKKAS,
JACK WARNER,
EUGENIO FIGUEREDO,
RAFAEL ESQUIVEL,
JOSÉ MARIA MARIN,
NICOLÁS LEOZ,
ALEJANDRO BURZACO,
AARON DAVIDSON,
HUGO JINKIS,
MARIANO JINKIS, and
JOSÉ MARGULIES,
      also known as José Lazaro,

      Defendants.

- - - - - - - - - - - - - - - - - - -X

**DEARIE, J.**

**LEVY, M.J.**

I N D I C T M E N T

# 15 CR 0252(RJD)(RML)

Cr. No. _____
(T. 8, U.S.C., § 1451(e);
T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(a)(6), 982(b), 1343,
1349, 1425(a), 1512(c)(2),
1956(a)(2)(A),
1956(a)(2)(B)(i), 1956(h),
1957(a), 1957(b),
1957(d)(1), 1962(d), 1963,
1963(a), 1963(m), 2, and
3551 et seq.; T. 21,
U.S.C., § 853(p); T. 26,
U.S.C. § 7206(2); T. 28,
U.S.C. § 2461(c))

CONTENTS

INTRODUCTION TO ALL COUNTS......................................... 1
I.   The Enterprise............................................... 1
   A.   FIFA.................................................... 2
   B.   The Continental Confederations......................... 8
   C.   The Regional Federations and National Associations. 12
   D.   The Sports Marketing Companies..................... 13
II.  The Defendants............................................. 14
III. The Defendants' Co-Conspirators........................ 22
IV.  The Conspirators' Corruption of the Enterprise......... 28
V.   Overview of the Racketeering Conspiracy................ 31
   A.   The Initial Corruption of the Enterprise........... 32
   B.   The Growth of the Sports Marketing Companies....... 36
   C.   The Centrality of the U.S. Financial System........ 39
   D.   Scandal and the Resignations of WARNER and LEOZ.... 41
   E.   The Continued Corruption of the Enterprise......... 42
   F.   Obstruction of Justice............................. 47
VI.  The Criminal Schemes..................................... 48
   A.   CONMEBOL Copa América Scheme....................... 48
   B.   CONCACAF Gold Cup Scheme........................... 61
   C.   CONMEBOL Copa Libertadores Scheme.................. 63
   D.   CBF Copa do Brasil Scheme.......................... 70
   E.   CBF Sponsorship Scheme............................. 74
   F.   CFU World Cup Qualifiers Scheme #1................. 76
   G.   2010 FIFA World Cup Vote Scheme.................... 80
   H.   UNCAF Region World Cup Qualifiers Scheme........... 86
   I.   2011 FIFA Presidential Election Scheme............. 89
   J.   CFU World Cup Qualifiers Scheme #2................. 94
   K.   CONCACAF Gold Cup/Champions League Scheme.......... 99
   L.   CONMEBOL/CONCACAF Copa América Centenario Scheme.. 102
CRIMINAL COUNTS.................................................. 113
CRIMINAL FORFEITURE ALLEGATIONS................................. 152

i

THE GRAND JURY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Enterprise</u>

1.    The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC") – together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise").  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

1

2.    The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide.  The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport.  The members of the enterprise, as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions.

3.    The enterprise operated in the Eastern District of New York and elsewhere, including overseas.

A.    <u>FIFA</u>

4.    FIFA was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was composed of as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following suit in the

2

1990s.  At various times relevant to the Indictment, FIFA maintained offices both in Zurich, Switzerland and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

5.    Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA: CONCACAF, CONMEBOL, UEFA, CAF, AFC, and OFC.  Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

6.    FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body.  FIFA also had a president, who represented the association worldwide and was responsible for the implementation of decisions.  FIFA also operated several standing committees, including a committee that organized Olympic soccer qualifying tournaments, whose members included soccer officials from various national member associations. FIFA also operated through a number of subsidiaries, including

subsidiaries that assisted with FIFA's media and marketing activities.

7.    The FIFA congress was composed of delegates from each of its member associations as well as observers appointed by each of the confederations.  Among other things, the congress was responsible for amending FIFA's statutes and electing the FIFA president.  The congress convened in ordinary sessions biennially or annually, and at other times in extraordinary sessions in various countries around the world, including the United States.

8.    The FIFA executive committee, often referred to as the "ExCo," was composed of the FIFA president and a number of ordinary members, some of whom also held the title of vice president.  The president was elected by the FIFA congress.  The vice presidents and ordinary members were appointed by the confederations.  Each confederation was entitled to appoint a specific number of vice presidents and ordinary members, as set forth in the FIFA statutes.  Since at least 1996, the executive committee was required by FIFA statutes to meet at least twice per year.  The executive committee held meetings at FIFA's headquarters in Zurich, Switzerland, as well as in various countries around the world, including the United States.

4

9.   Among other duties, the executive committee was responsible for selecting the host nations of FIFA tournaments, including, among others, the World Cup, the Women's World Cup, the Confederations Cup, the Under-20 World Cup, the Under-20 Women's World Cup, the Under-17 World Cup, the Under-17 Women's World Cup, and the Club World Cup.

10.   The World Cup, the sport's premier event, was a quadrennial international tournament involving the senior national men's teams of 24 and, beginning in 1998, 32 nations. In selecting the host nation for the World Cup, the executive committee typically followed a process in which bid committees for the competing nations campaigned for votes among the members of the executive committee.  Following this process, and at least six years prior to each World Cup, the executive committee typically held a vote in which its members cast their votes via secret ballot.  The winners, or host nations, for the World Cups from 1990 to 2022, as well as the other bidding nations that maintained their bids to the end of the process, are reflected in the table below:

5

**TABLE 1**: World Cup Host Selection

| World Cup | Date Selected by the ExCo | Winning Nation | Other Bidding Nation/Nations |
|---|---|---|---|
| 1990 | May 19, 1984 | Italy | Soviet Union |
| 1994 | July 4, 1988 | United States | Morocco<br>Brazil |
| 1998 | July 2, 1992 | France | Morocco |
| 2002 | May 31, 1996 | Japan/South Korea | Mexico |
| 2006 | July 6, 2000 | Germany | South Africa<br>England<br>Morocco |
| 2010 | May 15, 2004 | South Africa | Morocco<br>Egypt |
| 2014 | October 30, 2007 | Brazil | – |
| 2018 | December 2, 2010 | Russia | Spain/Portugal<br>Netherlands/Belgium<br>England |
| 2022 | December 2, 2010 | Qatar | United States<br>South Korea<br>Japan<br>Australia |

The U.S. men's national team qualified for each edition of the World Cup from 1990 to 2014.

11.  Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

6

12.   FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and by creating and enforcing rules that govern the confederations and member associations.  FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup.

- According to its published income statement for the 2007-2010 financial period, FIFA had total revenues of $4.189 billion, 83% of which ($3.480 billion) was attributable to the sale of television and marketing rights to the 2010 World Cup.  FIFA's profits during this same period were $631 million.

- According to its published income statement for the 2011-2014 financial period, FIFA had total revenues of $5.718 billion, 70% of which ($4.008 billion) was attributable to the sale of television and marketing rights to the 2014 World Cup.  FIFA's profits during this same period were $338 million.

FIFA, in turn, helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program ("FAP") and the Goal Program, which were established in the late 1990s to support the development of youth academies, soccer fields, technical centers, and other infrastructure projects.  According to its published income statement for the 2011-2014 financial period, FIFA spent $1.052 billion on development projects, including $538 million for the FAP program.

7

13.   FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006, again in 2009, and most recently in 2012 (generally, the "code of ethics").  The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues, and clubs.  Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain.  The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty.  By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

B.   The Continental Confederations

14.   In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis.  The leaders and representatives of the confederations conducted business with one another, as well as with the leaders

8

and associates of FIFA, throughout the year at locations around the world, including in the United States.  Each confederation was governed by its own congress, general secretariat, executive committee and standing committees.  From time to time, some of the confederations, like FIFA, also operated through subsidiaries, including subsidiaries that assisted with media and marketing activities.

15.  CONCACAF was a continental soccer confederation incorporated, since 1994, as a non-profit corporation in Nassau, Bahamas.  CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries.  The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.  From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business.  Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based.  CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation.

9

Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league – or club - teams.  In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

16.    CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asunción, Paraguay and, later, Luque, Paraguay.  CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams.  Since 1993, the United States has participated in the Copa América as an invitee three times, and in 2016 the United States will host and participate in a special edition of the tournament, the Copa América Centenario, to commemorate its centennial.

17.    UEFA was a continental soccer confederation registered as a legal entity under the laws of Switzerland and headquartered in Nyon, Switzerland.  UEFA comprised as many as 54 member associations, representing organized soccer in Europe

10

and certain nations in the Middle East and Central Asia.  Among other tournaments, UEFA organized the European Championship, featuring the top men's national teams, as well as tournaments featuring the top men's club teams.

18.  CAF was a continental soccer confederation headquartered in Cairo, Egypt.  CAF comprised as many as 56 member associations, representing organized soccer in Africa. Among other tournaments, CAF organized the Africa Cup of Nations, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

19.  AFC was a continental soccer confederation registered as a legal entity under the laws of Malaysia and headquartered in Kuala Lumpur, Malaysia.  AFC comprised as many as 47 member associations, representing organized soccer in Asia, as well as on the island of Guam, a territory of the United States.  Among other tournaments, AFC organized the Asian Cup, featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

20.  OFC was a continental soccer confederation incorporated under the laws of New Zealand and headquartered in Auckland, New Zealand.  OFC comprised as many as 14 member associations, representing organized soccer in New Zealand and the Pacific Island countries, including American Samoa, a

11

territory of the United States.  Among other tournaments, OFC organized the Nations Cup, a tournament founded in 1996 featuring the top men's national teams, as well as a tournament featuring the top men's club teams.

21.  The confederations also organized World Cup qualifying matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

C.   The Regional Federations and National Associations

22.  In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

23.  For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF"), and the North American Football Union ("NAFU").  The United States Soccer Federation was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

24.  At various times, CFU was an entity headquartered in Trinidad and Tobago and Jamaica.  The CFU statutes effective May 22, 2012 provided, in pertinent part, that CFU officials "shall observe all pertinent statutes, regulations, directives

12

and decisions" of FIFA, CONCACAF, and CFU, "including in particular . . . FIFA's Code of Ethics."

25.   The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States, the United States Soccer Federation, was based in Chicago, Illinois.

26.   The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level.  Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other venues worldwide.

D.    The Sports Marketing Companies

27.   FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport.  These sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United

13

States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights.  These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

28.  The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for the enterprise. The United States was an increasingly important and lucrative market for the commercialization of these rights.

II.  <u>The Defendants</u>

29.  The defendant ALEJANDRO BURZACO, a citizen of Argentina, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, BURZACO was a controlling principal of Torneos y Competencias S.A. (together with its affiliates, "TyC"), a sports media and marketing business headquartered in Argentina.  BURZACO was also a controlling principal of a number of subsidiaries and affiliates of TyC, including FPT Sports S.A. (together with its affiliates, "FPT Sports") and Productora de Eventos S.A.

14

BURZACO's companies are referred to collectively below as "Torneos."

30.   The defendant AARON DAVIDSON, a citizen of the United States, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, DAVIDSON was a high-level executive, including the president, of Traffic Sports USA, Inc. ("Traffic USA").  Traffic USA was a Florida corporation that had its headquarters and principal place of business in Miami, Florida and was involved in the purchase and sale of media and marketing rights associated with soccer in the United States and other parts of the CONCACAF region.  Traffic USA also participated in the ownership and management of the North American Soccer League ("NASL"), a division of United States men's club soccer sanctioned by the United States Soccer Federation, as well as the ownership and management of multiple clubs within the league.  The NASL was headquartered in New York City and its teams were based in various cities in Canada and the United States, including in the Eastern District of New York.  As further described below, Traffic USA was part of the Traffic Group, a multinational sports marketing conglomerate based in São Paulo, Brazil.

31.   The defendant RAFAEL ESQUIVEL, a citizen of Venezuela, was an individual employed by and associated with the

15

enterprise.  ESQUIVEL was the president of the Federación Venezolana de Fútbol ("FVF"), the Venezuelan soccer federation, which was a national member association of FIFA and CONMEBOL. In or about and between 2014 and the present, ESQUIVEL was also a vice president on the CONMEBOL executive committee.  At various times relevant to the Indictment, ESQUIVEL owned several pieces of residential property in the United States, specifically in the state of Florida.

32.   The defendant EUGENIO FIGUEREDO, a citizen of the United States and Uruguay, was an individual employed by and associated with the enterprise.  In or about and between May 2013 and the present, FIGUEREDO was a member of FIFA's executive committee and a FIFA vice president.  At various times relevant to the Indictment, FIGUEREDO also served on multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup.  In or about and between April 2013 and August 2014, FIGUEREDO served as the CONMEBOL president; prior to that, he had served as one of CONMEBOL's vice presidents.  In or about and between 1997 and 2006, FIGUEREDO served as the president of the Asociación Uruguaya de Fútbol, the Uruguayan soccer federation, which was a national member association of FIFA and CONMEBOL.  From at least in or about 2005 to the present, FIGUEREDO maintained a residence in

16

the United States, specifically in Arcadia, California.
According to a naturalization application FIGUEREDO filed in
2005 with U.S. immigration authorities, beginning in 1997
FIGUEREDO worked in "sales" at a "decorative rock" business in
Irwindale, California.  In his application, FIGUEREDO falsely
affirmed under penalty of perjury that (a) he neither worked
anywhere else in the previous five years nor ever had any
affiliation with any organization or association in the United
States or in any other place; and (b) he was exempt from the
required English language and civics exams because of a mental
disability.  Prior to obtaining his U.S. citizenship in August
2006, FIGUEREDO submitted documentation explaining his mental
disability that falsely stated that he had severe dementia.

      33.  The defendant HUGO JINKIS and his son, the
defendant MARIANO JINKIS, both citizens of Argentina, were
individuals employed by and associated with the enterprise.  At
various times relevant to the Indictment, HUGO JINKIS and
MARIANO JINKIS were the controlling principals of Full Play
Group S.A., a sports media and marketing business with its
principal offices in Argentina.  HUGO JINKIS and MARIANO JINKIS
also controlled subsidiaries and affiliates of Full Play Group
S.A., including, among others, Cross Trading S.A. ("Cross

Trading") and Yorkfields S.A.  HUGO JINKIS and MARIANO JINKIS's companies are referred to collectively below as "Full Play."

34.  The defendant NICOLÁS LEOZ, a citizen of Paraguay, was an individual employed by and associated with the enterprise.  In or about and between 1986 and April 2013, LEOZ was the president of CONMEBOL.  In or about and between 1998 and April 2013, LEOZ was also a member of FIFA's executive committee.

35.  The defendant EDUARDO LI, a citizen of Costa Rica, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, LI was the president of the Federación Costarricense de Fútbol ("FEDEFUT"), the Costa Rican soccer federation, which was a national member association of FIFA and CONCACAF.  In or about and between 2013 and the present, LI was also a member of CONCACAF's executive committee.  In April 2015, LI was elected by the CONCACAF congress to become one of CONCACAF's three representatives on FIFA's executive committee.  At various times relevant to the Indictment, LI also served on multiple FIFA standing committees, including the players' status committee. At various times relevant to the Indictment, LI owned a residence in the United States, specifically in the state of Florida.

18

36.   The defendant JOSE MARGULIES, also known as José Lazaro, a citizen of Brazil, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, MARGULIES was a controlling principal of Valente Corp. ("Valente") and Somerton Ltd ("Somerton"), South American companies registered in Panama and Turks and Caicos, respectively, that were involved in the broadcasting of soccer matches.  Valente and Somerton and their affiliates are referred to collectively below as the "Margulies Intermediaries."

37.   The defendant JOSÉ MARIA MARIN, a citizen of Brazil, was an individual employed by and associated with the enterprise.  In or about and between March 2012 and April 2015, MARIN served as the president of the Confederação Brasileira de Futebol ("CBF"), the Brazilian soccer federation, which was a national member association of FIFA and CONMEBOL.  At various times relevant to the Indictment, MARIN also served on multiple FIFA standing committees, including the organizing committee for the Olympic football tournaments, as well as the organizing committees for the World Cup and the Confederations Cup, as to which he was a special adviser.  At various times relevant to the Indictment, MARIN maintained a residence in the United States, specifically in the state of New York.

19

38.   The defendant JULIO ROCHA, a citizen of Nicaragua, was an individual employed by and associated with the enterprise.  Until approximately December 2012, ROCHA was the president of the Federación Nicaragüense de Fútbol ("FENIFUT"), the Nicaraguan soccer federation, which was a national member association of FIFA and CONCACAF.  From in or about 2003 to 2007, ROCHA was president of UNCAF.  In or about and between January 2013 and the present, ROCHA was a FIFA development officer based in Panama, responsible for overseeing FIFA's development efforts in Central America.

39.   The defendant COSTAS TAKKAS, a citizen of the United Kingdom, was an individual employed by and associated with the enterprise.  At various times relevant to the Indictment, TAKKAS was the principal of a number of businesses, including Kosson Ventures Limited ("Kosson Ventures"), a British Virgin Islands-registered personal holding company, and CPL Limited, a Cayman Islands-registered personal holding company. At various times relevant to the Indictment, TAKKAS was also the general secretary of the Cayman Islands Football Association ("CIFA"), a national member association of FIFA and CONCACAF, and served as an attaché to the CONCACAF president after the defendant JEFFREY WEBB assumed that role.

20

40.   The defendant JACK WARNER, a citizen of Trinidad and Tobago and, between approximately 1993 and 2013, a legal permanent resident of the United States, was an individual employed by and associated with the enterprise.  In or about and between 1983 and June 2011, WARNER was a member of the FIFA executive committee, and, beginning in 1997, was also a FIFA vice president.  In or about and between 1990 and June 2011, WARNER was also the president of CONCACAF and CFU, as well as a "special advisor" to the Trinidad and Tobago Football Federation, a national member association of FIFA and CONCACAF.

41.   The defendant JEFFREY WEBB, a citizen of the Cayman Islands, was an individual employed by and associated with the enterprise.  In or about and between 1991 and the present, WEBB was the president of CIFA.  At various times relevant to the Indictment, WEBB was a member of the CFU executive committee and the chairman of its normalization committee.  In or about and between May 2012 and the present, WEBB was the president of CONCACAF and a FIFA vice president and executive committee member.  At various times relevant to the Indictment, WEBB also served on multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup.  Outside of soccer, WEBB worked at various times as an executive at a bank in the Cayman Islands.

21

Since approximately 2013, WEBB owned a residence in the United States, specifically in Loganville, Georgia.  WEBB also owned other pieces of residential property in the United States, specifically in Stone Mountain, Georgia and Conyers, Georgia.

42.   The foregoing officials of FIFA, CONCACAF, CONMEBOL, and other soccer governing bodies were bound by fiduciary duties to their respective organizations.

III.  The Defendants' Co-Conspirators

43.   The identities of the following individuals and business entities are known to the Grand Jury:

44.   In or about and between April 1990 and December 2011, Co-Conspirator #1 was the general secretary of CONCACAF. Co-Conspirator #1 resided in New York, New York, where he oversaw CONCACAF's administrative headquarters and staff.  From in or about February 1997 until May 2013, Co-Conspirator #1 was also a member of FIFA's executive committee, serving as one of the three members of that body who had been appointed by CONCACAF and the only member who represented the United States. At various times relevant to the Indictment, Co-Conspirator #1 was also a member of various FIFA standing committees, including the marketing and television committee.

45.   Co-Conspirator #2 was the founder and owner of the Traffic Group, a multinational sports marketing company

22

based in São Paulo, Brazil.  The Traffic Group was comprised of,
among other entities, Traffic Assessoria e Comunicações S/C
Ltda. ("Traffic Brazil"), Traffic Sports International, Inc.
("Traffic International"), Traffic USA, Traffic Sports Europe
B.V., and Continental Sports International, Inc. (referred to
collectively herein as "Traffic" or the "Traffic Group").

   46. Beginning in the 1980s, Traffic's operations
focused on, among other things, the commercialization of soccer
in South America through the purchase and sale of media and
marketing rights associated with the sport.  Beginning in or
about 1990, Co-Conspirator #2 expanded Traffic's operations to
the United States, partnering with and later acquiring a Florida
company called Inter/Forever Sports, Inc., which was renamed
Traffic Sports USA, Inc. (collectively referred to below as
"Traffic USA") in or about 2003.  Over time, Traffic began to
expand its operations even beyond the Americas, including by
contracting directly with FIFA in the late 1990s and early 2000s
to acquire the rights to the first editions of the Club World
Championship.  Co-Conspirator #2 funded Traffic through various
mechanisms, including revenues generated by the downstream sale
of television and other rights obtained from media and marketing
contracts and direct and frequent infusions of capital from
Continental Sports International, Inc. ("Continental Sports"), a

Cayman Islands company that Co-Conspirator #2 controlled and that maintained an account at Citi Private Bank in New York. Between 2006 and 2013, Continental Sports wire transferred tens of millions of dollars to Traffic International's account at Delta Bank in Miami, Florida and tens of millions of dollars more to Traffic Brazil's accounts overseas.

47.   At various times relevant to the Indictment, Co-Conspirator #3 was employed as a high-ranking executive of Traffic USA.

48.   In or about and between 1999 and July 2012, Co-Conspirator #4 was employed as a high-ranking executive of Traffic USA.  In or about and between July 2012 and the present, Co-Conspirator #4 was employed as the general secretary of CONCACAF.  In that role, Co-Conspirator #4 oversaw the transition of CONCACAF's administrative headquarters from New York, New York, where the prior general secretary (Co-Conspirator #1) resided, to Miami, Florida, where it is presently located.  In addition to his duties as CONCACAF general secretary, Co-Conspirator #4 served as the general secretary of the Copa América Centenario executive committee, a joint CONCACAF/CONMEBOL body that was created in 2014 to oversee the 2016 Copa América Centenario, further described below.

24

49.  Co-Conspirator #5 was the controlling principal of Sports Marketing Company A, a company engaged in the purchase and sale of sponsorship and other commercial rights to soccer events.  Sports Marketing Company A was incorporated in Delaware and headquartered in Jersey City, New Jersey.  Co-Conspirator #5 resided in the United States.

50.  At various times relevant to the Indictment, Co-Conspirator #6 was a senior executive of Traffic Brazil and, later, of a group of companies under common ownership and control that were engaged in the commercialization of media rights associated with soccer.  The latter group of companies is referred to individually and collectively below as Sports Marketing Company B.

51.  At various times relevant to the Indictment, Co-Conspirator #7 was a high-ranking official of FIFA and AFC, the regional confederation representing much of Asia.

52.  At various times relevant to the Indictment, Co-Conspirator #8 was a high-ranking official of CONMEBOL and an official of FIFA.

53.  At various times relevant to the Indictment, Co-Conspirator #9 was employed as a high-ranking executive of Traffic Brazil and Traffic USA.

54.   At various times relevant to the Indictment, Co-Conspirator #10 was a high-ranking official of FIFA, CONMEBOL and the Asociación del Futbol Argentina ("AFA"), the Argentinian soccer federation, which was a national member association of FIFA and CONMEBOL.

55.   At various times relevant to the Indictment, Co-Conspirator #11 was a high-ranking official of FIFA, CONMEBOL, and CBF.

56.   At various times relevant to the Indictment, Co-Conspirator #12 was a high-ranking official of FIFA, CONMEBOL and CBF.

57.   At various times relevant to the Indictment, Co-Conspirator #13 was a senior executive of Traffic Brazil and Traffic USA, as well as a senior executive of a U.S. subsidiary of a group of companies under common ownership and control that were engaged in the commercialization of media rights associated with soccer.  The latter group of companies is referred to individually and collectively below as Sports Marketing Company C.

58.   At various times relevant to the Indictment, Co-Conspirator #14, a relative of the defendant JACK WARNER, was a businessman involved in, among other things, a number of soccer-related ventures.

26

59.   At various times relevant to the Indictment, Co-Conspirator #15 was a high-ranking official of the 2006 South Africa World Cup bid committee and the 2010 South Africa World Cup bid committee and local organizing committee.

60.   At various times relevant to the Indictment, Co-Conspirator #16 was a high-ranking official of the 2006 South Africa World Cup bid committee and the 2010 South Africa World Cup bid committee and local organizing committee.

61.   At various times relevant to the Indictment, Co-Conspirator #17 was a high-ranking official of CONMEBOL and a member of the FIFA executive committee.

62.   At various times relevant to the Indictment, Co-Conspirator #18 was a FIFA official.

63.   At various times relevant to the Indictment, Co-Conspirator #19 was an intermediary who operated, among other businesses, a consulting group based in Latin America.

64.   At various times relevant to the Indictment, Co-Conspirator #20 was a senior executive of the European parent of Sports Marketing Company C.

65.   At various times relevant to the Indictment, Co-Conspirator #21 was a senior executive of a U.S. subsidiary of Sports Marketing Company C.

27

66.   At various times relevant to the Indictment, Co-Conspirator #22 was the beneficial owner of Front Company A.

67.   At various times relevant to the Indictment, Co-Conspirator #23 was a high-ranking official of one of FIFA's national member associations, an official of FIFA and CFU, and a businessman.

68.   At various times relevant to the Indictment, Co-Conspirator #24 was a high-ranking official of CONMEBOL and one of FIFA's national member associations, as well as a FIFA official.

69.   At various times relevant to the Indictment, Co-Conspirator #25 was a high-ranking official of FIFA, CONMEBOL, and one of FIFA's national member associations.

70.   The foregoing officials of FIFA, CONCACAF, CONMEBOL, and other soccer governing bodies were bound by fiduciary duties to each of their respective organizations.

IV.   The Conspirators' Corruption of the Enterprise

71.   Certain individuals and entities employed by and associated with the enterprise, including the defendants JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, and JOSÉ MARGULIES, together with others, conspired with

28

one another to use their positions within the enterprise to engage in schemes involving the solicitation, offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks.  Although they also helped pursue the principal purpose of the enterprise, the defendants and their co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery, and money laundering, in pursuit of personal and commercial gain.  The defendants also participated in the corruption of the enterprise by conspiring with and aiding and abetting their co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.

72.  To further their corrupt ends, the defendants and their co-conspirators provided one another with mutual aid and protection.  The conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities.  The conduct engaged in by various members of the conspiracy included, among other things: the use of "consulting services" agreements and other similar types of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, financial advisors,

29

and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees, and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice.  Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

73.  The damage inflicted by the defendants and their co-conspirators was far-reaching.  By conspiring to enrich themselves through bribery and kickback schemes relating to media and marketing rights, among other schemes, the defendants deprived FIFA, the confederations, and their constituent organizations – and, therefore, the national member associations, national teams, youth leagues, and development programs that rely on financial support from their parent organizations – of the full value of those rights.  In addition, the schemes had powerful anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-

holders.  Finally, the schemes deprived FIFA, the

confederations, and their constituent organizations of their

right to the honest and loyal services of the soccer officials

involved.  Over time, and in the aggregate, such deprivations

inflicted significant reputational harm on the victimized

institutions, damaging their prospects for attracting

conscientious members and leaders and limiting their ability to

operate effectively and carry out their core missions.

V.    Overview of the Racketeering Conspiracy

        74.  Over a period of approximately 25 years, the

defendants and their co-conspirators rose to positions of power

and influence in the world of organized soccer.  During that

same period, sometimes with the assistance of the defendants and

their co-conspirators, a network of marketing companies

developed to capitalize on the expanding media market for the

sport, particularly in the United States.  Over time, the

organizations formed to promote and govern soccer in regions and

localities throughout the world, including the United States,

became increasingly intertwined with one another and with the

sports marketing companies that enabled them to generate

unprecedented profits through the sale of media rights to soccer

matches.  The corruption of the enterprise arose and flourished

in this context.

31

75.   The corruption of the enterprise became endemic.
Certain defendants and co-conspirators rose to power, unlawfully
amassed significant personal fortunes by defrauding the
organizations they were chosen to serve, and were exposed and
then either expelled from those organizations or forced to
resign.   Other defendants and co-conspirators came to power in
the wake of scandal, promising reform.   Rather than repair the
harm done to the sport and its institutions, however, these
defendants and co-conspirators quickly engaged in the same
unlawful practices that had enriched their predecessors.

A.   The Initial Corruption of the Enterprise

76.   From in or about 1983 to 2011, the defendant JACK
WARNER obtained power and influence over the enterprise, first
in the CONCACAF region, and then worldwide, eventually becoming
a FIFA vice president and member of its executive committee.   In
or about 1983, WARNER, who was then the secretary of the
Trinidad and Tobago Football Federation ("TTFF"), became a
CONCACAF vice president and was appointed to the FIFA executive
committee.   In or about 1990, WARNER was elected president of
CFU and resigned his formal position with TTFF, becoming a
special advisor.   The same year, WARNER ran for CONCACAF
president and, with the support of Co-Conspirator #1, who had
worked as an official in the United States Soccer Federation,

32

was elected.  WARNER worked closely thereafter with Co-
Conspirator #1, whose fortunes rose with WARNER's and who was
appointed to be WARNER's general secretary at CONCACAF.
Following his appointment, Co-Conspirator #1 transferred
CONCACAF's administrative headquarters to New York, New York.
WARNER established the president's office in his home country of
Trinidad and Tobago.

77.  In Trinidad and Tobago and elsewhere, the
defendant JACK WARNER established and controlled numerous bank
accounts and corporate entities in which he mingled his personal
assets and those of CONCACAF, CFU, and TTFF.  Beginning in the
early 1990s, WARNER, often with the assistance of Co-Conspirator
#1, began to leverage his influence and exploit his official
positions for personal gain.  Among other things, WARNER began
to solicit and accept bribes in connection with his official
duties, including the selection of the host nation for the World
Cups held in 1998 and 2010, which he participated in as a member
of the FIFA executive committee.

78.  The defendant JACK WARNER also become involved in
a number of other schemes, including the diversion of FIFA,
CONCACAF, and CFU funds into accounts that he controlled and
used for his personal benefit.  Among other things, WARNER
funded a 2005 purchase of a Miami, Florida condominium, held in

33

the name of a member of his family, with money drawn from an account held in the name of a soccer facility that was ostensibly affiliated with CONCACAF and was supported in part through FAP funds.

79.   During approximately the same period of the defendant JACK WARNER's rise, the defendant NICOLÁS LEOZ established himself as a powerful official at CONMEBOL and FIFA. In or about 1986, LEOZ, who had held other positions in soccer governance, was elected president of CONMEBOL.  LEOZ would serve in this position for approximately 25 years.  In or about 1998, LEOZ was also appointed to the FIFA executive committee, joining WARNER and Co-Conspirator #1, who had been selected the prior year with WARNER's approval, to serve on the same body.  Like WARNER, LEOZ would come to use his power and influence to unlawfully enrich himself.

80.   During the defendant NICOLÁS LEOZ's presidency, CONMEBOL developed a lucrative commercial relationship with Traffic, a growing sports marketing company that had been founded a few years earlier in Brazil.  In 1986, Traffic, represented by Co-Conspirator #2 (the company's founder and owner), entered into a contract with CONMEBOL to acquire the worldwide commercial rights associated with the 1987 edition of the Copa América, CONMEBOL's men's national team tournament.

34

Traffic would remain the exclusive holder of these rights through the 2011 edition of the tournament.

81.   Beginning in the early 1990s, as the value of the rights associated with the Copa América increased, various CONMEBOL officials, including the defendant NICOLÁS LEOZ, began soliciting bribe payments from Co-Conspirator #2 in exchange for the performance of various acts, including the renewal of the Copa América contract.  Co-Conspirator #2 agreed to pay.  Over time, Co-Conspirator #2 agreed to pay and paid tens of millions of dollars in bribes to CONMEBOL officials in connection with, among other things, the Copa América contracts, media and marketing rights to other South American soccer tournaments, and sponsorship rights acquired by United States sportswear companies.

82.   Co-Conspirator #2 used a number of sophisticated money laundering techniques to pay bribes and kickbacks, often relying on intermediaries to make and conceal bribe payments to the defendant NICOLÁS LEOZ and other soccer officials.  One such intermediary was the defendant JOSE MARGULIES, the brother of a late friend of Co-Conspirator #2.  MARGULIES used accounts in the names of offshore corporations that were held at United States financial institutions to make payments on Co-Conspirator #2's behalf.

35

B.     The Growth of the Sports Marketing Companies

83.   In or about 1992, Co-Conspirator #2 relocated
from Brazil to the United States, where he began negotiations
with the defendant JACK WARNER and Co-Conspirator #1 to acquire
the marketing rights to the Gold Cup, CONCACAF's men's national
team tournament, for Traffic's United States affiliate, Traffic
USA, which was based in Miami, Florida.  Co-Conspirator #2, with
the assistance of Co-Conspirator #3, a U.S.-based co-
conspirator, won the contract, which was subsequently amended
and renewed so that Traffic acquired the rights to the five
editions of the Gold Cup played between 1996 and 2003.  In
connection with the acquisition and renewal of those rights, Co-
Conspirator #2 and Co-Conspirator #3 together caused bribe
payments to be made to WARNER and Co-Conspirator #1.

84.   In the late 1990s and 2000s, Traffic, through
Traffic USA, continued to grow its business with CONCACAF and
its regional federations and member associations.  Co-
Conspirator #2 and several high-ranking executives working at
Traffic USA engaged in a number of bribery and fraud schemes in
connection with their efforts to obtain various rights from
CONCACAF, CFU, and various federations in the region, including
the federations from Trinidad and Tobago, Costa Rica, and
Nicaragua.  The Traffic USA executives involved in these schemes

36

included, among others, the defendant AARON DAVIDSON and Co-Conspirator #4.  The beneficiaries of the schemes included, among others, the defendants JACK WARNER, EDUARDO LI, the president of the Costa Rican soccer federation, and JULIO ROCHA, at the time the president of the Nicaraguan soccer federation and subsequently a FIFA development officer.

85.  As Traffic attempted to expand its operations and develop its ties with CONCACAF and CONMEBOL, several competing sports marketing companies sought a share of the growing profits associated with organized soccer.  Frequently, those companies, like Traffic, paid bribes to soccer officials in order to win business.

86.  Sports Marketing Company A, a New Jersey-based company owned and operated by Co-Conspirator #5, was one such company.  In or about 1996, CONMEBOL designated Sports Marketing Company A as its marketing agent for sponsorship and title sponsorship rights associated with the Copa Libertadores, CONMEBOL's premier club team tournament.  Co-Conspirator #5, either directly through Sports Marketing Company A or indirectly through affiliates, thereafter acted as agent in multi-party contracts to sell certain marketing rights to the tournament. At various times between the late 1990s and 2012, Co-Conspirator #5 used bank accounts in New York, New York and elsewhere to pay

37

bribes and kickbacks to the defendant NICOLÁS LEOZ and to Co-Conspirator #8 to maintain these rights in connection with editions of the tournament through 2012.

87.    Other sports marketing companies that competed for business in the region with Traffic included Torneos, controlled by the defendant ALEJANDRO BURZACO, Full Play, controlled by the defendants HUGO JINKIS and MARIANO JINKIS, and Sports Marketing Company B, controlled by Co-Conspirator #6.  At times, these companies worked in conflict with one another, each seeking to win business from soccer organizations in the CONMEBOL and CONCACAF regions.  At other times, the companies worked in concert, entering into contracts to share the media rights obtained from soccer organizations.  All of these sports marketing companies at various times and at the direction of the defendants ALEJANDRO BURZACO, HUGO JINKIS, MARIANO JINKIS, and Co-Conspirator #6, paid bribes and kickbacks to obtain and retain media rights contracts, with the defendant JOSÉ MARGULIES at times operating as an intermediary to facilitate and conceal these payments.

88.    Over the course of the racketeering conspiracy, the defendant JOSÉ MARGULIES used the Margulies Intermediaries' accounts at United States financial institutions to move millions of dollars among the sports marketing companies and to

38

soccer officials who were the recipients of illicit payments.
MARGULIES took additional steps to conceal the nature of the
payments he was facilitating beyond his use of the U.S.-based
accounts.  For example, he used the services of currency
dealers, he regularly shredded records of his activities, and he
discouraged soccer officials who were receiving payments from
using accounts in their own names lest they draw attention from
law enforcement, though they did not always heed his advice.  To
take one five-year period, for example, between March 2003 and
March 2008, the Margulies Intermediaries wired more than $3.5
million into accounts controlled by the defendants RAFAEL
ESQUIVEL, NICOLÁS LEOZ, and EUGENIO FIGUEREDO, almost entirely
through even, six-figure payments.  MARGULIES continued his
involvement in facilitating bribe payments up to the present
and, indeed, remained open to participating in new schemes: as
recently as 2014, MARGULIES discussed with a co-conspirator an
opportunity to render his services to a new sports marketing
business, offering to facilitate bribe payments for a $150,000
annual fee and a commission of 2% per payment.

   C. <u>The Centrality of the U.S. Financial System</u>

    89. Over the course of the 1990s and increasingly in
the 2000s and 2010s, the defendants and their co-conspirators
relied heavily on the United States financial system in

connection with their activities with the enterprise, including the schemes set forth below.  This reliance was significant and sustained and was one of the central methods and means through which they promoted and concealed their schemes.

90.  For example, at various times relevant to the Indictment:

· FIFA wired billions of dollars from its accounts at a major Swiss financial institution into beneficiary accounts in the United States and throughout the world via a correspondent account at the U.S. branch of a major Swiss financial institution;

· CONCACAF and CONMEBOL conducted business using accounts at the Florida and New York branches of major U.S. and Swiss financial institutions;

· CFU and two South American soccer federations, Federación Venezolana de Fútbol (FVF) and Asociación del Futbol Argentina (AFA), conducted business using the New York and Florida branches of multiple major and regional U.S. and foreign financial institutions;

· Continental Sports, a Traffic Group holding company, provided tens of millions of dollars in capital to support the operations of the Traffic Group using its account at the New York branch of a major U.S. financial institution;

· Traffic USA and Traffic International, two subsidiaries of the Traffic Group, conducted business using their accounts at the Florida branches of a major U.S. financial institution and a small U.S. financial institution that specialized in providing private banking services to clients from Latin America, respectively;

40

- Full Play, Torneos, Sports Marketing Company A, and Sports Marketing Company B conducted business using New York branches of major U.S., Swiss, and Brazilian financial institutions;

- Somerton and Valente, the intermediaries controlled by the defendant JOSÉ MARGULIES, conducted business using accounts at the New York and Florida branches of major U.S. and European financial institutions;

- The defendants AARON DAVIDSON, RAFAEL ESQUIVEL, NICOLÁS LEOZ, JULIO ROCHA, COSTAS TAKKAS, and JEFFREY WEBB personally controlled accounts at the New York, Miami, and San Francisco branches of major U.S. and Swiss financial institutions; and

- The defendant NICOLÁS LEOZ used a New York-based investment advisor registered with the U.S. Securities and Exchange Commission to manage a $40 million portfolio (as of 2012) of his worldwide investments.

In addition to the use of the particular financial institutions and wire facilities identified above, the conspirators also relied on the broader strength and stability of the U.S. financial system, including access to the private equity markets.

D.   Scandal and the Resignations of WARNER and LEOZ

91.   In 2011 and 2013, public revelation of corruption scandals involving the defendants JACK WARNER and NICOLÁS LEOZ forced both men to resign from their positions in the enterprise.

41

92.   In May 2011, the defendant JACK WARNER facilitated the payment of bribes by Co-Conspirator #7, who was running for the FIFA presidency, to members of CFU.  The following month, after the scheme came to light and FIFA commenced an investigation into the matter, WARNER resigned from his positions with FIFA, CONCACAF, CFU, and TTFF.  By the end of 2011, after the revelation of other financial irregularities at CONCACAF began to come to light, Co-Conspirator #1 resigned from his position as general secretary of CONCACAF.

93.   In April 2013, the defendant NICOLÁS LEOZ resigned from his positions as president of CONMEBOL and a member of the FIFA executive committee.  LEOZ's resignation followed the conclusion of an investigation by the FIFA ethics committee into payments made in the late 1980s and early 2000s to LEOZ and two other soccer officials from a Swiss sports marketing company in connection with the purchase of FIFA media and marketing rights.  The FIFA ethics committee found that the payments to LEOZ and the other officials were bribes.

E.    The Continued Corruption of the Enterprise

94.   The change in administration at CONCACAF and CONMEBOL did not usher in an era of reform at those organizations.  Instead, the new leadership continued to engage in criminal schemes in violation of their fiduciary duties.

42

95.   In early 2012, the defendant JEFFREY WEBB, who had long been the president of CIFA, emerged as a candidate to succeed the defendant JACK WARNER as the next CONCACAF president.  Co-Conspirator #4, then an executive at Traffic USA, supported WEBB's candidacy by causing $50,000 to be paid from Traffic USA's operating account to a Caymanian company controlled by the defendant COSTAS TAKKAS, a long-time associate of WEBB's and the former general secretary of CIFA.  Around the same time, WEBB, with TAKKAS's aid and assistance, used his growing influence to solicit a bribe from Traffic USA in connection with its efforts to acquire from CFU the commercial rights of its members to the qualifier matches to be played in advance of the 2018 and 2022 World Cups.

96.   In May 2012, the defendant JEFFREY WEBB was elected to be president of CONCACAF.  Like the defendant JACK WARNER, WEBB thereafter became a FIFA vice president and member of its executive committee.  Co-Conspirator #4 was appointed to be CONCACAF's general secretary and left his position at Traffic USA to oversee CONCACAF's operations under WEBB.  Upon assuming their respective positions, WEBB and Co-Conspirator #4 made public pronouncements about reforming CONCACAF.  Almost immediately after taking office, however, both men resumed their involvement in criminal schemes.

43

97.   For example, weeks after beginning work as general secretary, Co-Conspirator #4 began negotiations with the defendant AARON DAVIDSON, under whom he previously worked at Traffic USA, regarding the media rights to the Gold Cup and the CONCACAF Champions League, CONCACAF's club tournament.  Upon direction by and on behalf of the defendant JEFFREY WEBB, Co-Conspirator #4 negotiated a bribe payment for WEBB.  In or about November 2012, CONCACAF awarded the contract for the rights to the 2013 Gold Cup and the next two seasons of the CONCACAF Champions League to Traffic USA.

98.   Approximately one year later, Co-Conspirator #4 negotiated a second bribe from Traffic USA to the defendant JEFFREY WEBB in connection with the renewal of the Gold Cup and Champions League contract.  In the interim, Co-Conspirator #4 had begun to benefit personally from WEBB's bribe schemes, obtaining an expensive painting from an art gallery in New York that was paid for by the defendant COSTAS TAKKAS, who, having previously served under WEBB as general secretary at CIFA, obtained the new title of attaché to the CONCACAF president.

99.   In or about April 2013, following the defendant NICOLÁS LEOZ's resignation, the defendant EUGENIO FIGUEREDO – a dual citizen of the United States and Uruguay, who maintained a residence in California – assumed the CONMEBOL presidency and

44

LEOZ's place as a vice president on the FIFA executive committee.  Shortly after the elevation of FIGUEREDO to these positions, CONMEBOL, CONCACAF, and the sports marketing companies controlled by Co-Conspirator #2 and the defendants ALEJANDRO BURZACO, HUGO JINKIS, and MARIANO JINKIS, consummated a scheme to obtain a suite of valuable rights from CONCACAF and CONMEBOL officials in exchange for an agreement to pay $110 million in bribes.

100. As part of the scheme, Co-Conspirator #2 and the defendants ALEJANDRO BURZACO, HUGO JINKIS, and MARIANO JINKIS caused their respective companies to join together and form a new entity known as Datisa.  Following creation of this entity, Datisa entered into a $317.5 million contract with CONMEBOL to obtain the exclusive worldwide rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario, a tournament to celebrate the 100th anniversary of the first edition of the Copa América.  Following negotiations between CONMEBOL and CONCACAF, it was determined that the men's national teams of six CONCACAF member associations, including the United States Soccer Federation, would participate in the Copa América Centenario with the 10 CONMEBOL men's national teams.  It was further determined that the tournament would be

45

hosted by the United States in recognition of the growth of the market for soccer in North America.

101. Datisa subsequently entered into a $35 million contract with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's media rights to the tournament.

102. In connection with the acquisition of the media rights to the Copa América and Centenario tournaments from CONMEBOL and CONCACAF, Datisa agreed to pay $110 million in bribes to the defendants JEFFREY WEBB, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, and NICOLÁS LEOZ, and several other soccer officials. Datisa agreed to make these payments at various times over the life of the contracts. At least $40 million has been paid to date.

103. On May 1, 2014, CONCACAF and CONMEBOL held a press conference in Miami, Florida to officially announce and promote the Copa América Centenario. Datisa representatives, including the defendants ALEJANDRO BURZACO, HUGO JINKIS, and MARIANO JINKIS and Co-Conspirator #2, attended the press conference. A press release issued in connection with the announcement trumpeted the growing unity of organized soccer in the Americas. In the release, the defendant EUGENIO FIGUEREDO stated, "We are proud to play a leading role in the celebration

46

of the centennial of a tournament born to unite all
America. . . .  Now, CONCACAF and the United States will play
host to the world's oldest national team competition."  The
event's promotional materials bore the logo of Datisa's trade
name – wematch – alongside the logos of CONCACAF and CONMEBOL,
superimposed over a map of the western hemisphere.

104. The Copa América Centenario is scheduled to be
played in June 2016 in cities located throughout the United
States.

F.    Obstruction of Justice

105. Beginning in or about 2012 and continuing through
the present, as their awareness of law enforcement scrutiny
began to increase, many conspirators engaged in additional
conduct designed to prevent detection of their own illegal
activities and to provide one another with mutual aid and
protection.  At times, such conduct constituted obstruction of
justice.

106. The following are three examples of acts of
obstruction engaged in by the conspirators.  First, upon
learning that a co-conspirator was being interviewed by federal
law enforcement agents, another co-conspirator attempted to
persuade the co-conspirator being interviewed not to disclose to
agents everything he or she knew.  Second, conspirators,

47

including the defendant AARON DAVIDSON, alerted co-conspirators to the possibility that they would be recorded making admissions of their crimes.  Third, a co-conspirator destroyed evidence of bribe payments.

VI.   The Criminal Schemes

107. Set forth below are further details regarding certain criminal schemes in which the defendants and their co-conspirators agreed to engage in connection with their activities with the enterprise.

A.   CONMEBOL Copa América Scheme

108. In 1916, CONMEBOL organized the first edition of the Copa América, a tournament featuring the men's national teams of its members.  According to CONMEBOL, the tournament, which continues to be played today, is the longest continuously running such tournament in the world.

109. Beginning with the 1987 edition and continuing thereafter through 2011, Traffic held the exclusive worldwide commercial rights for each edition of the Copa América tournament, which rights were secured through a series of contracts between Traffic and CONMEBOL.

110. In or about 1986, Traffic Brazil, represented by its owner, Co-Conspirator #2, entered into negotiations with CONMEBOL, represented by the defendant NICOLÁS LEOZ and other

48

CONMEBOL officials, to acquire the media and marketing rights associated with the Copa América.  As a result of those negotiations, on or about October 3, 1986, Traffic Brazil entered into a $1.7 million contract with CONMEBOL officials for the exclusive worldwide commercial rights associated with the 1987 edition of the tournament.  Traffic subsequently purchased the rights to the 1989 and 1991 editions as well.

111. On or about January 23, 1991, Traffic Brazil entered into a contract with CONMEBOL to acquire the exclusive worldwide commercial rights for the 1993, 1995, and 1997 editions of the Copa América (as amended, the "1991 Copa América Contract").  At the time, the defendant NICOLÁS LEOZ was the president and Co-Conspirator #8 was the general secretary of CONMEBOL.  Under the terms of the contract, Traffic agreed to pay CONMEBOL $6.6 million for the media and marketing rights to the 1993, 1995 and 1997 editions: $2.2 million per edition.

112. On or about January 23, 1991, there was a signing ceremony at CONMEBOL headquarters in Asunción with other CONMEBOL officials.  At that time, Co-Conspirator #2 signed the contract on behalf of Traffic, as did two other CONMEBOL officials.  The defendant NICOLÁS LEOZ did not sign at that time.  Thereafter, in a private meeting, LEOZ told Co-Conspirator #2, in sum and substance, that Co-Conspirator #2

49

would make a lot of money from the rights he was acquiring and that LEOZ did not think it was fair that he (LEOZ) did not also make money.  LEOZ told Co-Conspirator #2 that he would not sign the contract if Co-Conspirator #2 did not agree to pay him a bribe.  After Co-Conspirator #2 agreed to make the payment, LEOZ signed the contract.  Co-Conspirator #2 caused the payment – a six-figure U.S. dollar payment – to be made to an account designated by LEOZ.

113.  On or about July 7, 1992, after the United States and Mexico accepted invitations to compete in the 1993 edition of the tournament, the parties executed an addendum to the 1991 Copa América Contract increasing the price for the 1993 edition by 20%, to $2.64 million.  The addendum provided that a similar price increase would be required in the event the United States and Mexico also participated in the 1995 and 1997 editions.  The addendum was signed by Co-Conspirator #2, on behalf of Traffic, and the defendant NICOLÁS LEOZ, on behalf of CONMEBOL.

114.  In approximately 1993 or 1995, the defendant NICOLÁS LEOZ began demanding additional bribe payments around the time each edition of the tournament contemplated by the 1991 Copa América Contract was played.  Co-Conspirator #2 agreed to make these payments and caused them to be made.

50

115. The defendant NICOLÁS LEOZ solicited and received bribe payments from Co-Conspirator #2 in connection with every Copa América edition after that date until 2011.  The payments increased over time, and ultimately reached the seven figures.

116. During this period, the defendant RAFAEL ESQUIVEL solicited personal payments from Co-Conspirator #2 and other Traffic representatives in connection with the Copa América tournament as well.

117. In 2007, the Copa América was hosted by Venezuela.  That year, the defendant RAFAEL ESQUIVEL, who at the time was the president of FVF, the Venezuelan soccer federation, and a member of the CONMEBOL executive committee, solicited a bribe payment of approximately $1 million from Traffic in exchange for ESQUIVEL's continued official support of Traffic's position as exclusive holder of the marketing rights to the Copa América and of Traffic's ability to commercialize the rights to the 2007 edition.  The defendant JOSÉ MARGULIES, with whom ESQUIVEL was close, conveyed the solicitation to Traffic.  Upon being informed of the solicitation, Co-Conspirator #2 agreed to the payment.

118. Also in 2007, the defendant RAFAEL ESQUIVEL solicited a separate payment from a senior Traffic executive, Co-Conspirator #9, in the form of a bribe and kickback of

51

profits to be generated by Traffic in connection with its
commercialization of television and sponsorship rights to that
year's edition of the Copa América.  Co-Conspirator #9 agreed
and caused Traffic to pay ESQUIVEL approximately $700,000 in
2007.

119. Four years later, at a meeting in Buenos Aires
during the 2011 Copa América, the defendant RAFAEL ESQUIVEL
solicited from Co-Conspirator #2 an additional $1 million bribe
and kickback payment in light of the substantial profits Co-
Conspirator #2 had earned in connection with the 2007
tournament.  After discussing the matter with Co-Conspirator #9,
Co-Conspirator #2 agreed to the payment and caused it to be
made, in part because he hoped to secure ESQUIVEL's official
support for Traffic in a dispute between Traffic and Full Play
(see CONMEBOL/CONCACAF Copa América Centenario Scheme, below)
concerning which company would hold the commercial rights to the
Copa América going forward.

120. In 2011, the Copa América was hosted by
Argentina.  Co-Conspirator #10 was at the time a long-standing
and high-ranking official at FIFA and AFA, the Argentinian
soccer federation.  The defendant ALEJANDRO BURZACO, a
controlling principal of the sports marketing conglomerate
Torneos, was close to and at times communicated on behalf of Co-

52

Conspirator #10.   Co-Conspirator #2 had dealt with BURZACO and
his colleagues at Torneos for years in connection with payments
to Co-Conspirator #10 personally.   For example, since the 1990s,
Co-Conspirator #2 had agreed on behalf of Traffic International
to pay AFA millions of dollars per edition of the Copa América
so that AFA would field its best players.   At times, Torneos
executives asked Co-Conspirator #2 to send the payments not to
AFA, but to a travel agency used to facilitate payments to Co-
Conspirator #10 personally.   Co-Conspirator #2 then sent the
payments as directed.

　　　　121. It was in the context of this long-standing
relationship that in 2011, in the months before the tournament,
the defendant ALEJANDRO BURZACO informed Co-Conspirator #2 that
Co-Conspirator #10 wanted a seven-figure bribe payment because
Argentina was hosting the 2011 edition of the tournament.   Co-
Conspirator #2 agreed to make the payment.   BURZACO told Co-
Conspirator #2 that rather than transfer any money directly to
Co-Conspirator #10, Co-Conspirator #2 could effectively make the
payment simply by permitting Torneos to reduce a debt it owed to
Traffic by the same amount.   Co-Conspirator #2 agreed with
BURZACO to make the payment in this manner, and subsequently
confirmed with Co-Conspirator #10 that he had indeed sought the
payment.

122. The defendants and their co-conspirators understood that accepting bribes was improper and thus sought to conceal the nature of the payments received from Co-Conspirator #2.   Accordingly, they used a number of sophisticated money laundering techniques, including the use of a numbered account at a Swiss bank, currency dealers, and trusted intermediaries, to effect bribe payments in a manner that obscured their true source and nature and promoted the corrupt schemes.   Co-Conspirator #2 was particularly reliant on intermediaries, including the defendant JOSÉ MARGULIES, to make the bribe payments to the defendant NICOLÁS LEOZ in connection with the Copa América.

123. As described above, the defendant JOSÉ MARGULIES and his family controlled the Margulies Intermediaries, using accounts held in the names of offshore corporations at United States financial institutions to make payments to the defendants on Co-Conspirator #2's behalf.   MARGULIES used the accounts of the Margulies Intermediaries to mask the sources and beneficiaries of bribe and kickback payments.

124. In the course of the scheme, and as far back as 1997, the defendants and their co-conspirators frequently used wire facilities and financial institutions located in the United States to make and receive payments related to the Copa América

54

contracts. In particular, Traffic International, which held the rights on behalf of Traffic beginning with the 1999 edition, maintained bank accounts in the United States and used the wire facilities of the United States to transfer payments in connection with Traffic's exploitation of the media and marketing rights associated with the Copa América.

125. For example, in 2004, Traffic International used the wire facilities of the United States to transfer funds from its account at Delta National Bank & Trust Co. in Miami, Florida in satisfaction of the $12 million in contract payments due to CONMEBOL for the rights associated with the 2004 edition of the Copa América:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| January 12, 2004 | Wire transfer of $1,200,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| March 29, 2004 | Wire transfer of $3,600,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |

55

| | |
|---|---|
| May 13, 2004 | Wire transfer of $3,600,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| June 2, 2004 | Wire transfer of $3,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| June 3, 2004 | Wire transfer of $600,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |

126. From 2006 to 2007, Traffic International again used the wire facilities of the United States to transfer funds from its account at Delta National Bank & Trust Co. in Miami, Florida in satisfaction of the $15 million in contract payments due to CONMEBOL for the rights associated with the 2007 edition of the Copa América:

| DATE | WIRE COMMUNICATION |
|---|---|
| July 21, 2006 | Wire transfer of $3,000,000 from Traffic International's account at |

56

|  | Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
|---|---|
| March 14, 2007 | Wire transfer of $2,200,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| March 26, 2007 | Wire transfer of $2,800,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| May 30, 2007 | Wire transfer of $5,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| June 13, 2007 | Wire transfer of $2,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL |

at Banco do Brasil in Asunción, Paraguay.

127. And from 2010 to 2011, Traffic International again used the wire facilities of the United States to transfer funds from its account at Delta National Bank & Trust Co. in Miami, Florida in satisfaction of the $22 million in contract payments due to CONMEBOL for the rights associated with the 2011 edition of the Copa América:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| November 8, 2010 | Wire transfer of $1,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |
| November 12, 2010 | Wire transfer of $4,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |
| March 4, 2011 | Wire transfer of $1,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |

58

| | |
|---|---|
| June 10, 2011 | Wire transfer of $9,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |
| June 28, 2011 | Wire transfer of $7,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |

128. The revenue generated by the commercialization of media and marketing rights associated with the Copa América increased dramatically over the course of the tournament editions covered by the 1991 Copa América Contract and Traffic's subsequent renewals (as amended, the "1996 Copa América Contract" and "2001 Copa América Contract," respectively), all of which Co-Conspirator #2 obtained through bribery.  Over time, these increases in revenue, and associated increases in profits, arose in significant part from Co-Conspirator #2 and Traffic's successful promotion and commercialization of the Copa América in the United States, including through contractual relationships with an array of broadcasters and advertisers based in the United States.

59

129. For example, the 2001 Copa América was quite profitable for Traffic, owing in part to the sale of broadcast and advertising rights to broadcast networks and beverage companies based in the United States.  To take another example, the 2007 Copa América was even more profitable for Traffic than the 2001 edition.  Traffic's television broadcasting revenues from the United States/Canadian market were its highest from any market worldwide, and its revenues from radio broadcasting and mobile telephone/Internet services in the United States market were similarly its highest worldwide.

130. The value of the sponsorship rights owned by Traffic also increased over time, owing in part to increased interest in the tournament in the United States.  For example, for the 2011 edition of the Copa América, Traffic sold sponsorship rights to 10 official sponsors, up from seven official sponsorships sold for the 2007 edition.  The official sponsors included major beverage companies based in the United States.  Sponsorship fees more than tripled between 2007 and 2011.

131. Traffic used its presence in the United States to assist it in exploiting the United States market.  For example, Traffic International assigned to Traffic USA, Traffic's Miami-based subsidiary, a portion of the rights it held under the 2001

60

Copa América Contract. Traffic USA exploited those rights in the United States by contracting directly with television and radio networks based in the United States and serving as an agent for Traffic in connection with the sale of global sponsorship rights.

132. In or about 2010, however, CONMEBOL terminated its long-standing relationship with Traffic and sold the rights to future editions of the tournament to Full Play, owned by the defendants HUGO JINKIS and MARIANO JINKIS.

B. CONCACAF Gold Cup Scheme

133. A few years after Co-Conspirator #2 entered into a bribe scheme with CONMEBOL officials in connection with the Copa América, Co-Conspirator #2 entered into a similar scheme with CONCACAF officials in connection with CONCACAF's analogue to the Copa América: the Gold Cup.

134. In or about 1991, CONCACAF began organizing and promoting the Gold Cup, a tournament featuring member associations of CONCACAF and, in later years, those of other confederations.

135. In or about 1992, Co-Conspirator #2 relocated to the United States in part to seek additional business opportunities for Traffic USA in the period leading up to the 1994 World Cup, which was to be hosted by the United States.

During this period, Co-Conspirator #2 and Co-Conspirator #3, a Traffic USA executive based in Miami, variously began negotiations with high-ranking CONCACAF officials, including the defendant JACK WARNER and Co-Conspirator #1, for Traffic USA to purchase the media and marketing rights associated with the Gold Cup.  Negotiations regarding the rights took place in the United States.

136.  Co-Conspirator #2's pitch to CONCACAF, in sum and substance, was that Traffic could replicate the commercial and sporting success it had had with the Copa América and make the Gold Cup a similar success.  On or about October 3, 1994, Traffic USA entered into a contract with CONCACAF for $9.75 million for the commercial rights associated with the 1996, 1998, and 2000 editions of the Gold Cup.  Beginning with the 1996 Gold Cup and continuing for four subsequent editions of the tournament (1998, 2000, 2002, and 2003), pursuant to the contract with Traffic USA (as subsequently amended and renewed following additional negotiations), CONCACAF granted to Traffic USA the exclusive worldwide commercial rights to the Gold Cup.

137.  During this period, Traffic caused hundreds of thousands of dollars in bribe payments to be made to the defendant JACK WARNER and Co-Conspirator #1, including payments that were made from or through banks based in the United States.

62

138. For example, on or about March 29, 1999, Traffic caused $200,000 to be wired to a correspondent account at Barclays Bank in New York, New York, for credit to an account held in the name of an entity controlled by Co-Conspirator #1 at Barclays Bank in the Cayman Islands.  Approximately three weeks later, on April 23, 1999, $100,000 – half of the amount paid to Co-Conspirator #1 - was transferred from Co-Conspirator #1's Cayman account to an account at First Citizens Bank in Trinidad and Tobago, held in the name of the defendant JACK WARNER.  As it had done in connection with the Copa América scheme, Traffic used an intermediary to make the payment to Co-Conspirator #1 in order to conceal the source and nature of the payment.

139. In or about 2003, CONCACAF terminated its contract with Traffic for Gold Cup media rights.

C.   CONMEBOL Copa Libertadores Scheme

140. In connection with its efforts to promote the sport of soccer in South America, CONMEBOL organized and funded a variety of international soccer tournaments to showcase the region's best teams.  Among other tournaments, CONMEBOL organized the Copa Libertadores, an annual tournament featuring the top men's club teams.  The first edition of the Copa Libertadores was held in 1960 with seven teams.  Over the

63

following decades, the tournament evolved into a major
competition featuring 38 teams from approximately 10 countries.

141. As the tournament developed and gained
popularity, CONMEBOL entered into contracts with sports
marketing companies to commercialize the marketing rights to the
tournament.  The marketing rights sold by CONMEBOL in connection
with the Copa Libertadores included an array of broadcasting
rights, sponsorship rights, and, starting in 1997, title
sponsorship rights.  In 1998, Toyota, Inc. ("Toyota") became the
tournament's first title sponsor, a position it held through
2007, during which period the tournament was known as the "Copa
Toyota Libertadores."  Grupo Santander ("Santander") was the
tournament's title sponsor from 2008 to 2012, during which
period the tournament was known as the "Copa Santander
Libertadores."  Bridgestone Corporation ("Bridgestone") was the
tournament's title sponsor from 2013 through the present, during
which period the tournament was known as the "Copa Bridgestone
Libertadores."

142. Television broadcasts of the Copa Libertadores
reached millions of viewers in markets across the globe,
including the United States.  According to CONMEBOL, the Copa
Libertadores was among the most widely watched sporting events
in the world.  The tournament was broadcast in more than 135

64

countries and, in 2009 and 2010, drew more than one billion viewers.  The United States accounted for 16% of the audience share in 2010, behind only Brazil, Mexico, and Argentina.

143. As the popularity and reach of the Copa Libertadores grew, so, too, did the value of the sponsorship rights to the tournament sold by CONMEBOL.  The United States was an important and lucrative market for the commercialization of these rights.

144. Starting in or about 1996 and continuing thereafter, Co-Conspirator #5 – operating through Sports Marketing Company A, a New Jersey-based sports marketing company that Co-Conspirator #5 founded and owned - was the exclusive marketing agent for the worldwide sponsorship rights to the Copa Libertadores.  As marketing agent, Co-Conspirator #5 identified potential tournament sponsors and negotiated contracts for the commercialization of the sponsorship rights to the tournament, including with major international businesses based or with offices in the United States, all in exchange for commission payments.

145. On or about August 15, 1997, CONMEBOL, Sports Marketing Company A, and a Japanese marketing agency (the "Japanese Marketing Agency") acting on behalf of Toyota entered into a contract pursuant to which Toyota became the first title

65

sponsor of the Copa Libertadores, for the 1998, 1999, and 2000 editions of the tournament.  The contract was signed by Co-Conspirator #5, on behalf of Sports Marketing Company A and as CONMEBOL's exclusive marketing agent; the defendant NICOLÁS LEOZ and Co-Conspirator #8 on behalf of CONMEBOL; and a representative of the Japanese Marketing Agency, for the benefit of Toyota.  Toyota subsequently contracted with the same parties for the title sponsorship rights to the 2001 through 2007 editions of the tournament.  In total, Toyota paid CONMEBOL over $35 million for the title sponsorship rights to the Copa Libertadores from 1998 through 2007.

146. On or about September 27, 2007, CONMEBOL, Sports Marketing Company A, and Santander entered into a $40 million contract pursuant to which Santander became the title sponsor of the Copa Libertadores for the 2008 through 2012 editions, at a cost of $8 million per edition.  The contract was signed by Co-Conspirator #5, on behalf of Sports Marketing Company A and as CONMEBOL's exclusive marketing agent; the defendant NICOLÁS LEOZ and Co-Conspirator #8, among other members of the CONMEBOL executive committee, on behalf of CONMEBOL; and representatives of Santander and a Chilean company acting as an intermediary rights holder on Santander's behalf.

147. On or about October 19, 2012, CONMEBOL, Sports Marketing Company A, and Bridgestone entered into a $57 million contract pursuant to which Bridgestone became the title sponsor of the Copa Libertadores for the 2013 through 2017 editions. The signatories to the contract were Co-Conspirator #5, on behalf of Sports Marketing Company A and as CONMEBOL's exclusive marketing agent; the defendant NICOLÁS LEOZ on behalf of CONMEBOL; and representatives of Bridgestone and an intermediary rights holder on Bridgestone's behalf.

148. On or about March 17, 2000, an entity affiliated with Sports Marketing Company A (the "Sports Marketing Company A affiliate"), the identity of which is known to the Grand Jury, CONMEBOL, and Co-Conspirator #5 entered into a $56.1 million contract pursuant to which, among other things, the Sports Marketing Company A affiliate acquired the sponsorship rights to the Copa Libertadores, excluding title sponsorship rights, for each edition of the tournament from 2001 through 2007, and CONMEBOL designated, and the affiliate agreed to the designation of, Co-Conspirator #5 as exclusive marketing agent for the sponsorship rights to the tournament. The contract was signed by Co-Conspirator #5, a representative from the Sports Marketing Company A affiliate, and, on behalf of CONMEBOL, the defendant

67

NICOLÁS LEOZ and Co-Conspirator #8.  The contract was renewed in or about 2007 and again in or about 2012.

149. Beginning in or about the early 2000s, the defendant NICOLÁS LEOZ at various times solicited bribe and kickback payments from Co-Conspirator #5 in exchange for LEOZ's support, as CONMEBOL's president and a member of its executive committee, of Co-Conspirator #5 as the exclusive marketing agent for the sponsorship rights to the Copa Libertadores.  LEOZ specified various means for Co-Conspirator #5 to make the payments, including direct payments into bank accounts controlled by LEOZ, diversion of funds owed to CONMEBOL into LEOZ's personal bank accounts, and transfers of extra-contractual payments into a CONMEBOL bank account.

150. The defendant NICOLÁS LEOZ also devised means of concealing the nature of the bribe payments.  For example, in or about 2010, LEOZ, through an assistant, directed Co-Conspirator #5 to wire a payment to LEOZ's personal account at Banco do Brazil and to reference a sham consulting contract as the basis for the transfer.  The reference to the consulting contract was designed to make the bribe payment to LEOZ, which was not ultimately sent, appear legitimate and, among other things, thereby evade financial institutions' anti-money laundering controls.

151. Co-Conspirator #5 agreed to make and did make bribe payments to LEOZ.  Among other things, the purpose of the payments was to obtain and/or retain, for Sports Marketing Company A and for the Sports Marketing Company A affiliate, contracts for the sponsorship rights associated with the Copa Libertadores, the ability to commercialize those rights, and the potential to secure contracts for sponsorship rights to additional CONMEBOL tournaments.

152. In or about and between February and May 2006, the defendant NICOLÁS LEOZ directed Co-Conspirator #5 to send more than $2 million owed to CONMEBOL pursuant to CONMEBOL's contract with the Sports Marketing Company A affiliate to personal bank accounts of LEOZ in Switzerland and Paraguay.  Co-Conspirator #5 used the wire facilities of the United States to communicate over email and by telephone to coordinate the transfer of funds from the Sports Marketing Company A affiliate's account to LEOZ's accounts.

153. From time to time in or about 2008, the defendant NICOLÁS LEOZ directed Co-Conspirator #5 to make payments above and beyond any payments that Co-Conspirator #5 owed by contract to a CONMEBOL bank account in Paraguay.  Co-Conspirator #5 used the wire facilities of the United States to make the payments

and to communicate with bank officials and others to facilitate the payments.

154. Also in or about 2008, after Sports Marketing Company A, CONMEBOL, and Santander entered into the $40 million title sponsorship contract described above, Co-Conspirator #8 solicited bribe and kickback payments from Co-Conspirator #5 in the amount of $400,000 per year. Co-Conspirator #5 agreed to make these payments and used the wire facilities of the United States to make bribe and kickback payments to Co-Conspirator #8 periodically until 2012, through two companies controlled by Co-Conspirator #8, the identities of which are known to the Grand Jury.

155. The defendant NICOLÁS LEOZ, directly or through personal assistants, frequently used the wire facilities of the United States to communicate by email in furtherance of the criminal scheme and to effect the transfer of legitimate and illegitimate payments in furtherance of the scheme.

D.   CBF Copa do Brasil Scheme

156. Between in or about 1990 and 2009, Traffic entered into a series of contracts with CBF, the Brazilian soccer federation, to acquire the commercial rights associated with the Copa do Brasil, an annual tournament for Brazil's top club teams. During the course of this period, Co-Conspirator

70

#11 – a high-ranking FIFA, CONMEBOL and CBF official - solicited and received bribes from Co-Conspirator #2 in connection with the sale of the Copa do Brasil media rights.

157.   As a result of an agreement reached between CBF and Traffic on or about January 22, 2009, Traffic Brazil owned the rights to each edition of the Copa do Brasil to be played from 2009 through 2014.

158.   On or about December 8, 2011, Sports Marketing Company B, a Traffic competitor owned by Co-Conspirator #6, entered into a contract with CBF to purchase the commercial rights for all editions of the Copa do Brasil between 2015 and 2022.

159.   In order to obtain the contract from CBF, Co-Conspirator #6 agreed to pay an annual bribe to Co-Conspirator #11, as Co-Conspirator #2 had done in the past.   During the course of their negotiations, Co-Conspirator #6 traveled to the United States to discuss the matter with Co-Conspirator #11.

160.   The signing of the foregoing contract between Sports Marketing Company B and CBF led to a dispute between Co-Conspirator #6 and Co-Conspirator #2, who perceived Co-Conspirator #6 – a former employee of his from Traffic Brazil – as stealing Traffic's business with CBF.

161. On or about August 15, 2012, to resolve this dispute, Traffic Brazil and Sports Marketing Company B entered into a contract to pool their marketing rights for future editions of the Copa do Brasil, from 2013 to 2022, and to share equally in the profits. As part of the contract, Traffic Brazil also agreed to pay 12 million reais to Sports Marketing Company B over the course of the contract.

162. Co-Conspirator #6 advised Co-Conspirator #2 of the bribe payments he had agreed to make to Conspirator #11. Co-Conspirator #6 further advised Co-Conspirator #2 that the bribe payment he had originally negotiated with Co-Conspirator #11 had increased when other CBF officials, including the defendant JOSÉ MARIA MARIN (who became the president of CBF in or about 2012), and Co-Conspirator #12, requested bribe payments as well. Co-Conspirator #2 agreed to pay half the cost of the bribe payments, which totaled 2 million reais per year, to be distributed among MARIN, Co-Conspirator #11 and Co-Conspirator #12. As of August 15, 2012, 2 million reais equated to approximately $986,000.

163. Co-Conspirator #2 and Co-Conspirator #6 used the wire facilities of the United States in furtherance of the Copa do Brasil bribery scheme, including in connection with the following domestic and international wire transfers:

72

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| December 5, 2013 | Wire transfer of $500,000 from Sports Marketing Company B's account at Itaú Unibanco in New York, New York, to a JP Morgan Chase correspondent account in New York, New York, for credit to the account of a luxury yacht manufacturer at HSBC bank in London, England. |
| December 23, 2013 | Wire transfer of $450,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco Itaú account in New York, New York in the name of Sports Marketing Company B. |

164. In or about April 2014, the defendant JOSÉ MARIA MARIN traveled to Miami, Florida to attend a press conference announcing the Copa América Centenario, a joint CONCACAF-CONMEBOL tournament discussed further below.  MARIN had a meeting with Co-Conspirator #2 during the trip in which MARIN discussed the status of the payments due to him and Co-Conspirator #12 in connection with the Copa do Brasil scheme. At one point, when Co-Conspirator #2 asked whether it was really necessary to continue to pay bribes to MARIN's predecessor as CBF president, MARIN stated, "[I]t's about time to – to have it coming our way.  True or not?"  Co-Conspirator #2 agreed, stating, "Of course, of course, of course.  That money had to be given to you."  MARIN agreed: "That's it, that's right."

73

E.   CBF Sponsorship Scheme

165.  The Brazilian national team won the 1994 World Cup, which was hosted by the United States in June and July of that year.  Around the same time, a representative of a multinational sportswear company headquartered in the United States ("Sportswear Company A"), the identity of which is known to the Grand Jury, approached CBF to determine whether CBF was interested in being sponsored by Sportswear Company A.  At the time, CBF already had a sponsorship agreement with another American sportswear company ("Sportswear Company B"), the identity of which is known to the Grand Jury.  Thereafter Co-Conspirator #11, a high-ranking CONMEBOL and CBF official, and Co-Conspirator #2, on behalf of Traffic Brazil, which at the time served as CBF's marketing agent, began negotiations with representatives of Sportswear Company A.

166.  The negotiations lasted into 1996.  The parties ultimately agreed to a 10-year deal, which required, among other things, that Sportswear Company A compensate Sportswear Company B, which agreed to terminate its existing contract with CBF.

167.  On or about July 11, 1996, the parties met in New York City for the closing.  The contract was signed by Co-Conspirator #11 on behalf of CBF, Co-Conspirator #2 on behalf of Traffic Brazil, and four representatives of Sportswear Company

74

A.   Among other terms, the contract, a 44-page Sponsorship and Endorsement Agreement (the "Agreement"), required Sportswear Company A to pay CBF $160 million over 10 years for the right to be one of CBF's co-sponsors and to be CBF's exclusive footwear, apparel, accessories, and equipment supplier.  CBF remitted a percentage of the value of the payments it received under the Agreement to Traffic Brazil.

168.  Additional financial terms were not reflected in the Agreement.  Sportswear Company A agreed to pay a Traffic affiliate with a Swiss bank account an additional $40 million in base compensation on top of the $160 million it was obligated to pay to CBF pursuant to the Agreement.  On July 14, 1996, three days after the Agreement was signed, a representative of Sportswear Company A and a representative of Traffic Brazil (Co-Conspirator #2) signed a one-page letter agreement acknowledging as follows: "CBF has authorized Traffic, or its designated banking agent, to invoice [Sportswear Company A] directly for marketing fees earned upon successful negotiation and performance of the ... [Agreement]."  Between 1996 and 1999, Traffic invoiced Sportswear Company A directly for $30 million in payments.

169.  Co-Conspirator #2 agreed to pay and did pay Co-Conspirator #11 half of the money he made from the sponsorship

75

deal, totaling in the millions of dollars, as a bribe and
kickback.

170. On or about January 25, 2002, the parties agreed
to terminate the Agreement before the end of the 10-year term,
ending any further obligations thereunder between Sportswear
Company A and CBF, and between Sportswear Company A and Traffic
Brazil.

F.    CFU World Cup Qualifiers Scheme #1

171. Since at least in or about 1998, the media rights
to matches played by nations seeking to qualify for the World
Cup have been owned by the home team for each qualifier match.
In negotiating the sale of these rights, CFU member associations
agreed to pool their "home team" rights.  The value of such
rights was dependent in significant part on the market size of
the opponent of the CFU member association, with Mexico and the
United States generally being the largest markets – and thus the
most "valuable" opponents to play – in the CONCACAF region.  By
pooling their rights and selling them prior to the draw for the
next round of World Cup qualifier matches, CFU member
associations sought to maximize leverage and increase
profitability to all the members.

172. From at least in or about 1998 until in or about
May 2011, the defendant JACK WARNER, as president of CFU, was

76

responsible for negotiating the sale of the CFU member associations' rights with sports marketing companies, including with Traffic USA.  During the same period, WARNER was also a special advisor to TTFF, the Trinidadian federation.

173. Beginning in 1998, CFU entered into contracts with Traffic USA for the sale of its members' rights to their home World Cup qualifier matches.  The first such contract, dated October 10, 1998, concerned the rights to qualifier matches to be played in connection with the 2002 World Cup (the "2002 World Cup qualifiers contract").  The second contract, dated July 17, 2000, concerned the rights to qualifier matches to be played in connection with the 2006 World Cup (the "2006 World Cup qualifiers contract").  The third contract, dated August 13, 2005, concerned the rights to qualifier matches to be played in connection with the 2010 World Cup (the "2010 World Cup qualifiers contract").  The fourth contract, dated July 3, 2009, and then subsequently revised on December 9, 2010, concerned the rights to qualifier matches to be played in connection with the 2014 World Cup (the "2014 World Cup qualifiers contract").  CFU's negotiations regarding each of these contracts were controlled by the defendant JACK WARNER, and WARNER signed each of these contracts on behalf of CFU.

77

174. Beginning with at least the 2006 World Cup qualifiers contract, the contracts stated that they included the sale of media rights owned by all CFU member associations, including TTFF.

175. Separately, however, at the defendant JACK WARNER's request, Traffic USA executives, including Co-Conspirator #4, Co-Conspirator #9, and Co-Conspirator #13, created another document purporting to be a contract with TTFF for the same rights Traffic USA had purchased as part of its deal with CFU.  WARNER signed these contracts, which were typically negotiated at the same time as the CFU contracts, as "special advisor" to TTFF.

176. Rather than paying the full value of CFU's contract to CFU and its member associations, Traffic USA executives, including Co-Conspirator #4, at the defendant JACK WARNER's request, diverted a substantial portion of that value to an account controlled by WARNER, purportedly as payment on Traffic USA's contract with TTFF.

177. For example, the 2006 World Cup qualifiers contract provided that Traffic USA was to pay CFU a base price of $900,000 for the media rights covered by the contract, which included the media rights owned by TTFF.  At the same time, Traffic USA entered into a contract with TTFF providing that

78

Traffic USA would pay TTFF $800,000 for the same TTFF rights it had purchased as part of its contract with CFU.

178. Upon the defendant JACK WARNER's request, Traffic USA executives subsequently wired payments on the TTFF contract to an account at a bank in Trinidad and Tobago that WARNER controlled.

179. For example, on or about April 19, 2004, Traffic wired $40,000 from an account at Citibank in Miami, Florida to a correspondent account at Wachovia Bank, for further credit to an account held in the name of "LOC Germany 2006 Limited" at First Citizens Bank in Trinidad and Tobago.

180. Approximately 11 days prior to the transfer, the defendant JACK WARNER sent an email to First Citizens Bank, requesting that the bank transfer $60,000 from the LOC Germany 2006 Limited account to his "personal checking account."  In the same email, WARNER advised that he expected a $40,000 deposit into the account the following week.

181. Similarly, the 2010 World Cup qualifiers contract provided that Traffic USA was to pay CFU $2.2 million for the media rights covered by the contract, which included the media rights owned by TTFF.  At the same time, Traffic USA entered into a contract with TTFF providing that Traffic USA would pay

TTFF $800,000 for the same TTFF rights it had purchased as part of its contract with CFU.

182. Upon the defendant JACK WARNER's request and as payment on the TTFF contract, on or about June 1, 2005, Traffic USA executives wired $40,000 from an account at Citibank in Miami, Florida to a correspondent account at Wachovia Bank, for further credit to the LOC Germany 2006 Limited account at First Citizens Bank in Trinidad and Tobago.

183. Five days later, on or about June 6, 2005, the defendant JACK WARNER transferred $40,000 from the LOC Germany 2006 Limited account to another bank account held in his name.

184. As part of this scheme and in order to ensure that TTFF would continue to receive payments from Traffic USA related to the TTFF contracts, the defendant JACK WARNER concealed the existence of the TTFF contracts from the CFU member associations.

G.    2010 FIFA World Cup Vote Scheme

185. In or about 2004, the FIFA executive committee considered bids from Morocco, South Africa and Egypt, as well as other nations that withdrew before the vote, to host the 2010 World Cup.

186. Previously, the defendant JACK WARNER and his family had cultivated ties with South African soccer officials

in connection with and subsequent to a failed bid by South Africa to host the 2006 World Cup.  In the early 2000s, Co-Conspirator #14, a member of WARNER's family, had used WARNER's contacts in South Africa to organize friendly matches for CONCACAF teams to play in South Africa.  At one point, WARNER also directed Co-Conspirator #14 to fly to Paris, France and accept a briefcase containing bundles of U.S. currency in $10,000 stacks in a hotel room from Co-Conspirator #15, a high-ranking South African bid committee official.  Hours after arriving in Paris, Co-Conspirator #14 boarded a return flight and carried the briefcase back to Trinidad and Tobago, where Co-Conspirator #14 provided it to WARNER.

187. In the months before the selection of the host nation for the 2010 World Cup, which was scheduled to take place in May 2004, the defendant JACK WARNER and Co-Conspirator #1 traveled to Morocco as they had done in 1992, in advance of the voting for the 1998 World Cup host.  While in Morocco during the 2004 trip, a representative of the Moroccan bid committee offered to pay $1 million to WARNER in exchange for his agreement to cast his secret ballot on the FIFA executive committee for Morocco to host the 2010 World Cup.

188. Subsequently, Co-Conspirator #1 learned from the defendant JACK WARNER that high-ranking officials of FIFA, the

South African government, and the South African bid committee, including Co-Conspirator #16, were prepared to arrange for the government of South Africa to pay $10 million to CFU to "support the African diaspora."  Co-Conspirator #1 understood the offer to be in exchange for the agreement of WARNER, Co-Conspirator #1, and Co-Conspirator #17 to all vote for South Africa, rather than Morocco, to host the 2010 World Cup.  At the time, Co-Conspirator #17, like WARNER and Co-Conspirator #1, was a FIFA executive committee member.  WARNER indicated that he had accepted the offer and told Co-Conspirator #1 that he would give a $1 million portion of the $10 million payment to Co-Conspirator #1.

189. In FIFA's executive committee vote held on May 15, 2004, South Africa was selected over Morocco and Egypt to host the 2010 World Cup.  The defendant JACK WARNER, Co-Conspirator #1, and Co-Conspirator #17 indicated that they voted for South Africa.

190. In the months and years after the vote, Co-Conspirator #1 periodically asked WARNER about the status of the $10 million payment.

191. At one point, Co-Conspirator #1 learned that the South Africans were unable to arrange for the payment to be made directly from government funds.  Arrangements were thereafter

82

made with FIFA officials to instead have the $10 million sent from FIFA – using funds that would otherwise have gone from FIFA to South Africa to support the World Cup - to CFU.

192. In fact, on January 2, 2008, January 31, 2008 and March 7, 2008, a high-ranking FIFA official caused payments of $616,000, $1,600,000, and $7,784,000 – totaling $10 million – to be wired from a FIFA account in Switzerland to a Bank of America correspondent account in New York, New York, for credit to accounts held in the names of CFU and CONCACAF, but controlled by the defendant JACK WARNER, at Republic Bank in Trinidad and Tobago.

193. Soon after receiving these wire transfers, the defendant JACK WARNER caused a substantial portion of the funds to be diverted for his personal use.  For example, on January 9, 2008, WARNER directed Republic Bank officials to apply $200,000 of the $616,000 that had been transferred into a CFU account from FIFA one week earlier toward a personal loan account held in his name.

194. The defendant JACK WARNER also diverted a portion of the funds into his personal accounts by laundering the funds through intermediaries.  For example, during the period from January 16, 2008 to March 27, 2008, WARNER caused approximately $1.4 million of the $10 million to be transferred to Individual

83

#1, a Trinidadian businessman whose identity is known to the Grand Jury, and Trinidadian Company A, a large supermarket chain in Trinidad and Tobago controlled by Individual #1.  Weeks later, checks totaling approximately the same amount and drawn on an account held in the name of Trinidadian Company B, a real estate and investment company also controlled by Individual #1, were deposited into a bank account held in the name of WARNER and a family member at First Citizens Bank in Trinidad and Tobago.  The identities of Trinidadian Company A and Trinidadian Company B are known to the Grand Jury.

195. During the three years following WARNER's receipt of the $10 million from FIFA, WARNER made three payments to Co-Conspirator #1, totaling over $750,000, in partial payment of the $1 million that WARNER had earlier promised Co-Conspirator #1 as part of the bribe scheme.

196. The first payment, in the amount of $298,500, was made by wire transfer sent on or about December 19, 2008 from an account held in the name of CFU at Republic Bank in Trinidad and Tobago, to a Bank of America correspondent account in New York, New York, for credit to an account controlled by Co-Conspirator #1 at a bank in the Cayman Islands.

197. The second payment, in the amount of $205,000, was made by check drawn on an account held in the name of CFU at

84

Republic Bank in Trinidad and Tobago.  On or about September 27, 2010, Co-Conspirator #1 caused the check to be deposited into his Merrill Lynch brokerage account in New York, New York. Approximately one month earlier, on or about August 23, 2010, WARNER sent an email to Co-Conspirator #1 to advise him that the payment was forthcoming.

198.  The third payment, in the amount of $250,000, was made by check drawn on an account held in the name of CFU at Republic Bank in Trinidad and Tobago.  The check was delivered to Co-Conspirator #1 by another individual who traveled by airplane from Trinidad and Tobago to JFK International Airport in Queens, New York, and then to CONCACAF's headquarters in New York, New York, where he delivered the check to Co-Conspirator #1.  A representative of FirstCaribbean International Bank in the Bahamas, where Co-Conspirator #1 held another account, subsequently traveled by airplane to New York, landing at Kennedy Airport.  After arriving, the bank representative traveled to New York, New York, where he took custody of the check.  He subsequently traveled to the Bahamas and, on or about May 3, 2011, deposited the check into Co-Conspirator #1's account.  Approximately two months earlier, on or about March 13, 2011, WARNER sent an email to Co-Conspirator #1 to advise him that the payment was forthcoming.

199. Co-Conspirator #1 never received the balance of the promised $1 million payment.

H.   UNCAF Region World Cup Qualifiers Scheme

200. As noted above, UNCAF was a regional federation within CONCACAF, which included as members the soccer federations of the Central American nations.  Like CFU, UNCAF members sought to sell the media rights they owned to home team matches played to qualify for the World Cup.  Unlike CFU, the UNCAF members did not agree to pool their rights; instead, the UNCAF member nations negotiated separately with prospective purchasers of the rights, which included Traffic USA.

201. Beginning in or about 2007, Co-Conspirator #4 was the Traffic USA executive responsible for negotiating with the UNCAF member associations for the purchase of media rights to World Cup qualifier matches.  In order to obtain contracts from four soccer federations in the UNCAF region, Co-Conspirator #4 agreed to pay bribes to the presidents of those federations, including the defendants EDUARDO LI and JULIO ROCHA.

202. In or about 2009, Co-Conspirator #4 began negotiating with the defendant EDUARDO LI, the president of the Federación Costarricense de Fútbol (FEDEFUT), the Costa Rican soccer federation, to renew the exclusive worldwide commercial rights to that federation's home qualifier matches in advance of

86

the 2018 World Cup.  On or about September 4, 2009, Traffic USA and FEDEFUT entered into a contract valued between $2.55 and $3 million (depending on the team's success), with a schedule of payments due between 2014 and 2017.  The contract was signed by LI and Co-Conspirator #4.  During the negotiations, LI asked Co-Conspirator #4 for a six-figure bribe in exchange for his agreement to award the contract to Traffic USA.  After obtaining approval within Traffic, Co-Conspirator #4 agreed to the payment and caused it to be made.

203.  After Co-Conspirator #4 left his position at Traffic USA to become general secretary of CONCACAF in 2012, the defendant EDUARDO LI continued to seek bribe payments in connection with the sale of FEDEFUT's future World Cup qualifier rights.

204.  The defendant JULIO ROCHA also participated in this scheme.  In or about 2011, ROCHA – at the time the president of the Federación Nicaragüense de Fútbol (FENIFUT), the Nicaraguan soccer federation - began negotiating with Co-Conspirator #4 to renew the exclusive worldwide commercial rights to exploit FENIFUT's rights to home qualifier matches in advance of the 2018 World Cup.  On or about April 26, 2011, Traffic USA and FENIFUT entered into a contract valued between $1.138 and $1.288 million (depending on the team's success),

with a schedule of payments due between 2011 and 2018.  The
contract was signed by ROCHA and Co-Conspirator #4.

205. During the negotiations, the defendant JULIO
ROCHA asked Co-Conspirator #4 for a six-figure bribe in exchange
for his agreement to award the contract to Traffic USA.  Co-
Conspirator #18, a FIFA official who was involved in
facilitating the negotiations, also asked for a payment for
himself and was aware of the payment to ROCHA.  After obtaining
approval within Traffic, Co-Conspirator #4 agreed to the
payments and caused them to be made.

206. The bribe payment was sent to the defendant JULIO
ROCHA in a manner designed to conceal the source and nature of
the payment.  On May 26, 2011, at the direction of Traffic
executives, $150,000 was wired from an account held in the name
of Co-Conspirator #19, an intermediary, at Banco Itaú in Brazil,
to an account held in the name of one of Co-Conspirator #19's
affiliated companies at Banco Itaú in Miami, Florida.  The
following day, the funds were wired from the latter account to
an account at BankInter in Madrid, Spain, held in ROCHA's name.
According to ROCHA, his portion of the payment was $100,000, and
$50,000 was for Co-Conspirator #19.

207. In or about 2012, the defendant JULIO ROCHA
stepped down as president of FENIFUT.  Nonetheless, he continued

88

to solicit bribe payments in connection with the sale of FENIFUT's future World Cup qualifier rights.

208. On or about February 25, 2014, the defendant JULIO ROCHA met with Co-Conspirator #4 in Miami, Florida. At the time, ROCHA was employed by FIFA as a development officer, and Co-Conspirator #4 was the general secretary of CONCACAF. During the meeting, ROCHA asked Co-Conspirator #4 to speak with his successor at Traffic USA about whether ROCHA could receive a payment in connection with the sale of FENIFUT's rights to their qualifier matches in advance of the 2022 World Cup.

209. During the time Co-Conspirator #4 was responsible for negotiating on behalf of Traffic USA with the UNCAF-region soccer federations for the purchase of media rights, Traffic USA made at least two other bribe payments to two other presidents of UNCAF member associations in connection with the purchase of rights for World Cup qualifier matches.

I.   2011 FIFA Presidential Election Scheme

210. In or about March 2011, Co-Conspirator #7 declared himself to be a candidate in the FIFA presidential election scheduled for June 1, 2011. At the time, Co-Conspirator #7 was a high-ranking official at FIFA and AFC. In accordance with the FIFA statues, the president of FIFA was

89

elected by the FIFA congress, which was composed of representatives from each of the 200+ FIFA member associations.

211. On or about April 1, 2011, Co-Conspirator #7 sent an email to the defendant JACK WARNER's America Online email account and asked WARNER to organize an extraordinary congress of the CONCACAF member associations, so that Co-Conspirator #7 could address them regarding his candidacy.  WARNER subsequently sent emails to CONCACAF officials, including to officials based in New York, New York, for the purpose of organizing the requested meeting.  For a time, before he was denied a visa, Co-Conspirator #7 was to have addressed the entire CONCACAF congress in the first week of May.

212. Following further correspondence, the defendant JACK WARNER agreed to organize a special meeting of the CFU member associations, rather than the entire CONCACAF membership. It was further agreed that Co-Conspirator #7 would pay the costs associated with organizing the meeting.

213. On or about April 28, 2011, $363,537.98 was wired from an account controlled by Co-Conspirator #7 to an account held in the name of CFU and controlled by the defendant JACK WARNER at Republic Bank in Trinidad and Tobago.  The funds were transmitted to Trinidad and Tobago through an account at Bank of America in New York, New York.

214. Upon direction by the defendant JACK WARNER, CFU
officials sent emails to representatives of CFU member
associations, including two member associations based in United
States territories, inviting them to the meeting with Co-
Conspirator #7. The CFU meeting took place on May 10 and May
11, 2011 at the Hyatt Regency Hotel in Trinidad and Tobago. The
meeting was attended by the presidents and other officials
representing the CFU member associations, including high-ranking
officials of the Puerto Rico Football Federation and the U.S.
Virgin Islands Football Federation, whose identities are known
to the Grand Jury.

215. On May 10, 2011, Co-Conspirator #7 addressed the
member associations regarding his candidacy, stating, among
other things, that he was seeking their support in the June 1,
2011 FIFA presidential election. Following Co-Conspirator #7's
address, the defendant JACK WARNER advised the CFU officials
that they could pick up a "gift" that afternoon at a conference
room in the hotel.

216. During the afternoon of May 10, 2011, certain CFU
officials, including an official of one of the member
associations of a United States territory ("Official #1"), went
to the appointed conference room, as directed by the defendant
JACK WARNER. The officials were instructed by CFU staff members

91

in the room to enter the room one at a time.  Inside the room, CFU staff handed each official an envelope bearing the name of the member association that he represented.  Inside each envelope was $40,000 in United States currency.

217. Prior to entering the conference room, Official #1 was advised that he must enter alone, and could not be accompanied by any other officials from his delegation.  Upon receiving his envelope, Official #1 was directed by CFU staff to open it while in the conference room.  Official #1 was further instructed not to discuss the payment with anyone.

218. The following day, May 11, 2011, the defendant JACK WARNER convened a meeting of the CFU officials prior to the scheduled start time.  At the meeting WARNER stated that the U.S. currency the members had received was from Co-Conspirator #7, and that WARNER had advised Co-Conspirator #7 to allow CFU staff to distribute the money so that it would not "even remotely appear that anybody has any obligation for your vote because of what gift you have given them."  WARNER further stated that a representative of one of the CFU member associations had contacted CONCACAF offices in New York to advise Co-Conspirator #1 of the payments.  WARNER was angry that the representative had done this.  WARNER stated, "There are some people here who think they are more pious than thou.  If

92

you're pious, open a church, friends.  Our business is our
business."

219. On or about May 12, 2011, Official #1 flew back
home.  On or about May 13, 2011, Official #1 deposited the
$40,000 into a bank account in the United States.

220. The purpose of the $40,000 payments was to induce
officials of the CFU member associations, including Official #1,
to vote for Co-Conspirator #7 in the June 1, 2011 FIFA
presidential election.  The defendant JACK WARNER participated
in the scheme by organizing the CFU meeting on May 10 and May
11, 2011, and by facilitating the $40,000 payment to each of the
CFU officials in attendance.

221. On or about July 14, 2011, after the scheme had
been uncovered and the defendant JACK WARNER resigned from his
soccer-related positions, Co-Conspirator #7 caused $1,211,980 to
be wired from an account that he controlled at Doha Bank in
Qatar, to a correspondent account at Citibank, for credit to an
account held in WARNER's name at Intercommercial Bank in
Trinidad and Tobago.  Prior to receiving the funds in this
account, WARNER attempted to have them wired instead to the bank
accounts of two of his family members, including Co-Conspirator

#14, and a member of his staff, but the bank where those accounts were held refused to accept the funds.

     J.    CFU World Cup Qualifiers Scheme #2

     222. On or about May 10, 2011, a representative of one of the CFU member associations that had been offered one of the $40,000 cash payments described above reported the payment to Co-Conspirator #1, at the time general secretary of CONCACAF. Co-Conspirator #1 subsequently advised FIFA, which initiated disciplinary proceedings against the defendant JACK WARNER and Co-Conspirator #7. In or about June 2011, WARNER agreed to resign from all soccer-related positions, including as FIFA vice president and executive committee member, CONCACAF president, CFU president, and TTFF special advisor. Later that year, Co-Conspirator #1 resigned as general secretary of CONCACAF.

     223. In or about May 2012, CONCACAF elected the defendant JEFFREY WEBB to be its president. In or about July 2012, Co-Conspirator #4, who had been a vice president at Traffic USA, was appointed as CONCACAF's general secretary.

     224. Prior to his appointment, Co-Conspirator #4 participated, on behalf of Traffic USA, in the negotiation of a contract to acquire the media and marketing rights to the 2018 and 2022 World Cup qualifier matches from the CFU member associations. The defendant JEFFREY WEBB, at the time the

94

president of the Cayman Islands Football Association and a high-
level CFU official, participated in the negotiations on behalf
of CFU.

225. Near the end of the negotiations, Co-Conspirator
#4 met with the defendant COSTAS TAKKAS, a close associate of
the defendant JEFFREY WEBB, in Hungary.  TAKKAS told Co-
Conspirator #4 that WEBB wanted a $3 million bribe in exchange
for his agreement to cause the CFU contract to be awarded to
Traffic USA.  Co-Conspirator #4 agreed.  When he returned to the
United States, Co-Conspirator #4 advised the defendant AARON
DAVIDSON, at the time the Traffic USA president, of the bribe.

226. The agreement by Traffic USA to purchase from CFU
the media and marketing rights to World Cup qualifier matches
was reached prior to Co-Conspirator #4's departure from Traffic
USA, but was not formally executed until a few weeks after his
departure.  On or about August 28, 2012, the parties entered
into a $23 million contract for the exclusive worldwide
commercial rights for CFU's 2018 and 2022 World Cup qualifier
matches.  The defendant AARON DAVIDSON signed the contract on
behalf of Traffic USA.

227. Separately, Traffic USA entered into a
partnership with Sports Marketing Company C, a multinational
sports marketing company based in Europe with affiliates in the

95

United States, to jointly exploit the CFU World Cup qualifier rights that Traffic USA was seeking to and ultimately did obtain. Co-Conspirator #4, on behalf of Traffic USA, and Co-Conspirator #13, Co-Conspirator #20, and Co-Conspirator #21, on behalf of Sports Marketing Company C, participated in the negotiations over the terms of the partnership. During the negotiations, Co-Conspirator #4 disclosed to Co-Conspirator #20 that Traffic USA had agreed to pay a bribe to the defendant JEFFREY WEBB to obtain the rights. Co-Conspirator #20 agreed on behalf of Sports Marketing Company C to split the cost of the bribe payment, which meant that both companies would be obligated to pay WEBB $1.5 million.

228. To effectuate payment of Traffic USA's portion of the bribe, Co-Conspirator #4 put the defendant COSTAS TAKKAS into contact with Traffic executives in Brazil and also participated in meetings on the subject. Co-Conspirator #4 participated in such meetings by telephone from Miami, Florida and also in person in Brazil. The payment was eventually made to accounts held in the name of entities controlled by TAKKAS, the identities of which are known to the Grand Jury, and then forwarded on through an intermediary account to the defendant JEFFREY WEBB.

229. Specifically, Traffic USA's payment was transmitted to the defendant COSTAS TAKKAS in the following manner:  On or about November 13, 2012, $1.2 million was wired from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a correspondent account at HSBC bank in Buffalo, New York, for credit to an account held in the name of Front Company A, the identity of which is known to the Grand Jury, at HSBC bank in Hong Kong.  Approximately one week later, on or about November 21, 2012, two wire transfers of $750,000 and $250,000 were sent from Front Company A's account at HSBC bank in Hong Kong to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures, controlled by TAKKAS, at Fidelity Bank in the Cayman Islands.  The remaining $200,000 was a fee paid to Co-Conspirator #22, the beneficial owner of Front Company A and a resident of Florida, to facilitate the payment.

230. On or about December 14, 2012, the remaining $500,000 of the $1.5 million promised to the defendant JEFFREY WEBB was paid by Traffic through the account of another individual, a business associate of Co-Conspirator #2, to another account controlled by the defendant COSTAS TAKKAS at Fidelity Bank in the Cayman Islands.

97

231. After receiving the funds, the defendant COSTAS TAKKAS wired a portion to an account in his name at Citibank in Miami.  TAKKAS subsequently transferred the funds to an account in the name of a swimming pool builder at United Community Bank in Blairsville, Georgia, for the benefit of the defendant JEFFREY WEBB, who was having a pool built at his residence in Loganville, Georgia.  TAKKAS transferred another portion of the funds directly from his Kosson Ventures account at Fidelity Bank in the Cayman Islands to SunTrust Bank in Georgia for WEBB's benefit in connection with WEBB's purchase of other real estate in Stone Mountain, Georgia.

232. The use of the defendant COSTAS TAKKAS's company to receive the payment, and TAKKAS's participation in the transaction as an intermediary more generally, was intended to conceal the fact that the defendant JEFFREY WEBB was the beneficiary of the payment.

233. To facilitate Sports Marketing Company C's payment of its portion of the bribe, Co-Conspirator #4 put Co-Conspirator #20 into contact with the defendant COSTAS TAKKAS, but the payment was not immediately made.  In 2014, the defendant AARON DAVIDSON met with Co-Conspirator #2 in New York to discuss the status of Traffic's ongoing bribe schemes, including the CFU World Cup qualifier scheme.  According to

DAVIDSON, Sports Marketing Company C still had not yet found a way to pay the defendant JEFFREY WEBB its portion of the bribe. The following year, Co-Conspirator #4 had conversations with executives from Sports Marketing Company C, including Co-Conspirator #21, who continued to search for a method to make the payment in a way that would conceal its true nature.

  K. <u>CONCACAF Gold Cup/Champions League Scheme</u>

   234. Shortly after he was appointed to be CONCACAF's general secretary in July 2012, Co-Conspirator #4, now on behalf of CONCACAF, entered into negotiations with Traffic USA to sell the commercial rights associated with upcoming editions of the Gold Cup and Champions League, CONCACAF's club tournament.  The defendant AARON DAVIDSON was involved in the negotiations on behalf of Traffic USA.  Ultimately, on or about November 27, 2012, CONCACAF and Traffic USA entered into a $15.5 million contract for the exclusive worldwide commercial rights for the 2013 edition of the Gold Cup and the 2013-14 and 2014-15 seasons of the CONCACAF Champions League (the "2012 Gold Cup/Champions League Contract").

   235. The defendant JEFFREY WEBB directed Co-Conspirator #4 to seek a bribe payment in connection with the negotiations.  Accordingly, in addition to the contract price, Co-Conspirator #4 solicited from Traffic USA its agreement to

99

pay WEBB a $1.1 million bribe in exchange for WEBB's agreement to award the 2012 Gold Cup/Champions League Contract to Traffic USA. The defendant AARON DAVIDSON and Co-Conspirator #2 agreed to the bribe payment.

236. Thereafter, the defendant JEFFREY WEBB and Co-Conspirator #4 discussed the best way to effectuate the bribe payment in a manner that would conceal its nature. Ultimately, WEBB decided to use an overseas company that manufactured soccer uniforms and soccer balls ("Soccer Uniform Company A"), the identity of which is known to the Grand Jury. Co-Conspirator #23, like the defendant COSTAS TAKKAS a close associate of WEBB, had a connection to Soccer Uniform Company A. WEBB eventually instructed Co-Conspirator #4 to submit a false invoice to Traffic USA for $1.1 million to be paid to Soccer Uniform Company A, which Co-Conspirator #4 did.

237. Traffic USA made domestic and international wire transfers to make the contract and bribe payments, respectively, in connection with the 2012 Gold Cup/Champions League Contract. For example, in 2013, five contract payments totaling $11 million were made by wire transfer from Traffic USA's account at Citibank in Miami, Florida to an account in CONCACAF's name at JP Morgan Chase bank in New York, New York. On or about December 4, 2013, the $1.1 million bribe payment for the

defendant JEFFREY WEBB was made by wire transfer from Traffic
International's account at Delta National Bank & Trust in Miami,
to a Wells Fargo correspondent account in New York, New York,
for credit to an account in the name of Soccer Uniform Company A
at Capital Bank in Panama City, Panama.

238. On or about November 15, 2013, Traffic USA
entered into a $60 million renewal contract for exclusive
sponsorship rights associated with the 2015, 2017, 2019, and
2021 editions of the Gold Cup and the 2015-16, 2016-17, 2017-18,
2018-19, 2019-20, 2020-21, and 2021-22 seasons of the CONCACAF
Champions League (the "2013 Gold Cup/Champions League
Contract").  Co-Conspirator #4 led the negotiations on behalf of
CONCACAF and the defendant AARON DAVIDSON led the negotiations
on behalf of Traffic USA.

239. Again, the defendant JEFFREY WEBB directed Co-
Conspirator #4 to solicit a bribe for WEBB in exchange for
WEBB's agreement to award the 2013 Gold Cup/Champions League
Contract to Traffic USA.  Though WEBB wanted more, the parties
eventually settled on $2 million as the size of the bribe
payment.  The defendant AARON DAVIDSON and Co-Conspirator #2
agreed to the bribe payment.

240. In a March 2014 meeting with Co-Conspirator #2 in
Queens, New York to discuss the status of Traffic's ongoing

101

bribe schemes, including the Gold Cup/Champions League schemes, the defendant AARON DAVIDSON said, referring to the practice of paying bribes to obtain commercial rights: "Is it illegal?  It is illegal.  Within the big picture of things, a company that has worked in this industry for 30 years, is it bad?  It is bad."

      L.    CONMEBOL/CONCACAF Copa América Centenario Scheme

      241. As noted above, from in or about 1991 to 2011, Traffic entered into contracts with CONMEBOL, obtained and retained through bribery, awarding Traffic the exclusive media and marketing rights to all editions of the Copa América from 1993 to 2011.

      242. In or about 2009 or 2010, a group of six presidents of the traditionally less-powerful member associations of CONMEBOL formed a bloc to obtain control over decisions with regard to the sale of CONMEBOL's commercial properties.  This bloc was led by Co-Conspirator #24, who had close ties with Full Play and the defendants HUGO JINKIS and MARIANO JINKIS, as well as by Co-Conspirator #25 and the defendant RAFAEL ESQUIVEL.

      243. In or about April 2010, CONMEBOL entered into an agreement with Full Play awarding the company the media and marketing rights to the 2015, 2019, and 2023 editions of the

Copa América, among other tournaments.  Traffic International
and Traffic USA, alleging that the agreement violated the 2001
Copa América Contract, which gave it the rights to the 2015
edition of the tournament and an option to retain those rights
for the subsequent three editions, sued CONMEBOL, Full Play, and
others.  The lawsuit was filed in Florida state court by virtue
of a forum selection clause in the 2001 Copa América Contract
designating the courts of Florida as the forum of choice in the
event FIFA declined to arbitrate, as it ultimately did.

244.  The lawsuit was settled in or about June 2013.

245.  In the months preceding the settlement, Co-
Conspirator #2 and other representatives of Traffic began
meeting with the defendants HUGO JINKIS and MARIANO JINKIS, as
well as the defendant ALEJANDRO BURZACO, who at that point had
joined with Full Play to share in some of the Copa América
rights.  In the meetings, the parties discussed a resolution of
Traffic's lawsuit that would involve Full Play and Torneos
agreeing to share with Traffic the commercial rights obtained by
Full Play from CONMEBOL to exploit the above editions of the
Copa América in exchange for Traffic agreeing to end the lawsuit
and assume its share of the costs associated with those rights.
Specifically, the representatives of the three companies
discussed forming a new company that would obtain and exploit

103

the commercial rights to the 2015, 2019, and 2023 editions of the tournament, as well as a special centennial edition of the tournament to be held in the United States in 2016.

246. By in or about March 2013, the discussions regarding the formation of the company advanced significantly. Those discussions included settlement of the Florida state court litigation, the percentage of shares each member would hold in the new company, and the operations of the new company. After a larger meeting in Buenos Aires in or about March 2013, Co-Conspirator #2 had a brief, smaller meeting with the defendants ALEJANDRO BURZACO, HUGO JINKIS, and MARIANO JINKIS. One of the defendants told Co-Conspirator #2 that Full Play and Torneos had already agreed to make bribe payments to CONMEBOL officials in connection with the Copa América rights. Co-Conspirator #2 was asked to contribute $10 million toward the cost of expenses, including the bribes, to date. Co-Conspirator #2 agreed to make these bribe payments and subsequently caused them to be made.

247. The creation of the new company, Datisa, was formalized in a shareholders' agreement dated May 21, 2013. Among other things, the agreement provided that Traffic, Torneos, and Full Play each held a one-third interest in the company.

248. Four days later, in London, Datisa entered into a contract with CONMEBOL and Full Play whereby Datisa obtained from CONMEBOL the exclusive worldwide commercial rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario, and CONMEBOL and Full Play assigned to Datisa the contracts related thereto that they had already executed with third parties (the "2013 Copa América Contract"). The 2013 Copa América Contract, dated May 25, 2013 and signed by representatives of each of Datisa's three shareholders and 12 CONMEBOL officials, was for $317.5 million: $75 million for the 2015 edition, $77.5 million for the 2016 edition, $80 million for the 2019 edition, and $85 million for the 2023 edition.

249. Datisa agreed to pay $100 million in bribes to CONMEBOL officials – all of whom were also FIFA officials – in exchange for the 2013 Copa América Contract: $20 million for contract signature and $20 million for each of the four editions of the tournament.  Each $20 million payment was to be divided among the bribe recipients as follows: $3 million to each of the "top" three CONMEBOL officials (the president of the confederation and the presidents of the Brazilian and Argentinian federations); $1.5 million to each of seven other CONMEBOL federation presidents; and $500,000 to an eleventh CONMEBOL official.  The officials who had solicited and/or were

105

to receive bribes included the defendants EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, NICOLÁS LEOZ, and JOSÉ MARIA MARIN and Co-Conspirator #10, Co-Conspirator #11, Co-Conspirator #12, Co-Conspirator #24, and Co-Conspirator #25, among others.

250. In or about June and September 2013, Co-Conspirator #2 and Traffic used financial institutions in the United States to make three payments, totaling $11.667 million, representing nearly all of Traffic's one-third contribution to the other shareholders of Datisa, who were responsible for paying the first $40 million in bribes to the CONMEBOL officials. The three payments were made from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to Citibank and/or JP Morgan Chase correspondent accounts in New York, New York, for credit to accounts at banks in Zurich, Switzerland in the names of Cross Trading (a Full Play affiliate) and FPT Sports (a Torneos affiliate), respectively, as follows:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| June 17, 2013 | Wire transfer of $5,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of Cross Trading, a Full Play affiliate, at Bank Hapoalim in Zurich, Switzerland. |

106

June 17, 2013          Wire transfer of $5,000,000 from
                       Traffic International's account at
                       Delta National Bank & Trust Co. in
                       Miami, Florida, to a JP Morgan
                       Chase correspondent account in New
                       York, New York, for credit to an
                       account in the name of FPT Sports,
                       a Torneos affiliate, at Bank
                       Julius Baer & Co. in Zurich,
                       Switzerland.

September 11, 2013     Wire transfer of $1,666,667 from
                       Datisa's account at Bank Hapoalim
                       in Zurich, Switzerland, via
                       Citibank and JP Morgan Chase
                       correspondent accounts in New
                       York, New York, for credit to an
                       account in the name of FPT Sports
                       at Bank Julius Baer & Co. in
                       Zurich, Switzerland.

A fourth payment of $1.667 million – bringing the total to

$13.333 million – was made by a transfer from an account in the

name of Datisa at Bank Hapoalim in Zurich, Switzerland to an

account in the name of Cross Trading at the same bank.

251. Bribe payments were subsequently wired from bank

accounts in Switzerland controlled by Datisa to accounts

controlled by CONMEBOL officials throughout the world, including

accounts in the United States.  For example, the defendants HUGO

JINKIS and MARIANO JINKIS set up another account at Bank

Hapoalim in Zurich, Switzerland – the same bank where Datisa

held its account - in the name of another Full Play company

called Bayan Group S.A. ("Bayan"), a Panamanian company used

specifically to pay bribes.  On or about January 31, 2014,

February 27, 2014, and July 23, 2014, HUGO JINKIS and MARIANO JINKIS caused payments of $50,000, $250,000, and $400,000, respectively, to be sent from the Bayan account to accounts in the names of entities controlled by the defendant RAFAEL ESQUIVEL at UBS, Bank of America, and Espirito Santo Bank in Miami, Florida.  The bribe payments to ESQUIVEL were made in this manner so as to conceal their true source and nature.

252. The defendant JOSÉ MARGULIES also participated in the Datisa scheme, facilitating the payment and laundering of bribe money from and through accounts controlled by the Datisa shareholders.  For example, from December 2013 to August 2014, Full Play transferred nearly $3.8 million into one of the U.S. accounts of the Margulies Intermediaries.  During the same period, the Margulies Intermediaries transferred more than $2 million into the same Bayan account at Bank Hapoalim in Zurich, Switzerland that made the above-referenced payments into accounts controlled by the defendant RAFAEL ESQUIVEL in the United States.

253. As the bribery scheme discussed in the preceeding paragraphs evolved and progressed, so, too, did CONMEBOL's and CONCACAF's efforts to organize and promote the 2016 Copa América Centenario.  In or about 2012, the then-acting president of CONCACAF informally announced that a special, Pan-America

edition of the Copa América would be held in 2016, involving
teams from CONMEBOL and CONCACAF, to celebrate the 100th
anniversary of the first edition of the tournament.  The acting
president stated that he hoped the tournament would be hosted in
the United States because "the market is in the United States,
the stadiums are in the United States, [and] the people are in
the United States."

254. At a press conference held in Miami, Florida on
May 1, 2014, high-ranking officials of CONMEBOL and CONCACAF
officially announced that CONMEBOL would celebrate the 100th
anniversary of the Copa América by organizing a special edition
of the tournament for the entire hemisphere – to be called the
Copa América Centenario – to include all 10 CONMEBOL men's
national teams and the men's national teams of six CONCACAF
member associations, including the United States.  The
tournament was to be played at major sporting venues in various
cities in the United States in June 2016.  The defendants
JEFFREY WEBB and EUGENIO FIGUEREDO presided over the press
conference.  Datisa representatives - including Co-Conspirator
#2 and the defendants ALEJANDRO BURZACO, HUGO JINKIS, and
MARIANO JINKIS - attended the press conference, and the logo of
Datisa's trade name was included alongside the logos of CONCACAF
and CONMEBOL in various promotional materials.

255. As set forth above, Datisa acquired the exclusive commercial rights to the Copa América Centenario that CONMEBOL held as part of the 2013 Copa América Contract. In addition, Datisa contracted with CONCACAF, in its capacity as the co-organizer of the tournament, to acquire CONCACAF's rights to that tournament as well. By letter agreement dated March 4, 2014 (the "2014 Centenario Contract"), Datisa agreed to pay $35 million to CONCACAF for those rights, which amount was in addition to the $77.5 million Datisa had already agreed to pay to CONMEBOL, pursuant to the 2013 Copa América Contract, for CONMEBOL's rights to the same tournament.

256. In connection with the negotiations between Datisa and CONCACAF, which involved Co-Conspirator #4 and the defendants ALEJANDRO BURZACO, AARON DAVIDSON, EUGENIO FIGUEREDO, HUGO JINKIS, MARIANO JINKIS, and JEFFREY WEBB, among others, Datisa also agreed to pay WEBB a bribe in exchange for WEBB's agreement to cause CONCACAF to enter into the 2014 Centenario Contract.

257. In a March 2014 meeting in Queens, New York, which occurred days after the 2014 Centenario Contract was signed, the defendant AARON DAVIDSON told Co-Conspirator #2 that the defendant MARIANO JINKIS had called him (DAVIDSON) the prior week to get DAVIDSON's help in figuring out a way to make the

110

payment to the defendant JEFFREY WEBB. DAVIDSON said he cut JINKIS off because he did not want to talk about the subject on the phone and told JINKIS that they would talk in person when JINKIS traveled to Miami, Florida the following week.

258. On or about April 1, 2014, the first payment pursuant to the 2014 Centenario Contract of $7 million was made from Datisa's account at Bank Hapoalim in Zurich, Switzerland, to an account in CONCACAF's name at JP Morgan Chase bank in Miami, Florida.

259. In or about August 2014, the president of CONMEBOL stated publicly: "The Americas are one, it is man who creates frontiers. I believe in a single America in a working context with CONCACAF and we've reached something real which will go ahead in 2016."

260. On or about September 25, 2014, at a meeting of the FIFA executive committee in Zurich, Switzerland, FIFA put its imprimatur on the Copa América Centenario by placing the tournament on its official calendar.

261. The payments contemplated by the 2013 Copa América Contract, the 2014 Centenario Contract, and the status of the associated bribes, are reflected in the table below:

**TABLE 2**: Copa América Centenario Scheme Bribes

| Edition | Host Nation | Contract Price | Bribe |
|---|---|---|---|
| [Contract signature] | – | – | $20 million [PAID] |
| 2015 | Chile | $75 million | $20 million [PAID] |
| 2016 | United States | $112.5 million | $30 million |
| 2019 | Brazil | $80 million | $20 million |
| 2023 | Ecuador | $85 million | $20 million |
| **TOTALS** | | **$352.5 million** | **$110 million** |

262. On May 1, 2014, the controlling principals of Datisa - Co-Conspirator #2 and the defendants HUGO JINKIS, MARIANO JINKIS, and ALEJANDRO BURZACO – met in South Florida after the press conference announcing the Copa América Centenario and discussed the bribery scheme. At one point, BURZAZO said: "All can get hurt because of this subject. . . . All of us go to prison."

* * * *

263. Apart from Co-Conspirator #1's disclosure to FIFA of the 2011 FIFA presidential election bribery scheme set forth above, no disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONCACAF, or CONMEBOL, including without limitation to their respective executive committees, congresses, or constituent organizations.

112

CRIMINAL COUNTS

COUNT ONE
(Racketeering Conspiracy)

264. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

265. In or about and between 1991 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, and JOSÉ MARGULIES, also known as José Lazaro, together with others, being persons employed by and associated with the enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

266. The pattern of racketeering activity through which the defendants JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL,

113

JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, and JOSÉ MARGULIES, together with others, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise consisted of multiple acts indictable under:

> (a) Title 18, United States Code, Section 1343 (wire fraud, including honest-services wire fraud);
>
> (b) Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy);
>
> (c) Title 18, United States Code, Section 1952 (interstate and foreign travel in-aid-of racketeering);
>
> (d) Title 18, United States Code, Section 1512 (obstruction of justice); and

multiple acts involving bribery, in violation of New York State Penal Law Sections 180.03 and 180.08.  Each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, the last of which would occur within 10 years of a prior act of racketeering activity.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

114

COUNT TWO
(Wire Fraud Conspiracy – CONMEBOL Copa América Scheme)

267. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

268. In or about and between January 1991 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant NICOLÁS LEOZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

115

<u>COUNTS THREE AND FOUR</u>
(Wire Fraud – CONMEBOL Copa América Scheme)

269. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as though fully set forth in this paragraph.

270. On or about the dates set forth below, within the Southern District of New York, the defendant NICOLÁS LEOZ, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

271. For the purpose of executing such scheme and artifice, the defendant NICOLÁS LEOZ, together with others, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

116

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| THREE | November 12, 2010 | Wire transfer of $4,000,000 from Traffic International's account at Delta National Bank & Trust in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| FOUR | June 10, 2011 | Wire transfer of $9,000,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT FIVE
(Money Laundering Conspiracy – CONMEBOL Copa América Scheme)

272. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

273. In or about and between January 1991 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendants NICOLÁS LEOZ and JOSÉ MARGULIES, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the

117

United States and to places in the United States from and
through places outside the United States, (a) with the intent to
promote the carrying on of specified unlawful activity, to wit:
wire fraud, contrary to Title 18, United States Code, Section
1343, all contrary to Title 18, United States Code, Section
1956(a)(2)(A), and (b) knowing that the monetary instruments and
funds involved in the transportation, transmission, and transfer
represented the proceeds of some form of unlawful activity and
knowing that such transportation, transmission, and transfer was
designed in whole and in part to conceal and disguise the
nature, the location, the source, the ownership and the control
of the proceeds of said specified unlawful activity, all
contrary to Title 18, United States Code, Section
1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and
3551 _et_ _seq._)

COUNT SIX
(Money Laundering – CONMEBOL Copa América Scheme)

274. The allegations contained in paragraphs 1 through
263 are realleged and incorporated as if fully set forth in this
paragraph.

275. In or about and between November 2010 and June
2011, both dates being approximate and inclusive, within the
Southern District of New York, the defendant NICOLÁS LEOZ,

118

together with others, did knowingly and intentionally transport,

transmit and transfer monetary instruments and funds, to wit:

wire transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United

States Code, Section 1343.

　　　　(Title 18, United States Code, Sections 1956(a)(2)(A),

2 and 3551 et seq.)

COUNT SEVEN
(Wire Fraud Conspiracy – CBF Copa do Brasil Scheme)

　　　　276. The allegations contained in paragraphs 1 through

263 are realleged and incorporated as if fully set forth in this

paragraph.

　　　　277. In or about and between December 2011 and the

present, both dates being approximate and inclusive, within the

Eastern District of New York and elswewhere, the defendant JOSÉ

MARIA MARIN, together with others, did knowingly and

intentionally conspire to devise a scheme and artifice to

defraud FIFA and CBF and their constituent organizations,

including to deprive FIFA and CBF and their constituent

organizations of their respective rights to honest and faithful

services through bribes and kickbacks, and to obtain money and

119

property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT EIGHT
(Money Laundering Conspiracy – CBF Copa do Brasil Scheme)

278. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

279. In or about and between December 2011 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant JOSÉ MARIA MARIN, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to

120

Title 18, United States Code, Section 1343, all contrary to
Title 18, United States Code, Section 1956(a)(2)(A), and (b)
knowing that the monetary instruments and funds involved in the
transportation, transmission, and transfer represented the
proceeds of some form of unlawful activity and knowing that such
transportation, transmission, and transfer was designed in whole
and in part to conceal and disguise the nature, the location,
the source, the ownership and the control of the proceeds of
said specified unlawful activity, all contrary to Title 18,
United States Code, Section 1956(a)(2)(B)(i).

       (Title 18, United States Code, Sections 1956(h) and
3551 <u>et</u> <u>seq</u>.)

COUNT NINE
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #1)

       280. The allegations contained in paragraphs 1 through
263 are realleged and incorporated as if fully set forth in this
paragraph.

       281. In or about and between July 2000 and June 2011,
both dates being approximate and inclusive, within the Southern
District of New York, the defendant JACK WARNER, together with
others, did knowingly and intentionally conspire to devise a
scheme and artifice to defraud CFU and its constituent
organizations, and to obtain money and property by means of
materially false and fraudulent pretenses, representations, and

121

promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNTS TEN AND ELEVEN
(Wire Fraud – CFU World Cup Qualifiers Scheme #1)

282. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as though fully set forth in this paragraph.

283. On or about the dates set forth below, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally devise a scheme and artifice to defraud CFU and its constituent organizations, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

284. For the purpose of executing such scheme and artifice, the defendant JACK WARNER, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| TEN | December 13, 2010 | Wire transfer of $290,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |
| ELEVEN | February 2, 2011 | Wire transfer of $250,000 from Traffic USA's account at Citibank in Miami, Florida to a Bank of America correspondent account in New York, New York, for credit to an account in the name of CFU at Republic Bank in Trinidad and Tobago. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWELVE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #1)

285. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

286. In or about and between July 2000 and June 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United

123

States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT THIRTEEN
(Money Laundering – CFU World Cup Qualifiers Scheme #1)

287. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

288. In or about and between December 2010 and February 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful

124

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 <u>et</u> <u>seq</u>.)

COUNT FOURTEEN
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Scheme (LI))

289. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

290. In or about and between September 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and FEDEFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and

125

sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT FIFTEEN
(Wire Fraud – UNCAF Region World Cup Qualifiers Scheme (LI))

291. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as though fully set forth in this paragraph.

292. On or about the date set forth below, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FEDEFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FEDEFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

293. For the purpose of executing such scheme and artifice, the defendant EDUARDO LI, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

126

| Count | Approx. Date | Wire Communication |
|-------|--------------|--------------------|
| FIFTEEN | August 1, 2012 | Wire transfer of $27,500 from Traffic USA's account at Citibank in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Federación Costarricense de Futbol at Banco Lafise in Costa Rica. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT SIXTEEN
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Scheme (LI))

294. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

295. In or about and between September 2009 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendant EDUARDO LI, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18,

127

United States Code, Section 1343, all contrary to Title 18,

United States Code, Section 1956(a)(2)(A).

　　　　(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

### COUNT SEVENTEEN
(Money Laundering –
UNCAF Region World Cup Qualifiers Scheme (LI))

　　　　296. The allegations contained in paragraphs 1 through

263 are realleged and incorporated as if fully set forth in this

paragraph.

　　　　297. In or about and between April 2011 and the

present, both dates being approximate and inclusive, within the

Southern District of New York, the defendant EDUARDO LI,

together with others, did knowingly and intentionally transport,

transmit and transfer monetary instruments and funds, to wit:

wire transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

activity, to wit: wire fraud, contrary to Title 18, United

States Code, Section 1343.

　　　　(Title 18, United States Code, Sections 1956(a)(2)(A),

2 and 3551 et seq.)

128

COUNT EIGHTEEN
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Scheme (ROCHA))

298. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

299. In or about and between April 2011 and December 2012, both dates being approximate and inclusive, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and FENIFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FENIFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

129

COUNTS NINETEEN AND TWENTY
(Wire Fraud – UNCAF Region World Cup Qualifiers Scheme (ROCHA))

300. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as though fully set forth in this paragraph.

301. On or about the dates set forth below, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and FENIFUT and their constituent organizations, including to deprive FIFA, CONCACAF, and FENIFUT and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

302. For the purpose of executing such scheme and artifice, the defendant JULIO ROCHA, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

130

| Count | Approx. Date | Wire Communication |
|-------|-------------|--------------------|
| NINETEEN | April 27, 2011 | Wire transfer of $88,000 from Traffic USA's account at Citibank in Miami, Florida, to a Citibank correspondent account, for credit to an account in the name of Federación Nicaragüense de Fútbol at Banco de Credito Centroamerica in Managua, Nicaragua. |
| TWENTY | May 27, 2011 | Wire transfer of $150,000 from an account controlled by Co-Conspirator #19 at Banco Itaú in Miami, Florida, to a JP Morgan Chase correspondent account, for credit to an account in the name of Julio Rocha Lopez at BankInter in Madrid, Spain. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT TWENTY-ONE
(Money Laundering Conspiracy –
UNCAF Region World Cup Qualifiers Scheme (ROCHA))

303. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

304. In or about and between April 2011 and December 2012, both dates being approximate and inclusive, within the Southern District of Florida, the defendant JULIO ROCHA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in

131

the United States from and through places outside the United

States, with the intent to promote the carrying on of specified

unlawful activity, to wit: wire fraud, contrary to Title 18,

United States Code, Section 1343, all contrary to Title 18,

United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

COUNT TWENTY-TWO
(Money Laundering –
UNCAF Region World Cup Qualifiers Scheme (ROCHA))

305. The allegations contained in paragraphs 1 through

263 are realleged and incorporated as if fully set forth in this

paragraph.

306. In or about and between April 2011 and December

2012, both dates being approximate and inclusive, within the

Southern District of Florida, the defendant JULIO ROCHA,

together with others, did knowingly and intentionally transport,

transmit, and transfer monetary instruments and funds, to wit:

wire transfers, from places in the United States to and through

places outside the United States and to places in the United

States from and through places outside the United States, with

the intent to promote the carrying on of specified unlawful

132

activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

<u>COUNT TWENTY-THREE</u>
(Wire Fraud Conspiracy – 2011 FIFA Presidential Election Scheme)

307. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

308. In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers,

133

emails and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TWENTY-FOUR
(Money Laundering Conspiracy –
2011 FIFA Presidential Election Scheme)

309. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

310. In or about and between April 2011 and July 2011, both dates being approximate and inclusive, within the Southern District of New York, the defendant JACK WARNER, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: United States currency and wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

134

COUNT TWENTY-FIVE
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme #2)

311. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

312. In or about and between January 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB, COSTAS TAKKAS, and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

135

COUNTS TWENTY-SIX THROUGH TWENTY-EIGHT
(Wire Fraud – CFU World Cup Qualifiers Scheme #2)

313. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as though fully set forth in this paragraph.

314. On or about the dates set forth below, within the Southern and Western Districts of New York, the defendants JEFFREY WEBB and COSTAS TAKKAS, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

315. For the purpose of executing such scheme and artifice, the defendants JEFFREY WEBB and COSTAS TAKKAS, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

136

| Count | Approx. Date | Wire Communication |
|---|---|---|
| TWENTY-SIX | November 13, 2012 | Wire transfer of $1,200,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a correspondent account at HSBC bank in Buffalo, New York, for credit to an account in the name of Front Company A at HSBC bank in Hong Kong. |
| TWENTY-SEVEN | November 21, 2012 | Wire transfer of $750,000 from Front Company A's account at HSBC bank in Hong Kong, to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures at Fidelity Bank in the Cayman Islands. |
| TWENTY-EIGHT | November 21, 2012 | Wire transfer of $250,000 from Front Company A's account at HSBC bank in Hong Kong, to a correspondent account at Standard Chartered Bank in New York, New York, for credit to an account in the name of Kosson Ventures at Fidelity Bank in the Cayman Islands. |

(Title 18, United States Code, Sections 1343, 2 and

3551 et seq.)

COUNT TWENTY-NINE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #2)

316. The allegations contained in paragraphs 1 through

263 are realleged and incorporated as if fully set forth in this

paragraph.

137

317. In or about and between January 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB, COSTAS TAKKAS and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

138

COUNT THIRTY
(Money Laundering – CFU World Cup Qualifiers Scheme #2)

318. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

319. In or about and between November 2012 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants JEFFREY WEBB and COSTAS TAKKAS, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location,

139

the source, the ownership and the control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2)(A), 1956(a)(2)(B)(i), 2 and 3551 et seq.)

COUNT THIRTY-ONE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme #2)

320. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

321. In or about and between July 2013 and November 2013, both dates being approximate and inclusive, within the Southern District of Florida, the defendants JEFFREY WEBB and COSTAS TAKKAS, together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code,

Section 1343, all contrary to Title 18, United States Code,
Section 1957(a).

(Title 18, United States Code, Sections 1956(h),
1957(b), 1957(d)(1) and 3551 et seq.)

COUNT THIRTY-TWO
(Money Laundering – CFU World Cup Qualifiers Scheme #2)

322. The allegations contained in paragraphs 1 through
263 are realleged and incorporated as if fully set forth in this
paragraph.

323. In or about and between July 2013 and November
2013, both dates being approximate and inclusive, within the
Southern District of Florida, the defendants JEFFREY WEBB and
COSTAS TAKKAS, together with others, did knowingly and
intentionally engage in monetary transactions, to wit: deposits,
withdrawals and transfers of funds and monetary instruments, in
and affecting interstate and foreign commerce, by, through and
to one or more financial institutions, in criminally derived
property that was of a value greater than $10,000 and that was
derived from specified unlawful activity, to wit: wire fraud,
contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1957(a),
1957(b), 1957(d)(1), 2, and 3551 et seq.)

141

COUNT THIRTY-THREE
(Wire Fraud Conspiracy –
CONCACAF Gold Cup/Champions League Scheme)

324. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

325. In or about and between July 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

142

COUNTS THIRTY-FOUR THROUGH THIRTY-SIX
(Wire Fraud – CONCACAF Gold Cup/Champions League Scheme)

326. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as though fully set forth in this paragraph.

327. On or about the dates set forth below, within the Southern District of New York, the defendants JEFFREY WEBB and AARON DAVIDSON, together with others, did knowingly and intentionally devise a scheme and artifice to defraud FIFA and CONCACAF and their constituent organizations, including to deprive FIFA and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

328. For the purpose of executing such scheme and artifice, the defendants JEFFREY WEBB and AARON DAVIDSON, together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds as described below:

143

| Count | Approx. Date | Description |
|---|---|---|
| THIRTY-FOUR | February 15, 2013 | Wire transfer of $3,000,000 from Traffic USA's account at Citibank in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank in New York, New York. |
| THIRTY-FIVE | December 4, 2013 | Wire transfer of $1,100,000 from Traffic International's account at Delta National Bank & Trust Co. in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Soccer Uniform Company A at Capital Bank in Panama City, Panama. |
| THIRTY-SIX | December 20, 2013 | Wire transfer of $3,000,000 from Traffic USA's account at Citibank in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank in New York, New York. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT THIRTY-SEVEN
(Money Laundering Conspiracy –
CONCACAF Gold Cup/Champions League Scheme)

329. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

330. In or about and between July 2012 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB and AARON DAVIDSON, together with others, did knowingly and intentionally conspire to transport, transmit, and

144

transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### COUNT THIRTY-EIGHT
(Money Laundering – CONCACAF Gold Cup/Champions League Scheme)

331. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

145

332. In or about and between February 2013 and the present, both dates being approximate and inclusive, within the Southern District of New York, the defendants JEFFREY WEBB and AARON DAVIDSON, together with others, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, and (b) knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(2)(A), 1956(a)(2)(B)(i), 2 and 3551 et seq.)

COUNT THIRTY-NINE
(Wire Fraud Conspiracy –
CONMEBOL/CONCACAF Copa América Centenario Scheme)

333. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

334. In or about and between April 2010 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB, EDUARDO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, and JOSÉ MARGULIES, also known as José Lazaro, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and CONMEBOL and their constituent organizations, including to deprive FIFA, CONCACAF and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

147

pictures, and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT FORTY
(Money Laundering Conspiracy –
CONMEBOL/CONCACAF Copa América Centenario Scheme)

335. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

336. In or about and between April 2010 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY WEBB, EDUARDO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, JOSÉ MARGULIES, also known as José Lazaro, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud,

contrary to Title 18, United States Code, Section 1343, all

contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and

3551 et seq.)

### COUNT FORTY-ONE
(Unlawful Procurement of Naturalization)

337. The allegations contained in paragraphs 1 through

263 are realleged and incorporated as if fully set forth in this

paragraph.

338. On or about and between March 24, 2005 and July

11, 2006, both dates being approximate and inclusive, within the

Central District of California, the defendant EUGENIO FIGUEREDO,

together with others, did knowingly and intentionally procure,

contrary to law, his naturalization, in that the defendant did

knowingly and intentionally make one or more false statements

under oath, in a case, proceeding and matter relating to

naturalization and citizenship, to wit: the defendant did

falsely state that (1) he was only employed by Sunburst

Decorative Rock in Irwindale, California and neither worked

anywhere else in the previous five years nor ever had any

affiliation with any organization or association in the United

States or in any other place; and (2) he had a medical

impairment, to wit: dementia, and thus was unable to complete

the required English language and civics competency exams.

(Title 18, United States Code, Sections 1425(a), 2,

and 3551 et seq.; Title 8, United States Code, Section 1451(e))

COUNTS FORTY-TWO THROUGH FORTY-SIX
(Aiding and Assisting in the Preparation of
False and Fraudulent Tax Returns)

339. The allegations contained in paragraphs 1 through

263 are realleged and incorporated as if fully set forth in this

paragraph.

340. On or about the dates set forth below, within the

Central District of California, the defendant EUGENIO FIGUEREDO,

together with others, did willfully aid and assist in, and

procure, counsel and advise the preparation and presentation to

the Internal Revenue Service under the internal revenue laws, of

the defendant's U.S. Individual Income Tax Returns, Forms 1040

and attached Schedules and Forms, which were false and

fraudulent as to material matters, to wit: among other things,

the defendant falsely stated the amount of taxable income and

failed to report his financial interest in a foreign bank

account in the following years:

| Count | Tax Year | Approximate Filing Date |
|-------|----------|-------------------------|
| FORTY-TWO | 2009 | March 08, 2010 |

150

| FORTY-THREE | 2010 | March 03, 2011 |
| FORTY-FOUR | 2011 | April 06, 2012 |
| FORTY-FIVE | 2012 | March 22, 2013 |
| FORTY-SIX | 2013 | April 01, 2014 |

(Title 26, United States Code, Section 7206(2); Title 18, United States Code, Sections 2, and 3551 et seq.)

<u>COUNT FORTY-SEVEN</u>
(Obstruction of Justice)

341. The allegations contained in paragraphs 1 through 263 are realleged and incorporated as if fully set forth in this paragraph.

342. In or about and between May 2013 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AARON DAVIDSON, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.

(Title 18, United States Code, Sections 1512(c)(2), 2, and 3551 et seq.)

151

CRIMINAL FORFEITURE ALLEGATIONS

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT ONE

343. The United States hereby gives notice to the
defendants that, upon their conviction of the offense charged in
Count One, the government will seek forfeiture in accordance
with Title 18, United States Code, Section 1963(a), which
requires any person or entity convicted of such offense to
forfeit: (a) any interest acquired or maintained in violation of
Title 18, United States Code, Section 1962; (b) any interest in,
security of, claim against, or property or contractual right of
any kind affording a source of influence over, any enterprise
which the defendant established, operated, controlled,
conducted, or participated in the conduct of, in violation of
Title 18, United States Code, Section 1962, and (c) any property
constituting, or derived from, any proceeds obtained, directly
or indirectly, from racketeering activity in violation of Title
18, United States Code, Section 1962, including but not limited
to all right, title and interest in: (a) the real property and
premises located at 2116 Adel Drive, Loganville, Georgia 30052;
(b) the real property and premises located at 5119 Madeline
Place, Stone Mountain, Georgia 30083; (c) the real property and
premises located at 7222 Lake Crossing, Stone Mountain, Georgia
30087; (d) the real property and premises located at 104 Ellis

152

Drive, Conyers, Georgia 30012; (e) the real property and premises located at 808 Brickell Key Drive, Apartment No. 1204, Miami, Florida 33131; (f) the real property and premises located at 18067 NW 74th Court, Hialeah, Florida 33015; (g) the real property and premises located at 18061 NW 74th Court, Hialeah, Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i)  the real property and premises located at 18049 NW 74th Court, Hialeah, Florida 33015; (j) the real property and premises located at 18043 NW 74th Court, Hialeah, Florida 33015; (k) the real property and premises located at 8450 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 201, Miami, Florida 33193; and (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193.

344. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS TWO THROUGH FOUR, SEVEN, NINE THROUGH ELEVEN, FOURTEEN, FIFTEEN, EIGHTEEN THROUGH TWENTY, TWENTY-THREE, TWENTY-FIVE, TWENTY-SIX THROUGH TWENTY-EIGHT, THIRTY-THREE THROUGH THIRTY-SIX, THIRTY NINE, AND FORTY-SEVEN

345.  The United States hereby gives notice to the defendants charged in Counts Two through Four, Seven, Nine through Eleven, Fourteen, Fifteen, Eighteen through Twenty, Twenty-Three, Twenty-Five, Twenty-Six through Twenty-Eight, Thirty-Three through Thirty-Six, Thirty-Nine, and Forty-Seven that, upon their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United

154

States Code, Section 2461(c), which require any person convicted
of such offense to forfeit any and all property, real or
personal, which constitutes or is derived from proceeds
traceable to a violation of such offense, including but not
limited to all right, title and interest in: (a) the real
property and premises located at 2116 Adel Drive, Loganville,
Georgia 30052; (b) the real property and premises located at
5119 Madeline Place, Stone Mountain, Georgia 30083; (c) the real
property and premises located at 7222 Lake Crossing, Stone
Mountain, Georgia 30087; (d) the real property and premises
located at 104 Ellis Drive, Conyers, Georgia 30012; (e) the real
property and premises located at 808 Brickell Key Drive,
Apartment No. 1204, Miami, Florida 33131; (f) the real property
and premises located at 18067 NW 74th Court, Hialeah, Florida
33015; (g) the real property and premises located at 18061 NW
74th Court, Hialeah, Florida 33015; (h) the real property and
premises located at 18055 NW 74th Court, Hialeah, Florida 33015;
(i) the real property and premises located at 18049 NW 74th
Court, Hialeah, Florida 33015; (j) the real property and
premises located at 18043 NW 74th Court, Hialeah, Florida 33015;
(k) the real property and premises located at 8450 SW 149th
Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real
property and premises located at 8660 SW 149th Avenue, Apartment

155

No. 201, Miami, Florida 33193; and (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193.

346. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

156

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS FIVE, SIX, EIGHT, TWELVE, THIRTEEN, SIXTEEN,
SEVENTEEN, TWENTY-ONE, TWENTY-TWO, TWENTY-FOUR, TWENTY-NINE,
THIRTY THROUGH THIRTY-TWO, THIRTY-SEVEN, THIRTY-EIGHT, AND FORTY

347. The United States hereby gives notice to the
defendants charged in Counts Five, Six, Eight, Twelve, Thirteen,
Sixteen, Seventeen, Twenty-One, Twenty-Two, Twenty-Four, Twenty-
Nine, Thirty through Thirty-Two, Thirty-Seven, Thirty-Eight, and
Forty, that, upon their conviction of any of such offenses, the
government will seek forfeiture in accordance with Title 18,
United States Code, Section 982(a)(1), which requires any person
convicted of such offense to forfeit any and all property, real
or personal, involved in such offense, or any property traceable
to such offense, including but not limited to all right, title
and interest in: (a) the real property and premises located at
2116 Adel Drive, Loganville, Georgia 30052; (b) the real
property and premises located at 5119 Madeline Place, Stone
Mountain, Georgia 30083; (c) the real property and premises
located at 7222 Lake Crossing, Stone Mountain, Georgia 30087;
(d) the real property and premises located at 104 Ellis Drive,
Conyers, Georgia 30012; (e) the real property and premises
located at 808 Brickell Key Drive, Apartment No. 1204, Miami,
Florida 33131; (f) the real property and premises located at
18067 NW 74th Court, Hialeah, Florida 33015; (g) the real
property and premises located at 18061 NW 74th Court, Hialeah,

157

Florida 33015; (h) the real property and premises located at 18055 NW 74th Court, Hialeah, Florida 33015; (i) the real property and premises located at 18049 NW 74th Court, Hialeah, Florida 33015; (j) the real property and premises located at 18043 NW 74th Court, Hialeah, Florida 33015; (k) the real property and premises located at 8450 SW 149th Avenue, Apartment No. 805, Miami, Florida 33193; (l) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 201, Miami, Florida 33193; and (m) the real property and premises located at 8660 SW 149th Avenue, Apartment No. 209, Miami, Florida 33193.

348. If any of the above-described forfeitable property, as a result of any act or omission of a defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

158

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT FORTY-ONE

349. The United States hereby gives notice to the defendant EUGENIO FIGUEREDO that, upon his conviction of the offense charged in Count Forty-One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(6), which requires any person convicted of such offense to forfeit: (a) any conveyance, including any vessel, vehicle or aircraft used in the commission of such offense; and (b) any property, real or personal, that constitutes or is derived from proceeds obtained directly or indirectly from the commission of such offense, or that is used to facilitate or intended to be used to facilitate the commission of such offense.

350. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property described in this forfeiture allegation.

     (Title 18, United States Code, Sections 982(a)(6) and

982(b); Title 21, United States Code, Section 853(p))

 

 

               A TRUE BILL

               _____

               FOREPERSON

_____
KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

161

F. #2015R00747

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT
## EASTERN *District of* NEW YORK
## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA
*vs.*

JEFFREY WEBB, EDUARDO LI, JULIO ROCHA, COSTAS TAKKAS, JACK WARNER, EUGENIO FIGUEREDO, RAFAEL ESQUIVEL, JOSÉ MARIA MARIN, NICOLÁS LEOZ, ALEJANDRO BURZACO, AARON DAVIDSON, HUGO JINKIS, MARIANO JINKIS, and JOSÉ MARGULIES, also known as José Lazaro,,

Defendants.

# INDICTMENT

(T. 8, U.S.C., § 1451(e); T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 982(a)(6), 982(b), 1343, 1349, 1425(a), 1512(c)(2), 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(h), 1957(a), 1957(b), 1957(d)(1), 1962(d), 1963, 1963(a), 1963(m), 2, and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 26, U.S.C. § 7206(2); T. 28, U.S.C. § 2461(c))

*A true bill.*

_____ Robert Heffernan _____
                                                                                    *Foreperson*

*Filed in open court this* _____ 20th _____ *day,*

*of* ___ May ___ *A.D. 20* 15 __

_____
                                                                                        *Clerk*

*Bail, $* _____

*Evan M. Norris, Amanda Hector, Darren A. LaVerne, Samuel P. Nitze, Keith D. Edelman, Brian Morris, Assistant U.S. Attorneys (718) 254-7000*