1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
                                  :
4    UNITED STATES OF AMERICA,     :
                                  :   15-CR-252 (RJD)
5              v.                  :
                                  :   January 13, 2016
6    ALFREDO HAWIT,                :   Brooklyn, New York
                                  :
7                    Defendant.    :
                                  :
8    ------------------------------X

9
        TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT/BAIL HEARING
10              BEFORE THE HONORABLE ROBERT M. LEVY
                  UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

     For the Government:        UNITED STATES ATTORNEY
14                              BY: AMANDA HECTOR, ESQ.
                                   PAUL TUCHMANN, ESQ.
15                                 KEITH EDELMAN, ESQ.
                                ASSISTANT U.S. ATTORNEY
16

17

     For the Defendant:         JUSTIN WEDDLE, ESQ.
18                              Brown Rudnick LLP
                                7 Times Square
19                              New York, New York 10036

20

21

     Court Transcriber:         SHARI RIEMER, CET-805
22                              TypeWrite Word Processing Service
                                211 N. Milton Road
23                              Saratoga Springs, New York 12866

24

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

1  (Proceedings began at 4:21 p.m.)

2          THE CLERK: Criminal Cause for Arraignment, <u>United</u>

3  <u>States v. Alfredo Hawit</u>, Case No. 15-CR-252.

4          Please state your appearances starting with the

5  plaintiff.

6          MS. HECTOR: Amanda Hector and Paul Tuchmann and

7  Keith Edelman for the Government.  Good afternoon, Your Honor.

8          THE COURT: Good afternoon.

9          MR. WEDDLE: Good afternoon, Your Honor.  My name is

10  Justin Weddle.  I'm from the law firm of Brown Rudnick for the

11  defendant, Alfredo Hawit.

12          THE COURT: Good afternoon.

13          THE CLERK: Will the interpreter please state her

14  name and the language she's interpreting for the record.

15          THE INTERPRETER:  Marcia Gotler [Ph.], Spanish.

16          THE CLERK: Were you previously sworn?

17          THE INTERPRETER:  I'm a per diem interpreter.  So

18  from time to time I'm sworn and in different judge's

19  courtrooms.

20          THE CLERK: Please raise your right hand.

21                Marcia Gotler, Interpreter, Sworn

22          THE CLERK: Will the defendant please raise his right

23  hand?

24                Alfredo Hawit, Defendant, Sworn

25          THE COURT: Good afternoon.  Mr. Hawit, I'm going to

1   advise you that you have a right to remain silent.  Anything

2   you say here today can be used against you.  Even if you've

3   made statements to the Government you don't have to say

4   anything else and you're here next to your attorney.  Feel

5   free to consult with him privately at any time.

6           Have you had a chance to meet with your lawyer?

7           THE DEFENDANT: Yes.  Yes, Your Honor.

8           THE COURT: Has he explained the charges in the

9   indictment to you?

10          THE DEFENDANT: Yes.

11          THE COURT: Would you like me to read the indictment

12  publicly?

13          MR. WEDDLE: No, thank you, Your Honor.  We waive the

14  public reading.

15          THE COURT: How does he plead?

16          MR. WEDDLE: Not guilty, Your Honor.

17          THE COURT: So let's go to bail at this time.

18          MR. WEDDLE: Thank you, Your Honor.

19          THE COURT: I understand we have a representative

20  from Pretrial Services here today and there is -- you're

21  prepared to make an oral presentation.  Is that right?

22          PRETRIAL:  Yes, [inaudible - not near microphone

23  during speaking] in Florida.  He has [inaudible] information

24  [inaudible] as well [inaudible] defense counsel has

25  [inaudible] bail package to Your Honor but just based on our

1  interview, Your Honor, we would recommend that Mr. Hawit is

2  bailable but [inaudible] secured bond [inaudible] feel that

3  based on the information that I have right now [inaudible].

4      THE COURT: So are you asking for time to be able to

5  verify his daughter's residence or other details relating to

6  her or --

7      PRETRIAL: [Inaudible] sureties that are proposed

8  [inaudible] actually [inaudible] but I'm just saying, Your

9  Honor, we haven't been able to verify [inaudible] but

10 regardless we would recommend a secured bond with the

11 condition that [inaudible] proposed.

12     THE COURT: That means electronic monitoring, home

13 confinement, surrender of the passport?

14     PRETRIAL: Right.  [Inaudible]

15     THE COURT: And living in Florida with his daughter

16 and grandson.

17     PRETRIAL: Yes.  The only other issue, Your Honor, is

18 that [inaudible] reported to me that he's had a serious

19 medical condition.  He had pancreatitis and hasn't been

20 treated in [inaudible] days.  He's been unable to [inaudible].

21     THE COURT: Okay.

22     MS. HECTOR:  Just before -- and I don't know who

23 Your Honor wants to hear from first but just to clarify one

24 thing.  We haven't had the opportunity to interview any

25 proposed suretors.  We've requested that opportunity a couple

of days ago.  We haven't been afforded the opportunity yet although we do understand from defense counsel that a number of suretors are homeowners.  We just haven't been able to talk to them about what sort of income levels they have, what property they might own, what equity is in that property, that sort of thing.

THE COURT: So you and Pretrial Services are in the same position at this time?

MS. HECTOR: [Inaudible].

THE COURT: Okay.  Do you want to address that first or hear what the Government has to say?

MR. WEDDLE: I'm going to go in whatever Your Honor wants.  We've had an ongoing dialogue with the Government so we're pretty familiar with each other's positions I think.

THE COURT: Okay.  I read both of your memos.  Is there anything else the Government would add to its memo at this time?

MS. HECTOR: Yes.  I think I would just note that I want to make clear that the Government's position is that the defendant here is bailable but based on the particular circumstances present and the facts of this case the Government's position is that it would need to be a significant bond and substantially secured for various reasons.  One, the risk of flight is significant in this case for the reasons we outlined in our letter.  Both the

defendant's ties abroad, his strong ties abroad.  He's a very

prominent citizen in Honduras.  He's a lawyer.  He's a

businessman.  Held significant positions within international

soccer organizations in Honduras and also as president of

CONCACAF.  He has ties to people that are prominent including

the former president of the Republic of Honduras, Rafael

Callejas who is also a co-defendant and engaged in some of the

criminal activity with the defendant as it is alleged.

The defendant, the charges are extremely serious.

They carry significant prison time as we've outlined in our

letter and the weight of our evidence is strong.  It includes

witnesses, documents, bank records and recorded statements of

the defendant.  And particularly relevant here I think is that

unlike some of his similarly situated co-defendants, Rafael

Callejas, Hector Trujillo who have been before Your Honor and

were released on consented to bonds.  The defendant here is

also charged with conspiracy to obstruct justice and witness

tampering and that activity took place and is recorded after

the first indictment in this case was unsealed in May, after

the defendant assumed presidency of CONCACAF.  We think that's

significant because under the Bail Reform Act in addition to

risk of flight and dangerousness, which we're of course not

arguing here, there's an additional prong that says that the

Court can order detention if there's a serious risk that the

defendant will obstruct or attempt to obstruct justice.

1      The defendant's actions in this case have not only

2 demonstrated a disrespect for the law but a heightened risk

3 that the defendant could continue that activity of obstruction

4 of justice.  We're not arguing that the defendant needs to be

5 detained because of that but it's an added reason why a

6 secured serious bond is necessitated here because were the

7 defendant to -- not only the bond would be forfeited not only

8 if the defendant fled but if he otherwise broke the conditions

9 of his bond which we would propose would include things like

10 no contact with certain individuals and co-defendants.  So for

11 that additional reason it's important.

12      I'll just note that the Government is being very

13 reasonable with respect to what we're proposing here.  If one

14 looks at some of the other bonds that the Government had

15 agreed to in this case with respect to defendants who are

16 charged in some of the same schemes, Rafael Callejas again and

17 Hector Trujillo.  Now, this defendant is charged in an

18 additional scheme and also with obstruction of justice and

19 witness tampering but putting that aside for a second both of

20 those defendants were released on a $4 million bond that was

21 heavily secured.  With Mr. Callejas it was I think around $2

22 million of security.  With Mr. Trujillo I think it was more

23 around $1 million.  The reason we proposed $500,000 in this

24 case is because we are taking into account our understanding

25 in part through conversations with defense counsel about the

1  relative asset levels and net worth of the various individuals

2  to try to come up with something that is -- that satisfies our

3  purposes but is also attainable by the defendant.

4        Again, we haven't been able to interview the

5  suretors in this case but our understanding is that several

6  people he is close to in the United States who are homeowners

7  and I think that just begs the question why that is not part

8  of the bond that's being proposed and it would be an important

9  part to the Government.

10        THE COURT: Have you asked that question?

11        MS. HECTOR: We have asked that question.

12        THE COURT: I assume I'll hear the answer here today.

13        MR. WEDDLE: Your Honor, if it's my turn I'll start.

14        THE COURT: Absolutely.

15        MR. WEDDLE: Your Honor, when I was in law school my

16  professor for criminal procedure asked the class, he said for

17  a defense lawyer what's the right amount of bail and I like

18  all of my fellow students had no idea what the answer to this

19  was and Judge Lynch said whatever you can [inaudible].  So

20  that's the situation that we're in here right now.  If we

21  could meet the package that the Government is proposing I'd

22  have no problem with it.  The problem that I have is that it's

23  unattainable.  I've had many, many conversations with the

24  family.  They've had many, many conversations with the people

25  who have come forward to be co-signers and people are not

willing to do it.  This is not a process that it's easy to get
into and there are a lot of people in the world who don't
fully trust the Government, they don't fully trust the process
and they're willing to co-sign but they're just not -- they
don't feel comfortable with how this process works
notwithstanding all of the explanations I've tried to give
them in terms of posting their house.

So I mean I think we want to take a step back.  I
recognize the Government has a large case to deal with here
and we need to try to run consistent policies throughout the
case but each defendant when you're deciding whether or not
they should be released on conditions should be taken on his
or her own and should only be imposed the least restrictive
conditions.

So I think this defendant is not a wealthy
defendant.  I'm not privy to the finances of Mr. Trujillo or
Mr. Callejas.  I don't know.  There are other packages that
have been agreed upon packages in this case that involve what
I think of as massive amounts of security, $10 million in
cash, security like that.  I don't know what those defendants'
finances are.  I do know what this defendant's finances are
and his net worth is nothing like those numbers, Your Honor,
and he's had to scrape and pull out all the stops obviously in
terms of funding his defense and he has a long road in front
of him in that respect.

1          His net worth as I put in the memo is largely made

2    up of his marital home.  It's actually owned by his wife.  She

3    has another piece of property in her name in Honduras and then

4    he has these other properties that are basically owned by the

5    bank because they're subject to mortgages and they essentially

6    pay for themselves.  They have a small amount of equity but

7    it's not massive and it's in Honduras.  So the situation we're

8    faced with is just looking at Mr. Hawit and trying to figure

9    out is he a risk of flight and what's going to ameliorate that

10   and I submit, Your Honor, that home detention with electronic

11   monitoring at the home of his daughter and grandson fully

12   ameliorates that and we're proposing more than that.

13          We're proposing that along with surrender of his

14   passport and we have the supporters who are willing to come

15   forward and sign for him and I think that that's more than

16   enough.

17          The question of obstruction, the Government said the

18   statute permits detention if there's a serious risk of

19   obstruction and they're making the argument not for detention

20   but for more money security and I think there's a little bit

21   of a non sequitur there.  It doesn't address the risk.  I

22   don't think that there's any risk of obstruction.  We haven't

23   gotten discovery in this case so I don't actually know more

24   than what's in the indictment.  I don't know what the

25   circumstances are of these consensually monitored

conversations allegedly involved in the defendant.

If as sometimes is the case these are cooperators who are essentially soliciting or engaging in a conversation with the defendant in order to elicit statements from the defendant, now that he's been arrested and he has a Sixth Amendment right to counsel there's no risk of that recurring. There's no risk of cooperators or undercover agents or anybody else engaging him in conversation about what should they say if they're asked by the FBI some questions. So I think that this is not -- as far as I know this is not an obstruction involving him reaching out and finding people and threatening people or doing any of the things that you think of as the basis for detention when someone who is a serious risk of interfering with the investigation. That's not the situation you have here. You have a defendant who waived extradition and who's here to deal with these charges.

Lastly I would say, Your Honor, the prong -- I put this in my memo but I think his prominence actually weighs in favor of release because he's not a type of person who can sort of melt away and disappear. He's a prominent person in Honduras. His assets in Honduras such as they are are not liquid assets. They're in his wife's name and they're real property and he doesn't have the kind of resources or persona that will permit him to just decide to do about face and decide to just flee and attempt to live the life of a

1  fugitive.  It's not within his means and all of the conditions

2  that we proposed more than make up for it.

3         And just my last point, Your Honor, is to reiterate

4  what Pretrial Services mentioned which is his health problems.

5  He does have serious health problems and he's been in jail in

6  Zurich, Switzerland for some time now and as you can imagine

7  the diet of a prison, and I'm not expecting it to accommodate

8  itself to his health conditions but it is not conducive to his

9  health conditions.  So he's had a lot of trouble with managing

10 his health and being in jail and I think under these

11 circumstances he really isn't a risk of flight.  He is a

12 Honduras citizen and his assets are in Honduras but it's not

13 really his fault because it just goes with the territory in

14 this global case that happens to be venued here in the Eastern

15 District of New York.

16        So he's really a visitor and -- but he has ties in

17 Florida and he's willing to stay within that home confinement

18 with electronic monitoring and that's the better place for

19 everyone for him to manage his health and there really isn't a

20 risk of flight that would justify the elevated conditions that

21 the Government is asking for.

22        THE COURT: So I have a few questions and you all

23 know more than I do at this point about who the suretors are,

24 what their assets are, what they do I assume.  So let me just

25 start with defendant's.  What can you tell me about the

1  suretors?

2      MR. WEDDLE: So I have their names.  I have not --

3  I've only spoken to two of them directly.  I believe their

4  names are in my brief.

5      THE COURT: Okay.  You don't have to put them on the

6  record if you don't need to.

7      MR. WEDDLE: So there's --

8      THE COURT: If they're in the brief -- I don't recall

9  that but maybe they are.

10     MS. HECTOR: I mean I could -- I have a list here of

11 what --

12     THE COURT: I got it.  Okay.  It's on Page 4.

13     MR. WEDDLE: So their names are in there.  Lizette

14 Hawit Green is his daughter who he proposed to live with.  She

15 lives outside Florida.  I have her address.  I don't know if

16 Your Honor wants me to put it on the public record but I have

17 it here.

18     THE COURT: No.  Is she the teacher, the school

19 teacher?

20     MR. WEDDLE: She's a school teacher.  She teaches at

21 the school that's attended by her son.

22     THE COURT: Do you know how much she makes?

23     MR. WEDDLE: I don't know but it's a modest salary

24 and she rents her home.

25     THE COURT: She rents.  Okay.

1    MR. WEDDLE: I would say just globally, Your Honor, I
2 don't have specific numbers on income or net worth for any of
3 these people.  I'm happy to have them interviewed by whoever
4 needs to interview them to find out that information.  As a
5 global matter my understanding is that these are people of
6 modest means.  Many of them are homeowners but I think that
7 they have little if any equity in their homes but they have
8 jobs and they're solid members of the community and reliable
9 members of the community who have come forward and said they
10 support Mr. Hawit.
11    So the second proposed co-signer is a gentleman
12 named Brett Green who's actually Lizette's ex-husband but
13 they're very close and they are in very regular contact.
14 They're in Florida.  I've met Mr. Green and he's fully on
15 board to support this process.
16    THE COURT: Do you have an idea of what kind of work
17 he does?
18    MR. WEDDLE: He's in the real estate investment
19 business, Your Honor.  Actually I do know his net worth.  I
20 had a conversation with him and he estimated his net worth to
21 be something like $1 million.  Because he's in the -- because
22 his business is real estate investment he has a number of --
23 so he has part ownership of various different real estate but
24 he's -- I asked him obviously and he's not in a position to
25 post it because his partners are part owners of that real

1  estate as well and so that's Mr. Green.

2         THE COURT: Do you know if he owns or rents for his

3  residence?

4         MS. HECTOR: Your Honor, I'll just note that defense

5  counsel previously represented to us that he is a homeowner

6  but again we haven't been able to speak to any of these

7  individuals, ask them about their net worth, their jobs and

8  that sort of thing.

9         THE COURT: Right.  So that was my question.

10        MR. WEDDLE: I believe he is a homeowner, Your Honor,

11 but I --

12        THE COURT: You need more details.

13        MR. WEDDLE: -- need to double check that.

14        THE COURT: Okay.

15        MR. WEDDLE: The next co-signer is a woman named

16 Lizette Hawit Madrano [Ph.].  She's Mr. Hawit's niece.

17        THE COURT: Right.

18        MR. WEDDLE: She also lives in the Miami area, also

19 is a U.S. citizen and is a homeowner and has a business which

20 is a package delivery company.

21        THE COURT: Okay.  I take it you don't have the

22 details, the financial details at this time.

23        MR. WEDDLE: I just don't have the income figures

24 [inaudible], Your Honor.

25        THE COURT: Or assets.

1          MR. WEDDLE: But as I said I think that they're solid

2    members of the community without extravagant free --

3          THE COURT: I understand what you're saying.

4          MR. WEDDLE:  -- cash flow.

5          The next co-signer that we propose is Sheila

6    Meschini.  I may be mispronouncing that.  M-E-S-C-H-I-N-I.

7    She's a U.S. citizen.  She's also a teacher at the school

8    where Lizette Hawit teaches.

9          THE COURT: Does she know the defendant or just the

10   defendant's daughter?

11         MR. WEDDLE: I believe that she knows the defendant

12   [inaudible].

13         And the last one is Edith Hawit Machi, —A-C-H-I.

14   That's Mr. Hawit's aunt who also lives in the Miami area and

15   is a U.S. citizen.  She's employed at a store as a general

16   manager and I do not have in front of me whether she is a

17   homeowner or not.  She does own a house I'm informed.

18                    [Pause in proceedings.]

19         MR. WEDDLE: Sorry, Your Honor.

20         THE COURT: No, no problem.  So if Pretrial Services

21   had its choice at this time what would you recommend, re-

22   adjourn until tomorrow to give you an opportunity to do some

23   kind of investigation of who -- of the proposed suretors,

24   their assets, et cetera?

25         PRETRIAL: [Inaudible] stand by [inaudible] secured

1  [inaudible] but [inaudible].

2          THE COURT: That sounds like what the Government

3  wants as well.

4          MS. HECTOR: We definitely want an opportunity to

5  interview them.  I'll also just note that just to correct a

6  couple of things with respect to counsel's representation. I

7  mean he indicated that given Mr. Hawit's friends and family

8  there's a distrust of the -- and lack of understanding about

9  the system and what the bond could mean.  I mean the people

10 that he has just proposed are all U.S. citizens or homeowners.

11 The Government could certainly explain to them the conditions

12 of a bond when we had the opportunity to interview them and

13 I'm sure the Court would do the same if these people appeared

14 and could reassure them that were he not to flee and were he

15 to abide by the conditions of his release there would be on

16 risk to their home.  So I think that we're still in a

17 situation where the big -- the elephant in the room so to

18 speak is why there is no one who is willing to -- including

19 family members who is willing to post the value, the equity of

20 their home.

21         THE COURT: Right.

22         MR. WEDDLE: If I could just respond to that.

23         THE COURT: Sure.  But I also just want to note that

24 I'm assuming all these people live in Florida and are in

25 Florida at this time.

1          MR. WEDDLE: That's correct, Your Honor.

2          THE COURT: So to the extent it would be useful we do

3    have video links here and it would be possible to connect and

4    have video interviews or to conduct an explanation for them so

5    they could actually speak to me or to speak to someone else

6    and be assured of what it means to sign the bond.

7          MR. WEDDLE: Exactly.  I've had this conversation

8    obviously with the Government and I think that it is a little

9    bit of burden shifting, Your Honor, because the question --

10   the burden is on the Government to prove that the set of

11   conditions is insufficient and the set of conditions is

12   supposed to be the least restrictive set of conditions.

13         THE COURT: I agree.

14         MR. WEDDLE: So to just sort of throw out there these

15   questions or speculative questions like well, why not, why not

16   more, why are people not willing to post more that's the wrong

17   question and it's just a burden to the defense and the burden

18   should be on the Government because if what's proposed is

19   enough and those are the least restrictive conditions or less

20   than those conditions are the least restrictive conditions

21   then less conditions should be imposed.  In fact, if two co-

22   signers are the least restrictive conditions under the

23   circumstances of surrendering a passport and being on home

24   detention with electronic monitoring.  If two co-signers are

25   enough then we shouldn't even be imposing five even though

1  five are willing.

2          So believe me, as I started this talk, Your Honor,

3  I've tried and it would make my job a lot easier if I had a

4  number of -- if every one of these people said sure, put a

5  lien on my house, I'm happy to sign, no problem, I get it, I'm

6  not worried about anything, that would make my job a lot

7  easier.  I've had these conversations.  People -- that's a

8  different step to put your house on the bond and that's why

9  the Government is asking for it and that's why they're posing

10  this question but all of those things like well, why not more

11  is really walking away from the words of the statute and

12  [inaudible].

13          THE COURT: I couldn't agree with you more that we're

14  always looking for the less restrictive alternatives.  I pour

15  over the figures of how many people were released on the bond,

16  how many people actually don't come back and I'm all for

17  making sure that they're the less restrictive alternatives

18  possible.  Pretrial Services has a question as -- Pretrial

19  Services believes as we heard from Mr. Calvy that it's

20  important to given the individual facts and circumstances of

21  this defendant and going through the four factors that the

22  Court needs to look at that something in the nature of a

23  secured bond is appropriate.  The Government appears to

24  believe that as well.  I haven't made my mind up about that

25  but it's useful for me to know what -- first of all, what

people -- what assets people have.  I have no idea of what the
assets are of most of the suretors at this point.

MR. WEDDLE: I'd support that, Your Honor.  I have no
problem with --

THE COURT: So I just have -- there are a lot of
blanks that need to be filled in.  So without making a
decision as to whether or not I agree with the Government and
Pretrial Services that a secured bond is necessary I do point
to several facts that are factors which everyone I think
understands.  Number one, that this is a global prosecution
and the fact that it's -- how they're situated in New York
does place some burdens on the defendants and that's certainly
true and I accept that point.

Number two, that we do have a defendant here who has
substantial ties to a foreign country and very few ties to the
United States.

Number three, that there are serious allegations and
that the allegations could depending on whose guideline
calculation and what the ultimate proof is in the case could
amount to either serious time or less serious time depending
on each of your memos.

In addition, there is what I think is different
about this case from some of the other defendants is the
allegations in I think it's Paragraphs 3, 14 -- or whatever it
is.  The allegations about obstruction and how the Court

1  should view those and I have listened to the arguments on both

2  sides and I think that there's certainly -- it's certainly

3  something that I have to consider, is it a basis for

4  detention.  I don't think anyone, Pretrial Services or the

5  Government is saying that Mr. Hawit should be detained as a

6  result of that but it is a factor that I need to consider and

7  evaluate.  For me to evaluate whether the package that's

8  presented is sufficient I need to know first of all what the

9  package is and it's -- that package is still blank or has some

10  blanks and I think that's no one's fault.  That's just what

11  happens when someone is extradited from a foreign country and

12  you've had very little time to actually do all of the field

13  work that needs to be done.

14        So I want to have those blanks filled.  I would like

15  to know whether or not the moral suasion that the suretors

16  will be applying on the defendant is sufficient and if the

17  suretors say well, we have substantial assets but we're only

18  willing to commit a very small portion of that because we

19  don't have faith that he'll come back to court that's one

20  thing.  If the suretors say we don't have substantial assets,

21  we're willing to commit those assets in this particular

22  situation because do have faith in him that's something else

23  and if the answer is somewhere in between then we'll talk

24  about that.

25        So I don't want this to be a hypothetical bond.  It

1   needs to be a firm a bond as possible.  So I think -- I don't

2   think there's much more to say.  I think there's no

3   disagreement about the electronic monitoring.  There's no

4   disagreement about the prohibition against contact with co-

5   defendants and certain others, home confinement, passport

6   surrender and the signatures of sureties.

7          The issue before the Court is does the bond have to

8   be secured and if so by cash, by property or combination of

9   both and if not is this package sufficient.

10          Have I missed anything?  Is there anything more we

11  need to discuss?

12          MR. WEDDLE: No, Your Honor, not from my point of

13  view.

14          THE COURT: So, again, I know you're working hard and

15  you're doing your best in a short time.  Should we schedule

16  this for some time tomorrow?

17          MR. WEDDLE: I think that's a good idea, Your Honor,

18  to schedule it for some time tomorrow.  I'm available and I'm

19  going to do everything I can to facilitate and interview by

20  Pretrial Services and/or the Government with each of these co-

21  signers between now and the appearance tomorrow.

22          THE COURT: Right.  And just in terms of satisfying

23  the concerns of those who are opposing your application at

24  this point, if there were a possibility of depositing some

25  cash or planting some property that might affect the

Government's position -- again, I'm going to make my own
independent evaluation but it may be that if their resources
are as limited as you say but there is some willingness to
pledge those resources -- I know you've worked --

MR. WEDDLE: Of course.  Your Honor, of course and if
someone comes around and is willing to do that I'm all in
favor of it.  I think that the number selected by the
Government is high and I think that -- my prediction is it's
unattainable based on the work that I've done on this so far.
If I'm wrong then great.  If there's some much lower number
that is attainable great but I think fundamentally the
security is not necessary to reasonably assure Mr. Hawit's
appearance in court and that's the standard.

THE COURT: Right.  Well, I understand that that's
your position and that the Government has a different position
and I haven't made up my mind yet on that.

I assume that it's impossible to transfer any assets
from Honduras to the United States.

MR. WEDDLE: As I said, Your Honor, the -- well,
there are issues in Honduras.  I don't believe that they're
based on the Government, the United States Government's
request or application.  There have been some issues with
their finances in Honduras in terms of their relationship with
their banks and potential activity being taken by the Honduran
government independent of any request from the government here

1  but the assets are -- the free assets in Honduras are owned by

2  the defendant's wife and essentially consist of a couple of

3  pieces of real property.

4         MS. HECTOR: Your Honor, if I may.

5         THE COURT: Yes.

6         MS. HECTOR: With respect to some of the other

7  defendants in this case that are in a similar situation in

8  which there are a number of assets abroad, we have had a

9  number of people who have been very creative about getting

10  assets here, whether it's loans on real property that's

11  abroad, whether it's friends and family which often times

12  prominent individuals can gather that are willing to send

13  money to an attorney's escrow account.

14         Just to sort of reiterate, the Government has really

15  attempted to be reasonable with respect to this defendant in

16  response to representations from defense counsel about the

17  ability to get funds out of Honduras and the defendant's

18  financial situation.  The Government coming up with the number

19  of $500,000 which is again substantially less than any other

20  defendant that we have done in this case it was based on that

21  relative analysis and the fact that our understanding was that

22  there were a number of homeowners in the United States.

23         So without getting to interview them and having more

24  information about the relative equity values of their homes,

25  between the number we thought getting up to $500,000 would

1  probably be attainable.  Now, we've yet to interview these

2  people and so we can do that and let you know if our position

3  is tweaked at all but just to sort of reiterate like we've

4  attempted to be reasonable in what we're requiring but given

5  the circumstances of this case it's -- we can't imagine a

6  situation in which we would be comfortable as the Government

7  without a significantly secured bond.

8         THE COURT: Again, I'm making my own decision on this

9  but I need all the facts.

10        Tell me about his health.  I understand with

11  pancreatitis that you need a particular diet.  Is that right?

12        MR. WEDDLE: That's correct, Your Honor.  There was a

13  severe attack of pancreatitis some time ago and spent some

14  time in the intensive care unit and -- so that affects his

15  diet.  He has lactose intolerance and he's diabetic.  I'm not

16  a doctor.  My understanding of pancreatitis is that he needs

17  to basically not eat fat and he has basically serious

18  digestive problems if he eats anything that's not a non fat

19  diet and not really something offered in the jail in

20  Switzerland and so he's -- in the jail in Switzerland you can

21  buy food from the commissary and he's essentially been

22  subsisting consisting on corn flakes and honey.  So I think

23  the situation here a little different.  Obviously there's a

24  bigger jail system with a lot more to worry about than the

25  jail that he was in in Zurich and I think that it may be worse

1  [inaudible] to be here.

2          THE COURT: I don't know the answer to that but we

3  can get a medical letter over to the -- is he going to the

4  MDC?

5          MS. HECTOR: I believe he's going to the MDC and we

6  would fully support -- I think Your Honor can order a medical

7  evaluation and get the appropriate -- we would certainly

8  support the appropriate diet and I think that the MDC handles

9  a host of various medical ailments and I think that handling a

10  diet is within their purview.

11          THE COURT: Well, it's late and overnight I don't

12  know what can be done but certainly the Court will do the best

13  it can.

14          MR. WEDDLE: Thank you, Your Honor.

15          THE COURT: We can call down to -- do you want to

16  call downstairs and just see if it's too late to get a medical

17  memo over there?

18                  [Pause in proceedings.]

19          THE COURT: We can set aside some time at 1:00

20  tomorrow.  Is that a good enough time or not?

21          MS. HECTOR: I would ask him if there's a number of

22  these suretors that we need to -- and I think we need to

23  coordinate interpreters for some of them for the interviews.

24                  [Pause in proceedings.]

25          THE COURT: Do you want to do it later in the day?  I

1  have 1:00 open.  I've held that open for you but if you want

2  it later in the day I can do it later in the day.

3  MR. WEDDLE: Why don't we do it later in the day just

4  so to make sure that we're not only half ready?

5  THE COURT: 4:30 then.  Did you want --

6  [Pause in proceedings.]

7  MS. HECTOR: I believe, Your Honor, we have an order

8  of excludable delay as well.  As Your Honor knows, Judge

9  Dearie set the next status conference for March 16th at noon

10  and has excluded time with respect to the case but I believe

11  we also have an OED for that same time period as well.

12  [Pause in proceedings.]

13  THE COURT: You can spend a minute explaining it to

14  him.  Whatever you prefer.  You tell me what you want me to

15  do.  Why don't you explain it to him and just read it?

16  [Pause in proceedings.]

17  MR. WEDDLE: Thank you, Your Honor.  We've signed the

18  application.

19  THE COURT: Mr. Hawit, do you understand what you're

20  doing?  You're an attorney so I assume you have sophisticated

21  legal knowledge.  So you have a right to a speedy trial.  That

22  right starts now at the time of your arraignment.  The

23  Government has to bring your case to trial within 70 days.

24  However, because this is a complex case as designated by Judge

25  Dearie who's supervising all of the defendants in this

1  indictment time has been excluded for other defendants in this

2  case in order to give them an opportunity to prepare

3  adequately in this complicated case.

4          The time to be excluded would be from today the 13th

5  of January to the 16th of March.  The speedy trial clock would

6  not start until that date.  My question is do you fully

7  understand your rights.

8          THE DEFENDANT: That's right.  Yes, Your Honor.

9          THE COURT: And do you agree to do this voluntarily?

10          THE DEFENDANT: Yes.

11          THE COURT: So the application to exclude time is

12  granted.

13                    [Pause in proceedings.]

14          THE COURT: Is there anything else?

15          MR. WEDDLE: I think, Your Honor, technically order

16  of detention [inaudible].

17          THE COURT: I assume it's on a joint request.  Is

18  that right?

19          MS. HECTOR: Yes.  A temporary order.

20          THE COURT: Anything else?

21          MR. WEDDLE: Just -- if I can just talk to counsel

22  for one moment.

23          THE COURT: Sure.

24                    [Pause in proceedings.]

25          MR. WEDDLE: For the record, Your Honor, we're

1 planning to do consulate notification tomorrow when we come

2 back to court.

3       THE COURT: Okay.

4       MR. TUCHMANN:  So we'll have the forms for that

5 tomorrow.

6       THE COURT: Good.

7       MR. TUCHMANN:  In the meantime the defendant has of

8 course counsel and if counsel wishes to notify the consulate

9 himself that is possible.

10       THE COURT: With respect to the medical issues, Mr.

11 Hawit, your lawyer explained what your medical issues were.

12 I'm going to have him just fill in the medical request to the

13 detention center.  If there's anything you think that should

14 be added to that you should explain that to him.

15       MR. WEDDLE: Your Honor, I spoke briefly just now

16 with my client after I explained to Your Honor what my

17 understanding was of the medical conditions and those are

18 correct but I think also the defendant feels like there's

19 something else happening with his health that he doesn't know

20 what the explanation for -- he doesn't know the explanation

21 for it and so my list is incomplete.  What he would like to

22 have --

23       THE COURT: A full medical exam.

24       MR. WEDDLE:  -- in a perfect world actually is an

25 endoscopy to figure out what is going on with his digestion

1  but obviously it's not going to happen tonight, Your Honor,

2  but I'll put down what the medical conditions are that we know

3  of.

4         THE COURT: You can say possible endoscopy

5  [inaudible] complications.

6         MR. WEDDLE: Thank you, Your Honor.

7         THE COURT: Does that cover it, Mr. Hawit?

8         MS. HECTOR: Yes, Your Honor.

9         THE DEFENDANT: Endoscopy and the other one because

10  there's one going this way and this way and also my liver and

11  my pancreas need to be checked.

12         MR. WEDDLE:  So I think a general GI medical exam is

13  what he needs.

14         THE COURT: Okay.  You'll put that in the record.

15         Anything else?

16         MR. WEDDLE: No, Your Honor.  Thank you very much.

17         MS. HECTOR: Thank you.

18         THE COURT: Thanks.  See you tomorrow at 4:30.

19  Again, if you need the resources --

20  (Proceedings concluded at 5:05 p.m.)

21                        *  *  *  *  *

22

23

24

25

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                        _____

6                         Shari Riemer, CET-805

7  Dated:  January 19, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25