```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3   ------------------------------X
                                   :
 4   UNITED STATES OF AMERICA,     :
                                   :   15-CR-252 (RJD)
 5            v.                   :
                                   :   January 14, 2016
 6   ALFREDO HAWIT,               :   Brooklyn, New York
                                   :
 7                 Defendant.     :
                                   :
 8   ------------------------------X

 9
             TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
10              BEFORE THE HONORABLE ROBERT M. LEVY
                  UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

     For the Government:       UNITED STATES ATTORNEY
14                             BY: AMANDA HECTOR, ESQ.
                                   PAUL TUCHMANN, ESQ.
15                                 KEITH EDELMAN, ESQ.
                               ASSISTANT U.S. ATTORNEY
16

17
     For the Defendant:        JUSTIN WEDDLE, ESQ.
18                             Brown Rudnick LLP
                               7 Times Square
19                             New York, New York 10036

20

21
     Court Transcriber:        SHARI RIEMER, CET-805
22                             TypeWrite Word Processing Service
                               211 N. Milton Road
23                             Saratoga Springs, New York 12866

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1    (Proceedings began at 4:42 p.m.)

2              THE CLERK: Criminal Cause for a Detention Hearing,

3    United States v. Alfredo Hawit, Case No. 15-CR-252.

4              Please state your appearances starting with the

5    plaintiff.

6              MS. HECTOR: Amanda, Paul Tuchmann and Keith Edelman

7    for the Government.  Good afternoon, Your Honor.

8              MR. WEDDLE: Good afternoon, Your Honor.

9              THE COURT: That's a very long name that you have.

10             MR. WEDDLE: You forgot your last name.

11             MS. HECTOR: I'm sorry.  Amanda Hector.

12             THE COURT: You said your name is Amanda Paul

13   Tuchmann.

14             MS. HECTOR: Amanda Hector, Paul Tuchmann and Keith

15   Edelman.  I'm sorry, Your Honor.

16             MR. WEDDLE: Good afternoon, Your Honor.  I'm Justin

17   Weddle and my client Alfredo Hawit is here next to me.

18             THE COURT: Good afternoon, sir.

19             THE DEFENDANT: Good afternoon, Your Honor.

20             THE COURT: What happened medically?  We -- did the

21   doctor --

22                        [Pause in proceedings.]

23             THE DEFENDANT: No, I did not see the doctor.

24             THE COURT: Do we know what happened?

25             THE CLERK: Will the interpreter please state your

3

1   name and the language she is interpreting for the record.

2              THE INTERPRETER: [Inaudible]

3              THE CLERK: Please raise your right hand.

4                        Interpreter, Sworn

5              THE CLERK: Will the defendant please raise his right

6   hand.

7                   Alfredo Hawit, Defendant, Sworn

8              THE CLERK: Thank you.

9              THE COURT: Has the Government been able to speak to

10  all the sureties at this point?

11             MS. HECTOR: The Government -- we've been able to

12  speak to everyone except Edith who to my understanding does

13  not want to be a surety.  I do have if the Court would like it

14  some additional information on some of these suretors

15  including some points of clarification from what's in the

16  Pretrial Services Report.

17             THE COURT: Okay.  Have you discussed this with --

18             MR. WEDDLE: Yes, Your Honor.  I spoke with Edith

19  Machi and she said she doesn't -- she has full faith that the

20  defendant is going to appear as required and is happy to

21  support him in any way that she can but she does not feel

22  comfortable signing anything.  She's 77 years old.  I think

23  there's been some miscommunication, confusion, second

24  thoughts.  I'm not sure what but regret to have to inform the

25  Court that she's not a proposed co-signer.

4

1            As I said yesterday I think that the risk of flight

2    here is fully ameliorated by home detention with electronic

3    monitoring and on top of that we have other proposed co-

4    signers but I think really home detention with electronic

5    monitoring would be enough given the situation here as long as

6    the defendant surrenders his passport.  But Edith is not a co-

7    signer.

8            I also was reading the Pretrial Services Report

9    regarding Pretrial's interview with Lizette Hawit Madrano.

10   Ms. Hector and I spoke to Ms. Madrano today and I separately

11   spoke to Ms. Madrano today and based on my conversation I do

12   not believe she's willing to post her property but she is

13   willing to co-sign the bond.

14           MS. HECTOR: Your Honor, if I may just note to

15   correct or to add to what's in the Pretrial Services Report,

16   my understanding from -- we both participated in a

17   conversation with Ms. Madrano.  She actually owns two homes,

18   not just one home.  The one home that is listed in the

19   Pretrial Services Report that is worth about $280,000 and does

20   not have a mortgage is owned between her and her brother and

21   she has another home that she purchased about 12 years ago

22   that is owned by Ms. Madrano and her son and that has a

23   current equity of about $240,000.  So both of those properties

24   are in the Miami, Florida area and together have a little more

25   than $500,000 worth of equity.

1          I'll also note that we did speak with Ms. Meschini

2   who Pretrial has noted in this report but they didn't get to

3   speak to her.  So I can give the Court some information about

4   her situation.  She knows Lizette Hawit, Lizette being the

5   daughter.  Not Lizette Madrano but Lizette Hawit, the daughter

6   of the defendant.  She said she's known her for about a year

7   but she became friends with her in October of this -- this

8   past October.  They work together.  Somewhat similar to the

9   defendant's daughter she makes about $600 per month because

10  she works part-time at the preschool and she has not met Mr.

11  Hawit, the defendant.  She just knows -- has become friends

12  with his daughter since October.

13          THE COURT: Okay.

14          MS. HECTOR:  And the other thing -- so in addition

15  to the Government continuing its position that we feel it's

16  important to have a secured bond and we had stated the amount

17  of $500,000 which is within the means here if Ms. Madrano and

18  her family members were willing to post their two properties

19  in Florida.

20          I'll also just note from the Pretrial Services

21  Report that it appears that the defendant has significantly

22  more assets than was propounded in the submission from defense

23  counsel.  From the Pretrial Services Report it looks like he

24  has a little over $2 million in assets.  The Pretrial Services

25  Report does not note anything about the income of the

6

1  defendant prior to his arrest or the income of his wife and it

2  is our understanding that his wife [inaudible] I don't know

3  what her income level is but we would just reiterate that one

4  of the [inaudible] that we look at that is important to us in

5  terms of securing a bond is that the amount be substantially

6  an [inaudible] in excess of the net worth so that there isn't

7  an opportunity for someone to say flee and compensate the

8  people that are on the hook for the bond.

9         Again, the Government was very hopeful and is still

10  hopeful that we can come up with a bond that satisfies what

11  the Government believes is sufficient but not greater than

12  necessary to secure his appearance and that may be possible if

13  Ms. Madrano were to reconsider or some of the other

14  individuals who are not on this list but were at some point

15  mentioned that are homeowners, if those people would perhaps

16  be willing to put up their property.

17         THE COURT: I have a question as to income because --

18  I have a question as to income because the income that Mr.

19  Hawit receives apparently comes from not only his work as a

20  lawyer but it may also come from other property.  Does counsel

21  know if there's any income from the shopping center or from

22  any of the properties in Honduras or what this -- a broader

23  question, what the source is of his income or his family's

24  income would be now.

25         MR. WEDDLE: My understanding is that there is some

7

1  income from the properties, from the apartments and the

2  shopping center but they largely just cover the expenses for

3  those properties.  So there isn't a substantial amount of net

4  income.  I could look in my binder.  I have some numbers.

5  Just to ball park it, Your Honor, I would say it's much less

6  than for example $10,000 a month in net income, much less than

7  that.

8          The defendant's income, and I'm doing this from

9  memory but he's lost some of his income because a lot of his

10 income came from FIFA and from CONCACAF.  There's no

11 indication that that money is going to continue flowing to

12 him.  In fact, FIFA has taken a number of steps against him

13 already notwithstanding the fact that he's been essentially

14 out of communication and locked up in Switzerland.  They've

15 moved swiftly.  I would estimate that his total income is --

16 was before losing those sources of income less than $200,000

17 but I can check with my client to see if I'm in the right ball

18 park.

19              [Pause in proceedings.]

20         MR. WEDDLE: My client tells me I'm in about the

21 right ball park, Your Honor.

22         I have to take issue with the prosecutor's statement

23 that the Pretrial Services Report is inconsistent with our

24 submission, Your Honor.  It's absolutely not inconsistent with

25 our submission.  Our submission said that the defendant has

1   some properties and small businesses with the equity value

2   less than $400,000.  The properties, the other properties are

3   owned by the defendant's wife.  There's a piece of property

4   owned by the defendant's wife that was inherited by her

5   parents many years ago.  It's in his family. I understand that

6   there's some title issues with this property.  I expressly

7   talked about this piece of property with Your Honor yesterday

8   in open court.  The prosecutor was next to me and I also

9   talked about the value of his house, and what I said about

10  those things, Your Honor, is that those are illiquid assets.

11  There are two pieces of property owned by his wife in

12  Honduras.

13          This flight of fancy the prosecutor is talking

14  about, the defendant is going to flee to Honduras and then pay

15  back all the suretors out of his net worth is beyond I think a

16  reasonable prediction of anything that would be likely to

17  occur.  If the defendant decided to flee the United States and

18  go to the one place where he has resided he would not only be

19  a recognizable famous person because of his prominence in the

20  community and because of the prominence of this case but the

21  only place he would have to go would be to his marital home

22  which is owned by his wife, the same place he's lived for

23  decades.  That is not [inaudible].  There's no risk that the

24  defendant is going to do that.  It's absurd.

25          So the risk of flight here -- there is a risk of

9

1   flight here, we acknowledge that, Your Honor, and it's caused

2   by the fact that the defendant is a Honduran citizen.  He's an

3   established member of the community in Honduras.  He has a

4   home.  It's a fixed home.  It's the same place he's lived for

5   a long time.  It's where he lives with his family.

6           This prosecution office decided to reach out across

7   the world and charge a crime involving people who travel to

8   the United States but do not commit the crime in the United

9   States.  The allegations that are in this indictment are about

10  the movement of money through banks and I should note, Your

11  Honor, that in this indictment only charge against the

12  defendant is venued in the Eastern District of New York.

13  Every charge against the defendant expressly states in the

14  indictment in the Southern District of New York and elsewhere

15  or in the Southern District of New York and the Southern

16  District of Florida and elsewhere.  On its face every charge

17  against the defendant is subject to a motion to dismiss for

18  lack of venue.  Every charge except for the RICO conspiracy.

19  The RICO conspiracy, Your Honor, obviously is there for

20  strategic reasons.  It's a massive charge involving at my last

21  count 40 something people spanning decades, people who have

22  met each other from different organizations all corrupting the

23  FIFA enterprise.  That's the only reason why the defendant

24  could be standing in this courtroom in front of Your Honor.

25          So because the defendant is an established member of

1  a community who's been dragged into this Court based on

2  allegations that don't even allege the commission of crimes in

3  this courtroom except for the RICO conspiracy.  He's now being

4  subjected to conditions way beyond what any similarly situated

5  defendant would be subjected to.  If he were the same person

6  with the same career living in a house in New Jersey we'd be

7  talking about release on his own recognizance, Your Honor, I

8  submit.

9           I could be wrong.  I was a prosecutor for many

10 years.  This looks like an ROR case to me or at most a

11 personal recognizance bond.  He's the same person.  We've

12 proposed that he live on home detention with electronic

13 monitoring with his daughter and with his grandson in Florida.

14 It's more than enough.  It satisfies the statute.  It is --

15 the statute requires not as much as we can get.  It doesn't

16 permit the speculation that the prosecution engages in to say

17 well, gee, this person has some property too.  Ms. Madrano has

18 $500,000 in property.  Both of those properties by the way are

19 co-owned with people who live in Honduras and regardless she

20 doesn't want to post the property, Your Honor.  The argument

21 that the prosecution makes would obtain in every case.  If

22 that were the standard, if the standard were if there's more

23 available let's take it then in every case you'd be having

24 massive, massive bail packages.  In an ROR case you would say

25 well, you couldn't release him on his own recognizance because

1  there's no real risk that he's going to flee but why not have

2  him sign a bond.  He could do that too.  It could be $1

3  million bond. If it's $1 million bond why not a $10 million

4  bond.  It's a signature.  He could do that also and if

5  someone's willing to sign a bond why not get a co-signer.

6  They can sign $1 million bond.  I'm sure they can get a co-

7  signer and if the co-signer has some property let's get that

8  property submitted to the Court.  That's not the question.

9  None of that is the question.  The question is what are the

10 least restrictive conditions that are going to reasonably

11 assure the defendant's appearance in court and everything that

12 we've heard from the prosecutor has nothing to do with that

13 question. It has to do with what more, why not, why isn't

14 someone else willing to put up some money.

15       The finances that are in Honduras owned by his wife

16 do not finance the life of a fugitive.  They don't.  They

17 might permit him to go home to Honduras where he would go home

18 and immediately be caught, exactly where he's supposed to be

19 at his marital home.

20       So, Your Honor, based on this -- obviously I've

21 talked about the statutory standard and it is the standard and

22 that's the standard that this Court should use.  I think that

23 in many cases notwithstanding that standard there's little

24 incentive, I talked about this yesterday, for a defense lawyer

25 to hold a court or to attempt to hold a court to that standard

1  because if they can meet the package why not, so what, it

2  doesn't matter.  This package that we've offered without

3  property security is what I'm confident we can deliver. If I

4  could deliver property as security I would have offered that.

5  I've talked to Ms. Madrano.  She told me she's not willing to

6  put up her property.  That's all I can do.  So if we engage in

7  this why not more, some people have property, let's get them

8  to take it, it's within their power to give it.  Of course

9  it's within their power to give it.  It's within all sorts of

10  people's power to co-sign bonds.  We don't walk around on the

11  streets and say well, it's in your power to co-sign a bond,

12  it's in your power to co-sign a bond, let's not let him out

13  unless those people who have the ability and the wherewithal

14  to do it come forward and co-sign a bond.  That's not how we

15  do it.  We figure out what are the least restrictive

16  conditions that are going to reasonably assure his appearance

17  and what we've proposed is more than enough, Your Honor.

18          MS. HECTOR: May I briefly respond?  There's a lot

19  that I think goes beyond sort of what we're here to decide

20  today.  But I think it's important to note that I think the

21  Government's position is very reasonable here and I think that

22  what is being proposed is far afield of what is the least

23  restrictive bond necessary to secure his continued presence

24  here and appearance in court.  The four individual -- of the

25  four individuals that are proposed two, his daughter and his

13

1    daughter's friend who I'm not sure is really a responsible
2    suretor of moral suasion to this individual but those two
3    people make the equivalent of $500 or $600 per month.  That is
4    a difficult person to offer anything other than moral suasion
5    and while his daughter may offer some moral suasion the second
6    woman really does not fall within that camp.  She's never even
7    met the defendant.
8              The other two people, Ms. Madrano, she has a
9    [inaudible] business that she just started in December that's
10   made about $1,000 thus far.  What she does have are these two
11   properties and I think that when you have a bond that's
12   consisting of suretors who are mostly moral suasion the
13   question you ask is do those people hold real influence over
14   the defendant and do they trust that they're willing to put
15   their name on something that will insure that the defendant
16   shows up.  I think it does beg a big question why Ms.
17   Madrano -- we're not talking about that she owns these
18   properties with strangers or non family members.  They're
19   family members.
20             Given the defendant here who's not a citizen of this
21   country, who had -- who was engaged in bribery schemes
22   involving the receipt, the person receipt by him and his
23   family members of hundreds of thousands of dollars of bribes,
24   we're talking about someone of means and prominence that has
25   the ability if not to flee to his home country of Honduras but

14

1   potentially somewhere else.  I mean he has significant

2   contacts abroad with powerful individuals as part of this

3   case.

4            So I think here really what the Government is asking

5   for and what Pretrial supports as a bond is the least

6   restrictive and it's important that he meet that in order to

7   assure the Court that he's going to appear in the future.

8            MR. WEDDLE: Your Honor, just briefly.  From my

9   reading of the Pretrial Services Report it does not support

10  the Government's application.  It asks for security, that's

11  for sure.  The Government asked for $500,000 in security.

12  Pretrial didn't say anything like that.

13           THE COURT: But I think you're framing the question

14  in the wrong way.  It's not whether it's your position or the

15  Government's position.  It's really what's a reasonable

16  position in this situation and I'm not sure that the

17  Government's position -- I'm not sure I would require the

18  entire amount of security that the Government is looking for.

19  It may be more than what I would require but I would like to

20  see more.  The package that you have now is not a substantial

21  package.

22           Now, if there's no prospect of getting anything more

23  than that then the question will be how long would it be fair

24  to detain someone in the hope that something more substantial

25  will materialize.

1          MR. WEDDLE: Your Honor --

2          THE COURT: And it looks as though -- it looks as

3    though you've exhausted your efforts at this point.  I mean

4    the question is not the Government's position or your

5    position.  The question is what is reasonably required in

6    order to keep someone who has very few ties with the United

7    States in this country for the prosecution of the case.  It's

8    essentially -- basically what it is is the home detention with

9    a couple of people securing it but with very limited incomes

10   and one of them doesn't even know the defendant.  So that's

11   not really a substantial package.

12          So the question is what in addition to the home

13   detention could secure his appearance in court.

14          MR. WEDDLE: Your Honor, I have exhausted -- I have

15   been working on this problem for a month, Your Honor, for more

16   than a month.  The defendant was arrested in Switzerland I

17   believe on December 3rd or something thereabouts and this is

18   what I've been working on.  I wish I could work on the case

19   but I've been working on this and I've been working as hard as

20   I can on this.  If I thought there was a little bit more -- if

21   I could make another phone call and get a little bit more

22   believe me I wouldn't be here so concerned about this argument

23   and about the statements that are being made by the prosecutor

24   because I would rather that we were doing something else on

25   this case than worrying about this.

1          But I believe that the package that we put forward

2    more than satisfies the statute.  It's up to Your Honor to

3    decide.  I completely recognize that and Your Honor is going

4    to make the decision that Your Honor thinks is best in your

5    wisdom and if it's something that we are not meeting today

6    then I'm going to go back and keep working on it.  I have no

7    prospect of coming up with anything else.  I've tried.  I mean

8    to just say there are these people who have equity, don't you

9    think I've tried to get them.

10          THE COURT: I believe that you tried very hard.  I'm

11   sure you have.

12          MR. WEDDLE: So --

13          MS. HECTOR: Your Honor, I think I have an important

14   point to make with respect to this because yesterday defense

15   counsel said that he had only spoken to two of these

16   individuals.  If you look at the Pretrial Services Report it

17   states that, Your Honor, the owner of those two properties

18   noted that she had not previously been asked to sign to post

19   those properties.  Now, I've had conversations with Ms.

20   [inaudible].  She said the same thing to me when I interviewed

21   her.  I've had conversations with Mr. Weddle about this.  I

22   think maybe there's some confusion about whether a family

23   member [inaudible] or not but my sense from talking to

24   [inaudible] was that some of this was a new prospect to them.

25   Whether there was a miscommunication or something that was

17

1   misunderstood may be but I'm not convinced that the efforts

2   have been exhausted, if people understood -- and this is not

3   something I communicated this on the phone to them because it

4   was not really my place to do so but if people understood that

5   that is necessary in order to secure the defendant's release

6   and there wasn't an alternative of well, maybe we can

7   [inaudible].

8          MR. WEDDLE: Well, it's not necessary to secure his

9   appearance, Your Honor, and that's the question.  It's not

10  necessary to secure his appearance.

11         THE COURT: I know you believe that and I haven't --

12  I haven't made a final decision on that but it's an issue that

13  for me is not as clear as you think.

14         MR. WEDDLE: Well, all I can do is make an argument,

15  Your Honor --

16         THE COURT: As I said, no --

17         MR. WEDDLE:  -- and I strongly believe that.

18         THE COURT: Right.

19         MR. WEDDLE: And I think if you look at the

20  defendants who have been let out on bail, Your Honor, around

21  the country and then there was a defendant who was let out on

22  bail recently, a very prominent defendant who then was

23  permitted to travel to Mexico with his entire family.  He

24  happens to be a U.S. citizen but the charges against this

25  defendant, the prosecutor talked about --

18

1          THE COURT: It's an obstruction charge.  That changes

2     things a little bit.  That's what distinguishes him from

3     others.

4          MR. WEDDLE: I understand that, Your Honor, and I

5     haven't heard the circumstances.  I don't know the

6     circumstances of the obstruction charge but it looks to me --

7          THE COURT: [Inaudible] in the indictment.

8          MR. WEDDLE: It looks to me like what happened is

9     under FBI supervision a cooperator solicited and elicited

10    conversations with the defendant about the pending charges and

11    his statements that are charged as an obstruction, rather in

12    the spectrum of obstruction charges, these are very close to

13    an exculpatory [inaudible].  There's no chance [inaudible]

14    defendant is going to seek out people the way that these

15    cooperators -- I suspect -- no one has corrected me to say

16    that I'm wrong.  I suspect that these cooperators participated

17    in seeking out the defendant and all -- this issue, Your

18    Honor, the obstruction issue is not connected to whether

19    there's security on a bond.

20         THE COURT: No, no.  The obstruction issue is

21    connected to the issue of respect for the law and whether or

22    not he would obey a lawful order or try to find a way to

23    circumvent it and that's the issue before me now.  The home

24    detention is one way to maintain him in a residence.  The

25    question is would he be looking for other means to get around

1    the home detention and to make his way somewhere else. It's

2    quite possible that he wouldn't.  He has medical conditions.

3    He's frail, et cetera.  But that's the issue for me and that's

4    the reason why the Government's argument and Pretrial

5    Services' conclusion that something more than this package is

6    necessary and I find that that argument is not totally without

7    reason.

8              So have they proven by a preponderance of the

9    evidence at this point that he's a risk of flight?  I'm going

10   to reserve decision on that.

11             MR. WEDDLE: I think -- maybe I said this -- all I

12   can say.  I understand the questions that th prosecutor is

13   asking.  I understand the prosecutor's needs.  I have big

14   numbers for the press but I think the reality is --

15             THE COURT: I'm not concerned about the prosecutor's

16   position frankly.  I hear what they have to say.  I hear what

17   you have to say and ultimately the decision is one that I'm

18   going to have to live with which is is this defendant a risk

19   of flight and has the Government proven it by clear and

20   convincing evidence.  I've looked at all the criteria under

21   the Bail Reform Act, his individual characteristics, the

22   nature of the crime, the evidence, et cetera, et cetera.  I

23   think we've discussed that.  It's been discussed in the

24   memoranda and in the end we all know what the criteria are but

25   applying them to this particular situation is something that

1  requires a little thought on my part and I'm going to give it

2  a little thought at this point.  If it were so clear that the

3  Government hadn't met its burden of proof I would release him

4  now but it's not that clear to me.

5           MS. HECTOR: I just note I think Your Honor has

6  spoken is it clear and convincing evidence.  It's a

7  preponderance.

8           THE COURT: No, I said preponderance.  Didn't I say

9  preponderance?

10          MR. WEDDLE: You said clear and convincing.

11          THE COURT: I thought I said preponderance.  Sorry.

12  Preponderance.  Yes, it's preponderance.

13          MS. HECTOR: I'll also just note that with respect to

14  the obstruction and witness tampering charge, as laid out in

15  the indictment, and this is a recorded conversation, the

16  defendant tells an individual to make false statements to the

17  FBI about the money.  He tells them -- he instructs him to

18  create sham contracts to disguise the bribe payments that he

19  received.  This isn't false exculpatories or exculpatories.

20  I'm not sure how you were responding to it but it's far from

21  [inaudible].

22          MR. WEDDLE: I take it because I've made this

23  allegation a number of times and no one from the prosecution

24  table has corrected me that the people that he talked to were

25  people that they set him up with and they probably directed

21

1  those people to elicit statements from him.  They probably

2  told them what to ask him.  They probably said to their

3  cooperators talk to Mr. Hawit, ask him what you should do if

4  you're contacted by the FBI.  So I don't fault them for that,

5  Your Honor, but I'm saying that the facts of this obstruction

6  are not going to recur.  There's no indication that that has

7  occurred.

8           THE COURT: I understand the argument on that.

9           MR. WEDDLE: Well, I don't think I have anything to

10  add, Your Honor.  I stand by the statutory language and

11  standard and the only reason that I'm arguing so hard, Your

12  Honor, is because I am deeply concerned that an order greater

13  than what we've proposed is unattainable and the defendant's

14  been in jail for -- since December 1st and I think we're

15  quivelling about security -- quivelling is the wrong word.  We

16  do have a disagreement between the parties and Your Honor has

17  pointed out it's not about our position or their position but

18  when you take a step back there's not a massive difference

19  between us.

20           THE COURT: It's about a package.  It's about the

21  strength of the package and at this point the package is

22  light.

23           MR. WEDDLE: And the piece of the package that

24  Pretrial and the Government has identified as missing that we

25  haven't put forward is security and --

1          THE COURT: Or more income or something else.  It's

2    something to make it -- it doesn't have to be what the

3    Government says.  It doesn't have to be --

4          MR. WEDDLE: I know it doesn't have to be but I don't

5    know any other target to shoot at, Your Honor.

6          THE COURT: No, the target to shoot at would be

7    something more and I don't know -- I accept your

8    representation that there won't be anything more.

9          MR. WEDDLE: I don't think there is anything more,

10   Your Honor.  I mean --

11         THE COURT: I'm going to consider the record and

12   think about it.

13         MR. WEDDLE: For a month I've been going back to this

14   family and saying more, I need more.  I've been saying that

15   for a month.  So -- and we got to here and in fact we then

16   took a step back because yesterday I had another person and

17   the entire process of asking for more is causing people

18   concern and I have a deep fear that it's unattainable and I

19   have my own personal belief which I understand is not Your

20   Honor's belief or doesn't have to be Your Honor's belief but

21   all I can do is say it again which is that it's more than

22   enough already and if Your Honor sets something more obviously

23   we're going to try to attain it and if we attain it great, I

24   was proven wrong.  But this isn't an appearance where the

25   defendant was arrested yesterday.  I've been doing this for a

23

1   month.

2            THE COURT: I understand.  I'm saying that I'm

3   reserving decision at this point on the package that's being

4   presented.  If you come up with something more of course that

5   would be helpful but I'll make my decision based on what's in

6   front of me.

7            MR. WEDDLE: Your Honor, I would submit that it would

8   be most helpful to order a package.  I mean set a group of

9   conditions that I can try to meet, Your Honor, because to

10  just --

11           THE COURT: It will give you a target.

12           MR. WEDDLE: To go back and say more I fear -- I

13  actually fear that that's going to result in less because

14  people are going to say -- they're going to say I don't get

15  it.  Like you've said that to us two weeks ago.

16           MS. HECTOR: Your Honor, the problem with that

17  proposal is to the extent that there are additional people

18  that are unknown right now that have not been identified, that

19  have not been interviewed, who knows what kind of assets those

20  people have, what kind of values in their homes.  So to set a

21  number without reference to who these people are and what they

22  can legitimately put together I think would be a mistake.  I

23  think that if defense counsel thinks that he can come up --

24  obviously the Government agrees that what is being offered is

25  insufficient but if defense counsel thinks he can come up with

24

1   more or convince additional people then we should talk about

2   that when there's something tangible to talk about.

3           MR. WEDDLE: Your Honor, I disagree.  I think that

4   that is burden shifting, Your Honor.  That's simple burden

5   shifting.  That's not how you do it.

6           THE COURT: I understand the position and I have set

7   bonds before without knowing who the suretors are going to be

8   and then if at that point the suretors appear not to be

9   appropriate then we can always say no but the -- there are

10  just a few disconnects here in this case which makes it

11  difficult for me to understand the significance of the

12  defendant's ability to get a stronger package.

13          The disconnects are number one, that he's prominent

14  in Honduras, he has many connections all over the world and I

15  would assume he has many friends and many people who believe

16  in him in Honduras and other places and it's just not clear to

17  me why no one can -- no one, friends or others can deposit

18  even $10,000 into the Court.

19          MR. WEDDLE: So order $10,000 then.  He has been

20  unable to communicate with anyone except for his Swiss lawyers

21  until yesterday, Your Honor.  Yesterday.  I visited in jail in

22  Zurich in the first week of December.

23          THE COURT: I understand.  So he needs more time to

24  do that.

25          MR. WEDDLE: Your Honor, he needs to get out so he

1   can talk to people.  If he could talk to people then maybe

2   this would be different.  He's relying on his sons and his

3   daughter and most of his contacts are in Honduras, Your Honor,

4   and so we've been told that we should look for United States

5   contacts and that's what we're looking for.  If Your Honor

6   ordered $10,000 security then at least I'd be able to go and

7   say you got to find me $10,000.  If Your Honor ordered what

8   the Government's proposed $500,000 security I don't think we

9   would meet it but frankly that's better than Your Honor just

10  saying go get more because it's causing serious issues because

11  I have to deal with my client.  I have to deal with his entire

12  family and I have to rely on obviously what I -- my judgment

13  on this and I say look, this is the type of case -- I mean the

14  schemes that he's charged in have a grand total of $1 million.

15  The bribes that he personally is alleged to have taken took

16  place in I think 2012.

17          So this is not a detention case.  This is not a

18  massive package case.  His finances are not the finances of a

19  person who can post a massive package and if they were believe

20  me, we'd be -- we wouldn't be in this position.  I would have

21  reached an agreement.

22          THE COURT: I understand your position.

23          MS. HECTOR: Your Honor, I just feel the necessity to

24  sort of correct the record here.  He's suggesting that this is

25  not the person of prominence that he is.  I mean we're talking

1   about someone that has a net worth in Honduras of

2   approximately $2 million who was a prominent lawyer who held

3   positions of prominence being the president of the Honduran

4   Soccer Federation, the president, the acting president of

5   CONCACAF and then the president of CONCACAF, traveled all over

6   the world, was very close with the former president of the

7   Republic of Honduras.  This is not someone who -- I think Your

8   Honor has hit the nail on the head.  It begs the question why

9   unlike similarly situated defendants who have been able to

10  call on friends -- yes, he's been detained but as defense

11  counsel stated defense counsel has been in contact with his

12  family for at least a month now.  He has a wife who is in

13  Honduras and can be sort of making phone calls on his behalf.

14          I also think again and I said it yesterday.  I think

15  there's a big elephant in the room here that why someone like

16  Lizette Madrano who is his cousin who claims to be so close

17  with him and believes that there's no way he would ever

18  contravene the conditions of his bail has two properties that

19  she owns with family members and is unwilling or hasn't been

20  asked or who knows to post those.

21          MR. WEDDLE: Your Honor, I have asked --

22          MS. HECTOR: I think that begs a huge question as far

23  as even the family's trust or willingness to put something

24  that they own at risk with respect to the defendant's

25  appearance in court.  If everyone is so certain that there's

1  no way that anything is at risk I'm not sure why we're in this

2  bubble.

3            So I just think that defense counsel is presenting a

4  picture and he does sort of a good job of it when he goes on

5  and on about these circumstances that acts like this person is

6  of very limited means and of very limited contacts and is far

7  from home and has been far from home for a while.  We're

8  talking about a very sophisticated individual who engaged in a

9  sophisticated scheme, bribery schemes over a period of years

10 and held significant positions of power that he abused and

11 abused that position of trust that people put him in to get

12 himself here.  So I think we're sort of losing a little bit of

13 sight of the true facts here.  And the obstruction and witness

14 tampering, I mean that -- as Your Honor said, that's hugely

15 significant because while at this point he might not be given

16 the same exact opportunity to obstruct justice or tamper with

17 witnesses [inaudible] ability to still exists throughout the

18 rest of this investigation and -- this don't go away.

19           So for all those reasons I mean just sort of -- I

20 don't want to sound like a broken record but the Government

21 believes that he is completely bailable and the Government

22 also believes that it is within his -- defense counsel keeps

23 saying he can't come up with it.  I guess there's a question

24 of the semantics of what the definition of can't.  Can't maybe

25 because his family members won't post their property.  They

1  could, they could.  They could meet the conditions that the

2  Government has suggested.  I know that's just the Government's

3  position but they could meet those conditions with a couple of

4  signatures but if they were willing but they're not and I

5  think that's basically --

6             THE COURT: Well, I'm actually wondering why someone

7  couldn't get a loan, a home equity loan or a loan on some

8  property in Honduras and transfer it.  Those are questions.

9             MR. WEDDLE: Yes, Your Honor, the problems with that

10  are, Your Honor, that last I checked which was a couple of

11  weeks ago Honduras had taken steps to seize the properties

12  including his marital home.  I don't know if that's caused by

13  the United States Government.  I don't believe it is because

14  there's no indication that any of his property was purchased

15  with any bribe money or anything like that.  There's nothing

16  like that that's been said to me.  So I think that that is

17  just Honduras acting on its own.

18             MS. HECTOR: And frankly --

19             MR. WEDDLE: But these things are not so easily done

20  and if they were easily done we would have already done them.

21             MS. HECTOR: And frankly it's based on that

22  representation the Government in an attempt to be reasonable

23  did not suggest huge amounts of cash as we had gotten in the

24  case of some similarly situated defendants who frankly weren't

25  charged with as many schemes as this defendant and certainly

1    weren't charged with witness tampering and obstruction of

2    justice.  It's why we suggested the $500,000 in security.  Not

3    in cash based on properties in Honduras because who knows. I

4    don't know that that's accurate or whether Honduras is moving

5    to seize those properties or not.  I don't.

6              MR. WEDDLE: My understanding is that there's no

7    mechanism that would be acceptable to the prosecution to

8    actually post property in Honduras.  What Your Honor mentioned

9    is owing money against the property in Honduras.  If we could

10   do that great.  It hasn't happened.  I understand that there's

11   a lot of uncertainty in Honduras including with the bank

12   accounts because in this day and age when a charge is against

13   somebody sometimes bank accounts, they're frozen or closed

14   just by action of the bank.

15             So I don't think that it's easy to do that and I'm

16   not sure that it's doable to do that.  The properties that

17   we're talking about, the prosecution says he's a very

18   prominent person with a $2 million net worth.  75 percent of

19   that net worth is only in the name of his wife and most of

20   that comes from her family property inherited and the rest

21   is --

22             THE COURT: But is that property that she owns

23   herself or --

24             MR. WEDDLE: I believe that it's property -- I think

25   that she owns part of it herself or maybe co-owned with

1    siblings.  My understanding is that there's some title issues

2    in the sense that there are some people who have moved in.  So

3    there are people occupying like squatters and so all of these

4    are issues.

5            THE COURT: This is all very vague.  It's very hard

6    to get a handle on all of this.

7            MR. WEDDLE: It's Honduras, Your Honor.

8            THE COURT: I understand.

9            MR. WEDDLE: I agree and I think if Your Honor --

10   but, Your Honor, the bottom line is his net worth is not some

11   massive net worth.  He can be president of FENAFUTH.  It

12   doesn't create wealth and I can show you what his income is

13   like.  I gave you a ball park before.  His monthly income from

14   FENAFUTH I believe was about $6,000.

15           MS. HECTOR: Well, you already said that his income

16   is $200,000 was what he's making.

17           MR. WEDDLE: His monthly income from CONCACAF -- can

18   I just -- his monthly income from CONCACAF is about $7,000.

19   He had an income from FIFA which started when he became a vice

20   president of FIFA this year after the first indictment was

21   issued and that created income.  I think he got a lump sum of

22   $150,000 from income but that's not an ongoing amount of money

23   and that's new.  Then his wife has a salary in the order of

24   two to $3,000 a month.  She makes consulting money and he has

25   a pension from his time as a professor of about $1,600 a

1  month.  So his total income -- he's not a person who's --

2          THE COURT: Does he have money in the bank? Is there

3  any -- does he have any savings?

4          MR. WEDDLE: Negligible.  I don't have a listing of

5  bank accounts here but my understanding is that there's money

6  in the bank.  Cash in the bank is considerably less than

7  $20,000.

8          MS. HECTOR: Your Honor, we're also talking about

9  someone that's alleged to have received hundreds of thousands

10 of dollars in bribes.

11         MR. WEDDLE: Years ago.

12         MS. HECTOR: So -- no, between, conduct 2008 to 2014-

13 ish.  So I think -- to a certain extent we're taking these

14 representations as -- and I'm certainly not suggesting that

15 counsel's representations aren't what counsel believes to be

16 accurate but I think we have to take some of that with a grain

17 of salt. I mean when we're talking about someone who received

18 bribe money who used intermediaries and received that bribe

19 money and that money directed to an account in someone other

20 than his -- we got to take it with a grain of salt also.

21         THE COURT: As I said, I think there are a lot of

22 unanswered questions here that give me pause and given the

23 amount of assets that Mr. Hawit had, the income that he had

24 over time, the family assets at least through his wife,

25 there's just a question of why no cash -- it's impossible to

1   posit any cash or secure any property.  That's the --

2           MR. WEDDLE: He also has to fund his defense, Your

3   Honor.

4           THE COURT: I understand.

5           MR. WEDDLE: So that was the starting thing to

6   collect money to fund the defense.  Then we started with this

7   bail issue.  So there's not a lot of free funds and --

8           THE COURT: I haven't seen any though, any cash

9   that's been deposited.  That's --

10          MR. WEDDLE: I just -- I [inaudible], Your Honor, if

11  you set something that you think will reasonably assure the

12  defendant's appearance we'll try to meet it.

13          THE COURT: Well, if you -- I can't say that I'm

14  going to rule for or against but if I saw something in the

15  range of 20 to $50,000 deposited in cash with the Court that

16  would be a significant amount.

17          MR. WEDDLE: Thank you, Your Honor.  I appreciate

18  that guide.  I'm going to take that right back and see if we

19  can find that.  I know that he's owed $50,000 by FIFA.  We're

20  pursuing that.  We haven't received it yet.  If that came

21  in --

22          THE COURT: If you got the 50 of it that would be a

23  more significant amount.

24          MR. WEDDLE: We would be happy to deposit that with

25  the Court but this is --

1          MS. HECTOR: [Inaudible] his conduct while he was an

2   official with FIFA I'm not sure that FIFA would feel that they

3   owe him the money he thinks that he [inaudible].

4          THE COURT: That's something else.  Let's see what he

5   can find.

6          MR. WEDDLE: I totally agree and I appreciate hearing

7   from the prosecutor that they think that his conduct that

8   they're charging him with is clearly within the confines of

9   his activities on behalf of FIFA.

10         MS. HECTOR: That's not what I said.

11         MR. WEDDLE: Well, then I misunderstood.

12         THE COURT: Well, anyway, I think we got enough

13   colloquy here at this point.

14         MR. WEDDLE: If that were the case, Your Honor, that

15   might solve some issues for me [inaudible] their position that

16   they said on the record.

17         THE COURT: Do you want me to set a time next week

18   for you to come back or do you want me to reserve decision and

19   wait to hear from you?  We have a temporary now.

20         MR. WEDDLE: I would prefer to have Your Honor rule

21   and issue a set of conditions.

22         THE COURT: I told you that if I saw some cash and

23   I'm saying even as low as 20 to $50,000 in cash at this point

24   that would answer some of the questions that I have.  I can't

25   tell you that I would definitely rule in one -- on one side's

34

1    favor or another without that but I can tell you that there is

2    a -- you have a much, much better likelihood of securing his

3    release with the 20 to 50.

4          MR. WEDDLE: Then yes, Your Honor, let's set a date

5    to come back for sure.

6          THE COURT: Do you need about a week, do you need a

7    little less than a week?  Today is the 14th.  Do you want to

8    come back on the 21st?  Is that enough time to do what you

9    need to do?

10         MR. WEDDLE: I believe so.  I hope so, Your Honor.

11   The one wrinkle that I see -- I was going to say less than a

12   week, Your Honor, but since Monday is a holiday and likely a

13   bank holiday that's going to be harder.

14         THE COURT: 11:30 on the 21st?

15         MR. WEDDLE: Your Honor, would it be possible to do

16   it in the afternoon?  I'm supposed to be engaged in another

17   interview starting at nine a.m. which should end by noon or

18   one but possibly the afternoon.

19         THE COURT: The afternoon is full.

20         MR. WEDDLE: Okay.

21         THE COURT: I could do -- no, I can do 2:30.

22         MR. WEDDLE: Thank you, Your Honor, for accommodating

23   us.

24         Your Honor mentioned a deposit of cash with the

25   Court.  I'm not sure if Your Honor needs to issue some kind of

35

1   order to permit the Court to receive such a thing.

2           THE COURT: That comes when the money comes for you.

3           MR. WEDDLE: If I show up with a check or something

4   and if I call chambers and say I've got a wire transfer --

5           THE COURT: We have a form here that I can sign.

6   It's not a problem.

7           MR. WEDDLE: Okay.  Thank you, Your Honor.

8           THE COURT: We've done wire transfers in cases of

9   others.

10          MR. WEDDLE: Okay.  Perfect.

11          THE COURT: You can contact Gerry.  He knows how to

12  do it.

13          MR. WEDDLE: Thank you, Your Honor.  Thank you very

14  much for all the time you spent with us.

15          MS. HECTOR: Thank you.

16          THE COURT: You have the time.  Thank you.

17  (Proceedings concluded at 5:32 p.m.)

18                        *  *  *  *  *

19

20

21

22

23

24

25

36

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                          _____

6                              Shari Riemer, CET-805

7  Dated:  January 20, 2016