UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X    **Docket#**
UNITED STATES OF AMERICA,      :    15-cr-00252-RJD-15
                               :
      - versus -               :    U.S. Courthouse
                               :    Brooklyn, New York
ALFREDO HAWITT,                :
              Defendant        :    January 21, 2016
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**


<u>**For the Government**</u>:          **Robert L. Capers, Esq.**
                               United States Attorney

                        BY:    **Amanda Hector, Esq.**
                               **Keith Daniel Edelman, Esq.**
                               **Paul Tuchmann, Esq.**
                               Assistant U.S. Attorney
                               271 Cadman Plaza East
                               Brooklyn, New York  11201


<u>**For the Defendant**</u>:          **Justin S. Weddle, Esq.**
                               Brown Rudnick LLP
                               7 Times Square
                               New York, NY 10036


<u>**Transcription Service**</u>:     **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               <u>laferrara44@gmail.com</u>




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE CLERK: Criminal Cause for a Detention

2   Hearing, United States v. Alfredo Hawit, case number 15-

3   cr-252.

4          Please state your appearances for the record.

5          MS. HECTOR:  Amanda Hector, Paul Tuchmann and

6   Keith Edelman for the government.

7          Good afternoon, your Honor.

8          THE COURT:  Good afternoon.

9          MR. WEDDLE:  Good afternoon, your Honor.

10          Justin Weddle and I am here together with my

11   client, Alfredo Hawit.

12          THE COURT:  Good afternoon.

13          THE CLERK:  And will the interpreter please

14   state her name and the language she is interpreting for

15   the record?

16          THE INTERPRETER:  Maristela Verastegui, Spanish

17   language interpreter.  Previously sworn.

18   (INTERPRETER PREVIOUSLY SWORN)

19          THE CLERK:  And will the defendant please raise

20   his right hand.

21   A L F R E D O   H A W I T ,

22       called as a witness, having been first duly sworn,

23       was examined and testified follows:

24          THE COURT:  All right.  So I understand there

25   have been some developments since the last hearing.

Proceedings

1          MR. WEDDLE:  Yes, your Honor.  We submitted

2     some letters.  I'm not sure if your Honor prefer that I

3     stand or sit.

4          THE COURT:  No, you can sit because I think

5     it's easier for the interpreter to hear.

6          MR. WEDDLE:  We submitted two letters, your

7     Honor.  Taking up on or picking up on your Honor's

8     comments at our last hearing where you indicated that if

9     there were an amount of cash on deposit, that that might

10     tip the balance in the defendant's favor for release,

11     based on the package she had proposed.

12          We proposed to add $50,000 in cash security to

13     the bond.  Obviously there's been an exchange of letters.

14     We submitted a letter.  The government opposed that

15     proposal.  We submitted a response to their opposition.

16     I can speak more about that proposal if your Honor would

17     like.  I think most of it's in the papers.

18          And then a development from today, your Honor,

19     is that I spoke to Lizette Medrano (ph.), who is the

20     defendant's cousin.

21          THE COURT:  Yes.

22          MR. WEDDLE:  And is one of the proposed co-

23     signers.  And she told me that she is willing to post one

24     of her properties.  We discussed at one of our prior

25     appearances, your Honor, that she has two properties in

1   the Miami area, one that she resides in and one that her

2   son resides in.  She's willing to post the one that her

3   son resides in.  She estimates that the value of that

4   property is about $260,000 and it carries a mortgage with

5   a principal amount of about $18,000.

6           So despite my predictions, we have been able to

7   come forward with some additional property from these co-

8   signers to secure the bond.  Obviously, your Honor, I

9   stand by the position we originally submitted which was

10  the original proposal was enough, reasonably to assure

11  the defendant's appearance but this is obviously a much

12  stronger proposal and we would ask that your Honor order

13  it.

14          MS. HECTOR:  Your Honor, the government

15  continues to oppose the adequacy of this proposal for the

16  following reasons.  I won't go into the government's

17  position with respect to the original proposal of $50,000

18  from the attorney's retainer because I believe that's

19  that's fully explicated in the filings, although I am

20  happy to talk about that further if your Honor would like

21  further argument with respect to that issue.

22          But with respect to the additional property

23  from Ms. Medrano, the government believes that is a step

24  in the right direction.  What we've asked for all along

25  is approximately $500,000 worth of security on this bond

1 which could be accomplished by the two properties that

2 Ms. Medrano owns. Two -- a property that's worth

3 approximately 240- or -- I think $240,000, it's -- and

4 signed by the four proposed four suretors that the

5 defendant is proposing here is still inadequate, we

6 think, for a number of reasons.

7        One, the four proposed suretors, in essence, I

8 think all the government would likely to be able to

9 collect if the defendant fled, would be the posted

10 property and that's because the suretors that have been

11 proposed, their financial situations don't permit much

12 more -- the government obtain much more than that from

13 them.

14        That $250,000ish -- $240,000, is still just a

15 fraction of the defendant's net worth. It is still

16 significantly less than the amount of bribes the

17 defendant is accused of having received as part of his

18 participation in this scheme.

19        As we've stated before on the record, I think

20 it's relevant, although each defendant needs to be looked

21 at individually, I think the packages that have been

22 approved with respect to some of the defendant's

23 similarly situated co-defendants is relevant here because

24 some of the same considerations apply there. This

25 individual including -- as compared to individuals like

Proceedings

1 Rafael Callejas, and Hector Trujillo, they're all

2 individuals who are prominent individuals, nationals of

3 other countries, people who held significant positions,

4 people who have significant assets and consistent

5 contacts abroad, significant travel abroad.  This amount

6 is just still inadequate with respect to securing his

7 presence here.

8          THE COURT:  Tell me what we know right now and

9 I am addressing this to all of you, including pretrial

10 services, what we know about Mr. Hawit's net worth in

11 Guatemala (sic).

12          MS. HECTOR:  Well, what we know has been self-

13 reported from the defendant to pretrial services and I

14 believe it's in the realm of $2 million.  I understand

15 that some of that is tied up in property.

16          MR. WEDDLE:  Your Honor, if I could just --

17          THE COURT:  Hold on.

18          MS. HECTOR:  Some of it is tied up in property

19 that the defendant's wife owns.  The rest of it is

20 largely in businesses.  I think there's a supermarket or

21 shopping center that according to the defendant are

22 heavily mortgaged.  But again, that's self-reported.

23          And in addition to that, you know, we're

24 talking about someone who received $100,000 dollars of

25 bribes and laundered that money.  The bribes were

1  received into his relative's account, including his wife.

2  Our view on that is, in part to hide where the money was

3  going.  And I think that's significant here.

4          And again, as your Honor has previously noted,

5  we're also talking about someone who unlike the similarly

6  situated co-defendants that I just referred to, both of

7  whom were released on $4 million bonds that were secured

8  by between a million to $2 million of property and cash,

9  some of -- a lot of which I think came from foreign

10  locations but was brought into this courthouse.

11          You know, this defendant is also charged with

12  witness tampering and obstruction of justice, which those

13  defendants weren't charged with.  This defendant is

14  charged in essentially two separate schemes.  Those

15  defendants were charged in one scheme.  I think those

16  factors are significant.

17          And I also think the movement we've seen here,

18  despite the protest of a complete inability to get any

19  movement suggests that there's room here for the

20  defendant to come to a bond that the government would be

21  agreeable to and the government feels could more

22  adequately secure both his appearance and decrease the

23  likelihood that he would engage in further obstructive

24  conduct because that obstructive conduct would be a

25  violation of the bond too and would also put, you know,

Proceedings

1  whatever security the defendant posts at rest.

2          THE COURT:  I think my most serious question at

3  this point is whether or not any of the assets and I know

4  we've talked about this a little but I have only gotten

5  statements, I don't really have any evidence of this,

6  whether the assets in Guatemala are in any way liquid,

7  whether they're all -- the properties are all mortgaged,

8  whether there's a -- what the situation is with the

9  properties, whether any of the assets from Guatemala

10 could be used by the defendant, if for example, he were

11 to flee or now for the bond.  That's one of my major

12 concerns here.

13         I haven't seen any real evidence of what the

14 situation is there and I know that it's not always easy

15 to get but I am left mostly with hearsay about what

16 properties there are.  The government has come forward

17 with its prima facie case, I suppose, showing that there

18 are properties there that are assets.

19         MR. WEDDLE:  Your Honor, if I may?

20         THE COURT:  But, you know, I am concerned.

21         MR. WEDDLE:  The assets that are listed in the

22 pretrial services report were reported by me to pretrial

23 services.

24         THE COURT:  Right.

25         MR. WEDDLE:  So it's all self-reported, your

Proceedings

1  Honor.

2          THE COURT:  Yes.

3          MR. WEDDLE:  All of it.  And it's the best

4  information that we have.  There's been  no evidence

5  presented at any of the bail hearings that we have

6  appeared at, your Honor.  The government has presented no

7  evidence.  They've proceeded entirely by proffer, as have

8  we.  And this is the best information that we have.

9          The government talks about the defendant's $2

10  million net worth which really, I think, could easily be

11  misinterpreted, your Honor.  The bulk of the assets that

12  make up this $2 million figure are in the name of his

13  wife and half of the $2 million figure is a piece of

14  property inherited by his wife.  It's a piece of real

15  property and --

16          THE COURT:  And you said she's not the sole

17  owner of that property or you're not sure?

18          MR. WEDDLE:  I believe she is the sole owner.

19          THE COURT:  Uh-huh.

20          MR. WEDDLE:  I'm not a hundred percent sure

21  about that.  I believe she is the sole owner of that

22  piece of property.

23          THE COURT:  So that only goes to whether or not

24  the property was acquired potentially as a result of

25  bribes, not as to whether or not that's an asset, right?

1        MR. WEDDLE:  It was definitely not acquired as
2   a result of bribes.  It was acquired decades prior to any
3   alleged bribe, your Honor.
4        THE COURT:  Right.  I think that's what you're
5   saying but --
6        MR. WEDDLE:  As was their marital home, which
7   is also in the wife's name, solely in the wife's name.
8        THE COURT:  Uh-huh.
9        MR. WEDDLE:  And it was acquired decades before
10   any allegation of bribes.  So --
11        THE COURT:  Right, but my question really is
12   any of those -- are those assets in any way liquid?  Can
13   any loan or mortgage or second mortgage be taken on any
14   of that property that would provide some security because
15   the problem has been at least until today that the bail
16   package was very light.  I understand the $50,000 but
17   that's not put up by -- it's not additional money that
18   came from the defendant.  It's just moved from one pot to
19   another and I understand it may cause some problems,
20   but --
21        MR. WEDDLE:  Well, your Honor, I completely
22   disagree.  Two pieces of real property in Honduras, your
23   Honor, are not liquid.  That's not liquid.  The only way
24   that they could conceivably support the defendant's
25   flight is if the defendant's light consisted of leaving

Proceedings

1  the United States and going home to his marital home

2  where he's lived for decades.  That's like the opposite

3  of any kind of successful flight.  That's the most

4  obvious place to find him, if not on home detention with

5  his daughter on electronic monitoring as we've proposed,

6  your Honor.

7           So there's nothing about those properties that

8  are owned by his wife that would support flight.  I, of

9  course, have talked to the family about generating money,

10  both for bail purposes and to fund a defense, your Honor,

11  and as I understand it, the Honduran government has taken

12  steps to seize or freeze those pieces of property.

13           THE COURT:  Right.  And if that's all true,

14  that's something the Court would take into consideration

15  but how do we find this out?

16           MR. WEDDLE:  Your Honor, if I tried to go get a

17  mortgage tomorrow on this property -- I haven't been

18  indicted.  I mean, this wouldn't all just generate cash.

19  I think, you know, the defendant has been indicted.  The

20  Honduran government has taken steps to freeze assets.

21  They've been told not to move assets because obviously

22  that would cause problems.  There are essentially two

23  pieces of property not owned by the defendant in

24  Honduras.

25           Neither of those pieces of property in any way

Proceedings

1  could facilitate or support any risk of flight.  There's

2  no real evidence of risk of flight, your Honor, except

3  for the fact that the defendant has lived in the same

4  place for decades and is an established member of the

5  community and that place happens to be in Honduras.  It

6  just happens to be Honduras.

7          THE COURT:  I'm sorry, I keep saying Guatemala.

8  Honduras, right.

9          MR. WEDDLE:  So this is not --

10          THE COURT:  Let me just ask the government --

11  hold on just one second.

12          MR. WEDDLE:  Sorry.

13          THE COURT:  What does the government know about

14  freezing of assets in Honduras?

15          MS. HECTOR:  I frankly know nothing about that.

16  I just have -- I am hearing what defense counsel says but

17  I have no independent knowledge of whether that's

18  accurate or not.  I will say that defense counsel keeps

19  referring to, well, this is property owned by his wife.

20  Well, okay, in some ways that suggests that she may have

21  a greater opportunity to, for example, take a loan

22  against inherited land from her family that's worth a

23  million dollars.

24          I could see that maybe someone who has been

25  indicted may not be able to go to a bank in Honduras and

Proceedings

1  get a home equity loan with respect to his house.  I

2  could see that that might not be a problem.

3          But the fact that defense counsel's

4  representing that the marital home and the land that

5  together is about $1.7 million is just in his wife's

6  name, suggests that there might be something that can be

7  done there.  I mean, certainly I tink some of the other

8  co-defendants in this case have done similar things where

9  they take, you know, bank loans or collateralized bank

10 loans in a foreign country and get cash to bring to this

11 country.

12         And that's just one way -- that's just one way

13 that the defendant could theoretically secure this bond

14 more.  Another way would be for Ms. Medrano be willing to

15 post both properties or for the defendant, who may have

16 other contacts or it seems to me, have other loose

17 familial relations in the United States to gather some

18 additional security because I think we have both here.

19 We have just the 240ish, thousand dollar property and we

20 have four suretors who are -- most of whom are sort of

21 straining the sort of financial -- financially

22 responsible to become a suretor standard.

23         I mean, remember one of them is a relatively

24 recent friend of his daughter who has never met the

25 defendant and makes a couple of hundred dollars --

Proceedings

1    THE COURT:  $7,200 a year, about.

2    MS. HECTOR:  Yea.  Something that there's a

3 piece of -- I think the government has some concerns

4 about whether she should really be signing the bond,

5 whether she understands exactly the extent --

6    THE COURT:  Well, she wouldn't be a key part of

7 the bond.  The key part of the bond is Ms. Medrano and

8 Mr. Green, I believe.

9    MS. HECTOR:  Yea.

10    THE COURT:  And the $50,000 --

11    MS. HECTOR:  But the fact that the house that

12 she's thus far unwilling to post is according to her, co-

13 owned.  Now this house was purportedly co-owned and

14 apparently it's not, but if that one still is actually

15 co-owned by her and a family member, that would be

16 problematic for the government to collect upon that if it

17 weren't posted for the bond, if it were just an asset of

18 hers and she was a signatory to the bond.

19    THE COURT:  Do we know that it is co-owned, the

20 property --

21    MR. WEDDLE:  I've been told that it is co-owned

22 with her brother, your Honor, the house that she resides

23 in.  The other property, not the one that we proposed

24 posting.

25    MS. HECTOR:  Who would also (indiscernible).

Proceedings

1          MR. WEDDLE:  Your Honor, I --

2          THE COURT:  Right.

3          MR. WEDDLE:  I have at least three responses to

4    the government's continued presentation here.  One is,

5    they talk about other cases and other defendants in this

6    case.  My understanding is that these other defendants

7    have negotiated bail packages that they agreed to with

8    the government.  So it's absolutely not a relevant test

9    what those people agreed to because as --

10          THE COURT:  It's not relevant to me, so you

11    don't need to argue that point.

12          MR. WEDDLE:  The other thing is for other

13    defendants, I have no idea what those people's assets

14    are.  So --

15          THE COURT:  Right.  I have to look at each

16    individual separately, I agree with you.

17          MR. WEDDLE:  And in order for me to respond

18    fully to this argument, your Honor, and I would have to

19    get disclosure from the government on what the assets are

20    of all the other defendants who agreed to those other

21    packages because it may be that looking at those assets

22    show that their packages are even less of a proportional

23    amount of the assets at their disposal than the

24    defendant's.  I don't know.

25          But in any event, talking about other

Proceedings

1  defendants, I agree with your Honor, is irrelevant.  And

2  repeatedly, essentially the entire presentation by the

3  government has talked about what suggests that there

4  could be more and speculation about there could be more

5  and Ms. Medrano could give more, and perhaps there could

6  be more generated from properties in Honduras.  And there

7  could be more from here or there.

8          That is not the statutory test.  That is not

9  the law.  That is the way to talk about maximum amount of

10  conditions that the defendant can meet.  That's not in

11  the test.   The test that binds this Court is what are

12  the least restrictive set of conditions, reasonably to

13  assure the defendant's appearance.

14          The two main things that do that, your Honor,

15  are home detention with his daughter and his grandson on

16  electronic monitoring.  Based on the finances of this

17  family, I think that they have moved heaven and earth.

18  To do more than that, your Honor, and people have stepped

19  forward to co-sign a bond.

20          It's more than enough under the statutory test

21  and it is inappropriate, your Honor -- it is

22  inappropriate for the government to invite speculation

23  about what more could be obtained if we just kept this

24  defendant locked up for longer.

25          It's been six weeks, your Honor.  Six weeks.

Proceedings

1  Sure, we could keep him locked up for another year.

2  Maybe more money would come forward.  That is not the

3  test.  That's coercion and it's not the test.  So I would

4  invite your Honor not to indulge in that kind of

5  speculation and to apply the test.

6          Finally, your Honor, the government has talked

7  about their inability to recover on the personal

8  recognizance bond.  The government started down this

9  road.  They proposed a $4 million personal recognizance

10 bond.  And they told your Honor in this courtroom that

11 it's their normal policy to seek a bond that far exceeds

12 a defendant's neg worth.

13         So apparently, it's their policy to seek a bond

14 that is unrecoverable and whatever the reasons for that

15 are, that's fine.  I think it means something to have a

16 million dollar bond that you may or may not be able to

17 recover on because even for people who have few assets,

18 that's going to make their life fairly miserable if the

19 defendant flees.

20         So we've offered a million dollar bond.  I

21 think it's substantial and meaningful.  It's an extremely

22 meaningful condition that will reasonably assure the

23 defendant's appearance because the defendant therefore

24 has to not only think about the criminal risks he would

25 face from fleeing, the likelihood he would be caught,

Proceedings

1  especially since apparently the place that he's most

2  likely to flee to is his marital home where he's lived

3  for decades in Honduras where he is -- was always

4  prominent and now is quite famous.

5          And he's have to think about the fact that

6  these people who stood up for him in his time of need are

7  going to be made miserable by the United States

8  government because of a bond that they had co-signed,

9  regardless of recoverability, your Honor.  I think that's

10  an extremely important incentive for the defendant not to

11  flee.  I think it's well more than what's required by the

12  statute and I think that he's been in jail long enough.

13          MS. HECTOR:  Your Honor, if I may just move

14  onto a couple of points.

15          THE COURT:  Uh-huh.

16          MS. HECTOR:  One, first of all, the government

17  never stated that it was our policy to ask for a bond

18  amount that far exceeds the defendant's assets.  If

19  anything, we stated that that's one of the considerations

20  that we think is relevant because if a bond amount is

21  significantly less than the defendant's assets then

22  presumably a defendant could flee, gather their assets

23  and sort of repay the suretors who lost money as a result

24  of the defendant's flight.  That's all the point we were

25  making with respect to that analysis.

Proceedings

1    Two, the government is certainly not asking

2  well, what more could he give just for a mental exercise?

3  We understand what the statute requires.  The government

4  thinks that more than what is being proposed is required

5  to assure his presence.

6    With respect to the places that the defendant

7  could go to flee and the argument that the only place he

8  could go to flee would be his family home in Honduras, of

9  course that's not the case, right?  I mean, someone could

10  flee to a host of different countries and presumably with

11  $1.7 million worth of assets that may not be able to be

12  liquidated like that but certainly could be liquidated at

13  some point to support a life somewhere else.  Of course

14  that's within the realm of possibilities.

15    But I think all of that being said, I think

16  we're still in a situation where the Court mentioned

17  something at the last hearing that I thought was

18  important which was that there was sort of a disconnect

19  given the defendant's net worth, largely held by his

20  wife, given his prominence, that there wasn't sort of an

21  amount of cash being put forth.  That the only thing that

22  seemed even reachable was Ms. Medrano's two homes.

23    We're still in that situation.  The only thing

24  that changed with respect to that is the defendant's

25  lawyers offered to remove $50,000 from their retainer

Proceedings

1  which as your Honor noted, is already a cost that's been

2  expended by the family and that (indiscernible) by the

3  defendant's flight.

4          With all that being said, the government still

5  believes that the defendant is bailable and the

6  government believes that the package that the government

7  thinks would be the least restrictive one and I do say

8  least restrictive one -- I mean, I think we've attempted

9  to take into account the defendant's net worth and

10  representations that defense counsel has made in sort of

11  coming up with that figure.  The government still

12  believes that this is attainable by this defendant.

13          And I do think that there's something that begs

14  the question about why there aren't either additional

15  people or Ms. Medrano isn't worth -- isn't willing to but

16  part of the reason we have sureties is because you have

17  friends and family members who are saying I trust that

18  this person is going to still be here.  I trust that

19  they're going to show up for court appearances.  I'm

20  willing to state my financial future on that. And I think

21  we're still missing that.

22          MR. WEDDLE:  Your Honor, if you would like to

23  accept co-signers who are citizens of Honduras and reside

24  in Honduras, I would be happy to have 100 co-signers co-

25  sign this bond.

Proceedings

1    MS. HECTOR:  Some of those co-signers may be

2  willing to post cash.  If there were -- we've never

3  suggested as defense counsel suggests in this letter,

4  that we would only accept security from U.S.-based

5  suretors, there have been other cases of this where

6  someone has friends of family in Honduras that had assets

7  that are willing to transfer the assets to the United

8  States in order to secure a defendant's bond.

9         And if that's a new realization to defense

10  counsel, then we certainly would invite him to explore

11  that possibility to see if there could be further

12  security in the bond.  The point is that those amounts

13  have some sort of moral suasion over the defendant.  If

14  it's his friends and families in Honduras that are

15  willing to transfer an additional $250,000 to the clerk

16  of court, and they're not U.S.-based persons, that is

17  something that the government would be open to.

18         THE COURT:  Has anyone spoken to --

19         MR. WEDDLE:  My letter, your Honor --

20         THE COURT:  Excuse me.  Has anyone spoken to

21  Ramol Hawit (ph.) about his willingness to sign the bond?

22  he's the co-owner of the property with Ms. Medrano.

23         MR. WEDDLE:  I don't know, your Honor.  I have

24  not.  I believe --

25         THE COURT:  I mean because that seems to be the

Proceedings

1   only impediment to her signing --

2           MR. WEDDLE:  Your Honor, I spoke to her.  She

3   assured me he would not be willing to.

4           THE COURT:  Okay.

5           MR. WEDDLE:  And she's not willing to.  So

6   that's where we are.  She said she is willing to post one

7   of these properties.

8           THE COURT:  Okay.

9           MR. WEDDLE:  Your Honor, just to clarify one

10  thing.  My letter said that the government had indicated

11  that they were not willing to accept suretors from

12  outside the United States.  Believe me, I have spoken to

13  people in Honduras about obtaining cash.  I've talked to

14  your Honor about their extraordinary efforts that they've

15  gone through not only to secure assets for bail and co-

16  signers for bail, but also to fund the defense.

17          So, you know, the government raised a lot of

18  speculation about my livelihood, your Honor, and how I

19  get paid.  I would be happy to share the information with

20  your Honor in camera.  Frankly, the only reason that I

21  put in my letter that this money was coming out of my

22  retainer was so that your Honor didn't get the sense that

23  we just had a bunch of cash lying around and here, you

24  know, after you had mentioned $50,000 in cash, here's the

25  cash.  This is  cash that had been collected for my

1  retainer for weeks, your Honor, and it finally came in

2  and instead, I have decided to put off my retainer for

3  the expedience of moving that money towards the bail.

4  It's still coming from all the same sources and they're

5  tapped out, your Honor.  We've been trying to do this for

6  a long time.

7          THE COURT:  Perhaps you would like to make an

8  in camera proffer on that.

9          MR. WEDDLE:  I'd be happy to, your Honor.

10         THE COURT:  All right.  Any objection?

11         MS. HECTOR:  No.

12         THE COURT:  Okay.  I'm just going to -- can I

13  clear the courtroom for a moment?

14         (Off the record)

15         THE COURT:  Does pretrial services wish to be

16  heard?

17         PRETRIAL SERVICES OFFICER:  Don't have any

18  (indiscernible).

19         THE COURT:  Okay.  And your recommendation was

20  release on a substantial bond, secured by property.

21         PRETRIAL SERVICES OFFICER:  With location

22  monitoring.

23         THE COURT:  With location monitoring.  Okay.

24  And now we'll debate here today as to whether this is a

25  substantial bond.  Would you prefer not to give an

Proceedings

1    opinion on that?

2            PRETRIAL SERVICES OFFICER:  Yes, your Honor.

3            THE COURT:  Okay.  I am going to take a two-

4    minute recess.

5            (Off the record)

6            THE COURT:  The government has expert

7    investigators.  The government has financial experts.

8    What do we know about Mr. Hawit's finances?  Whether he

9    has assets elsewhere?  And about whether or not the

10   government could put a lien on the property in Honduras

11   or whether there is -- whether that property is in fact

12   convertible easily into cash, something that could

13   finance either flight or reimbursed suretors.

14           MS. HECTOR:  One second, your Honor.

15           (Pause)

16           MS. HECTOR:  Your Honor, I will do my best to

17   answer your questions.  I don't believe we're aware of

18   any assets of this defendant outside of Honduras.  I know

19   that defense counsel has remarked that he believes that

20   he's owed some money from FIFA but we indicated that we

21   had some concern that FIFA may take the view and I'm not

22   speaking for FIFA but FIFA may take the view that he's

23   not entitled to that money given the charges in this

24   case.  I don't know.

25           With respect to your second questions, are you

Proceedings

1  asking whether -- what is the government's ability to put

2  a lien on property were the defendant to flee and we were

3  trying to collect or are you asking whether we have any

4  information about the defendant's ability to either

5  borrow money against or otherwise get money out of --

6          THE COURT:  Both questions, the first is could

7  the defendant get, let's say a mortgage or a home equity

8  loan or the equivalent in Honduras and secondly, could

9  the government have priority?  Could the government put a

10  lien on that property or somehow secure it the way it

11  could happen in other states?

12          MS. HECTOR:  Right.

13          THE COURT:  I mean this case is unusual in that

14  there's still a lot that's not known about the finances.

15  That could cut either way though because the government

16  has the burden of proof on risk of flight.

17          And the question I have in formulating my

18  individualized assessment of whether there's -- the

19  package is sufficient here is whether or not the net

20  worth that's attributed to Mr. Hawit through his wife,

21  which was apparently mostly in real estate and was

22  obtained through an inheritance and not through -- as a

23  result of criminal activity or bribes, whether that

24  property or money could be used to either reimbursed

25  suretors or to assist in flight.

Proceedings

1    And I haven't heard -- I have heard an

2  assertion that there may be -- that it's not possible to

3  get a mortgage at this point or get a loan against that

4  property.  I've had proffers from counsel that it's -- as

5  to the difficulty and the variety of means that have been

6  used in order to fund the case so far.

7    So the question I have is what does the

8  government know about these assets and Mr. Hawit's

9  ability to turn them into liquid cash or as money?

10    MS. HECTOR:  Well, one, I don't think we've

11  been provided by defense counsel, addresses or anything

12  specific as to the property other than the general

13  information that's in the pretrial services report.

14    Certainly in this case, there have been other

15  defendants who have been able to get bank loans against

16  property and assets in foreign countries that they can

17  then transfer cash to the United States for purposes of

18  supporting the bond.

19    So generally speaking, I think that's a

20  possibility.  I can't talk to whether in this case, he

21  would be able to do that.  I don't know whether those

22  inquiries have been made by defense counsel.

23    I will say that I think it is accurate that

24  it's the government's burden to prove a risk of flight by

25  a preponderance of the evidence.  I don't know that it's

1   then further the government's burden to make further

2   assertions of proof about the defendant's ability to get

3   assets out of Honduras or that sort of thing.

4           THE COURT:  No, but I think the burden of proof

5   is to show that the conditions that have been offered at

6   this time are not sufficient to prevent the risk of

7   flight and if the Court finds the package to be

8   substantial and the government says well no, it's not

9   substantial, because there are other assets in Honduras,

10  and those assets are alienable in some way, then that

11  would go to your burden of proof.

12          MS. HECTOR:  Right.  So with respect to -- I

13  mean, first of all, just putting that aside for a second,

14  I think that the government is of the view that the

15  suretors have other assets in the United States that

16  could be posted.

17          THE COURT:  You mean the one other house.

18          MS. HECTOR:  The one other house.  I believe

19  the defendant's son-in-law had some cash.  In our

20  interview with him, I think he expressed that he had

21  about $70,000 of cash.  That's the defendant's son-in-

22  law.

23          THE COURT:  Ex-son-in-law.

24          MS. HECTOR:  Ex-son-in-law, one of the proposed

25  suretors.

Proceedings

1    With respect to the other question of -- I've

2  never been -- in my time at the Office, I've never been

3  involved in a case where we have accepted foreign

4  property -- there have been times that foreign properties

5  have been put on a bond as sort of additional security,

6  when the security that was posted as part of the bond was

7  otherwise sufficient to make the government comfortable

8  that the risk of flight was ameliorated.

9    THE COURT:  Uh-huh.

10    MS. HECTOR:  I haven't been part of a case that

11  the bulk of the property has been foreign property and I

12  think that's because the government is of the view that

13  it's extremely difficult, if not impossible for the

14  government to collect on property that they put a lien on

15  or otherwise collect property that's in a foreign

16  jurisdiction and if that even were possible, I think the

17  amount of time and resources that would be expended to do

18  so would be probably inordinate.  I am not sure that the

19  Marshal's Service would --

20    THE COURT:  I don't think the Marshal Service

21  would do that.  And they wouldn't be able to sell it.

22    Well, the difference now between what was

23  before me the last time I was here and what's before me

24  today is close to $300,000 in security.  We have $50,000

25  plus the approximately -- in cash, assuming it arrives

Proceedings

1   and $240,000 in equity in the house, if you proposed it.

2         That is a substantial package and the question

3   is -- and I interpret that as being substantial within

4   the meaning of what was recommended by pretrial services

5   but also just in my own independent judgment, I think

6   that's substantial.  The defendant between the $300,000

7   and the $500,000, I am not sure given the evidence that

8   is before me that makes such a substantial difference.

9         I am aware of the seriousness of the charges.

10   I'm aware of the -- you know, we've gone through the

11   nature of the charges, the fact that obstruction is a

12   serious crime and the fact that the purpose of bribery

13   often is to increase an individual's assets.  And the

14   concern that the assets might somewhere be located in

15   Honduras, but the defendant has maintained and proffered

16   that there are no other sources of wealth available,

17   other than those disclosed.  The government has been

18   conducting investigation for some time and isn't aware of

19   any more.  That doesn't mean there isn't another asset

20   but at this point, I am not aware of any other assets

21   that he has that could be used at this time.

22         Home detention with electronic monitoring and

23   close supervision from pretrial services would provide

24   additional protections against the risk of flight.  So

25   unless the government has anything further to add at this

Proceedings

1  point --

2      MS. HECTOR:  Just one thing, your Honor, if I

3  just may have a second.

4          (Pause)

5      MS. HECTOR:  Your Honor, if I may and I am

6  sorry, I might have misspoken when I said that we're not

7  aware -- well, I'll explain -- that we don't have any

8  knowledge about money outside of Honduras.

9          As part of the information we have regarding

10  where some of the bribe money that the defendant is

11  alleged to have to have received ended up, we do have

12  information that between 2011 and 2013, approximately

13  500,000 in bribe money went into the defendant's wife's

14  account, one account in the wife's name in Panama and

15  then another account of his wife in Honduras.

16          So in the defendant's disclosure about his net

17  worth, I don't believe there's any disclosure about any

18  cash on hand in any bank accounts.  I believe that

19  defense counsel made a representation at one of our

20  hearings that the defendant had a de minimis amount of

21  cash.

22          I'll also note that I believe that the

23  defendant's wife has a job as a consultant and there's no

24  indication about where money that she receives as part of

25  employment might be.  I think that's relevant to the

Proceedings

1    Court's consideration.

2          MR. WEDDLE:  Your Honor, I think I -- sorry,

3    your Honor.  I don't have the numbers right in front of

4    me.  There are bank accounts.  I don't think that they

5    have tens of thousands of dollars in them.  I think that

6    the amounts -- the word I used was negligible.  I mean, I

7    think that in this context, you kind of say do you have

8    thousands of dollars in bank accounts and the answer was

9    no.  I can ask my client what he knows about bank

10   balances.  Obviously, he's been locked up since December

11   3rd.

12         We did talk about orally, the defendant's

13   wife's salary and I don't remember what it was off the

14   top of my head but I can check but she makes less money

15   than he does.  I think that in terms of salary -- again,

16   these are not wealthy people.  I mean even when he was

17   working --

18         THE COURT:  But we're talking about substantial

19   amounts of bribe money allegedly and that's I think the

20   government's --

21         MR. WEDDLE:  That's 2012, your Honor.

22         MS. HECTOR:  And I will say --

23         MR. WEDDLE:  Yea, in 2012.

24         MS. HECTOR:  -- I don't know the current status

25   of those accounts.

Proceedings

1          THE COURT:  Okay.  Is there a way to find out?

2          MS. HECTOR:  We've made inquiries to the

3   foreign government but we haven't received that

4   information as of yet.

5          THE COURT:  And I take it they're not in a U.S.

6   bank, even in a foreign country.  In other words, not

7   Citibank in Pana or --

8          MS. HECTOR:  No, I don't believe so.

9          THE COURT:  So at this time, the government has

10  no information about what happened to the money that was

11  traced that went into the bank account -- those two bank

12  accounts in Panama?

13         MS. HECTOR:  No definitive information, your

14  Honor, no.

15         THE COURT:  And that was 2012?

16         MS. HECTOR:  2011 and 2013.  I think the point

17  that we're making is that with respect to the financial

18  disclosure, we do have reason to believe that there are

19  potentially accounts that are missing from this.

20         THE COURT:  Was he asked to disclose his wife's

21  accounts?  I assume pretrial service would ask for

22  disclosure of Mr. Hawit's wife's assets, as well?

23         MR. WEDDLE:  Your Honor, if I could just --

24  none of the pretrial services officers who are here are

25  the ones that I spoke to about this, so maybe I should

Proceedings

1  start.

2          When we first appeared before your Honor,

3  pretrial services had a very truncated amount of time to

4  interview the defendant.

5          THE COURT:  Right.

6          MS. HECTOR:  In my experience, normally

7  pretrial services would ask the defendant directly about

8  their finances.  But we were a little bit rushed to get

9  in front of your Honor because the defendant came

10  essentially straight from the airport.  So when I talked

11  to Mr. Calvi, the pretrial services officer, I said, "Did

12  you get down, you know, what his assets are?"  And he

13  said, "I didn't have a chance to do it."

14          So the next morning I called and spoke to

15  another pretrial services officers, who I believe is also

16  named Calvi, a woman, and I said, these are his -- let me

17  tell you what his assets are and I told him what the

18  assets were.  It wasn't a questioning.  No one asked me

19  about bank accounts.  I mean, I don't know the bank

20  balances.  They're not significant.  So I sort of just

21  didn't, you know, catalog them all.  It's not --

22          THE COURT:  I am not going to ask you were

23  aware of accounts in Panama but that obviously is the

24  consideration that --

25          MR. WEDDLE:  Well, your Honor, it's in the

Proceedings

1 indictment that there's an account in Panama. I mean,

2 frankly I would discount that account also because I

3 would have assumed given the indictment, that the

4 government already had bank records for that bank

5 account. I have received no discovery but I would assume

6 that even if there were money in that bank account, the

7 government would not be eager to use that as security

8 since according to the indictment, the proceeds of the

9 crime flow through that bank account.

10      So my client's been locked up since December

11 3rd. I don't think he has current information. I can

12 give you his estimate of what's in the Panama bank

13 account. But, you know, it has to be caveated by the

14 fact that he's been locked up for a while. But whatever

15 it is, it's less than $10,000.

16      Would you like that, your Honor?

17      THE COURT: Yes.

18      MR. WEDDLE: My client estimates -- I said is

19 it less than $10,000 and he said yes. He estimates less

20 than $7,000.

21      THE COURT: Uh-huh.

22      MR. WEDDLE: He really doesn't have a firm

23 number.

24      THE COURT: And this is an account in his

25 wife's name?

Proceedings

1          MR. WEDDLE:  I believe -- yes, this is an

2    account in his wife's name in a Panamanian bank, right?

3          THE COURT:  And has he disclosed all of his

4    accounts to pretrial services?

5          MR. WEDDLE:  No, your Honor.

6          THE COURT:  Are there more accounts that --

7          MR. WEDDLE:  Yea, I mean I sort of filtered

8    this and I said, like these are his major assets.  So the

9    early stages of my representation of this client, I asked

10   him about money that he has in his bank accounts, partly,

11   you know, with respect to funding a defense.  And that

12   was several weeks ago, your Honor, but nothing was more

13   than $10,000.

14         So it was of a magnitude that I didn't

15   catalogue.  I can ask my client right now what he can

16   tell us about all bank accounts.

17         THE COURT:  Okay.

18         MR. WEDDLE:  Would you like me to do that, your

19   Honor?

20         THE COURT:  Yes.

21         (Counsel and client confer)

22         MR. WEDDLE:  Okay, your Honor.  I got some

23   information about bank accounts. So there's this Panama

24   bank account which my client estimates to be less than

25   $7,000.  There are two bank accounts in Panama.  I mean,

1 not in Panama.  I'm sorry, two bank accounts in Honduras.

2 And together, my client estimates that they total less

3 than $10,000.

4          And he has an account -- he's unsure of the

5 official name of the bank but he essentially gets like a

6 pension from the university where he taught for many

7 years and that's deposited into an account that he thinks

8 of as the university bank.  It's not actually the name of

9 the bank.   But he estimates that those deposits are

10 about $1,700 a month.  And he uses that for living

11 expenses, you know.

12          THE COURT:  Uh-huh.

13          MR. WEDDLE:  So he doesn't carry a balance in

14 that account.

15          THE COURT:  Right.

16          MR. WEDDLE:  He estimates that his wife's

17 monthly income is about $2,000.  And she has another bank

18 account in her name that he believes has less than

19 $10,000 in it.  That's it.

20          THE COURT:  Okay.  Thank you.  Does the

21 government have any questions?

22          MS. HECTOR:  No, your Honor.

23          THE COURT:  Okay.  All right.  Taking into

24 consideration all of the factors under the Bail Reform

25 Act, which I think we've gone over at great length in

Proceedings

1    these several days of hearings, the seriousness of the

2    crime, the weight of the evidence, the individual

3    characteristics of the defendant and other issues, and

4    other factors under the Bail Reform Act, the

5    recommendations of pretrial services and the bail package

6    that's been presented, let me start by saying that the

7    package initially was very light.  Of the suretors, only

8    Mr. Green, Fred Green, the ex-son-in-law, had a

9    substantial income and some assets.  The cousin, who is

10   willing to put up a bond -- is that Hawit-Medrano --

11   initially wasn't willing post her house -- one house, the

12   house in which her son is living but now is willing to

13   post, a house worth $240,000 in equity.  The other

14   suretors have insubstantial income and no assets.

15           In addition, $50,000 is being offered to be

16   deposited in the Court.  That money was raised through a

17   variety of means, some of them requiring some ingenuity.

18   And that brings a total secured package of $290,000,

19   coming primarily from one individual and the sureties who

20   are substantial are two in number, Mr. Green and Ms.

21   Medrano.

22           Before I give my ruling, I have one question as

23   to the assets of Mr. Green.  I believe it was stated that

24   he has $70,000 in the bank but I would like to verify

25   what his assets are, his net worth is.  Does anybody --

1          MS. HECTOR:  Your Honor, I spoke with Mr. Green

2     at some length.

3          THE COURT:  Uh-huh.

4          MS. HECTOR:  My understanding is that he is a

5     real estate associate.  He has an annual gross income

6     from that of $150,000.  He also owns properties that he

7     rents as investment properties with a partner.  That as

8     thirteen properties, all residential.  His estimate is

9     that they're worth about one million but because he has a

10    partner, his portion would be $500,000.  And he also has

11    another company that he uses that is solely his, the flip

12    properties.  He gets about $50,000 net annually from that

13    but it sounds  -- it sounded like its only asset is one

14    property that's under contract to be sold in the next

15    thirty days that's worth about $140,000.  And that he's

16    had between a checking account and -- a business checking

17    account and only of the business that's only his and the

18    personal checking account, about $70,000.

19         THE COURT:  All right.  So that there's -- he

20    has a substantial income and some money in the bank that

21    could be seized if there were flight and the government

22    could, I suppose try to claim his share in the real

23    estate partnership, although I don't know how the laws in

24    Florida work.

25              Has Mr. Green been asked if he would be willing

Proceedings

1 to deposit any money in the court?

2          MR. WEDDLE:  Yes, your Honor.

3          THE COURT:  And he's not willing?

4          MR. WEDDLE:  He's not willing.

5          THE COURT:  But if Mr. Hawit were to flee, the

6 $70,000 in the bank and all of his other assets would, of

7 course, be subject to seizure by the government.

8          MR. WEDDLE:  Of course.  And he understands

9 that, your Honor.

10          THE COURT:  Okay.  All right.  So I find that

11 given the package which is now enhanced and in the

12 absence of any evidence from the government that there

13 are other active accounts that have not been reported at

14 this time that can be attributed to this defendant, in

15 other words, that his disclosure hasn't been complete, I

16 find that the package is sufficient at this time to

17 warrant his release under very strict conditions.

18          The conditions would be electronic monitoring

19 with home detention.  He can only leave his home and

20 he'll be living with his daughter at an address that is

21 described in the pretrial services report, Lizette Hawit

22 Green.  He can only leave it for attorney visits, court

23 appearances, medical appointments or emergencies,

24 religious services and activities approved by pretrial

25 services.  His travel is restricted to the Eastern

Proceedings

1  District of New York and the Southern District of

2  Florida, unless approved by pretrial services.  He is to

3  surrender passports and make no new applications.

4          He is to have no contact with co-defendants or

5  co-conspirators unless in the presence of counsel.  No

6  contacts with victims or witnesses.  These suretors are

7  all guaranteeing all the conditions of the bond.  He is

8  also subject to random home and employment visits.  And

9  the bond is for $1 million.

10          Are there any other conditions that either

11  party would like to impose at this time?

12          MS. HECTOR:  Your Honor, yes.  One, just

13  respectfully, your Honor, we are going to need to consult

14  with our colleagues about the possibility of an appeal.

15          THE COURT:  Uh-hum.

16          MS. HECTOR:  There is an additional condition

17  and we would also ask that given the closeness of this

18  call, that the defendant not be released until these

19  suretors sign the bond and that the property and the

20  other cash --

21          THE COURT:  Right.

22          MS. HECTOR:  -- is secured.  You know, also

23  because I think there has been some back and forth about

24  suretors who said they're willing and then dropped out at

25  the last minute and I think that's important.

Proceedings

1          With respect to the --

2          THE COURT:  And so just to amplify that, the

3  release would be upon the signature of the suretors and

4  upon either a confession of judgment or whatever

5  procedure there is in Florida.

6          MS. HECTOR:  Exactly.  As well as the transfer

7  of the $50,000.

8          THE COURT:  Right.  The deposit with the Court.

9          MS. HECTOR:  Yes.  With respect to the

10  conditions, the government would ask that there be a non-

11  association condition.  That the defendant not directly

12  or indirectly associate or have contact with co-

13  defendants or any individual employed by or associated

14  with including through consulting agreements, the

15  following entities:  any sports marketing company

16  identified in the indictment including Media World and

17  Traffic Group and any of their subsidiary or affiliate

18  entities, CONCACAF and any affiliated or constituent

19  entity, including but not limited to FENAFUTH, CONMOVAL

20  (ph.) and any affiliated or constituent entity, and FIFA

21  and any affiliated or constituent entity.

22          THE COURT:  All right.  So actually I will give

23  you the bond to attorneys, the bond to fill out the

24  conditions.  He won't be released today but the

25  conditions will all be written.

Proceedings

1          MR. WEDDLE:  Your Honor, I just wanted to raise

2    one logistical issue.  I'm not asking for a change in

3    what your Honor has ordered but in terms of the defendant

4    getting from New York to Florida --

5          THE COURT:  Yea, and places in between for

6    purposes of travel.

7          MR. WEDDLE:  Well, there's that but also the --

8    well, I would ask in the event, for example, there's a

9    court appearance here in Brooklyn and he's in New York,

10   that he be permitted to visit me in my office, which

11   happens to be in Manhattan, your Honor.  That --

12         THE COURT:  With permission of pretrial

13   services.

14         MR. WEDDLE:  Okay.

15         THE COURT:  I'm sure pretrial services will

16   approve his itinerary.

17         MR. WEDDLE:  Fine.  And I had a limited

18   conversation with pretrial services about how they

19   normally work this but since the defendant, you know, is

20   from Honduras, normally when he travels, even

21   domestically, within the United States, for purposes of

22   TSA, having a photo I.D., he would normally use his

23   passport for that.  And so I am sure it's something that

24   we can work out with pretrial services.  I think that

25   sometimes they just essentially like temporarily permit

Proceedings

1  carrying the passport, just to get on the flight to Miami

2  and then turn it back over to pretrial in Florida.  If

3  there's some other mechanism that can be worked out, so

4  he can actually get on a plane, great.  We're amenable to

5  any of them.  We support him surrendering his passport.

6  We're not quibbling with that condition of release, of

7  course.

8          But in the event there is a logistical hiccup,

9  I just wanted to raise it with your Honor so that we

10  could, for example, send a letter to your Honor to figure

11  something out so that he can get on a plane.

12          THE COURT:  All right.  We'll deal with it.

13  Does pretrial services have anything to add?

14          PRETRIAL SERVICES OFFICER:  Your Honor, we have

15  an identification paper document that we issue to

16  defendants (indiscernible).  We don't (indiscernible).

17          THE COURT:  Right.

18          MR. WEDDLE:  Perfect.  If they could do that,

19  that's great.

20          THE COURT:  Anything else from the government?

21          MS. HECTOR:  No, your Honor.  I think that's --

22  oh, is there a time frame for or do we just sort of wait

23  to --

24          THE COURT:  We wait for the defendant to

25  fulfill all the conditions.

Proceedings

1          MS. HECTOR:  Okay.

2          THE COURT:  Once those conditions are

3   fulfilled, and the government concurs, then he'll be

4   released.  If there's a disagreement, then you'll come to

5   court but obviously he has to come to court to be

6   released though.

7          MS. HECTOR:  Right.  So we would just ask --

8          MR. WEDDLE:  Okay.

9          MS. HECTOR:  -- that defense counsel coordinate

10  with us, so that we can do the appropriate 475 to get the

11  defendant to court and review the confession of judgment

12  in that respect.

13         MR. WEDDLE:  Yes, of course, your Honor.  And I

14  anticipate since all of these co-signers are in Florida

15  that we can work out a procedure where they can sign in

16  front of a clerk in Florida and I'm sure that gets worked

17  out between the courts and as soon as we feel like we've

18  satisfied the conditions, we'll consult with the

19  government and accomplish the release.  Thank you, your

20  Honor.

21         THE COURT:  You can contact Jared Goldman, my

22  law clerk --

23         MR. WEDDLE:  Thank you.

24         THE COURT:  -- who knows the procedure for how

25  to get bonds signed in other states.

Proceedings

1          MR. WEDDLE:  Thank you, your Honor.

2          THE COURT:  Okay.  Anything else?

3          MS. HECTOR:  No, and so just to be clear, the

4    Court wants us to fill this out and then provide it.

5          THE COURT:  Yes, I want you both to agree that

6    all of the conditions are there --

7          MS. HECTOR:  Yes.

8          THE COURT:  -- legibly written.

9          MS. HECTOR:  Great.

10          THE COURT:  Okay.  Anything else from pretrial

11   services?

12          PRETRIAL SERVICES OFFICER:  No, your Honor.

13          THE COURT:  Thank you all for sitting through

14   this.

15          MS. HECTOR:  Thank you.

16                    (Matter concluded)

17                         -oOo-

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **23rd** day of **January**, 2016.

Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.