

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EMN:AH/PT
F. #2015R00747

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 9, 2016

By ECF & Hand

The Honorable Robert M. Levy
United States Magistrate Judge
United States District Court
Eastern District of New York
226 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Eduardo Li
      Docket No. 15-CR-252 (S-1) (RJD) (RML)

Dear Judge Levy:

   The government respectfully submits this letter in anticipation of the defendant's detention hearing in the above-listed case, which is scheduled for February 10, 2016 at 9:30 a.m. The defendant, a citizen of Costa Rica, was about to assume his position as a FIFA executive committee member on May 27, 2015 when he was arrested in Switzerland pursuant to a provisional arrest request submitted by U.S. authorities. At the time of his arrest he was the president of the Costa Rican soccer federation ("FEDEFUT") and a member of the CONCACAF executive committee. Following his arrest he was held without bail in Switzerland while he contested his extradition. In September 2015, the defendant was ordered extradited by Swiss authorities, and in December 2015, while his appeal of that decision was pending, he waived extradition and was transferred to the United States. Following his arrival in the District on December 18, 2015, the defendant was arraigned on the above-listed superseding indictment. For the reasons set forth below, including the defendant's significant personal wealth and the fact that Costa Rica does not extradite its nationals, the government respectfully submits that the defendant poses a serious risk of flight and should only be released pursuant to a $10 to 15 million bond, secured by $5 to 7.5 million in cash or United States properties (or an equivalent corporate security bond), and signed by at least four financially responsible U.S.-based sureties and subject to additional conditions of release including, among others, home detention with electronic monitoring and video surveillance.

BACKGROUND

On May 20, 2015, a grand jury sitting in this District returned a sealed indictment charging the defendant, along with 13 others, with participating in a long-running racketeering conspiracy involving a worldwide enterprise of corrupt soccer officials and sports marketing companies.  On May 27, 2015 that indictment was unsealed and the defendant was arrested in Switzerland, which subsequently commenced extradition proceedings.  On November 25, 2015, the grand jury returned the superseding indictment (hereafter, the "indictment"), under seal, which charged the defendant, along with 26 others, with participating in racketeering conspiracy and other crimes.  The indictment, unsealed on December 3, 2015, charges the defendant with one count of racketeering conspiracy (Count One), two counts of wire fraud conspiracy (Counts Eighteen and Fifty-Eight), seven counts of wire fraud (Counts Nineteen through Twenty-Three and Fifty-Nine and Sixty), two counts of money laundering conspiracy (Counts Twenty-Four and Sixty-One), and two counts of money laundering (Counts Twenty-Five and Sixty-Two).

In connection with the racketeering conspiracy count and various of the stand-alone counts, the indictment alleges that, between 2009 and the present and in his capacity as the president of FEDEFUT, the defendant conspired to accept and launder more than $700,000 in bribes in exchange for awarding two different World Cup qualifier media and marketing rights contracts to Traffic Sports USA, Inc. ("Traffic USA"), a Florida sports marketing company.  Ind. ¶¶ 231-249.  The indictment further alleges that in the course of seeking these bribes, the defendant tried to force a Traffic USA employee to divert to himself personally tens of thousands of dollars that Traffic USA owed FEDEFUT pursuant to another contract.  Also in connection with the racketeering conspiracy and certain stand-alone counts, the indictment alleges that the defendant accepted and laundered $40,000 in bribes in exchange for authorizing the Costa Rican national soccer team to play two friendly matches with the national soccer teams of other federations.  Ind. ¶¶ 277-278, 290-291.

For the reasons set forth below, the government respectfully submits that, given the serious risk of flight the defendant poses, an appropriate bond would be $10 to $15 million secured by $5 to $7.5 million in cash or real property in the United States with a similar amount of equity value, as well as the signatures of at least four financially responsible U.S.-based sureties.  If the defendant cannot meet these conditions, he should be detained pending trial.

ARGUMENT

I.      Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  By contrast, detention based on dangerousness must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g). The rules governing admissibility of evidence at trial do not apply in a detention hearing. See 18 U.S.C. § 3142(f); Fed. R. Evid. 1101(d)(3). Accordingly, the government may proceed by proffer, United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).

II.     The Defendant Is a Risk of Flight

   A.  Nature and Circumstances of the Charged Offenses

The charges the defendant faces are serious and favor detention. The defendant is charged with racketeering conspiracy and other crimes in connection with his participation in multiple longstanding schemes to deprive soccer governing bodies of their right to honest services by using his position to enrich himself rather than work toward the common benefit of the constituents of those bodies. Reflecting the seriousness of the charged offenses, the racketeering conspiracy count set forth in Count One and the other 14 counts with which the defendant is charged all carry a maximum sentence of 20 years' imprisonment, as well as forfeiture and mandatory restitution.

In addition, even assuming, for purposes of the defendant's bail determination, that the defendant's U.S. Sentencing Guidelines range was to be based solely on the conduct outlined in the indictment and on loss amounts relating to bribery schemes in which the defendant personally participated, the government currently calculates the defendant's base offense level as 27 and his corresponding guidelines range as 70-87 months.[1] Even if credit for acceptance of responsibility were factored in, the defendant still faces a heavy term of incarceration that creates a substantial incentive to flee. The Second Circuit has held that the possibility of a severe sentence is an important factor in assessing flight risk. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); Martir, 782 F.2d at 1147 (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to

---

[1] The guidelines calculation included above is based only on the amounts of bribes involved in schemes in which the defendant participated personally and does not include bribe amounts relating to other schemes that occurred as part of the same racketeering conspiracy in which the defendant is charged and for which the defendant may ultimately be held responsible. The government provides the above conservative estimate solely to inform the Court's assessment of the defendant's motivation to flee.

consider flight."); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

### B. History and Characteristics of the Defendant

The history and characteristics of the defendant also strongly militate in favor of detention in the absence of a substantial bail package. In particular, as further detailed below, the defendant's significant wealth and the fact that he is a national of a country that does not extradite its citizens are factors that necessitate a substantial bail package.

First, the defendant is a prominent citizen of Costa Rica, where his wife and children reside and where he owns a significant amount of real property and multiple businesses. Specifically, according to defense counsel's representations to the government, the defendant and his wife together have over $9 million in assets in Costa Rica. Moreover, according to defense counsel, other close relatives of the defendant have a total of almost $1.35 million in assets in Costa Rica. While the government credits that defense counsel's estimates and descriptions of assets belonging and available to the defendant were made in good faith, at this time the government is unable to independently verify that the defendant has provided full financial disclosure. Notably, as alleged in the indictment, the defendant used an account in the name of a Costa Rican corporate entity to launder and accept $300,000 of bribe receipts, and he used a different bank account in Panama to launder and accept $40,000 of other bribe receipts. Ind. ¶¶ 249, 291. The government does not know whether these funds or accounts were included in the list of assets defense counsel provided to the government.

Second, because Costa Rica, by its constitution, prohibits the extradition of its citizens to other countries, if the defendant fled to Costa Rica, the government could not seek his extradition. For that reason, unless the bond amount is significantly in excess of the defendant's net worth and a substantial portion of the assets available to him in Costa Rica are converted into cash or assets that can be posted in this Court (such as through liquidation, borrowing against them to produce cash, or a corporate surety bond), the defendant could essentially "buy" his freedom by absconding to Costa Rica and compensating any sureties with his assets in Costa Rica. Because of this reality, it is imperative that any bond prevent the defendant from acting on this rational calculation.

Third, as evidenced by his official positions within FIFA, CONCACAF, and FEDEFUT over an extended period, the defendant has significant and powerful contacts abroad and has frequently traveled all around the world. Even if he were not able to flee to Costa Rica, his contacts elsewhere and wherewithal would enable him to find shelter in other countries with which the United States does not have an extradition treaty or that would be unlikely to honor their treaty obligations.[2]

---

[2] The defendant makes the curious argument that his decision to "voluntarily waive[] extradition" to the United States somehow indicates that he is "without the proclivity to flee." See Def. Ltr. at 6. In fact, the defendant only waived extradition after spending over six months in Swiss custody without being granted bail, during which time he actively fought the government's efforts to extradite him to the United States. It was only after he had been ordered

C. Evidence of the Defendant's Guilt

The weight of the evidence against the defendant is strong. The government's evidence includes witness testimony that is corroborated by, among other evidence, bank records and contracts that show a flow of funds from sports marketing companies and consulting companies, often through bogus transactions with third-party sham entities used to conceal and disguise the bribe payments, ultimately to bank accounts held in the name of the defendant or controlled by a close associate. This evidence is further corroborated by consensual recordings in which the defendant acknowledged his receipt of bribe payments and confirmed his use of sham transactions to hide these bribes. This factor, too, thus favors detention in the absence of a significant bail package.

III. The Proffered Bail Package Is Insufficient

In his letter to the Court of February 4, 2016, the defendant proposed a $5 million bond co-signed by his wife and two adult children, "collateralized by $300,000 in cash, [the defendant's] home in Florida, as well as any real estate owned by [the defendant] and his wife in Costa Rica." Def. Ltr. at 5. Importantly, the defendant's proposal did not include any indication as to the value of the Florida home, how the "real estate owned by [the defendant] and his wife" would be secured for purposes of the bond, or the approximate value of the Costa Rican real estate. For these and other reasons explained more fully below, this proposal is seriously inadequate.

As an initial matter, the proposed bond amount is far below the net worth of the defendant and his family, who, even by defense counsel's own representations, would still be worth at least $5 million if he fled (assuming that the proposed $5 million bond was fully secured by property that could be seized by the government). For that reason alone, the government submits that a bond in the amount of $10 to $15 million is necessary to ensure the defendant's continued presence in this jurisdiction.

Second, the three sureties proposed by the defendant - specifically the defendant's wife and his two children - are neither U.S. citizens nor permanent residents. They are Costa Rican nationals without substantial ties to or assets in the United States. As such, should the defendant be released on the proposed bond and then abscond, the government would be unable to collect anything from the defendant's wife or children, whose assets would remain untouched in Costa Rica and who could live there unaffected by any judgment resulting from the defendant's flight. For any sureties appearing on behalf of the defendant to have any value for the purpose of actually securing the bond, they must be U.S.-based persons from whom the

---

extradited and had filed an appeal that the defendant shifted course and decided to abandon what he presumably saw as a futile appeal and waive extradition. This decision enabled him to avoid spending additional time in Swiss jail and come to the United States, where he would have the opportunity to argue to be released on bond. At best, the defendant's decision to waive extradition when he did is a neutral factor in the flight analysis.

government can actually collect a judgment, or at the very least foreign nationals who own property in the United States, with significant equity, that can be attached by the Court.

Curiously, the defendant has submitted five letters from "good friends" in the United States who have offered their opinion that the defendant is not a flight risk. Def. Ltr. at 6. While the government has not had the opportunity to interview these individuals, they would appear, based on their own representations, potentially qualified to serve as sureties. Despite this fact, the defendant's proposed bail package does not propose any of these individuals as sureties and further does not indicate whether any of them own property in the United States that may be available to secure the bond, or have cash or liquid assets to post.

Third, the defendant's proposal to post $300,000 in cash is, while a significant sum in absolute terms, immaterial in comparison with the over $11 million net worth of the defendant and his family. In light of the disparity between this cash amount and the defendant's net worth, his rational calculation could well be to "pay" $300,000 in exchange for avoiding prosecution and the potential of incarceration. The availability of the defendant's Florida home as collateral does not alter the equation: defense counsel has previously represented to the government that there is no equity in the property.

Finally, the defendant's offer to secure the bond with "any real estate" he and his wife own in Costa Rica is irrelevant unless he proposes some method – of which there are several – to transfer the value of that real estate to the United States for the purpose of securing a bond. Real property located in a foreign country cannot be the primary form of security for a bond, and for good reason: there is much uncertainty as to whether a foreign court would recognize a judgment imposed by this Court against such property, particularly in the circumstances of a bond violation committed by a national of the foreign country where the property is held. In addition, even in the unlikely event a foreign court was to recognize such a judgment, the U.S. Marshals Service will not dispose of such property for the government.

In sum, the security that the defendant offers in support of a bond worth less than half his family's $11 million net worth is $300,000 in cash and the signatures of his wife and two children, from whom the government is unlikely to ever collect a penny in the event he flees. Such a package is far short of what is necessary to assure the appearance of a defendant of significant means who: (a) is charged with serious and sophisticated financial crimes, (b) is without substantial ties to the United States, (c) is a citizen of a country that is constitutionally prohibited from extraditing its nationals, and (d) faces a significant term of imprisonment.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the defendant should not be released unless and until he provides full financial disclosure and posts a bond of $10 to 15 million, rather than the defendant's proposed figure of $5 million, secured by either (a) $5 to 7.5 million in cash or a corporate surety bond, or (b) real property in the United States with a similar amount of equity value, as well as the signatures of at least four financially

responsible U.S.-based sureties.  Further, any such release should be under the conditions of home confinement with electronic monitoring and video surveillance, among other restrictions.

                              Respectfully submitted,

                              ROBERT L. CAPERS
                              United States Attorney

By:    /s/_____
        Evan M. Norris
        Amanda Hector
        Paul Tuchmann
        Nadia Shihata
        Keith D. Edelman
        Assistant U.S. Attorneys
        718-254-7000

cc:    Clerk of Court (RJD/RML) (by ECF)
        Counsel of Record (by ECF)