UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,

    -against-                                           MEMORANDUM
                                                     AND ORDER
JUAN ÁNGEL NAPOUT,                         15 CR 252 (S-1) (PKC) (RML)

                Defendant.
-------------------------------------------------------X

LEVY, United States Magistrate Judge:

        On August 3, 2016, the Honorable Raymond J. Dearie, United States District Judge, referred the parties' unresolved privilege issues to me. (See Government's Letter Requesting that the Court Direct Defendant Napout to File by Aug. 31, 2016 a Response Concerning Claimed Privileges, dated Aug. 16, 2016, Dkt. No. 409, at 1); see also FED. R. CRIM. P. 59(a). Defendant Juan Ángel Napout ("defendant" or "Napout") asserted various privileges over materials the government had obtained during its investigation of this case, including materials contained on electronic devices recovered from Napout in connection with his arrest, and records obtained from the headquarters of the Confederación Sudamericana de Fútbol ("CONMEBOL") in Asuncion, Paraguay. (See generally Letter of Silvia Piñera-Vazquez, Esq., dated Aug. 31, 2016 ("Def.'s 8/31/16 Ltr."), Dkt. No. 420, at 2-4.) This decision addresses Napout's assertion that he and CONMEBOL entered into a valid common interest agreement spanning the period from June 17, 2015 to December 3, 2015, during which Napout was

CONMEBOL's president.[1] (See Letter of Silvia Piñera-Vazquez, Esq., dated Nov. 16, 2016 ("Def.'s Post-Hr'g Ltr."), Dkt. No. 480, at 3-5; Transcript of Oct. 25, 2016 Evidentiary Hearing, filed Nov. 10, 2016 ("Hr'g Tr."), Dkt. No. 474, at 49.) In opposition, the government seeks an order holding that "communications between Napout or his attorneys and representatives of or counsel to CONMEBOL are not subject to a common interest privilege." (Gov't Post-Hr'g Br. at 2.)

The court conducted an evidentiary hearing on October 25, 2016, at which defendant presented two witnesses. (See Hr'g Tr.) For the reasons explained on the record on January 19, 2017 (see Transcript of Jan. 19, 2017 Conference, filed Jan. 27, 2017 ("Conf. Tr."), Dkt. No. 528), and as explained herein, the court concludes that Napout has failed to establish the existence of a valid common interest agreement. Therefore, communications between Napout or his attorneys and representatives of, or counsel to, CONMEBOL are not subject to a common interest privilege.

## BACKGROUND

I assume familiarity with the facts underlying this dispute. Briefly, the first indictment in this multi-defendant case was unsealed on May 27, 2015, after the arrests of some of the initially charged defendants. (See Indictment, dated May 20, 2015 ("Indictment"), Dkt. No. 464-2.) The government represents, and defendant's key witness acknowledged, that CONMEBOL was a victim of the crimes alleged in the indictment. (See Gov't Post-Hr'g Br. at 4; Hr'g Tr. at 33; see also Indictment ¶¶ 32, 34 (charging the two presidents of CONMEBOL prior to defendant).) On the date of the unsealing of the first indictment, Napout was serving as

---

[1] Napout was arrested on December 3, 2015 and resigned as CONMEBOL's president on December 11, 2015. (See Government's Post-Hearing Brief Concerning the Existence and Scope of Certain Privileges Claimed by Defendant Napout, dated Nov. 16, 2016 ("Gov't Post-Hr'g Br."), Dkt. No. 482, at 1, 16 n.10.)

the president of CONMEBOL, a position he held until his resignation several days after his December 3, 2015 arrest pursuant to the superseding indictment. (See generally Def.'s 8/31/16 Ltr. at 2; Gov't Post-Hr'g Br. at 16 n.10.) After the unsealing of the first indictment, Napout retained John Pappalardo of Greenberg Traurig, LLP to represent him in his personal capacity. (See Def.'s 8/31/16 Ltr. at 2.) In or about early to mid-June 2015, Pappalardo arranged for Michael Kendall, then of McDermott Will & Emery, to represent CONMEBOL in connection with the government's investigation and other pressing commercial and governance issues. (See Hr'g Tr. at 31-34, 70-72; Letter of Ben O'Neil, Esq., dated Oct. 21, 2016, Dkt. No. 453, at 1.) Pappalardo told Kendall that "Napout had decided to retain" him and he "was hired." (Hr'g Tr. at 71.)

    Kendall testified at the evidentiary hearing that on June 15, 2015, Pappalardo advised him that Pappalardo had learned from the government that Napout was a target of the government's ongoing criminal investigation. (Id. at 34.) Pappalardo explained that "Napout doesn't want anything you do or tell him to do to cause him problems with the Eastern District . . . . [H]e wants to run everything by [another of his defense attorneys,] Esteban [Burt,] and me because he doesn't want anything he does to make things worse with the Eastern District." (Id. at 35; see generally id. at 35-36 (explaining that, due to the forfeiture provision in the indictment, CONMEBOL would have to negotiate its release from "contracts purchased with bribery").) On June 17, 2015, Kendall, who at that time still "hadn't met the client" and "was only speaking to Mr. Pappalardo," told Pappalardo that "if you want to [ ] have Juan run stuff by you [and defense attorney Esteban Burt], we've got to have a common interest agreement because I don't want the privilege waived so all these other people are going to find out what we're doing." (Id. at 36-37.)

3

The telephone discussion was memorialized in an email exchange between Kendall and Pappalardo dated June 18 and 19, 2015. (See Emails of Michael Kendall, Esq. & John Pappalardo, Esq., filed Aug. 31, 2016, Dkt. No. 420-1, at 1.) On June 18, 2015, Kendall wrote to Pappalardo:

> The purpose of this email is to memorialize our discussions yesterday concerning our clients' common interests in the FIFA-related issues. We will cooperate pursuant to a common interest agreement. I understand it will have terms similar to the last one we had, and we can work out whether to have it in writing, specific details, etc. when you land. It is effective starting yesterday. Please confirm by return email.

(Id.)[2] The following day, Pappalardo replied "[s]o confirmed. I am fine with an oral agreement under the circumstances of this matter." (Id.)

At the evidentiary hearing, Kendall repeatedly testified that the purported agreement related only to "commercial rights or commercial interests" and not to the criminal investigation. (See, e.g., Hr'g Tr. at 35-38, 40, 42-43.) This meant "unraveling all the financial problems and deals and agreements" between CONMEBOL and indicted "middlemen." (See id. at 35-37.) However, Kendall also testified that, although the purported agreement excluded any privileged exchange of information related to Napout's criminal case, "[a] lot of things were inter-related" and it was "messy how to separate out the issues" because "[i]f [CONMEBOL was] going to do a commercial deal with the networks and free up the money, [CONMEBOL] had to run it by the EDNY and get their blessing." (Id. at 37; see also id. at 42 (explaining that "[t]he focus was on the commercial issues but . . . things blurred a little bit in practice").

---

[2] Kendall did not disclose the specific terms of the prior common interest agreement between his and Pappalardo's clients, but indicated that they were "boilerplate." (See Hr'g Tr. at 30-31, 42, 85-88.)

4

## DISCUSSION

"The joint defense privilege, more properly identified as the 'common interest rule,' has been described as an extension of the attorney client privilege." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (internal citations and quotation marks omitted). "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." Id. (citation omitted); see also Sokol v. Wyeth, Inc., No. 07 CV 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) ("A 'common interest' doctrine . . . is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege."). The common interest rule further provides that the privilege "cannot be waived without the consent of all parties to the privilege." United States v. Weissman, No. 94 CR 760 (S1), 1996 WL 737042, at *26 (S.D.N.Y. Dec. 26, 1996) (citations omitted).

"The common interest doctrine 'is not an independent source of privilege or confidentiality.'" Sokol, 2008 WL 3166662, at *5 (quoting In re Commercial Money Ctr., Inc., Equip. Lease Litig., 248 F.R.D. 532, 536 (N.D. Ohio 2008)); see also In re Rivastigmine Patent Litig., 05 MD 1661, 2005 WL 2319005, at *2 (S.D.N.Y. Sept. 22, 2005). Thus, "[i]f a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." Sokol, 2008 WL 3166662, at *5 (citation omitted); see also Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 284 F.R.D. 132, 139 (S.D.N.Y. 2012). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter, and it is therefore unnecessary that there be actual litigation in progress for the common interest

5

rule of the attorney-client privilege to apply." Schwimmer, 892 F.2d at 243-44 (internal quotation marks and citations omitted).

"The burden of establishing the existence of an attorney client privilege rests entirely upon the individual asserting the privilege." Weissman, 1996 WL 737042, at *6 (citing Schwimmer, 892 F.2d at 244). This placement of the burden reflects the underlying "policy that the privilege be used sparingly, only when well identified and established." Id. "Obtaining the protections of the common interest doctrine requires a two-part showing." Fireman's Fund Ins. Co., 284 F.R.D. at 139. "First, the parties exchanging otherwise privileged information must establish 'a common legal, rather than commercial, interest.'" Id. (quoting Sokol, 2008 WL 3166662, at *5). "'The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial.'" Id. (quoting North River Ins. Co. v. Columbia Cas. Co., No. 90 CV 2518, 1995 WL 5792, at *3 (S.D.N.Y. Jan. 5, 1995)). Thus, "the doctrine 'does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation.'" In re Rivastigmine Patent Litig., 2005 WL 2319005, at *2 (quoting Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995)).

"For courts to find such a common legal interest, the parties must have come to an agreement, 'though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy.'" Fireman's Fund Ins. Co., 284 F.R.D. at 139 (quoting Lugosch v. Congel, 219 F.R.D. 220, 237 (N.D.N.Y. 2003)); but see In re Rivastigmine Patent Litig., 2005 WL 2319005, at *4 (explaining that "parties relying on an oral agreement run the risk that the Court can not determine when or if an agreement was reached") (internal quotation marks and citation removed). "Courts may look to whether 'multiple persons are represented by the same attorney' or any other evidence to demonstrate the existence of 'coordinated . . . legal

efforts.'" Fireman's Fund Ins. Co., 284 F.R.D. at 139 (ellipses in original) (quoting Bank Brussels Lambert, 160 F.R.D. at 446, 448).

The final element is that "the parties [to the agreement] must establish that any exchange of privileged information was 'made in the course of formulating a common legal strategy,' and that the parties understood that the communication would be in furtherance of the shared legal interest." Id. at 140 (quoting Sokol, 2008 WL 3166662, at *5); see also In re Rivastigmine Patent Litig., 2005 WL 2319005, at *2 (explaining that "it is not sufficient for the party seeking the protection of the common interest doctrine merely to show that a unified legal interest theoretically existed [, but rather] it must also demonstrate that the parties demonstrated cooperation in developing a common legal strategy").

Turning to the instant case, defendant has cited no case law, nor has the court's research uncovered any, recognizing a valid common interest agreement under circumstances similar to those here. With respect to the parties' interests, it is difficult to reconcile Napout's interest as a target of the government's investigation with CONMEBOL's opposing interest as a purported victim of the crimes alleged in the indictment. That the parties apparently did not recognize this distinction during the relevant time period does not alter the analysis.

Furthermore, the extensive testimony at the hearing clearly establishes that the purpose of the agreement was to allow Napout to "run everything by" his defense attorneys in an effort to shield himself from criminal liability from the government's ongoing investigation. As Pappalardo made clear at the hearing, he and Kendall entered into the common interest agreement because he "did not want [Napout] in his official capacity as president of CONMEBOL to further implicate himself." (Hr'g Tr. at 21.) However, defendant has offered no persuasive evidence that this arrangement furthered any cognizable legal interest of

7

CONMEBOL.[3] Rather, the record before me describes an arrangement whereby information would flow in only one direction – from CONMEBOL to Napout – and only for Napout's benefit. It is significant that Napout, acting in his individual capacity, apparently authorized both parties to enter into the common interest agreement and, as a former manager, now seeks to constrain the entity's exercise of control over corporate communications. See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349 (1985) ("Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.") In sum, I know of no precedent or principle supporting defendant's argument.

---

[3] In an affidavit submitted by defendant after the briefing schedule had elapsed, and without first requesting leave of the court, Kendall asserted, inter alia, that he "thought it reasonable to conclude Mr. Napout and CONMEBOL shared a common interest in reforming CONMEBOL's commercial relations, without generating any concern by the government that CONMEBOL or its sitting president were continuing to further the criminal activities described in the indictment." (Affidavit of Michael Kendall, Esq., dated Nov. 28, 2016, Dkt. No. 497-1, ¶ 7.) This explanation, which was not elicited upon direct or re-direct examination but rather responds directly to arguments in the government's post-hearing brief, nonetheless fails to account for the inherent divergent interests of a target president in his personal capacity and a purported victim entity.

## CONCLUSION

For the reasons stated above, the court concludes that communications between Napout or his attorneys and representatives of, or counsel to, CONMEBOL are not subject to a common interest privilege.

SO ORDERED.

Dated: Brooklyn, New York
      March 10, 2017

s/ Robert M. Levy
_____
ROBERT M. LEVY
United States Magistrate Judge
