PT:SPN/MKM/KDE
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
− − − − − − − − − − − − − − − − −X

UNITED STATES OF AMERICA

    - against -

                                  Docket No. 15-CR-252 (S-2) (PKC)

JUAN ÁNGEL NAPOUT,
MANUEL BURGA, and
JOSÉ MARIA MARIN,

            Defendants.

− − − − − − − − − − − − − − − − −X


## THE GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PARTIALLY ANONYMOUS AND SEMI-SEQUESTERED JURY


                                       BRIDGET M. ROHDE
                                       ACTING UNITED STATES ATTORNEY
                                       Eastern District of New York
                                       271 Cadman Plaza East
                                       Brooklyn, New York 11201

Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant United States Attorneys
      (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for a jury that is anonymous as to the press and public (but not the parties or their counsel of record) and semi-sequestered (transported to and from the courthouse by the U.S. Marshals Service). These limited measures are necessary to protect the integrity of the trial and the jury's impartiality by preventing harassment, intimidation, and other types of interference in a case that (1) has drawn intense domestic and international media coverage, including press reports that have publicized personal information about perceived witnesses; and (2) has given rise to documented attempts to obstruct justice and intimidate witnesses. Because the jury will not be anonymous as to the defense, and the Court can instruct the jury that anonymity and semi-sequestration are routine and are designed to protect the jurors' privacy, there is no risk that the defendants' fundamental rights will be infringed. Accordingly, and for the reasons set forth below, the motion should be granted.[1]

BACKGROUND

I.      The Indictments

On May 20, 2015, a grand jury in this District returned a 47-count indictment (the "Original Indictment") charging 14 individuals, including defendant José Maria Marin, with racketeering conspiracy and wire fraud and money laundering offenses, among other crimes, in connection with their participation in schemes to enrich themselves and their co-conspirators

---

[1] The defendants object to the government's motion and intend to set forth their opposition in writing.

through the corruption of international soccer.  The Original Indictment was unsealed on May 27, 2015, following the arrests of some of the charged defendants.

On November 25, 2015, the grand jury returned a 92-count superseding indictment (the "First Superseding Indictment") charging 16 additional defendants, including defendants Juan Ángel Napout and Manuel Burga.  The First Superseding Indictment was unsealed on December 3, 2015, following the arrests of some of the newly charged defendants. In anticipation of trial, on June 14, 2017, the government sought and obtained a second superseding indictment (the "Second Superseding Indictment" or "Indictment"), charging the three trial defendants who are currently before the Court with the same offenses charged in the First Superseding Indictment and effectively severing their case from that of the remaining defendants named in the First Superseding Indictment.  See United States v. Napout, et al., 15-CR-252 (S-2).

Trial against defendants Napout, Marin, and Burga is scheduled to begin on November 6, 2017.

II.     Widespread Media Coverage

The media coverage of this case, and of allegations of corruption in international soccer more broadly, has been extensive.[2]  Before the unsealing of the Original Indictment, the public had long been interested in corruption relating to the institutions that govern soccer, the world's most popular sport.  See, e.g., "The Beautiful Bung: Corruption and the World Cup," BBC Panorama (June 11, 2006), transcription available at http://news.bbc.co.uk/1/hi/

_____

[2] A Google news search for "FIFA corruption" gives some sense of the scope of the media coverage of the case beyond the specific examples referenced herein.

programmes/panorama/5076282.stm; "Timeline of Events Surrounding FIFA Corruption Claims," <u>BBC Sport</u> (June 1, 2011), <u>available at</u> http://www.bbc.com/sport/football/13601803; David Conn, "FIFA Corruption Intrigue Deepens as Brazil's Ricardo Teixeira Resigns," <u>The Guardian</u> (March 12, 2012), <u>available at</u> https://www.theguardian.com/football/2012/mar/12/fifa-ricardo-teixeira-resigns; Teri Thompson, <u>et al.</u>, "Soccer Rat!  The Inside Story of How Chuck Blazer, Ex-U.S. Soccer Executive and FIFA Bigwig, Became a Confidential Informant For the FBI," <u>N.Y. Daily News</u> (Nov. 1, 2014), <u>available at</u> http://www.nydailynews.com/sports/ soccer/soccer-rat-ex-u-s-soccer-exec-chuck-blazer-fbi-informant-article-1.1995761.

Press and public interest in the corruption of international soccer only intensified after the unsealing of the Original Indictment, resulting in the publication of hundreds, if not thousands, of articles about the arrests, many on the front pages of domestic and international newspapers and on various websites around the globe.  <u>See, e.g.</u>, Matt Apuzzo, <u>et al.</u>, "Arrests Sweep Governing Body of Global Soccer," <u>N.Y. Times</u>, at A1 (May 27, 2015); Aruna Viswanatha, <u>et al.</u>, "FIFA Rocked as U.S. Charges 14 in Corruption Investigation," <u>Wall St. J.</u> (May 27, 2015), <u>available at</u> https://www.wsj.com/articles/six-soccer-officials-arrested-in-fifa-corruption-investigation-1432710956; Tina Susman, <u>et al.</u>, "'FIFA Is Imploding': 14 Charged in Corruption Probe; At Least 8 Arrested," <u>L.A. Times</u> (May 27, 2015), <u>available at</u> http://www.latimes.com/sports/la-sp-fifa-extradition-20150527-story.html; Kara Scannell, <u>et al.</u>, "US Indicts 14 Over 'Rampant' FIFA Corruption," <u>Financial Times</u>, <u>available at</u> https://www.ft.com/content/afc0246c-042d-11e5-a5c3-00144feabdc0; Michael E. Miller, <u>et al.</u>, "U.S. Indicts World Soccer Officials In Alleged $150 million FIFA Bribery Scandal," <u>Wash. Post</u> (May 27, 2015), <u>available at</u> https://www.washingtonpost.com/news/morning-

mix/wp/2015/05/27/top-fifa-officials-arrested-in-international-soccer-corruption-investigation-according-to-reports/?utm_term=.095d32482aef; Michelle Kaufman, Jay Weaver, and Jacqueline Charles, "FBI Raids Miami Beach Office of CONCACAF as Part of International Soccer Investigation," <u>Miami Herald</u> (May 27, 2015), <u>available at</u> http://www.miamiherald.com/ news/local/community/miami-dade/article22409883.html; <u>see generally</u> "2015 FIFA Corruption Case," <u>Wikipedia</u>, <u>available at</u> https://en.wikipedia.org/wiki/2015_FIFA_corruption_case (last visited Sept. 1, 2017).

The intense media coverage continued through the summer of 2015 as the case progressed.  <u>See, e.g.</u>, Ed Thomas, "FIFA Corruption: Documents Show Details of Jack Warner 'Bribes,'" <u>BBC News</u> (June 7, 2015), <u>available at</u> http://www.bbc.com/news/world-latin-america-33039014; Sam Borden, "The FIFA Scandal: Questions and Answers," <u>N.Y. Times</u> (Oct. 8, 2015), <u>available at</u> https://www.nytimes.com/2015/10/09/sports/soccer/the-fifa-scandal-questions-and-answers.html; Christian Red, "Brazil's José Maria Marin Agrees to Extradition to U.S. in FIFA Bribery Case," <u>N.Y. Daily News</u> (Oct. 28, 2015), <u>available at</u> http://www. nydailynews.com/sports/soccer/jose-maria-marin-agrees-extradition-fifa-bribery-case-article-1.2414472.

The press again reported extensively on the unsealing of the First Superseding Indictment in December 2015 and on the filing of charges against defendants Napout and Burga. <u>See, e.g.</u>, Rebecca R. Ruiz, <u>et al.</u>, "FIFA Corruption: Top Officials Arrested in Pre-Dawn Raid at Zurich Hotel," <u>N.Y. Times</u> (Dec. 3, 2015), <u>available at</u> https://www.nytimes.com/2015/ 12/03/sports/fifa-scandal-arrests-in-switzerland.html; Evan Perez, <u>et al.</u>, "U.S. Charges 16 FIFA Officials In Widening Probe," <u>CNN</u> (Dec. 3, 2015), <u>available at</u> http://www.cnn.com/

2015/12/03/sport/fifa-corruption-charges-justice-department/index.html; Nathaniel Vinton,

"FIFA Defendant Juan Ángel Napout Posts $20 million Bond After Not-Guilty Plea," N.Y. Daily

News (Dec. 5, 2015), available at http://www.nydailynews.com/sports/soccer/fifa-defendant-

posts-20-million-bond-not-guilty-plea-article-1.2467136.

    Unlike in many cases, the interest of the public and the press has continued

through the Court's resolution of legal motions and other procedural matters.  See, e.g., Nate

Raymond, "Plea Talks Under Way in FIFA Bribery Case as U.S. Trial Date Set," Reuters (Sept.

19, 2016), available at http://www.reuters.com/article/us-soccer-fifa-court-idUSKCN11P1UI;

Christina Carrega, "Judge Rejects Indicted Ex-FIFA Official's Request for Later Curfew," N.Y.

Daily News (Jan. 5, 2017), available at http://www.nydailynews.com/new-york/nyc-crime/judge-

rejects-indicted-ex-fifa-official-request-curfe-article-1.2936187; William F. Johnson, "FIFA

Judge Rejects Target-Victim Common Interest Agreement," N.Y. Law J. (Mar. 1, 2017),

available at http://www.newyorklawjournal.com/id=1202780222910/FIFA-Judge-Rejects-

TargetVictim-Common-Interest-Agreement?slreturn=20170723071359; Adam Rhodes,

"Government Wins Bid To Limit Warrants' Use In FIFA Corruption Case," Law 360 (Aug, 8,

2017), available at https://www.law360.com/articles/952097/gov-t-wins-bid-to-limit-warrants-

use-in-fifa-corruption-case.

    Such interest has continued to the present and is sure to increase leading up to and

during trial.  See, e.g., "Peru President OK's Extradition of Ex-Soccer Boss to U.S.," Fox News

(Nov. 24, 2016), available at http://www.foxnews.com/world/2016/11/24/peru-president-ok-

extradition-ex-soccer-boss-to-us.html; Rob Harris, "U.S. Attorney General Reveals FIFA

Corruption Probe Is Ongoing As First Trial Approaches," The Independent (Jan. 14, 2017),

available at http://www.independent.co.uk/sport/football/international/us-attorney-general-reveals-fifa-corruption-probe-is-ongoing-as-first-trial-approaches-a7527766.html; Larry McShane, "Brooklyn Judge Tosses Out Motions From FIFA Officials Hoping to Dodge Corruption Charges," N.Y. Daily News (Feb. 21, 2017), available at http://www.nydailynews.com/new-york/brooklyn/brooklyn-judge-won-drop-corruption-charges-fifa-officials-article-1.2978236; "Fresh Arrest Shows FIFA's Corruption Turmoil Far From Over," USA Today (July 18, 2017), available at https://www.usatoday.com/story/ sports/soccer/2017/07/18/fresh-arrest-shows-fifas-corruption-turmoil-far-from-over/103794478/.

   The press in South America, where the defendants and many witnesses are from, has been particularly focused on this case.  Prominent South American media outlets have published dozens of articles about almost every facet of the case, as well as related cases in other countries.  Compilations of articles available on the websites of some of these publications are illustrative.  See, e.g., "Escândalo Na FIFA," O Globo (Brazil), available at https://oglobo.globo.com/esportes/escandalo-na-fifa/; "FIFA," El Comercio (Peru), available at http://elcomercio.pe/noticias/fifa-1; "Escándalo FIFA," El Popular (Peru), available at http://www.elpopular.pe/escandalo-fifa; "Caso FIFA," La Nación (Paraguay), available at http://www.lanacion.com.py/search/caso%2Bfifa/?q=caso+fifa%2F; "Escándalo En La FIFA," El Clarín (Argentina), available at https://www.clarin.com/tema/escandalo_en_la_fifa.html.

   In short, the media attention devoted to this case has been widespread and intense and can only be expected to increase during jury selection and trial.

III.     Press Reporting of Personal Information about Perceived Witnesses

The media coverage in this case has gone well beyond reporting on the legal issues and the alleged criminal conduct to focus on personal details relating to the alleged conspirators and those viewed as likely witnesses in the government's case.  Some of these reports have included personal information about perceived witnesses that could put those individuals at risk.  The government respectfully requests that the Court consider the specific instances described in the sealed supplement filed herewith (the "Sealed Supplement").[3]

IV.     Attempted Obstruction of Justice and Witness Intimidation

In addition to drawing widespread media coverage, this case has given rise to several instances of attempted obstruction of justice and witness intimidation.   Although to date these instances have not resulted in criminal charges (other than as part of the pattern of racketeering activity), it is clear that publicity generated by the case, as well as the significant penal, economic, and reputational interests at stake, have resulted in attempts to obstruct justice and prevent information from reaching the government and the public.  The government

---

[3] The government respectfully requests permission to file the supplement under seal.  As an initial matter, the government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal.  See, e.g., United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (noting "the requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); Lugosch v. Pyramid Co., 435 F.3d 110, 119-20 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored").  However, based on the facts set forth in the Sealed Supplement, sealing is necessary to protect the safety of witnesses and the integrity of the government's case and ongoing investigation.  See United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the safety of witnesses and the integrity of an ongoing investigation may be compelling reasons justifying sealing).  As the facts set forth in the Sealed Supplement provide ample support for the "specific, on the record findings" necessary to support sealing, Lugosch, 435 F.3d at 120, the government respectfully requests that the Court record those findings and file the Sealed Supplement under seal.

respectfully requests that the Court consider the facts relating to obstructive conduct and witness intimidation that are set forth in the Sealed Supplement.

ARGUMENT

I.      <u>Legal Standards</u>

      The Second Circuit has long recognized that anonymous juries are often necessary to protect the integrity of a trial and to ensure an impartial jury and, when properly used, do not infringe a defendant's constitutional rights.  <u>See, e.g.</u>, <u>United States v. Pica</u>, 692 F.3d 79, 81 (2d Cir. 2012); <u>United States v. Quinones</u>, 511 F.3d 289, 291 (2d Cir. 2007); <u>United States v. Gotti</u>, 459 F.3d 296, 345 (2d Cir. 2006); <u>United States v. Aulicino</u>, 44 F.3d 1102, 1116 (2d Cir. 1995); <u>United States v. Wong</u>, 40 F.3d 1347, 1376-77 (2d Cir. 1994); <u>United States v. Thai</u>, 29 F.3d 785, 800-01 (2d Cir. 1994); <u>United States v. Amuso</u>, 21 F.3d 1251, 1264-65 (2d Cir. 1994); <u>United States v. Locascio</u>, 6 F.3d 924, 946-47 (2d Cir. 1993); <u>United States v. Paccione</u>, 949 F.2d 1183, 1192 (2d Cir. 1991); <u>United States v. Vario</u>, 943 F.2d 236, 239 (2d Cir. 1991); <u>United States v. Tutino</u>, 883 F.2d 1125, 1132 (2d Cir. 1989); <u>United States v. Persico</u>, 832 F.2d 705, 717 (2d Cir. 1987); <u>United States v. Thomas</u>, 757 F.2d 1359, 1364-65 (2d Cir. 1985); <u>United States v. Barnes</u>, 604 F.2d 121, 133-43 (2d Cir. 1979).

      Anonymous juries are necessary when jurors whose identities are known are vulnerable to pressure and influence by "defendants' friends or enemies, or harassment by the public."  <u>Vario</u>, 943 F.2d at 240 (internal quotation marks omitted); <u>accord</u> <u>Quinones</u>, 511 F.3d at 296.  Furthermore, even if no one improperly approaches a juror, the fact that the jurors are aware that their identities are publicly known may subtly and unconsciously impair their impartiality.  <u>See</u> <u>Barnes</u>, 604 F.2d at 141 ("If the anonymous juror feels less pressure as the

8

result of anonymity, this is as it should be a factor contributing to his impartiality." (internal quotation marks and citation omitted)).

    To determine whether to empanel an anonymous jury, the district court must follow a two-step process.  First, the court must assess whether there is "strong reason to believe that the jury needs protection."  Pica, 692 F.3d at 88 (internal quotation marks omitted).  Courts in this Circuit have considered various factors in determining whether there is reason to believe the jury's safety and impartiality need protection, including: (1) whether the trial is likely to attract media attention and publicity; (2) whether the defendants or their associates have engaged in past attempts to interfere with the judicial process; (3) whether the defendants have access to the means to interfere with the jury; and (4) the dangerousness of the defendants.  See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (citing Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33); Amuso, 21 F.3d at 1264-65 (assessing the defendant's "means to interfere with the jurors if he so desired").  In considering these factors, the Court can rely on the government's proffer of facts showing that the jury needs protection.  See United States v. Persico, No. 10-CR-147 (SLT), 2012 WL 1188243 (E.D.N.Y. Apr. 6, 2012) (citing Wong, 40 F.3d at 1376-77).

    Second, if the court determines that anonymity is necessary to protect the jury, the court should then take "reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."  Pica, 692 F.3d at 88 (internal quotation marks omitted).  Where a fully anonymous jury is to be empaneled, the court should "conduct a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and reduce the possibility that the jury will infer that the defendant is dangerous by

giving the jurors "a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116. In many such cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media. See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363. So long as these precautions are taken, "the use of an anonymous jury does not infringe a defendant's constitutional rights." Aulicino, 44 F.3d at 1116.

Within these parameters, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Paccione, 949 F.2d at 1192. In this regard, a court can order that the prospective and final jurors be anonymous as to the parties and the public (as in the cases cited above) or be known to the parties but anonymous as to the press and the public. For instance, in United States v. Shkreli, 15-CR-637 (KAM) (E.D.N.Y.), Judge Matsumoto permitted the parties to know the jurors' identities but, because of the media coverage surrounding the case, ordered that their names and "private, personal information" not be disclosed publicly. Mem. & Order dated June 25, 2017, ECF Dkt. No. 259 ("Shkreli Op."), at 3. The court recognized that in a "high-profile case in which there has been ongoing pre-trial media coverage," the disclosure of juror names would increase the risk that prospective jurors would feel the pressure of public identification and therefore "not be candid." Id. at 5, 12. The court also recognized that public dissemination of the jurors' names posed a "significant risk of disruption of the trial process" because members of the press and "other individuals may take advantage of this information in an inappropriate and damaging manner." Id. at 12-13.[4]

---

[4] After trial, certain press organizations moved to compel the disclosure of the final jurors' and alternates' names. See Shkreli, ECF Dkt. No. 308. The defense opposed the motion and the government took no position. See id., ECF Dkt. Nos. 313, 319. Observing that her

The court in United States v. Grasso, No. 12-CR-447 (JG) (E.D.N.Y.), ordered similar relief.  There, the government requested that the jurors' information be kept from the parties, as well as the public, in light of the severity of the charged crimes as well as the pre-trial media attention.  See id., Gov't Mot. for Anonymous Jury, ECF Dkt. No. 86.  Specifically, a defendant's arrest, as well as his relationship with a cooperating witness, were the subject of cable television show "Mob Wives" and had been reported in the New York Daily News.  See id. at 5-7.  Judge Gleeson granted the government's motion in part, ordering that the jurors' names be withheld from the press and public but not the parties.  See id., ECF Dkt., Feb. 18, 2014 Minute Entry.

II.     Discussion

Applying the standards and considering the factors set forth above, the government respectfully submits that it is necessary to keep the prospective and final jurors' names, addresses, places of employment, and other identifying information from the public (but not the parties or their counsel of record) as well as to require that the jury be semi-sequestered.

A.     Extensive Press Coverage of This Case Requires a Partially Anonymous and Semi-sequestered Jury

The most important factor weighing in favor of anonymity here is the intense, global media attention this case has received.  See United States v. Kadir, 718 F.3d 115, 121 (2d

---

pretrial ruling contemplated such relief, Judge Matsumoto granted the motion because the need to ensure the defendant's right to an impartial trial was moot and there was "no evidence that the security of any juror would be placed at risk."  Id., ECF Dkt. No. 325, at 2, 5.  As set forth below and in the Sealed Supplement, there is specific reason to believe that the jurors must be protected in this case.  In any event, any such request by the press would not be ripe and should be resolved after trial.

Cir. 2013) (observing that "extensive media coverage" is a "significant" factor in considering whether to empanel an anonymous jury).  As set forth above, innumerable press reports have been published around the world documenting the indictments, arrests, and even legal filings in this case, as well as the government's (and other similar) ongoing investigations.  Domestic publications such as the New York Times, Washington Post, Wall Street Journal, Los Angeles Times, Miami Herald, New York Daily News, and New York Post have reported extensively on this case, which has many times been "front-page news."  Paccione, 949 F.2d at 1193.  Members of the press and cameramen have followed defendants and attorneys upon their entry into and exit from the courthouse for nearly every court appearance.  See, e.g., Nathaniel Vinton, "FIFA Defendant Juan Ángel Napout Posts $20 million Bond After Not-Guilty Plea," N.Y. Daily News (Dec. 5, 2015), available at http://www.nydailynews.com/ sports/soccer/fifa-defendant-posts-20-million-bond-not-guilty-plea-article-1.2467136; "FIFA Crisis: Brazil's José Maria Marin Denies Bribery Charges in US Court," The Guardian (Nov. 3, 2015), available at https://www. theguardian.com/football/2015/nov/03/fifa-jose-maria-marin-extradited; "USA: Former FIFA Vice-President Jeffrey Webb's family leaves NYC court," Ruptly TV (July 15, 2015), available at https://www.youtube.com/watch?v=OFVERUFtP5Y; Michael O'Keefe, "FIFA Scandal Defendant Enters Not Guilty Plea in Brooklyn," N.Y. Daily News (May 29, 2015), available at http://www.nydailynews.com/sports/soccer/fifa-scandal-defendant-enters-not-guilty-plea-brooklyn-article-1.2240762.

The international press is particularly likely to cover the upcoming trial extensively.  Prior to their arrests, the three trial defendants were well-known and powerful figures in their home nations.  The charges against them and their subsequent arrest and

extradition to the United States have made national news in their respective countries.    See, e.g., "Manuel Burga: Declaran infundado Hábeas Corpus para el ex presidente de la FPF," El Popular (Oct. 22, 2016), available at http://www.elpopular.pe/deportes/2016-10-22-manuel-burga-declaran-infundado-habeas-corpus-para-el-ex-presidente-de-la-fpf (picturing Burga in an apparent protective vest surrounded by police officers); Marcos Ricardo Velazquez, "Napout, Acusado de Levado y Asociación Criminal por EE.UU.," ABC Color (Dec. 4, 2015), available at http://www.abc.com.py/edicion-impresa/politica/napout-acusado-de-lavado-y-asociacion-criminal-por-eeuu-1432618.html (photograph of Swiss hotel where Napout was arrested); "EUA pedem extradição de executivos da Fifa presos na Suíça," Globo (July 2, 2015), available at http://g1.globo.com/mundo/noticia/2015/07/eua-pedem-extradicao-de-executivos-da-fifa-presos-na-suica.html (photograph of Marin); see also Alex Johnson, "FIFA Scandal: U.S. Formally Requests Extradition of Jack Warner From Trinidad," NBC News (July 22, 2015) (photograph of co-defendant Jack Warner surrounded by reporters after extradition hearing); "Ex-Guatemala Football Chief Brayan Jimenez Held in FIFA Probe," BBC News (Jan. 13, 2016), available at http://www.bbc.com/news/world-latin-america-35299194 (photograph of co-defendant Brayan Jiménez surrounded by reporters).

        In addition, as set forth in the Sealed Supplement, the media has also reported on personal and location information of alleged conspirators.  Of particular concern, and as noted above and as described in greater detail in the Sealed Supplement, press reporting on the case has revealed sensitive personal information about perceived witnesses, the publication of which has put the safety and availability of those individuals at risk.  Reporting of this sort on jurors called to serve in the case would pose serious risks to their safety and ability to serve impartially.

13

These facts, and those set forth in the Sealed Supplement, strongly support the limited anonymity requested in this motion.  See Kadir, 718 F.3d at 121; Wong, 40 F.3d at 1377 ("The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment.").  The fact that jurors are aware that their identities are public may subtly and unconsciously impair their impartiality in a case with this degree of media attention.  See Vario, 943 F.2d at 240 (noting that "[p]retrial publicity may militate in favor of an anonymous jury because it can enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public" (internal quotation marks omitted)); Shkreli Op., at 5, 12 (observing that in a "high-profile case in which there has been ongoing pre-trial media coverage," disclosure of juror names would increase the risk that jurors would feel the pressure of public identification and "not be candid").  To preserve their impartiality and ability to fairly consider the evidence without fear of public intrusion or reprisal, the jurors' identities should be anonymous as to the public and they should be kept together during lunch recesses and transported by the U.S. Marshals Service to and from an undisclosed location each trial day.[5]

This partial anonymity and semi-sequestration is also needed to protect against improper contact and harassment of the jurors during the trial.  As described above and in the Sealed Supplement, the press, particularly the international media, is likely to closely monitor the

---

[5] Absent semi-sequestration, anonymous jurors can easily be identified by, for example, the license plates of their cars parked near the courthouse.  The government has conferred with the U.S. Marshals Service, which is prepared to make the necessary transportation arrangements for the upcoming trial if the Court orders a semi-sequestered jury.

case and its daily developments and, absent anonymity and semi-sequestration, might even seek

to interview or follow jurors entering or leaving the courthouse. Partial anonymity and semi-

sequestration is thus also necessary to protect the jurors from inappropriate contact. See

Paccione, 949 F.2d at 1193 (stating that anonymity and semi-sequestration were appropriate

because the "case had been front-page news and that the trial could be expected to be the subject

of extensive publicity, exposing the jurors to inappropriate contacts that could compromise the

trial"); Shkreli Op., at 12-13 (ordering anonymity as to the public because of the "significant risk

of disruption of the trial process" where members of the press and "other individuals may take

advantage of this information in an inappropriate and damaging matter"); see also United States

v. Gotti, No. S8 02-CR-743 (RCC), 2004 WL 2274712, at *3 (S.D.N.Y. Oct. 7, 2004) (ordering

juror anonymity and semi-sequestration after noting: "There is strong reason to believe that the

likely media attention to the trial will potentially expose the jurors to harassment and

intimidation.").

      Accordingly, the nature and degree of media attention likely to surround this case

strongly weigh in favor of a partially anonymous and semi-sequestered jury.

      B.    Attempted Obstruction of Justice and Witness Intimidation Also Support
           Partial Anonymity and Semi-Sequestration

      As indicated above, the Sealed Supplement sets forth details about attempted

obstruction of justice and witness intimidation that further support the protective measures

requested herein. See also Mem. in Opp. to Mot. to Vacate Sealing Order, ECF Dkt. No. 607, at

4 (describing ex parte applications requesting deferred disclosure that detail, among other things,

"information about witnesses who face serious security risks"). Some aspects of the obstructive

conduct at issue have been referenced in public filings, including in connection with the

15

government's ongoing investigation into attempted obstruction of justice regarding the removal of Napout's electronic devices from CONMEBOL's headquarters.  See Aug. 15, 2017 Ltr., ECF Dkt. No. 648, at 5 (describing obstruction of justice investigation).  Indeed, one category of predicate acts alleged in the racketeering conspiracy charged in Count One of the Indictment against the defendants is obstruction of justice, in violation of 18 U.S.C. § 1512.

The government respectfully submits that this conduct, along with the additional obstructive conduct and witness intimidation referenced in the Sealed Supplement, would support a fully anonymous jury, notwithstanding that none of the defendants has been charged with obstruction of justice to date (other than as part of the pattern of racketeering activity).  See, e.g., United States v. Mayes, No. 12-CR-385 (ARR), 2013 WL 6175824, at *4-5 (E.D.N.Y. Nov. 25, 2013) (empaneling anonymous and semi-sequestered jury based in part on "extensive-pretrial publicity" and the government's proffer of obstructive conduct even though "the defendants are not charged in the indictment with witness tampering, jury tampering, or obstruction of justice"); see also United States v. Kaziu, 559 F. App'x 32, 37-38 (2d Cir. 2014) (summary order) (affirming decision to empanel an anonymous jury without a hearing based on, among other things, the government's "proffer" of attempted witness tampering and "an online commenter's suggestion that force be used to free [the defendant] from custody"); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 630242, at *8 (E.D.N.Y. Feb. 13, 2015) (observing that "attempt[s] to interfere with the judicial process," including intimidation of witnesses, weigh "in favor of determining that there is a 'strong reason' to believe the jury needs protection").  Indeed, even assuming that the conduct detailed in the Sealed Supplement did not occur at the direction of any of the defendants, the incidents nevertheless support the conclusion that there

are people interested in preventing the facts from reaching the public who have the means to accomplish that goal.

The government nevertheless seeks only partial anonymity in an effort to balance the defendants' constitutional trial rights with the need to protect jurors from harassment or interference.  Limiting the group of people who have access to the jurors' identifying information to the defendants and their U.S.-based counsel of record will substantially reduce the risk that jurors will be exposed to interference at the hands of people beyond the identified defense teams who have an interest in interfering with the judicial process, such as charged or uncharged co-conspirators or others who may fear unwanted publicity through trial testimony.  As noted above, these risks are exacerbated by and related to the intensity of the media attention drawn by the case.  See Shkreli Op. (ordering that jurors be anonymous from the press and public based solely on media attention); see also United States v. Mora, No. 94-CR-729 (CPS), 1995 WL 519987, at *4 (E.D.N.Y. Aug. 16, 1995) (balancing the "obligation to both prospective jurors, the defendants' rights, and the integrity of the criminal proceeding" to prevent public inquiry into "the first names of prospective jurors, their specific addresses, and the specific places of their and their spouses' employments").

C.     Protection of the Defendants' Rights

The Court can take simple precautions to ensure that the relief requested by the government will not infringe the defendants' rights.  See Kadir, 718 F.3d at 120 (stating that if a "district court determines that an anonymous jury is appropriate, the court must take 'reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights'") (quoting Thai, 29 F.3d at 801).

A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (1) the right to make informed choices during the jury selection process; and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity.  See Kadir, 718 F.3d at 120.  Because the government is not requesting that the jurors be anonymous as to the defendants or their counsel of record, the first concern is not applicable here.  The defense will be able to meaningfully participate in voir dire and execute its for-cause and peremptory challenges as in any other case.

The Court also can easily alleviate the second concern by informing the jurors that partial anonymity is being ordered to protect their privacy, which the Second Circuit has expressly sanctioned as an appropriate "plausible and nonprejudicial" reason for not disclosing jurors' identities.  Id. at 120-21 (upholding decision where the court instructed the jury that, "given the media interest in the case, anonymity would protect the jurors' 'rights of privacy' and assist them 'in discharging [their] responsibility as jurors independently, fairly and impartially'" (quoting jury instructions) (alterations in original)); see also Thai, 29 F.3d at 801; United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989).  The Court can also explain the jurors' partial anonymity by (accurately) telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the questions asked in voir dire.

As for semi-sequestration, the government proposes that the jury similarly be told that transportation is being provided to protect their privacy and to ensure that the trial can proceed expeditiously.  This explanation has been routinely given in cases where transportation to and from court is provided.  See United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL

18

2783359, at *3, n.3 (E.D.N.Y. July 15, 2008) ("Jurors are generally told that such steps are not unusual and are taken to ensure their privacy and impartiality in light of the media and public attention the trial is expected to receive.") (citing cases); see also United States v. Gotti, 459 F.3d 296, 345-46 (2d Cir. 2006) (reviewing decision to order anonymity and semi-sequestration under the same standard); Rivera, 2015 WL 630242, at *8 (observing that "the same reasons that warrant the use of an anonymous jury also warrant partial sequestration of the jury") (internal quotation marks omitted).

*       *       *

In short, the extensive media coverage of this case, which is sure to intensify leading up to and during trial, combined with attempts to obstruct justice and intimidate witnesses, require that jurors be protected by having their personal information kept from the press and the public.  Doing so will protect the impartiality of the jury and reduce disruption during trial without infringing on the defendants' rights.

## CONCLUSION

For the reasons set forth above and in the Sealed Supplement, the government respectfully submits that the Court should grant the instant motion and order that the prospective and final jurors' names, addresses, places of employment and other identifying information be

anonymous as to the public and the media (but not to the parties and their counsel of record) and

that the final jury be semi-sequestered.

Dated: Brooklyn, New York
        September 1, 2017

Respectfully submitted,

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant United States Attorneys
        (Of Counsel)

20