U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SPN/MKM/KDE

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 2, 2017

By ECF and Hand

The Honorable Pamela K. Chen
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Juan Ángel Napout, et al.
>       Criminal Docket No. 15-252 (S-2) (PKC) (RML)

Dear Judge Chen:

The government respectfully submits this letter, at the Court's direction, in support of the admission into evidence of (1) certain emails of the defendant Juan Ángel Napout that were previously authenticated by Christine Kalaveshi, an employee of Microsoft Corporation; and (2) certain handwritten and typed notes recovered by José Schettino, a federal prosecutor in Brazil, during a search of the office of Klefer Producoes E Promocoes Ltda ("Klefer") conducted in Rio de Janeiro, Brazil on May 27, 2015.

I.   Defendant Napout's Emails

On November 30, 2017, Ms. Kalaveshi testified that Government Exhibits 800 – 977 are true and accurate copies of emails from the account janb107@hotmail.com that were kept by Microsoft during the course of its business and produced to the government pursuant to a judicially authorized search warrant. The government has substantially reduced the number of emails it intends to introduce into evidence (from well over 150 to approximately 50). All of the emails are relevant and admissible. None is barred by the rule against hearsay. The emails are categorized below according to the primary exception to the hearsay rule on which the government relies, along with a brief description of each email as well as alternate bases of admissibility.

A.   Co-Conspirator Statements

1.   Applicable Law

Statements of a defendant's coconspirators are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence if the Court makes two findings by a

preponderance of the evidence: "'first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.'" United States v. Desena, 260 F.3d 150, 157-58 (2d Cir. 2001) (quoting United States v. Gigante, 166 F.3d 75, 82 (2d Cir 1999)). With respect to the first requirement, "[i]n determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." United States v. Gupta, 747 F.3d 111, 123 (2d Cir. 2014). Because these statements are presumptively unreliable, there must be "some independent corroborating evidence of the defendant's participation in the conspiracy" in addition to the statements themselves. United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996).

"[T]here is no requirement that the person to whom the statement is made also be a member" of the conspiracy, only that "both the declarant and the party against whom the statement is offered be members." In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 139 (2d Cir. 2008) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989)). In the racketeering context, statements in furtherance of the racketeering conspiracy are admissible against a defendant even if the statements do not further a particular "subpredicate conspiracy" in which the defendant is charged. United States v. Coppola, 671 F.3d 220, 246-47 (2d Cir. 2012) (upholding admission of statements as in furtherance of "the broader racketeering conspiracy" even if not part of the "narrower [predicate] extortion conspiracy").

"As to the second requirement, statements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82 (quoting United States v. Maldonado–Rivera, 922 F.2d 934, 958 (2d Cir. 1990)). "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness." Gigante, 166 F.3d at 82. For example, statements that "inform . . . [coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(E)." Russo, 302 F.3d at 46. Even "statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy." United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) (internal quotations and citations omitted).

    2.    Applicable Exhibits

The emails listed in the table below are all statements of the defendants' co-conspirators in the charged racketeering conspiracy as well as the underlying wire fraud and money laundering conspiracies relating to the Copa América and the Copa Libertadores. As set forth below, these emails also served to further the charged conspiracies by, among other things, planning future events and fostering cohesiveness among the coconspirators. See, e.g., Gigante, 166 F.3d at 82. As set forth in the third column, many of these documents also satisfy other exceptions to the hearsay rule.

To the extent additional evidence not currently in the record is required to establish the admissibility of any evidence (including whether these emails satisfy Rule 801(d)(2)(E)), the Court may conduct a hearing outside the presence of the jury. See Fed. R. Evid. 104(a) ("The court must decide any preliminary questions about whether . . . evidence is

admissible."). In such a hearing, the Court "is not bound by evidence rules, except those on privilege." Id.; see also id. 1101(d)(1) (stating that evidence rules "do not apply to . . . the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility").

| GX | Description | Additional Bases / Notes |
|---|---|---|
| 804 | Email from Manuel Burga to Juan Ángel Napout, et al. dated November 14, 2010 in which Burga expresses his knowledge of being under investigation in Peru and seeking FIFA's assistance and attaches documents relating to the investigation. | Attached to the government's in limine motion, see ECF Dkt. No. 718, at 11 n.5, and therefore admissible pursuant to the Court's Order dated November 8, 2017. See Tr. at 123-26. |
| 813 | Email from Juan Ángel Napout to Santiago Peña dated January 7, 2014 in which Napout states that he is at CONCACAF's offices to sign documents relating to the Copa America Centenario | Statement of defendant |
| 828 | Email from Juan Ángel Napout to Alejandro Peralta dated May 17, 2010 in which Napout discusses need to discuss contract negotiations with the Jinkises relating to the rights to World Cup qualifying matches | Statement of defendant |
| 833 | Email from Juan Ángel Napout to Hugo Jinkis dated November 30, 2011 in which Napout asks to meet | Statement of defendant |
| 834 | Email from Romer Osuna to Juan Ángel Napout dated December 17, 2012 in which Osuna reports how funds are spent for the Copa Libertadores | Notice; state of mind of defendant Napout |
| 857 | Email from Mariano Jinkis to Juan Ángel Napout dated May 16, 2013 in which Jinkis confirms he will attend dinner with Napout and others | Statement of future intent |
| 866 | Email from Manuel Burga to Juan Ángel Napout, et al. dated May 8, 2010 in which Burga discusses actions of the Group of Six | Statement of defendant |
| 871 | Email from Juan Ángel Napout to APF dated March 20, 2012 in which Napout indicates that, at request of Alejandro Burzaco, he wishes to attend soccer event paid for by Fox Sports | Statement of defendant<br>Contains requests, which are not assertions<br>Statement of future intent |

| 939 | Email from Hugo Jinkis to Juan Ángel Napout dated October 4, 2014 in which Jinkis provides Napout with description and pictures of potential apartment to be rented | |
| --- | --- | --- |
| 940 | Email from Hugo Jinkis to Juan Ángel Napout dated October 4, 2014 in which Jinkis provides Napout with description and pictures of potential apartment to be rented | |
| 944 | Email from Juan Ángel Napout to Karin Forster dated November 18, 2014 in which Napout forwards email from Hugo Jinkis indicating apartment had been rented for Napout | Top email does not contain an assertion |
| 976 | Juan Ángel Napout WhatsApp chat with Alejandro Burzaco | Already admitted during testimony of Alejandro Burzaco pursuant to Fed. R. Evid. 801(d)(2)(E) |

B. Statements of the Defendant or the Defendant's Agent

1. Applicable Law

Admissions of a party opponent are categorically not hearsay. See Fed. R. Evid. 801(d)(2)(A). Under this rule, "the statements of others can be admitted to provide context necessary to the defendant's statements." United States v. Estevez, No. S2 16-CR-307 (CM), 2017 WL 700775, at *4 (S.D.N.Y. Feb. 16, 2017) (citing United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006)).

Similarly, admissions "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay. Fed. R. Evid. 801(d)(2)(D). To satisfy this exception, the government must show "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." United States v. Rioux, 97 F.3d 648, 660 (2d Cir. 1996) (internal quotation marks omitted). As with co-conspirator statements, the statements of the agent or employee in question "must be considered" but do not by themselves "establish the . . . existence or scope of the relationship under (D)." Fed. R. Evid. 801(d)(2).

2. Applicable Exhibits

Many of the emails summarized in the chart below were authored by defendant Napout and thus are admissible under Rule 801(d)(2)(A). The statements of the other participants in the emails may be offered as non-hearsay to provide context for Napout's statements. Finally, certain emails contain statements of agents of defendants Napout and Marin, including: (1) Maria Lis Rolon (an assistant to the president of CONMEBOL during Napout's

4

tenure, as indicated in Government Exhibits 807, 884, 941, 942, and 964)[1]; (2) Victor Del Puerto (an employee of Kostas, a travel agency repeatedly used by Napout, as indicated in Government Exhibits 703 (Swiss Airlines records) and 751B (Hyatt records)) ; (3) Alexandre Silveira (who Alejandro Burzaco identified as "Alexandre," the personal assistant to the defendant Marin and other high-level officials of the Brazilian soccer federation, see Trial Tr. at 267, and whose picture Eladio Rodriguez identified as "Alejandro" but with the same role, see Trial Tr. at 2115).

| GX | Description | Additional Bases / Notes |
|---|---|---|
| 800 | Email from Gustavo Bareiro attaching letters from defendant Napout requesting funding for the Paraguayan soccer association dated July 9, 2007 | Cover email not offered for truth |
| 820 | Email from Juan Ángel Napout to Alvaro Caceres dated June 8, 2015 | |
| 859 | Email from Juan Angel Napout to Acosta Perez dated May 20, 2010 | |
| 869 | Email from Juan Ángel Napout to Andrea Prono dated August 2, 2011 | |
| 874 | Email from Alexandre Silveira to Juan Ángel Napout dated February 27, 2013 | Alexandre Silveira acting as defendant Marin's agent |
| 884 | Email from Maria Lis Rolon to Enrique Byrom dated February 19, 2014 | Includes statements of Napout's agent, Rolon |
| 900 | Email from Juan Ángel Napout to Ricardo Gortari dated November 10, 2010 | Statement of future intent |
| 901 | Email from Juan Ángel Napout to "emigarcia31@hotmail.com" dated November 18, 2010 | |
| 903 | Email from Juan Ángel Napout email to Ricardo Gortari dated June 27, 2011 in which Napout indicates where he will be in the future | Statement of future intent |
| 909 | Email from Juan Ángel Napout to Inge Schandy dated July 15, 2011 | |

---

[1] In addition to emails recovered from Napout's Hotmail account, emails recovered from the computer used by Napout at CONMEBOL headquarters also reveal Maria Lis Rolon's status as an assistant to Napout. See Government Exhibits 1002, 1003, 1005, and 1006.

5

| | | |
|---|---|---|
| 911 | Email from Virginia Napout to Juan Ángel Napout dated July 18, 2011 that includes a letter from Juan Ángel Napout | |
| 913 | Email from Juan Ángel Napout to Rafael Esquivel dated December 9, 2011 | Co-conspirator statement |
| 917 | Email from Juan Ángel Napout to "secgeneral@scf.com.py" dated June 21, 2012 | |
| 919 | Email from Juan Ángel Napout to "secgeneral@scf.com.py" dated September 7, 2012 | |
| 923 | Email from Juan Ángel Napout to "Gabriel" dated September 27, 2012 | |
| 926 | Email from Juan Ángel Napout to Jose Luis Chilavert dated May 14, 2013 | |
| 928 | Email from Jose Luis Meiszner to Juan Ángel Napout dated June 17, 2013 in which they discuss future meeting | Statement of future intent |
| 929 | Email from Juan Ángel Napout to Washington Rivero dated August 29, 2013 | |
| 932 | Email from Juan Ángel Napout to Eugenio Figueredo dated February 20, 2014 | |
| 934 | Email from Victor Del Puerto to Juan Ángel Napout dated May 7, 2014 | Statement of future intent<br>Statement of Napout's agent |
| 936 | Email from Juan Ángel Napout to Noelia Blanco dated August 11, 2014 | Statement of future intent |
| 945 | Email from "Belen" to Juan Ángel Napout dated December 9, 2014 | Top email contains no assertion<br>Statement of future intent |
| 948 | Email from Juan Ángel Napout to Enrique Byrom dated February 11, 2015 | |
| 949 | Email from Juan Ángel Napout to "marecoc@hotmail.com" dated June 13, 2009 | |

6

C.  Statement of Future Intent

1.  Applicable Law

Under Federal Rule of Evidence 803(3), statements that reflect on the declarant's state of mind, including intent, fall within an exception to the rule against hearsay. If relevant, "such a statement may be introduced to prove that the declarant thereafter acted in accordance with the stated intent." United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000). Such statements of future intent also are admissible to prove that a third party acted in accordance with the declarant's stated intent if there is "independent evidence that connected the declarant's statement with the non-declarant's activities." Id. Such corroboration "may be provided by circumstantial evidence." Id. at 199; accord United States v. Williams, 2007 WL 3105760, at *3 (2d Cir. Oct. 23, 2007) (summary order).

2.  Applicable Exhibits

| GX | Brief Description | Additional Bases / Notes |
|---|---|---|
| 815 | Email from Eugenia Bossi of Full Play Group to Juan Ángel Napout, et al., dated April 25, 2014 detailing the agenda for events surrounding the announcement of the Copa America Centenario (and ample record evidence places Napout in Miami for this event) | |
| 853 | Email from Juan Ángel Napout to Lole Magenties dated April 23, 2010 attempting to arrange travel and arrival | Statement of defendant |
| 877 | Email from Andrea Prono to Juan Ángel Napout dated May 22, 2013 enclosing agenda to meet with Alejandro Burzaco in London at the Cumberland Hotel (about which Burzaco testified, see Trial Tr. at 509) | Top email contains no assertion |
| 925 | Email from Agostina Schiuma to Juan Ángel Napout dated May 14, 2013 in which they discuss future meeting | Contains statement of Napout's agent |
| 943 | Email from Eladio Rodriguez to Juan Ángel Napout dated October 28, 2014 in which they discuss future flight plan | Alternatively, not offered for truth of dates of flight but to show relationship |
| 958 | Email from Victoria Tozzo to Juan Ángel Napout, et al. dated May 16, 2013 in which they discuss future meeting at the Cumberland Hotel (as described above) | |

| | | |
|---|---|---|
| 975 | Email from Agostina Schiuma to Juan Ángel Napout dated November 14, 2014 in which Schiuma discusses future flight from meeting at the draw for the Copa América 2015, which occurred in Chile in November 2014 (about which Alejandro Burzaco and Jay Berhalter testified, see Trial Tr. at 579, 2535-37; see also Government Exhibit 1120 (picture of Napout and others in Chile in November 2014) | Second clause of first sentence does not contain assertion |

D. Statements That Are Not Hearsay

1. Applicable Law

Finally, statements that are not offered to prove the truth of the matter asserted therein are not hearsay at all. This includes statements that (1) do not contain any assertions (such as questions), see United States v. Coplan, 703 F.3d 46, 84 (2d Cir. 2012) ("[A]s a matter of law, questions are not 'assertions; within the meaning of Rule 801 . . . ."); (2) are offered to demonstrate that the recipient was on notice of the statement, see United States v. Buck, No. 13-CR-282 (JSR), 2017 WL 5201447, at *2 (S.D.N.Y. Oct. 30, 2017); and (3) are relevant for the fact that they were made but not the truth of any assertion made therein, see United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013).

2. Applicable Exhibits

| GX | Brief Description | Additional Bases / Notes |
|---|---|---|
| 821 | Email from Juan Ángel Napout to Alvaro Caceres dated June 12, 2015 | Contains no assertion |
| 852 | Email from Jorge Marino to Juan Ángel Napout dated January 25, 2010 | Offered to show fact that Napout was aware of Full Play bank account in United States |
| 886 | Email from Juan Ángel Napout to Luis Bedoya dated September 13, 2014 | Does not contain assertion<br>Statement of defendant |
| 947 | Email from Hugo Jinkis to Juan Ángel Napout dated January 28, 2015 | Does not contain assertion |
| 961 | Email from Nestor Benitez to Juan Ángel Napout dated May 26, 2014 | Does not contain assertion |

8

| 968 | Email from Hugo Kuroki to Cesar Rene, copying Juan Ángel Napout dated April 8, 2014 | Top email contains request<br><br>Offered to show fact that bill sent to CONMEBOL |
|---|---|---|
| 972 | Email from Jorge Antico to Juan Ángel Napout dated March 27, 2014 | Top email not offered to prove any assertion<br><br>Contains statement of defendant |

II.     Documents Recovered From Klefer's Offices

The government also writes in support of the admission of Government Exhibits 300, 301, 302, 303, 304, 306, and 307 (the "Klefer Exhibits") into evidence at trial, pursuant to the Court's direction at the end of the trial day on Friday, December 1.[2] The government understands that counsel for Marin do not challenge the admissibility of the contracts marked Government Exhibits 300-304. Rather, counsel for Marin objects to the admission of Government Exhibits 306 and 307 on the grounds that the government has not established their authenticity and that, in any event, they are barred by the rule against hearsay.

As discussed further below, the testimony of Brazilian prosecutor José Schettino, along with physical features of the records themselves, including the folders in which they were provided to the U.S. government and certain self-authenticating aspects of the notes, when viewed in light of the other evidence in this case, establish the authenticity of the exhibits well beyond the required preponderance standard. The government attaches hereto additional materials supporting the authenticity of the exhibits. The exhibits also are plainly relevant as proof of Marin and others' involvement in charged the racketeering conspiracy as well as the conspiracies to commit wire fraud and money laundering in connection with the Copa América and, as to Marin, the charged conspiracy related to the Copa do Brazil. The exhibit are admissible as the co-conspirator statements of the principal of Klefer (the "Executive").

A.     The Klefer Exhibits Are Authentic

1.     Applicable Law

In order to establish an exhibit's authenticity, the government must "produce sufficient evidence to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). That standard is met where "sufficient proof has been introduced so that a reasonable jury could find in favor of authenticity or identification." United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004) (internal quotation marks omitted). The standard is "not

---

[2] The government does not seek admission of the partially legible notes marked Government Exhibit 305 nor the typed documents marked Government Exhibits 308 and 309.

9

particularly high." United States v. Bout, 651 F. App'x 62, 64 (2d Cir. 2016) (summary order) (internal quotation marks omitted).

Rule 901 "does not definitively establish the nature or quantum of proof that is required" to authenticate an item of evidence. United States v. Sliker, 751 F.2d 477, 499 (2d Cir. 1984); accord United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014). "[P]roof of authentication may be direct or circumstantial." United States v. Al-Moayad, 545 F.3d 139, 172 (2d Cir. 2008). Such proof may include testimony by a "witness with knowledge" that "a matter is what it is claimed to be." United States v. Rommy, 506 F.3d 108, 138 (2d Cir. 2007). But "a document can be authenticated by distinctive characteristics of the document itself, such as its appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances." Vayner, 769 F.3d at 130 (internal quotation marks and alterations omitted). Proving a "chain of custody will [also] suffice to authenticate physical evidence, and the chain of custody need not be free of defects. . . . Alleged breaks in the chain typically do not bear upon the admissibility of evidence, only the weight of the evidence." Bout, 651 F. App'x at 64 (internal quotation marks omitted). And "after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party 'remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility.'" Vayner, 769 F.3d at 131 (quoting Tin Yat Chin, 371 F.3d at 38) (emphasis in original). That standard is easily met here.

        2.      Argument

The testimony of Mr. Schettino, a consensual recording in which Klefer's principal indicates that he kept notes of bribe payments in his safe, and the physical characteristics and contents of the documents at issue combine to establish the authenticity of the Klefer Exhibits.

        a.      Testimony of Jose Schettino

Mr. Schettino, the chief federal prosecutor in Rio de Janeiro, testified at trial that on May 27, 2015, he participated in the execution of a request for a search of the offices of Klefer, a sports marketing company in Brazil, pursuant to a Mutual Legal Assistance request submitted by authorities in the United States. (Trial Tr. at 2572-73). "[M]ost" of the documents that were ultimately seized came from a safe that the Executive had opened. (Id. at 2575.) And because Mr. Schettino and another prosecutor were "overseeing" the search, Mr. Schettino reviewed "most of the documents" that were actually seized by the Brazilian federal police. (Id.) Mr. Schettino recalled looking at broadcasting documents between the Brazilian soccer federation and Klefer, declarations from CBF regarding the Copa do Brasil, and "handwritten notes with some numbers," which were important because Mr. Schettino explained that he would seize handwritten notes whenever he conducted a search. (Id. at 2576; see also Trial Tr. at 2589 ("I do remember that there were some handwritten notes with numbers written on it.".)

10

Mr. Schettino reviewed a box of documents, including Government Exhibits 300-309. All of these documents (except these specific marked exhibits[3]) were bound in blue folders with certain markings on the front. Mr. Schettino stated that he "certainly remember[ed]" a gray and white folder marked Klefer Marketing Esportivo (which were previously bound within the outer blue folders), which contained broadcasting contracts and declarations. (Trial Tr. at 2577.) When reviewing one of the handwritten notes marked Government Exhibit 306, Mr. Schettino stated that he "collected some documents like this one." (Id. at 2578.) After reviewing all of them, Mr. Schettino stated that all they he did not read each document in its entirety during the course of the search, the marked exhibits "certainly look like" the documents that were seized. (Id. at 2582.)

After the documents were seized at Klefer's office and placed in evidence bags (Trial Tr. at 2579), the federal police took them to the police station in order to provide them to the court after a certain period of time. This procedure is what "always happens." (Id. at 2579.) Mr. Schettino explained that at the court, "[a]ll the evidence" is bound in blue folders. (Id. at 2603-05.) Mr. Schettino also explained that one of the blue folders contains a notation "auto de apreensao," i.e., "seized file" with the number "246/2015." He also explained that a series of numbers indicates that the blue folders relate to a case filed in 2015 in the city of Rio de Janeiro. (Id. at 2609.) He also explained that many of the folders contained the notation "Apenso," attachment, with a particular number. (Trial Tr. at 2611.)

After documents and files are bound in blue folders, the Brazilian court then authorizes the documents to be sent to the requesting country. (Trial Tr. at 2583, 2608.) Documents are not removed from the blue folders prior to being sent to the foreign country. (Id. at 2608.)

b. Consensual Recordings

The request for the search was based in part on a recording of the Executive made by a cooperating witness (the "CW"), in which the Executive confirmed that he kept records of bribe payments in a safe in his offices. The Executive specifically indicated that he had handwritten notes about the particular payments related to the Copa do Brasil, though the implication was that he kept records of such payments generally. A transcript of the portions of the recording the government intends to introduce into evidence at trial, marked Government Exhibit 1706-T, is attached hereto under seal as Exhibit A.

At the start of the conversation, the CW stated that the Executive told him that the bribe payments arranged for the Copa do Brazil were $1.5 million to be divided "500 for Ricardo [Teixeira] and 500 for Marco Polo [Del Nero] . . . and 500 for [Jose Maria] Marin." (GX 1706-T at 1.) The Executive responded to the CW, in effect, that it is dangerous to talk about the subject. During an argument about the amounts of the bribes that were agreed to, the Executive

---

[3] As explained, a paralegal removed these documents from the blue folders for purposes of marking and, if necessary, could testify to the location of the exhibits within the relevant blue folder. The government understands that counsel for Marin is not contesting fact that the exhibits were originally bound in the blue folders.

indicated that he didn't "remember the figures. If it was one, two, one point two, one point, eight, two . . ." but added that "an equation was created to include more people," a reference to Teixeira no longer being the only one to receive the bribes and the addition of Del Nero and Marin. (Id. at 3.) Pressed for more details, the Executive stated that he has them in a safe in his office: "[T]here, in my safe, I have the notes, my – about my – my stuff . . . for that reason – because I don't trust my memory . . . ."[4] (Id. at 5.) When the CW suggests that one of the Executive's officers (who is part of the conspiracy) had made a mistake in the math, the Executive responded, "There is no—there is no—there is no mistake. He keeps his notes on his thing, but I also have my own, in my safe. And in my handwriting. Not done by any fucking machine, or anything else. I wrote it myself. I have it there."

    c.  The Klefer Exhibits

  The physical features and contents of the Klefer Exhibits reveal their authenticity. All of the marked exhibits were contained within the blue folders prepared by the Brazilian authorities that contain the marking "AUTO DE APREENSAO NO. 246/2015." Further, the records themselves indicate they are authentic documents gathered from Klefer's office, including the safe. For example, Government Exhibit 306 is a piece of paper with handwritten notes with the title "MPM" that states, among other things, "Copa do Brasil – R$1,000,000," matching the amount of money that the Executive indicated on the consensual recording was owed to Marin and Del Nero.

  Government Exhibit 307 is a typed piece of paper with the title "MPM" that states, among other things:

> Copa America
> Parties: Full Play – Traffic – Torneos
> Period 2015-2023
> MPM US$3M for each CA played + US $3M for contract signing
>
> Copa do Brasil
> Parties: Klefer
> Period: 2013-2022
> MPM: R$1M per year

    d. Additional Materials

  The government attaches hereto as Exhibit C a letter dated August 4, 2015, from the Brazilian Ministry of Justice, National Secretariat of Justice, Department of Assets and Recovery and International Legal Assistance to the United States Office of International Affairs. In this letter, the Brazilian authorities referenced the United States government's request for

---

[4] There are portions of the tape in which the Executive refers to the safe using the diminutive, translated to mean a little safe, although in fact the safe was large. But the use of the diminutive is a common colloquialism. The Executive also calls the CW by the diminutive in other recordings, and uses the diminutive in naming his associate in GX 1706-T.

mutual legal assistance dated May 26, 2015, that requested, among other things, "search and seizure measures." The letter explains that the Brazilian government was transmitting "documentation gathered during the search and seizure measure (Auto do Apreensao no. 246/2015 – Apenso 5, 6, 7, 8, 9, 10 and 11)." The Office of International Affairs provided these materials to the United States Attorney's Office under a letter dated August 20, 2015, which is also included in Exhibit C.

        3.     <u>Conclusion</u>

In light of the foregoing, there is no plausible argument that the documents that arrived from the Brazil, bound in blue folders of the federal system following the search described by Mr. Schettino, are something other than documents recovered from the Klefer's offices. Their physical characteristics match the descriptions captured on consensual recordings. In any event, the government has adduced "sufficient proof . . . so that a reasonable jury could find in favor of authenticity or identification." <u>Tin Yat Chin</u>, 371 F.3d at 38 (internal quotation marks omitted).

        B.     <u>The Klefer Exhibits Are Admissible Co-Conspirator Statements</u>

The Klefer Exhibits are relevant and admissible as proof of the racketeering conspiracy charged in Count One of the second superseding indictment and as proof of the conspiracies to commit money laundering and wire fraud in connection with the Copa do Brasil and Copa América charged in Counts Four through Seven.

The record at trial has established that the Executive was involved in numerous businesses with the Jinkises and that he was aware of the government's investigation and had relayed his information to Hugo Jinkis who, in turn, relayed the information to Alejandro Burzaco. (Trial Tr. at 587-88.) In recordings made by the CW, including Government Exhibit 1712-T, attached hereto under seal as Exhibit B, the Executive confirmed that Marin and Del Nero understood they were getting bribes and that Teixeira continued to receive payments even though he was no longer president of CBF. In one exchange, referring to the fact that Teixeira was receiving $1 million reais and Del Nero and Marin were receiving $1 million reais between then, "Uh- Uh- uh [the Executive]—Marin and Marco Polo—do they know you're paying Ricardo more?" He responds, "Nuh—Of course they know!" The CW asks whether the "one-- for-- for Marin, he shares it with Marco Polo, does he not?" To which the Executive responded, "He does share—how they do it, I have not the slightest idea." (GX 1712-T at 4.)

The Executive's ties to the Jinkises and membership in the charged conspiracies is further established by the contracts included in the Klefer Exhibits and by the contents of Government Exhibit 307, in which contract terms and bribe amounts are detailed for various contracts involving both Klefer and Full Play. To give one example, Burzaco testified that the Copa America agreement included an agreement to pay the president of the Brazilian federation $3 million for the 2015 Copa America and, subsequently, $3 million for the signature of the Datisa contract. (<u>See, e.g.</u>, Trial Tr. at 460-61). Burzaco testified that he paid the first $1 million to Teixeira (it was diverted to Grondona in connection with the World Cup hosting vote for Qatar) and still owed him $2 million, to be paid close to the 2015 cup. (Trial Tr. at 401-02.) By

13

2013, when the Datisa contract was being finalized, Marin and Del Nero had taken Teixeira's place and were to receive the bribe money previously owed to Teixeira. They had a conversation at a hotel in London at which Burzaco provided an update on these payments:

> And the second [purpose of the meeting] was making clear, and establishing very clear, that the $3 million that they were to collect for the signature of these Datisa-CONMEBOL contracts, was something totally different than the $2 million that was still pending to pay the Brazilian debt for the 2015 edition, as I explained, and that it was going to be done in June 2015, right before the Copa America 2015.

(Trial Tr. at 500:10-16.)

Burzaco testified that he went on to pay Marin and Del Nero the $3 million owed for the Datisa signature. (Trial Tr. at 500.) The text at the bottom of Government Exhibit 307 includes the following notation from the Executive: "MPM: US$3M for each CA played + US$3M for contract signing. Already paid US$4M (US$3M to MPM and US$1M to Miami). US$2M + US$6M remaining." These notes can only be a reference to the $3 million split between Del Nero ("MP") and Marin ("M"), and to the $1 million paid to "Miami," or Teixeira, who had close ties to the city of Miami. (GX 1712-T at 7-8.)

It is clear, based on the testimony quoted above in combination with the contents of the Klefer Exhibits that the Executive was a member of the charged racketeering conspiracies as well as the conspiracies relating to the Copa America and Copa do Brasil. Accordingly, the Klefer Exhibits are admissible as co-conspirator statements under Rule 801(d)(2)(E). See infra Part I.A.1 (setting forth applicable law). Of course, the defendants will be free to argue that the notes in Government Exhibits 306 and 307 are insignificant, or are not what the government states they are, or mean something other than what the government argues they mean. But those are arguments for the jury, not a bar to the admission of authentic, relevant statements of co-conspirators.

                                                  Respectfully submitted,

                                                  BRIDGET M. ROHDE
                                                  Acting United States Attorney

By:        /s/
               Samuel P. Nitze
               M. Kristin Mace
               Keith D. Edelman
               Assistant U.S. Attorneys
               (718) 254-7000

cc:     Counsel of Record (by ECF)