

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KTF/VAZ
F. #2015R00707

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 26, 2022

<u>By ECF and Hand</u>

The Honorable Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    <u>United States v. Reynaldo Vasquez</u>
                 <u>Criminal Docket No. 15-252 (S-3) (PKC)</u>

Dear Judge Chen:

      The defendant Reynaldo Vasquez, the former president of the Federación Salvadoreña de Fútbol ("FESFUT"), El Salvador's soccer federation, is scheduled to be sentenced on September 29, 2022. On August 23, 2021, he pled guilty to one count of racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963. The Presentence Investigation Report ("PSR") calculates a total adjusted offense level of 19 and a criminal history category of I, with a corresponding Guidelines range of imprisonment of 30 to 37 months. PSR ¶¶ 55, 58, 87. The defendant objects to this calculation insofar as it includes a 2-level enhancement for abuse of position of trust, <u>see</u> United States Sentencing Guidelines ("USSG") § 3B1.3, which the defendant argues is inapplicable because, at the time he took bribes and facilitated the receipt of bribes by other soccer officials, he was no longer serving in an official capacity at FESFUT. As discussed further below, the government agrees that § 3B1.3 should not apply here. The government respectfully submits that the Court should adopt the PSR with the exception of the 2-level enhancement under USSG § 3B1.3 and sentence the defendant to a term of imprisonment within the applicable Guidelines range of 24 to 30 months.

I. Background

As described in more detail in the PSR and the above-listed third superseding indictment (the "Indictment"), the sport of soccer is governed worldwide by the Fédération Internationale de Football Association ("FIFA"), FIFA's constituent continental confederations (including CONCACAF, the confederation covering North America, Central America and the Caribbean), and FIFA's constituent national member associations (which are also known as federations). CONCACAF's member associations are organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF") and the North American Football Union ("NAFU"). Since 2004, soccer officials have been bound by FIFA's code of ethics, which, among other things, imposes a fiduciary duty on soccer officials in favor of FIFA, the continental confederations and the member associations, and prohibits soccer officials from taking bribes or kickbacks. The defendant was the president of the FESFUT – which was and is a national member association of FIFA, CONCACAF and UNCAF – from approximately June 30, 2009 to July 31, 2011.

As set forth below and in the Indictment and the PSR, the defendant participated in two bribery schemes in connection with various soccer tournaments, including World Cup qualifier and friendly matches played by national teams overseen by UNCAF. He was charged on November 25, 2015 in the first superseding indictment with one count of racketeering conspiracy, two counts of wire fraud conspiracy, three counts of wire fraud, two counts of money laundering conspiracy and one count of money laundering. He was extradited from El Salvador on Count One, which charged him with racketeering conspiracy, and first appeared in this district on January 29, 2021. He pled guilty on August 23, 2021 to Count One of the Indictment, which alleged the same offense on which he was extradited.

II. Offense Conduct

A. UNCAF Region World Cup Qualifiers Scheme

In 2009, while Vasquez was president of FESFUT, FESFUT entered into negotiations to sell to Media World, a sports marketing company based in Miami, the media and marketing rights to El Salvador's World Cup qualifier matches to be played in advance of the 2014 World Cup. On September 25, 2009, a contract to this effect was signed with Media World by Vasquez on behalf of FESFUT.

In or about 2012, Media World paid a six-figure bribe payment to obtain rights owned by FESFUT to its 2018 World Cup qualifier matches. To obtain the contract, Media World agreed to pay a bribe to Vasquez and others using a Panamanian company controlled by a co-conspirator ("CC-1") to launder the bribe payment. Media World wired $350,000 from its Bank of America account in Miami to CC-1's account in Panama. Approximately $340,000 were then wired from CC-1's account in Panama to an account in the name of Vasquez. The payment was to be split between Vasquez, the incoming FESFUT president, Vasquez's predecessor and other members of the federation's executive committee. Vasquez, who by this time was the former president of FESFUT but nevertheless retained influence over current federation officials, kept some of the funds himself and provided a portion of the money back to

The Honorable Pamela K. Chen
September 26, 2022
Page 3

a Media World employee ("CC-2"), who delivered it to the then-current president of FESFUT, as Vasquez instructed.

B. UNCAF Region Friendlies Scheme

From in or about 2012 to 2015, CC-1 and CC-2 organized and promoted friendly matches between the Salvadoran men's national team and the teams of other FIFA member associations. To induce FESFUT to participate in these matches, CC-1 and CC-2 agreed to pay, and did pay, bribes to Vasquez, at this point a former FESFUT federation president who retained influence over FESFUT affairs, as well as to two then-current FESFUT officials ("Official 1" and "Official 2"), as set forth below.

In or about May and June of 2012, the Salvadoran team played friendly matches in Houston, Texas; Dallas, Texas; and Washington, D.C. To induce FESFUT to participate in these matches, CC-1 and CC-2 agreed to pay, and did pay, approximately $60,000 in bribes to Official 1. In furtherance of this scheme, CC-2 paid a portion of the bribes to Official 1 in United States currency while they were in the Washington, D.C. area.

On or about October 10, 2014 and October 14, 2014, the Salvadoran team played friendly matches in Harrison, New Jersey, just outside of New York City. To induce FESFUT to participate in these matches, CC-1 and CC-2 agreed to pay, and did pay, a $10,000 bribe to Official 2. The conspirators agreed that this bribe would, in the first instance, be wired to an account controlled by Vasquez, and then distributed by Vasquez to Official 2. On or about October 17, 2014, the payment was wired from a Bank of America account in Wellington, Florida controlled by CC-1 and held in the name of a consulting company to an account in El Salvador held by a retail business controlled by Vasquez. Vasquez sent CC-2 a sham invoice to mask the true nature of the payment.

On or about March 28, 2015 and March 31, 2015, the Salvadoran national team played friendly matches in Fort Lauderdale, Florida and Carson, California. To induce FESFUT to participate in these matches, CC-2 and CC-1 agreed to pay, and did pay, a $10,000 bribe to Official 2.

On or about May 31, 2015, and June 5, 2015, the Salvadoran national team played friendly matches in Washington, D.C. and Rancagua, Chile. To induce FESFUT to participate in these matches, CC-1 and CC-2 agreed to pay a $10,000 bribe to Official 2. The bribe was never paid, though Vasquez continued to seek its payment on behalf of Official 2. On or about September 2, 2015, after the original indictment in this case had been unsealed, laying bare bribery schemes in international soccer, CC-2 met with Official 2 in Miami, Florida. During the meeting, Official 2 asked CC-2 about the bribe. CC-2 said, in sum and substance, that he thought he was not sure he could obtain approval for the payment. Thereafter, on or about September 23, 2015, CC-2 received a letter in Miami, Florida, via common carrier sent from a return address in El Salvador and dated September 16, 2015. The letter said, in relevant part (translated from Spanish):

The Honorable Pamela K. Chen
September 26, 2022
Page 4

> I understand that due to the events that took place a couple of months ago, the way things were done was likely suspended, revised and reconsidered… Also, I knew there would be some difficulty to communicate with you. However, you have built a barrier when we speak on the phone or we chat that does not allow us to discuss the matter…
>
> Recently, our mutual friend told me that he would meet with you… I am very confused as to how that meeting went. He told me that you paid little attention to him and gave him very little time to talk. That you ignored the fact that he is [an official of FESFUT] where he works and principally, our friend, who has taken care of your interests in the past couple of years, and who through great personal efforts went to this meeting looking for answers, to this uncertain situation. You know the way of keeping leadership in your field, and he was very disappointed and frustrated…
>
> Finally, I want to remind you that there are two friendly matches pending to be liquidated, that have nothing to do with the other matter. Please let me know how you will handle that.
>
> My dear, I hope you have the time and interest to send me back your comments. I will keep on meeting with [Official 2] to calm him down.
>
> It is very sad that I have to use this means to talk to you. But you have given me no alternative.

The letter's reference to "the events that took place a couple of months ago" is seemingly a reference to the unsealing of the original indictment in this case, and Vasquez appears to scold CC-2 for failing to follow through with bribe payments even after this case became public. The same day, CC-2, while still in Miami, Florida, spoke by telephone with Vasquez, who was in El Salvador. During the conversation, Vasquez acknowledged that he had written the above-described letter and suggested that Official 2 might block negotiations to renew Media World's contract with FESFUT for 2022 World Cup qualifier rights if CC-2 did not pay the bribe.

   III.   Sentencing

      A.   Legal Standard

Sentencing courts have the authority to fashion a reasonable and appropriate sentence in each case. In so doing, a sentencing court must consider the Guidelines in formulating such a sentence. United States v. Booker, 543 U.S. 220, 259-62 (2005). The "Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). Next, a sentencing judge should consider all the factors in 18 U.S.C. § 3553(a) to determine the appropriate sentence in each case. Id. at 49-50. Those factors include,

The Honorable Pamela K. Chen
September 26, 2022
Page 5

among other things, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant; and to avoid unwarranted disparities between similarly situated defendants.

> B. The Applicable Guidelines Range

As indicated above, the Probation Department has calculated a total offense level of 19, which corresponds to a Guidelines range of 30 to 37 months under Criminal History Category I. PSR ¶¶ 55, 58, 87. The defendant has not contested this Guidelines range, except to the application of a two-level enhancement for abuse of a position of private trust, pursuant to USSG § 3B1.3.

Specifically, the defendant argues that at the time he committed the crimes described above, which took place in 2012 through 2015, he was no longer a FESFUT official. His term as President ended on July 31, 2011. Br. at 4. Although the defendant was only in a position to accept bribes and facilitate the bribes of current federation officials as a result of his past position within FESFUT, the government agrees that the defendant was no longer an employee or official of FESFUT at the time he conspired to receive bribes and facilitate their payment to then-current FESFUT officials.[1] Thus, the government is not seeking the 2-level enhancement for abuse of trust.

With this change, the total offense level becomes 17, and the applicable Guidelines range is 24 to 30 months under Criminal History Category I.

---

[1] The Supreme Court has granted certiorari in Ciminelli v. United States, 142 S. Ct. 2901 (2022), to decide whether a private citizen who holds no elected office or government employment, but has informal political or other influence over governmental decisionmaking, owes a fiduciary duty to the general public such that he can be convicted of honest-services fraud. In that case, the defendant was convicted of honest-services wire fraud conspiracy in connection with accepting bribes while working on the governor of New York's reelection campaign. See United States v. Percoco, 13 F.4th 180, 186 (2d Cir. 2021), cert. granted, 142 S. Ct. 2901 (2022). Although technically no longer a state employee, the defendant continued to use his former telephone, desk, and office to conduct state business, and represented to others that he had a guaranteed position with the governor's administration after election. Id. The government notes that the outcome of Ciminelli has no bearing on the defendant's conviction because – among other reasons – in addition to accepting bribes himself, he facilitated bribe payments to his successor officials who were in office and held fiduciary duties to the federation at the time of the defendant's participation in the charged conspiracy.

The Honorable Pamela K. Chen
September 26, 2022
Page 6

    D.    <u>Section 3553(a) Analysis</u>

For the reasons set forth below, a consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) supports imposition of a term of incarceration within the applicable Guidelines range of 24 to 30 months.

    1.    <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the defendant's criminal conduct support the imposition of a sentence within the applicable Guidelines range. The defendant accepted bribes and facilitated the acceptance of bribes by then-current federation officials, diverting money from a needy soccer federation to line his own pockets. And even after the government laid bare for the world the corruption endemic in international soccer, the defendant continued to cajole and threaten his co-conspirators to pay bribes to FESFUT officials.

The defendant was well aware that his co-conspirators had the duty of promoting and protecting the interests of the El Salvadoran soccer community. Indeed, he had those duties himself when he was the President of FESFUT, and he parlayed that previous position of trust into a position of accepting and facilitating illegal payments. He abandoned his country's soccer federation to serve his own selfish interests by accepting and facilitating bribes for the award of lucrative media rights to Media World. He did so not once but over an extended period of time, costing that community hundreds of thousands of dollars in sorely needed funds that should have gone towards youth or women's soccer development in his poverty-stricken home country, through efforts like the construction of soccer fields in low-income areas, or providing uniforms, equipment or training to those in El Salvador who could not afford them.

The defendant's greedy conduct continued even after the first indictment was unsealed in this case. When his Media World co-conspirators resisted paying bribes that had been promised before the first wave of this case became public, he sent one of them an anonymous letter cajoling them to pay, and verbally threatened to block future negotiations if the bribe was not completed. This is remarkably bold and ruthless behavior considering that over a dozen similarly situated individuals had just been arrested for nearly identical conduct.

It is also worth noting that in this case, the loss amount is based on a conservative measure of actual harm suffered by the victim FESFUT. This is not a case involving a thwarted conspiracy, or an intended loss that was not actually suffered by a victim, or an enormous paper loss figure only loosely connected to a defendant's own conduct and role in a scheme. Rather, the defendant's Guidelines loss calculation is easily quantifiable, based on the money he and the other FESFUT officials pocketed, all of which was directly diverted from the coffers of FESFUT. In short, this is not a situation where the Guidelines range is driven by an astronomical loss amount untethered from a real harm suffered by a real victim.

The Honorable Pamela K. Chen
September 26, 2022
Page 7

        2.      <u>Factors Under 18 U.S.C. § 3553(a)(2)</u>

As the Court is well aware, 18 U.S.C. § 3553(a)(2) requires the Court to consider at sentencing, among other things, adequate deterrence of criminal conduct, and promoting respect for the law – in other words, to "send a message" to others who would abuse their positions in sports governance to enrich themselves, and to a public that deserves to know that when corrupt sports officials are caught engaging in such conduct they will be appropriately punished. For far too long, too many such officials have enriched themselves with impunity. The sheer number of soccer officials who have been indicted or otherwise convicted in this Court demonstrates just how pervasive a problem this has been in the world of soccer, for decades, and how necessary it is for the Court to emphasize general deterrence in its sentence.

While the defendant may not have played the largest role or pocketed the most money of all the defendants in the case, his conduct nevertheless shows that he engaged in the same type of conduct as the rest of the corrupt soccer officials who have been charged. And that corrupt conduct requires a significant sentence, one within the applicable Guidelines range, for the following reasons: (1) to deter the many other officials who govern soccer (and other sports) from similarly harming the organizations whose interests they are supposed to represent; (2) to encourage soccer officials who may have engaged in such conduct in the past to come forward and volunteer information in hopes of receiving leniency; and (3) to assure the public – from "clean" sports officials who do not breach their duty of loyalty by accepting bribes or kickbacks, to soccer fans of modest means, to players on the field – that the law truly holds accountable people who, notwithstanding their high positions, abuse those positions for their own benefit.

        3.      <u>History and Characteristics of the Defendant</u>

As the Court also well knows, when formulating its sentence it must also consider the defendant's history and characteristics. Understandably, when analyzing this factor the defendant highlights the testimonials of people who know him. No doubt the defendant has people who care about him, and that is clear from the submitted testimonials. The Court must also consider, however, that the defendant was a person of great power and influence in his community, with access to vast resources and money, and he chose to wield power to do harm rather than good.

The defendant argues that he has already endured sufficient punishment due to the time he spent in jail and prison in El Salvador on a separate offense and awaiting extradition to the United States. While the government agrees that it is appropriate to credit with the defendant with time spent in jail awaiting extradition on this case, the government respectfully submits that the Court should not credit the defendant with the approximately 16.5 months that the defendant spent in pretrial detention before he was sentenced to a separate, unrelated crime in El Salvador. Although the defendant may have otherwise made bail pretrial had he not been facing extradition in this case, it appears that the defendant has already received credit for that time, since he was sentenced to 8 years' imprisonment in El Salvador but served less than 5 years total as set forth below:

The Honorable Pamela K. Chen
September 26, 2022
Page 8

- December 16, 2015 – April 24, 2017: pretrial detention in El Salvador (approx. 16.5 months), and
- April 25, 2017 – June 7, 2020: prison sentence in El Salvador (approx. 38 months).

Time spent in jail on this separate, unrelated crime (which is otherwise unaccounted for in the defendant's criminal history category, which does not include overseas convictions, see USSG § 4A1.2(h)) does not serve the purpose of deterring others from committing the same crimes, encouraging wrongdoers and witnesses to come forward, and satisfying the public's right to a just punishment.  The Court should, however, credit the defendant with the approximately 10 months that he served after he had completed his sentence on the Salvadoran charges as set forth below:

- June 7, 2020 – January 29, 2021: detained pending extradition to the US (approximately 7 months), and
- January 30, 2021 – April 15, 2021: detained in the United States (approximatley 3 months).

A sentence of time served is insufficient given the defendant's crime, the scale of the conspiracy in which he participated, and the need to deter others.  It would also appear to give the defendant a benefit for committing multiple crimes, since it would appear to conflate his sentences for two completely distinct crimes and give him credit for both.  A Guidelines sentence (with the appropriate credit given for the approximately 10 months the defendant spent awaiting extradition and in U.S. jail) would better reflect the need for just punishment in this case.

IV.     Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 24 to 30 months.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/ Kaitlin T. Farrell
        Kaitlin T. Farrell
        Victor Zapana
        Eric Silverberg
        Assistant U.S. Attorneys
        718-254-7000

cc:     Defense Counsel (by ECF)
        Clerk of the Court (PKC) (by ECF)
        Jennifer Fisher, U.S. Probation Officer (by email)