UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

         - against -

FULL PLAY GROUP, S.A. and HERNÁN
LOPEZ,

                Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CR-252 (S-3) (PKC)

PAMELA K. CHEN, United States District Judge:

Defendants Full Play Group, S.A. ("Full Play"), an Argentine sports marketing company, and Hernán Lopez ("Lopez"), the former Chief Executive Officer ("CEO") of Fox International Channels ("FIC"), are among dozens of individuals and entities charged in an almost decade-long prosecution targeting corruption in international soccer. The wide-ranging prosecution has resulted in the convictions of dozens of former officials of the Fédération Internationale de Football Association ("FIFA") and affiliated continental and regional soccer confederations, such as la Confederación Sudamericana de Fútbol ("CONMEBOL") and the Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), as well as executives and employees of certain sports broadcasting and media rights companies, along with the companies themselves.

Here, Defendants Full Play and Lopez (collectively, "Defendants") were charged with being participants in an intricate scheme to pay bribes and kickbacks to CONMEBOL officials for the purpose of obtaining the broadcasting and marketing rights for popular regional soccer tournaments. Specifically, Full Play was charged with several wire-fraud and money-laundering schemes related to the Copa Libertadores and Copa América soccer tournaments, and various "friendly" matches ("friendlies") and World Cup qualifiers amongst South American national

1

teams; and Lopez was charged as a co-conspirator in the wire-fraud and money-laundering counts related to the Copa Libertadores scheme.  On March 9, 2023, a jury found Full Play and Lopez guilty on all counts charged against them after a seven-week trial.[1]

Defendants Full Play and Lopez now move under Federal Rule of Criminal Procedure 29 ("Rule 29") for judgments of acquittal.  Although before trial the Court rejected some of the same legal arguments Defendants now renew in their post-trial motions, because of intervening Supreme Court decisions signaling limits on the scope of the honest services wire fraud statute, the Court grants Defendants' motions and vacates their convictions.

## BACKGROUND

### I.    Initial Indictments and 2017 Trial

This case began in May 2015 with the indictment of nine FIFA officials and five sports media executives for their alleged participation in bribery schemes related to international soccer tournaments.  (*See generally* Sealed Indictment, Dkt. 1.)  Six months later, in November 2015, the grand jury returned a superseding indictment charging additional defendants.  (*See generally* Sealed Indictment, Dkt. 102.)  In the few years that followed, many of the charged defendants chose to cooperate with the Government and/or plead guilty.  *United States v. Napout*, 963 F.3d 163, 170 (2d Cir. 2020).  In June 2017, in anticipation of trial, the Government obtained a second superseding indictment pertaining only to defendants Juan Ángel Napout, Manuel Burga, and José Maria Marin.  (*See generally* Superseding Indictment (S-2), Dkt. 604; Government Letter re S-2 Indictment, Dkt. 603).)

---

[1] A third defendant, Carlos Martinez ("Martinez"), was charged with the same counts as Lopez, but was acquitted by the jury on all counts.

On November 6, 2017, Napout, Burga, and Marin proceeded to a jury trial before this Court.  (*See* 11/6/2017 Minute Entry.)  After six weeks of trial, Napout was convicted of the racketeering conspiracy and wire fraud conspiracy counts, but acquitted on the money laundering conspiracy counts; and Marin was convicted on all counts, except for one money laundering conspiracy count.  (*See* 12/22/2017 Minute Entry; Verdict Sheet, Dkt. 873.)  Burga was acquitted on all counts against him.  (*See* Dkts. 871, 874.)  Napout and Marin challenged their convictions, principally arguing that they were convicted based on impermissible extraterritorial applications of the wire fraud statutes.  *See generally United States v. Napout*, 332 F. Supp. 3d 533 (E.D.N.Y. 2018); *Napout*, 963 F.3d 163.  This Court denied their post-trial motions for acquittal and new trials, *Napout*, 332 F. Supp. 3d at 575, and the Second Circuit affirmed, *Napout*, 963 F.3d at 190.

## II.    Third Superseding Indictment

On March 18, 2020, the grand jury returned a third superseding indictment, adding charges against Defendants Full Play, Lopez, and Martinez.  (Sealed Superseding Indictment (S-3) ("S-3 Indictment" or "the Indictment"), Dkt. 1337.)  Like the previous indictments, the S-3 Indictment alleged a wide-ranging racketeering conspiracy, spanning "a period of more than 20 years," that involved various schemes to solicit, pay, and receive bribes and kickbacks "in connection with the sale of media and marketing rights to various soccer tournaments and events" around the world. (S-3 Indictment, Dkt. 1337, ¶ 63.)  Full Play, a South American sports media and marketing company, was charged in the overarching Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy and several of the wire-fraud and money-laundering schemes underlying the RICO conspiracy, including ones connected with the Copa Libertadores ("Copa Libertadores #2 Scheme"), the Copa América ("Copa América Scheme"), and various friendly and World Cup qualifier matches ("World Cup Qualifiers/Friendlies Scheme").  (*Id*. ¶¶ 19–20, 113–15, 129–35, 146–56.)  Lopez and Martinez, both United States citizens who were executives at FIC, a

subsidiary of Twenty-First Century Fox, Inc. ("Fox"), were charged as co-conspirators with Full Play in the counts related to the Copa Libertadores #2 Scheme—but not in any of the other counts in the S-3 Indictment, including the RICO count. (*See id.* ¶¶ 21–22, 129–35.)

Prior to Defendants' trial, the Government decided not to proceed to trial on the RICO count as to Full Play (Dkt. 1756) and the substantive wire fraud counts as to Full Play, Lopez, and Martinez (Dkt. 1864). Consequently, only Defendants' conspiracy counts for honest services wire fraud and money laundering remained. (*See generally* Dkt. 1868 (Government's proposed trial indictment "edited to omit counts from the [Third Superseding] Indictment that are irrelevant to the trial . . . .").)

## A.      Copa Libertadores #2 Scheme

With respect to the Copa Libertadores #2 Scheme, the wire fraud conspiracy charge in the S-3 Indictment alleged:[2]

> In or about and between 2000 and 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FULL PLAY, HERNAN LOPEZ, and CARLOS MARTINEZ, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONMEBOL and their constituent organizations, including to deprive FIFA and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, telephone calls and emails, contrary to Title 18, United States Code, Section 1343.

---

[2] The Government produced an S-3 Indictment for Defendants' trial that contained only the charges remaining against them and the allegations relevant to Defendants and those charges. (*See* Tr. Indictment, Dkt. 1868-1.) Other than being edited and renumbered to include only the defendants going to trial, the language of the relevant counts in the Trial Indictment was identical to the S-3 Indictment. (*Compare, e.g.*, S-3 Indictment, Dkt. 1337, ¶ 130 (charging Count Nine, wire fraud conspiracy related to the Copa Libertadores #2 Scheme against 13 defendants) *with* Tr. Indictment, Dkt. 1868-1, ¶ 34 (charging Count One, wire fraud conspiracy related to the Copa Libertadores #2 Scheme against Full Play, Lopez, and Martinez).)

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

(Tr. Indictment, Dkt. 1868-1, ¶ 34.)[3]  The Indictment detailed 11 fraudulent wire transfers between March 20, 2015 and May 26, 2015 that Full Play, Lopez, Martinez, and their co-conspirators "did transmit and cause to be transmitted" in furtherance of the alleged scheme.  (Dkt. 1337, ¶ 133.)

### B.  Copa América Scheme

As to the Copa América Scheme, the S-3 Indictment alleged that between 2010 and 2015, Full Play and others agreed to pay tens of millions of dollars in bribes to CONMEBOL officials to secure the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América, as well as the Copa América Centenario held in 2016 in the United States.  (*See id*. ¶¶ 81–85, 150–54.)  The S-3 Indictment specified six fraudulent wire transfers between April 27, 2015 and May 26, 2015 that Full Play and its co-conspirators "did transmit and cause to be transmitted" in furtherance of the alleged scheme.  (*Id*. ¶ 154.)

---

[3]  Section 1343 of the federal criminal code—the wire fraud statute—provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," is guilty of a felony offense.  18 U.S.C. § 1343.  Notably, § 1343 does not reference schemes and artifices to defraud by depriving organizations of "their respective rights to honest and faithful services." *Id*.  Rather, as discussed *infra* Discussion Section I.A.2, honest services wire fraud was created when Congress enacted 18 U.S.C. § 1346, which provides that the term "'scheme or artifice to defraud' [for purposes of § 1343] includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.  Section 1343 therefore can be violated *either* through a scheme to deprive an organization of honest services, or a scheme to obtain the property of another through false representations.  Although the Indictment appears to allege both forms of wire fraud under § 1343 as objects of the § 1349 conspiracy charge (and does not explicitly reference § 1346) (*see* Tr. Indictment, Dkt. 1868-1, ¶ 34), the Government sought to prove an honest services wire fraud conspiracy only at trial (*see* Dkt. 1869, at 33–40 (Government's proposed jury charges defining "wire fraud" using the "elements of honest services wire fraud")), and does not argue differently now.

### C.      World Cup Qualifiers/Friendlies Scheme

Lastly, the S-3 Indictment alleged that between 2007 and 2015, Full Play and its owners, Hugo and Mariano Jinkis, engaged in a scheme to pay bribes and kickbacks to the presidents of various soccer federations within CONMEBOL in exchange for media rights to certain World Cup qualifying matches and certain friendly matches.  (*Id.* ¶ 79.)

## III.     Pre-Trial Rulings

On July 23, 2021, Defendants Full Play, Lopez, and Martinez filed motions to dismiss the S-3 Indictment under Federal Rule of Criminal Procedure 12(b)(3).   (Dkts. 1594, 1595.) Defendants moved for dismissal on three grounds: (1) the honest services wire fraud charges were unconstitutionally vague as applied to Defendants; (2) the Indictment impermissibly sought to apply the wire-fraud statute extraterritorially; and (3) the Indictment did not sufficiently allege an offense. *United States v. Full Play Grp., S.A.*, No. 15-CR-252 (PKC), 2021 WL 5038765, at *4 (E.D.N.Y. Oct. 29, 2021) (citing Dkts. 1594-1, 1595-1).  The Court's previous ruling regarding Defendants' first argument, the vagueness challenge, is relevant to this Memorandum and Order and is summarized below.[4]

By written decision issued on October 29, 2021, the Court denied Defendants' motions in their entirety.  (*Id.*)  At the time, the Court "ha[d] no trouble rejecting Defendants' [] vagueness arguments" because "although jurists may continue to debate the source and scope of the fiduciary duties encompassed by § 1346, at least when it comes to bribery and kickback schemes—such as the ones alleged here[]—those debates are academic." *Id.* at *6.  Specifically, the Court disagreed with Defendants' attempt to differentiate *foreign* private sector bribery from *domestic* private

---

[4] Defendants' second argument regarding extraterritoriality is not re-raised in their present motions and therefore the issue is largely not discussed herein.  *See also infra* Discussion Section I.C.

6

sector bribery, in large part, because the Second Circuit had "rejected a substantively indistinguishable argument" in *United States v. Bahel*. *Id.* at *7 (citing *United States v. Bahel*, 662 F.3d 610, 616–17 (2d Cir. 2011)). The Court explained that in *Bahel*, "a foreign national employee of the United Nations" "argued that he could not be prosecuted for honest-services fraud under § 1346 because 'none of the pre-*McNally* cases extended an "honest-services" theory of fraud to an international setting involving foreign nationals[.]'" *Id.* (quoting *Bahel*, 662 F.3d at 632). But "[t]he Circuit found this argument unavailing, concluding that § 1346 'is limited to the *nature of the offenses* prosecuted in the pre-*McNally* cases (i.e., bribery and kickback schemes)—not the *identity of the actors* involved in those cases.'" *Id.* (quoting *Bahel*, 662 F.3d at 632) (emphasis added). The Court agreed with the *Bahel* panel, *id.*, and denied Defendants' vagueness challenge along with the rest of Defendants' dismissal arguments, *id.* at *15 ("Defendants' motions to dismiss the S-3 Indictment (Dkts. 1594, 1595) are denied in their entirety.").

## IV.    Trial

Jury selection began on January 12, 2023 (1/12/2023 Minute Entry), and trial started the following week, on January 17, 2023. Over of the course of the approximately seven-week trial, the Government called 14 witnesses and introduced voluminous documents concerning international soccer, FIFA and CONMEBOL, the broadcasting market for international soccer, the alleged bribery schemes, and Defendants' roles in those schemes. Defendants mounted a vigorous defense, calling 11 witnesses, introducing voluminous documents in opposition to the Government's theory of the case, and made numerous trial-dispositive motions. Indeed, between Full Play, Lopez, and Martinez, the defense made near-daily motions for mistrial and severance the first two weeks of trial. (*See, e.g.*, Tr. 80 (Martinez moving for mistrial on day one); Tr. 112–16 (Martinez and Lopez moving for mistrial and severance from Full Play on day one); Tr. 250–51 (Lopez and Full Play moving for severance and mistrial on day two); Tr. 1435 (Martinez

7

moving for mistrial on day six); Tr. 1513 (Lopez moving for mistrial on day seven); Tr. 1941–42 (Martinez moving for mistrial on day eight); Tr. 2389 (Martinez moving to sever from Full Play on day nine).)

Viewed in the light most favorable to the Government, *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008), the evidence at trial established the following facts.[5]

### A.    1999–2008: The Formation of the Bribery Scheme

In 1999, Torneos y Competencias ("Torneos"), a sports media company owned by Luis Nofal ("Nofal"), and Traffic Group ("Traffic"), a sports media company owned by Jose Hawilla, formed a company called T&T Sports Marketing Ltd. ("T&T Cayman").  (Tr. 375–76; GX 1609; GX 150-T.)   T&T Cayman bought television rights for various South American soccer tournaments—including the Copa Libertadores, the Copa Sudamericana, and the Recopa Sudamericana—from CONMEBOL and resold them. (Tr. 376:7–8.)  Around 2002, T&T Cayman re-negotiated its contract with CONMEBOL and began paying bribes in exchange for rights that were far cheaper than market value and would be "renew[ed] well before they were going to mature to involve any competitor."  (Tr. 391–92; Tr. 332:7–15; 393:10–17.)  Each contract securing the

---

[5] The centerpiece of the Government's case against Defendants was the testimony of Alejandro Burzaco ("Burzaco"), a cooperating witness who had pleaded guilty in 2015 to multiple offenses relating to his extensive role in various bribery schemes involving the television rights for South American soccer.  (*See* Minute Entry for Burzaco Change of Plea Hr'g, Dkt. 90.)  Though English is not his first language, Burzaco testified without an interpreter.  Burzaco was the only witness who testified about Lopez's knowledge of, and role in, the Copa Libertadores bribery scheme.  Burzaco was on the stand for nearly eleven days.  Burzaco was also a key witness in the *Napout* trial in 2017.  *See Napout*, 332 F. Supp. 3d at 561 (describing Burzaco as "one of the government's key witnesses").  While Defendants argue that the jurors could not have credited Burzaco's testimony, such credibility determinations are for the jury, and not the Court, to make, *United States v. Cote*, 544 F.3d 88 (2d Cir. 2008), and here the jury had ample opportunity to assess Burzaco's testimony over the course of his eleven days of testimony.  For purposes of Defendants' motions, the Court therefore views Burzaco's testimony in the light most favorable to the Government.  *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008).

rights also included a "macroeconomic clause" requiring T&T Cayman and CONMEBOL to re-negotiate the price of the rights in good faith in the event that macroeconomic conditions in the region improved.[6]  (*See, e.g.*, GX 150-T.)

In 2002, Traffic sold its 50% stake in T&T Cayman to Fox Pan-American Sports ("FPAS"), a company comprised of three owners: Liberty Media Corporation ("Liberty Media"), Hicks, Muse, Tate & Furst ("Hicks Muse"), and Fox Sports.  (Tr. 380.)[7]  Thus, as of 2002, T&T Cayman was jointly owned by Torneos and FPAS, each with a 50% stake.  Burzaco, who had already been involved with T&T Cayman as an adviser "putting together the partners in the FPAS" joint venture in 2001, became Torneos's CEO in 2006.  (Tr. 334:13–15; 347:23–24.)  He was informed of the bribes by his predecessor, Torneos-founder Luis Nofal, in 2004.  (Tr. 392:2.)

In 2005, FPAS came to own 75% of T&T Cayman, but retained just 50% of the voting interest, a decision that, according to Burzaco, was intended to limit FPAS's exposure to liability for T&T Cayman's illegal activities.  (Tr. 381:12–15.)  Starting in 2005, the Copa Libertadores tournament was aired on Fox in all of the Spanish-speaking South and Central American countries, whereas the "two most important matches" of each week were shown in Brazil on a "free-to-air" channel owned by Tele Globo ("Globo").  (Tr. 383–84.)

From the time FPAS acquired a 75% share of T&T Cayman in 2005, until 2009, the flow of media rights and payments was as follows.  T&T Cayman served primarily as a pass-through

---

[6] This so-called macroeconomic clause provided: "The parties agree that if, during the term of the agreement, through the 2018 edition, the macroeconomic conditions in the region change substantially from the current conditions (*for these purposes, offers from third-parties are not considered as an improvement*), the parties agree to renegotiate, in good faith, the current financial terms of the agreement."  (GX 154-T (emphasis added).)  The italicized portion was added to the macroeconomic clause in 2008.

[7] Liberty Media subsequently sold its small share to Hicks Muse, leaving Hicks Muse with 62% of FPAS by 2005.  (GX 1609.)

entity for the rights: it bought the Copa Libertadores rights from CONMEBOL at a relatively low price and resold them at "a very small or insignificant or no margin" to FPAS. (Tr. 385:15–21.) Torneos's core business was producing the tournaments so that T&T Cayman would have a "full finished product" to sell to its clients, principally FPAS. (Tr. 402:23–24.) FPAS bought the fully produced tournaments from T&T Cayman and resold them to other media companies, which aired the tournaments locally. (Tr. 407.) Additionally, although most Spanish-speaking media rights were sold to FPAS, the most valuable matches in Brazil—the two weekly, primetime "free-to-air" matches—were sold by T&T Cayman to another company, T&T Sports Marketing B.V. ("T&T Netherlands"), to be resold at a significant mark-up to Globo. (Tr. 386.) T&T Cayman sold these Brazilian "free-to-air" rights to T&T Netherlands at an extremely low price—just $900,000 for rights that T&T Netherlands turned around and sold to Globo for $7.2 million—as compensation for T&T Netherlands's small margins, and as a "break fee" for a merger that never occurred between FPAS and Torneos. (Tr. 447–48.) Despite its name, T&T Netherlands did not have any corporate relationship to T&T Cayman, and was not a subsidiary of Torneos. Instead, it was a separate company originally created and wholly owned by Luis Nofal. When Burzaco bought all of Torneos's shares in 2005, he co-owned T&T Netherlands as a joint venture with Nofal, and came to own it entirely when Nofal passed away in 2008. According to Burzaco, he primarily used the money generated by the sale of the Brazilian "free-to-air" rights to Globo to pay bonuses for Torneos employees, and to pay certain club teams to participate in the tournaments. (Tr. 409, 417–18, 448.)

Meanwhile, from 2005 to 2008, T&T Cayman paid bribes to the "six most relevant executives of CONMEBOL" to secure the Copa Libertadores media rights: Nicolas Leoz ("Leoz"), Ricardo Teixeira ("Teixeira"), Julio Grondona ("Grondona"), Eduardo DeLuca

10

("DeLuca"), Romer Osuna ("Osuna"), and Eugenio Figueredo ("Figueredo"), using two mechanisms.[8]  (Tr. 393:20–394:3.)    First, the largest share of the bribes was paid via sham contracts between T&T Cayman and companies called Spoart, Valente, and Somerton (also known as the "Lazaro contracts") for services that were not actually performed.  (Tr. 399, 457.)  Second, a smaller portion of bribes were paid out of CONMEBOL's own treasury.  (Tr. 399.)  Beginning in 2008, T&T Netherlands also began paying bribes through a contract with Somerton.  (Tr. 452.)

Nofal's close personal relationship with Grondona, President of the Argentine Football Association ("AFA") and Senior Vice President of FIFA, was crucial to the partnership between T&T Cayman and the CONMEBOL Executive Committee.  (Tr. 361–62, 364:1–3.)   When Burzaco became CEO of Torneos in 2006, he took "charge of supervising the relationship with . . . the CONMEBOL officials," as well as with Hicks Muse and Fox in their collective management of T&T Cayman.  (Tr. 357.)  When Nofal became sick, Burzaco stepped into Nofal's relationship with Grondona, and took "a more active presence" in paying the bribes to the CONMEBOL officials.  (Tr. 364, 393:5–7.)

## B.    The Group of Six

In 2009, the Argentine government pressured Grondona to nationalize the rights, held at the time by Torneos, for Argentina's first division club soccer league.  (Tr. 571–73.)  Grondona obliged and terminated Torneos's rights.  (*Id.*)  Burzaco, shaken by Torneos's substantial loss of revenue and worried that the Argentine government would use Grondona's influence to threaten Torneos's access to the Copa Libertadores, Copa Sudamericana, and Recopa rights, took steps to

---

[8] Leoz was President of CONMEBOL, DeLuca was General Secretary, Osuna was Treasurer, and Figueredo was First Vice President.  Grondona and Teixeira were included because they were the presidents of the two largest national football associations in CONMEBOL, Argentina and Brazil.  (Tr. 393:20–394:3.)

reinforce its claim to those lucrative tournaments.  (Tr. 574:23–574:12.)  Torneos had not been bribing Grondona for the AFA rights—and understood from a conversation with Grondona one week before the AFA rights were nationalized—that T&T Cayman's bribes to Grondona for the Copa Libertadores rights could help protect FPAS's claim to those rights against future threats from the Argentine government.  (Tr. 577:19–580:2.)  Even so, Burzaco could not be sure that the bribes to Grondona were sufficient to keep the CONMEBOL Executive Committee from nationalizing the Copa Libertadores rights and sought to reinforce T&T Cayman's claim to the Copa Libertadores rights by establishing a contingency plan. (Tr. 581:21–582:2.)  So, in October 2009, Burzaco and Nofal met with Hugo and Mariano Jinkis, the owners of Defendant Full Play, a sports media company, looking for help.  (Tr. 582:3–583:17.)  The Jinkises had an active bribery scheme with six members of the CONMEBOL Executive Committee, known as the "Group of Six"[9]—a different group than the six CONMEBOL officials that T&T Cayman was already bribing—to maintain Full Play's access to various World Cup qualifying and friendly matches. (Tr. 585:3–7; 595:1–11.)  The Jinkises promised Burzaco and Nofal that they (the Jinkises) would not seek to buy the Copa Libertadores rights, and further "committed to speak with" the Group of Six about establishing a bribe scheme with Torneos, "in order to have six votes out of 10 countries[,]" in case Grondona was pressured by the Argentine government to terminate the Copa Libertadores and Copa Sudamericana rights contracts.  (Tr. 595:24–596:3.)

Soon after this meeting with the Jinkises, Rafael Esquivel, President of the Venezuelan Football Association, told Burzaco that this "Group of Six" members felt left out of the bribe payments that Grondona, Leoz, and the others had been receiving, and that the Group of Six

---

[9] The Group of Six was comprised of Luis Chiriboga (Ecuador), Rafael Esquivel (Venezuela), Luis Bedoya (Colombia), Manuel Burga (Peru), Juan Ángel Napout (Paraguay), and Carlos Chavez (Bolivia).  (Tr. 585.)

"would need to start collecting a bribe." (Tr. 603:5–13.) Each of these six presidents began receiving $400,000 per year in 2010 from T&T Cayman. (Tr. 605.) These officials joined the other six CONMEBOL officials—Teixeira, Leoz, Grondona, DeLuca, Osuna, and Figueredo—in receiving bribes from T&T Cayman. (Tr. 619.) Only two CONMEBOL Executive Committee members, Harold Mayne-Nicholls of Chile and Sebastian Bauza of Uruguay, did not receive bribes. (*Id.*)

### C.  2009–11: Lopez Joins the Bribery Scheme; Fox Acquires FPAS

Lopez and Burzaco were aware of each other as early as 2003 through Lopez's indirect involvement with the Copa Libertadores as a senior employee at FIC. (Tr. 524.) In 2008, Lopez and Burzaco began discussing Fox's plans to acquire Hicks Muse's share of FPAS. (Tr. 525; *see, e.g.*, GX 1821.) By 2009, Lopez was elevated to FIC's CEO, and his working relationship with Burzaco grew.

In 2010, Lopez persisted in pursuing FIC's acquisition of FPAS and launching a Fox Sports channel in Brazil. (Tr. 650.) Lopez and Burzaco met numerous times that year. In February 2010, Lopez approached Burzaco in the lobby of a Fort Lauderdale hotel and told Burzaco that "after . . . so many months already analyzing FPAS, [Lopez determined that] there is some type of special arrangement with [the] executives" and that Burzaco therefore had "to trust [Lopez] because he need[ed] that information to solidify [his and Burzaco's] relationship together." (Tr. 651, 652:17–23.) During that conversation, Burzaco disclosed that T&T Cayman was paying bribes to CONMEBOL executives. On cross-examination, Burzaco clarified that he "didn't ask [Lopez] to be [his] partner" and did not know what Lopez expected to get by joining the scheme. (Tr. 2032:8–10.)

Later that year, while in New York City for a T&T Cayman board meeting, Burzaco told Lopez more about the bribery mechanisms. (Tr. 653:25–654:4.) Lopez "said [the bribes were]

13

benefiting Fox[;] . . . that's why they wanted to buy 100 percent of FPAS." (Tr. 655:9–10.)  In June 2010, Lopez replaced Fox executive David Sternberg as an FPAS-appointed director of T&T Cayman. (Tr. 669:23–670:2.)  By December 2010, Lopez was aware of the three mechanisms by which FPAS was paying bribes: (1) by funneling additional bribe money for the Group of Six into the existing CONMEBOL contract; (2) through the Lazaro sham contracts; and (3) most recently, through T&T Netherlands. (Tr. 688–89.)  In October 2011, as Fox's acquisition of FPAS was being finalized, Burzaco informed Grondona of his counterpart at Fox, i.e., Lopez, and conveyed Lopez's request to Grondona for assistance regarding Fox's bid for the English-language rights to the 2018 and 2022 World Cups. (Tr. 776, 779:24–781:7.)  After Fox's successful World Cup bid, Lopez asked Burzaco whether he could set up a meeting with Grondona so that Lopez could thank Grondona personally for his help. (GX 1882-T.)

Fox's acquisition of FPAS was finalized in November 2011.  With the acquisition came numerous assurances from Fox executives, including Lopez and his superiors, that Torneos's business with Fox would continue as it had before, or even grow. (GX 2173; Tr. 821–22.)  That month, Burzaco met with Lopez and Martinez at a Dean & DeLuca coffee shop near Fox's offices in New York City. (Tr. 815:7–14.)  At the meeting, Lopez told Burzaco that Martinez (as head of FIC in Latin America) would be Burzaco's principal point of contact moving forward. (Tr. 841–42.)  Lopez also asked Burzaco, now that Fox owned the majority stake of T&T Cayman via FPAS—and in light of Fox's increased vigilance regarding bribery following the "News of the World" scandal in 2011—whether they needed to "tidy up" the bribe-paying mechanisms. (Tr. 816:18–22.)  Burzaco identified cleaning up the sham Lazaro contracts as a priority.

### D.    The October 2012 CONMEBOL Executive Committee Meeting

Throughout 2012, the relationship between Torneos and Fox—and between Burzaco and Martinez—chilled as Burzaco felt that Fox was marginalizing or undermining Torneos.  For

14

example, Burzaco rebuffed an e-mail from Martinez that indicated that both Lopez and Martinez wanted Martinez to directly participate in the Copa Libertadores negotiations with CONMEBOL officials, because Burzaco believed that the CONMEBOL officials would look at him as though he was "coming from a different planet" if he included the American executives in negotiations involving bribes.  (Tr. 892, 885:20–25.)  In addition, instead of the mutual collaboration and growth between Torneos and Fox that Burzaco had been led to believe would follow Fox's acquisition of FPAS, Fox was actually reducing Torneos's business.  For example, after Burzaco relinquished Torneos's exclusive right to produce Fox's soccer broadcasts in Brazil a year earlier—a concession made in exchange for a "promise to produce in other regions and enlarge the number of hours of production" overall—Martinez asked for a second release of exclusivity.  (Tr. 868:17–869:19; 922:6–10; 925:4–23; GX 1906-T.)  Even worse from Burzaco's perspective, while Fox relied on Burzaco to negotiate a further extension of their below-market-rate Copa Libertadores rights with CONMEBOL, Fox would not commit to automatically renewing its existing service agreements with Torneos—business on which hundreds of Torneos employees' jobs depended.  (Tr. 1027:9–10.)  To Burzaco, this felt "like a betrayal story."  (Tr. 928:3; GX 1923-T.)

Burzaco also believed that Fox was taking an unreasonable approach to the extension negotiations for the Copa Libertadores rights.  CONMEBOL was seeking a price increase on the then-current Copa Libertadores contract pursuant to the macroeconomic clause.  While Burzaco saw granting that increase as a given—especially in light of what he believed to be the deflated price T&T Cayman was paying for the rights and their skyrocketing value—Martinez and Lopez were only willing to pay the macroeconomic increase in exchange for an extension of the rights through 2022.  (Tr. 982; 1007; 1015.)  They also wanted to negotiate a macroeconomic increase

15

that lasted all the way until 2018, rather than re-negotiating the increase again for the 2016 through 2018 period, as was standard. (Tr. 2192–93.)

Burzaco thought that Fox's unwillingness to grant the macroeconomic increase without the extension opened T&T Cayman up to competition. As of August 2012, most of the bribes were being paid through the Lazaro sham contracts or directly out of CONMEBOL—both of which came primarily from the money FPAS paid for the Copa Libertadores rights. (Tr. 1035.) Therefore, FPAS's desire to keep suppressing the price it was paying also reduced the amount of money available for bribes to the CONMEBOL Executive Committee. At the time, Paco Casal, CEO of the Uruguayan sports media company GolTV, was actively trying to poach T&T Cayman's Copa Libertadores rights by organizing meetings with all of the CONMEBOL executives (Tr. 915–16), outbidding T&T Cayman (Tr. 1074), organizing clubs that felt that they were being shortchanged by CONMEBOL, and threatening legal action. Luis Bedoya, one of the Group of Six, did not want to do business with Casal, even though Casal was offering a much higher price than Fox, because Casal's company, Globo, was having trouble making payments. (Tr. 4720.)[10] Other Uruguayans on the Executive Committee, however, were interested in Casal's overtures, and the clubs who felt that they were being shortchanged by the Fox deal were also putting pressure on CONMEBOL officials to consider Casal's proposals. (*Id.*)

It was in the context of this uncertainty that Burzaco took steps to formulate a "Plan B" in advance of the CONMEBOL Executive Committee meeting ("October 2012 Executive Committee meeting"). Burzaco sought and received approval from Torneos's board—in particular, Bruce Churchill of DirectTV—for Torneos to guarantee CONMEBOL's macroeconomic increases from 2013 to 2018, and to secure the 2019–2022 extension for Torneos rather than T&T Cayman. (Tr.

---

[10] Bedoya was the only CONMEBOL official to testify at trial.

16

1059–60; 1082.)  This would enable Torneos to negotiate with Fox from a stronger position—as the holder of the lucrative Copa Libertadores rights—for Torneos's crucial service agreements with Fox.  (Tr. 1060:5–12.)  Burzaco still hoped that "Plan A"—i.e., Fox maintaining the status quo arrangement by either guaranteeing Torneos the service agreements for the 2019–2022 Copa Libertadores rights extension or putting the extension off for later and simply paying the macroeconomic increase CONMEBOL was owed—would work out.  However, Burzaco was also prepared to enter the CONMEBOL Executive Committee meeting with a contingency plan, i.e., "Plan B."  (1059:10–1060:12.)  Martinez conveyed Fox's final position just days before the Executive Committee meeting: Fox would "honor the macroeconomic clause" and pay an additional $77 million between 2013 and 2018, but only if CONMEBOL extended T&T Cayman's exclusive rights to the Copa Libertadores until 2022.  (Tr. 1058.)  Fox was silent on whether the service agreements between Fox and Torneos would continue for the 2019–2022 Copa Libertadores rights extension.  (Tr. 1057:23–1058:10.)

Burzaco unilaterally put "Plan B" in motion at the October 2012 Executive Committee Meeting.  He negotiated the macroeconomic increase at the price permitted by Fox and extended the rights in the name of TyC International, a wholly-owned subsidiary of Torneos.  (Tr. 2203.)  Burzaco additionally negotiated an agreement for the Copa Libertadores "international rights" (broadcasting rights for the Copa Libertadores outside North and South America), that he believed would strengthen T&T Cayman's position against outside threats from Paco Casal while also benefiting Fox.  (GX 164-T; Tr. 1121–22.)  Fox had long desired the Copa Libertadores international rights, but was unable to contract for them with CONMEBOL due to the "automatic" extension Jose Hawilla and Traffic had enjoyed with respect to those rights as a condition of the 2002 sale of Traffic's share of T&T Cayman to FPAS.  Burzaco also explained to the

17

CONMEBOL Executive Committee that Torneos and Full Play would take over international distribution from Traffic and give 70% of the revenues to CONMEBOL.  (Tr. 1096; GX 164-T.) Now that Torneos and Full Play were going to assume Traffic's rights, Burzaco planned to "sit down [with Fox] and . . . read all the service agreements" in order "to decide on the territories that Fox [would be] operating internationally outside the Americas with an arm's length negotiation and give them priority to acquire those rights."  (Tr. 1083:1–6.)[11]  Despite this plan, Burzaco had arranged prior to the October 2012 Executive Committee meeting for DirectTV "to buy the [Copa Libertadores] rights after 2018 in case Fox would [not] pay whatever the necessary price would be."  (Tr. 2210:7–9.)  According to Bedoya, even though Torneos was buying the extension, the CONMEBOL Executive Committee expected that the arrangement proposed by Burzaco "was just

---

[11] On cross-examination, Burzaco reiterated his intention to use the rights extended in Torneos's name as leverage in subsequent negotiations with Fox:

Q: Plan B was that if Fox didn't agree to keep the services agreements the same with Torneos, you were going to take the extension for your company and cut Fox out, right?

A: Incorrect.

Q: That was the plan right?

A: Incorrect.

Q: Well, that's what you did.

A: Incorrect. . . Incorrect because that you are taking out of the context of everything we did and how we went to the Board and what was our final intention, which is reaching an agreement, extending the service agreements, and that Fox keeps having the very important business of distributing the rights without T&T having a margin[;] . . . the Plan B was meant to purchase the rights directly through Torneos to have a stronger negotiating power with Fox, and the same way Fox was using . . . the extension request not to honor its obligations under T&T Cayman to award Torneos the service agreements.

(Tr. 2133:15–22, 2133:24–2134:17.)

18

to keep the situation as it was" while fostering an agreement that would result in Traffic withdrawing a lawsuit it had filed against certain CONMEBOL officers the year prior in Miami. (Tr. 4728–29; Tr. 1185:19–1186:13.)  Burzaco and the CONMEBOL officials never discussed whether Fox or another company would ultimately broadcast the Copa Libertadores games in the future at the October 2012 Executive Committee meeting.  (Tr. 4729.)

Although Burzaco did not extend the rights in the name of T&T Cayman because he felt "betrayed by our partner Fox" and because of his fiduciary duty to Torneos, he always intended to exchange the 2019 to 2022 Copa Libertadores rights for the Torneos service agreements.  (Tr. 1102–03.)  Both Martinez and Lopez wrote Burzaco the next day, October 25, 2012, to approve the macroeconomic increase after seeing a press release about the agreement.  (GX 1952-T.) Burzaco forwarded an email from Martinez approving the macroeconomic increase to other Torneos executives, writing "We are doing well, right?  Poker has shown me how to read my enemies . . . ."  (GX 1954-T.)  But Burzaco did not actually view Lopez and Martinez as his enemies; rather, he saw them as his "counterparties in a business situation that was taking a hard stance for demanding an extension" in exchange for paying a previously obligated payment.  (Tr. 1628.)

It is unclear when exactly Burzaco told Lopez and Martinez that he had extended the rights in Torneos's name, not T&T Cayman's.  He did not do so in response to Lopez and Martinez's emails approving the macroeconomic increase because he worried that saying so "in black and white . . . would put us at a risk of [a] lawsuit when our final intention was to reach an agreement." (Tr. 2208:22–24.)  Burzaco testified that he informed them at some undefined point in 2013, before November of that year.  (Tr. 1111.)  In response, Lopez was "annoyed" and "not happy" (Tr. 1111:24, 1113:2–3.)  Martinez did not seem annoyed, and was willing to return to the negotiating

19

table regarding the Copa Libertadores rights and related Torneos service agreement extensions after learning that the rights had been extended under Torneos's name. (Tr. 1112–13.)

E. **2013: Collaborating on the Swap Agreement**

Soon after the October 2012 Executive Committee meeting—but before Burzaco's Fox counterparts learned of Torneos's assumption of the Copa Libertadores 2019–2022 rights extension—Burzaco perceived a thaw in their previously chilly relationship. Burzaco, Lopez, and Martinez focused on "cleaning up T&T Cayman" by engineering a so-called "Swap Agreement." (GX 284-T). First, they cancelled the sham Valente and Somerton contracts, retaining only the agreement with Spoart, which, though also fraudulent, *did* perform some services and was therefore "a more digestible vehicle to have in T&T Cayman books." (Tr. 1122.) The loss of the Valente and Somerton contracts as bribe-paying vehicles was compensated for by eliminating the $900,000 payment T&T Netherlands had been making to T&T Cayman for the Brazil free-to-air rights, and using those funds to pay bribes. (*Id.*) Thus, from the time the Swap Agreement was executed until the end of the conspiracy, "a hundred percent of the bribes" were paid through T&T Netherlands. (Tr. 1987:8–11.) Burzaco also collaborated with Lopez regarding Fox's acquisition of Asian soccer rights and assisted Martinez with securing worldwide rights for Fox for the Copa Centenario soccer tournament. (Tr. 1163–65.) When Traffic initiated a lawsuit in Florida against CONMEBOL and its officers based on CONMEBOL's termination of Traffic's contract for the 2015 Copa América, Burzaco discussed the lawsuit with Lopez since Burzaco thought that the lawsuit increased the risk of American enforcement against their bribery schemes. (Tr. 1186–87.)

In 2013, Burzaco, Martinez, and Lopez began discussing an agreement between Fox and Torneos for transfer of the Copa Libertadores 2019–2022 rights extension to Fox. By November 2013, Burzaco had discussed such an agreement with Martinez. (Tr. 1276:7–11.) Burzaco also discussed his plan to sell the 2019–2022 Copa Libertadores rights to Fox Sports with Eugenio

20

Figueredo, First Vice President of CONMEBOL's Executive Committee.  (GX 2000-T; Tr. 393:20–394:3, 1271–75.)

### F.     2014–15: Negotiations for the Copa Libertadores 2019–2022 Rights

In the summer of 2014, Grondona passed away, and Juan Ángel Napout became President of CONMEBOL.  (Tr. 1315–16.)  That September, Lopez—at Burzaco's urging—organized a meeting of Lopez, Burzaco, Martinez, Napout, and Bedoya at a Greek restaurant in Miami Beach. (Tr. 1326–27.)  The purpose of the meeting was "restructuring the contractual relationship between CONMEBOL and [T&T Cayman]" to reinforce Torneos and FPAS's relationship with CONMEBOL in the aftermath of Grondona's death.  (*Id.*, Tr. 1323:23–25.)  They discussed eliminating T&T Cayman from the scheme, such that Fox would pay CONMEBOL directly for the Copa Libertadores rights.  (Tr. 1323–24; GX 2024-T; GX 2041-T.)  The Brazil free-to-air rights would continue to be handled as they had been, given by T&T Cayman to T&T Netherlands to be resold to Globo, while the "international rights" would be exploited in the existing partnership between Full Play and Torneos.  Burzaco testified that although bribes were not openly discussed at the meeting (Tr. 2281:24–2182:1), they were clearly in the subtext—that is, the Brazilian "free-to-air" rights, which had become so central to the bribe-paying arrangement, would remain intact and fully funded by Fox.  (Tr. 1324–25.)

Burzaco spoke with Martinez and Lopez over the phone in advance of this meeting regarding all of these details: eliminating T&T Cayman, allowing FPAS to contract directly with CONMEBOL for the Copa Libertadores rights, and maintaining the T&T Netherlands-Globo arrangement.  (Tr. 1327–28.)  Burzaco admitted that, at the meeting with Napout and Bedoya, he "was trying [to get] Fox to pay more money closer to market price [for the Copa Libertadores extension rights] but not as much money as possible which would be an infinite amount."  (Tr. 2284 (citing 3500-AB-31A, at 6).)  However, Burzaco testified that he did so for the long-term

sustainability of the relationship between Torneos, Fox, and CONMEBOL.  (Tr. 2285:23–25 ("I thought that this is going to be more sustainable in the long run if Fox pays something closer to market price."), Tr. 2286:11–12 ("I was trying [to get] Fox to close the deal but not so, not so out of market conditions.").)  During his testimony, Bedoya corroborated that the September 2014 meeting was convened in part to negotiate the rights extensions with Fox.  (Tr. 4763–65.)

In January 2015, Martinez met with Burzaco in Buenos Aires to further discuss the audit being conducted by Fox (in the wake of the News of the World scandal) and the restructuring that had been discussed at the September 2014 meeting with Napout and Bedoya in Miami Beach. Martinez was "concerned" because his decision to approve the 2012 "swap agreement" had come under scrutiny during the audit, and another senior Fox executive, Peter Rice, had heard from a Globo executive that the real value of the Globo rights T&T Cayman assigned for free to T&T Netherlands was $16 million per year.  (Tr. 1361, 1365–66.)  Martinez represented that the elimination of T&T Cayman was a "must condition" if Fox was to preserve its relationship with Torneos moving forward.  (Tr. 1362–63.)  Crucially, this new arrangement would allow Fox to "never have to speak about bribes going forward," because the bribes would all be paid out of T&T Netherlands rather than through a combination of T&T Netherlands and FPAS payments to CONMEBOL. (Tr. 1363:15–16.)  T&T Netherlands's budget would be augmented so that it could pay more bribes: the Copa América rights would be assigned alongside the Brazilian free-to-air rights to T&T Netherlands rather than shared with FPAS.  (Tr. 1362–63.)  Further, since Torneos would lose its 25% interest in T&T Cayman, Martinez "was willing to extend all the service agreements and even compensate" Torneos as much as $10 million per year.  (Tr: 1361–62.)

In April 2015, Burzaco met Lopez and Martinez at a hotel in the Bahamas, where a CONCACAF meeting was to occur.  At the time, Burzaco thought that Lopez might "be a

cooperator of the Government in some sort of sense." (Tr. 3305:17–20 (Burzaco: "I was seeing a cooperator or someone recording me in many places.").)  After hearing for months about mounting corruption investigations, including being questioned as a possible "mole" by FIFA official Jeffrey Webb, Burzaco "was suspicious of many people at the same time." (Tr. 3306:1–2.)  On May 14, 2015, Martinez sent Burzaco a draft contract for the 2019–2022 Copa Libertadores rights that reflected their earlier negotiations, including (1) Fox contracting directly with CONMEBOL for the Copa Libertadores media rights, (2) reasonable production service terms for Torneos, and (3) re-assignment of the "international rights" for the Copa Libertadores from Traffic to Torneos. (GX 2100-T; Tr. 1386–88.)

### G.      Government's Evidence Regarding Source of Fiduciary Duty

The Government's theory as to the source of the CONMEBOL executives' fiduciary duty to CONMEBOL is that they were bound by the FIFA Code of Ethics and the later-enacted CONMEBOL Code of Ethics not to accept bribes. (Tr. 7214:23–7215:16.)  Lara Sian Elliott, legal counsel at FIFA, testified that, according to the August 2010 FIFA Statutes, CONMEBOL officials were bound by FIFA's Code of Ethics, which was regularly revised and re-issued. (Tr. 269–272, 273:17–19; 276:7–9; 287:5–288:6; GX 1265.)[12]  The 2004 FIFA Code of Ethics ("2004 FIFA Code") was disseminated to FIFA member associations and confederations in November of that year. (Tr. 288:9–24; GX 1215.)  Specifically, the 2004 FIFA Code established that "[o]fficials and members of bodies shall discharge their duties especially, with regard to FIFA, its associations

---

[12] The August 2010 FIFA Statutes provide in relevant part that "[t]he bodies and Officials must observe the Statutes, regulations, decisions and Code of Ethics of FIFA in their activities" (Art. 7.1); that FIFA members must "ensure that their own members comply with the Statutes, regulations, directives, and decisions of FIFA bodies" (Art. 13.1(d)); and that each confederation, including CONMEBOL (Art. 20.1(a)), must "comply with and enforce compliance with the Statutes, regulations and decisions of FIFA" (Art. 20.3). (GX 1265.)

23

and the confederations, with[] absolute loyalty," and explicitly prohibited "[p]ersons bound by [the] code" from accepting bribes "or any other benefit in return for violating their duties in the interest of third-parties." (Tr. 288:9–290:21; 291:2–9; 292:21–292:5; GX 1215.) The 2006, 2009, and 2012 FIFA Codes of Ethics were also disseminated with the same provisions mandating the officials' loyalty to FIFA and the confederations, and prohibiting bribery (Tr. 293:2–294:24; 297:21–299:1; 314:20–315:6; GX 1224–26), and the more general FIFA Code of Conduct promulgated in 2012 outlined a "zero tolerance" policy for bribery. (Tr. 295:1–297:20; GX 1223.)

The Government also introduced evidence that CONMEBOL officials were aware that they were bound by the FIFA Codes of Ethics. Luis Bedoya testified that he began receiving the FIFA Code of Ethics from the time he became president of the Colombian Federation of Soccer ("CFS") in 2006, and that he had a duty to FIFA, CONMEBOL, and the CFS to comply with the code and not to accept bribes. (Tr. 4669:1–25; 4868:13–4869:16; 5036:13–24.) Bedoya also testified that CONMEBOL first promulgated a code of ethics, which included in relevant part: (1) a duty of "absolute loyalty" to "CONMEBOL, FIFA, the confederations, the associations, the leagues and the clubs," (2) a prohibition against conflicts of interest, and (3) prohibited CONMEBOL officials from accepting gifts, money, or bribes of any kind, in December 2013.[13] (Tr. 4870:3–4876:24; 5038:2–5041:12; GX 1310-T.)

### H.    Jury Charge Regarding Honest Services Fraud

At Defendants' trial, the Court instructed the jury regarding honest services fraud, in relevant part, as follows:

---

[13] The Court recognizes that CONMEBOL's code of ethics was promulgated after the occurrence of many of the scheme's major events. (*See* Full Play Mot., Dkt. 1946-1, at 5 ("The [G]overnment introduced evidence regarding the existence of a CONMEBOL Code of Ethics, which was adopted in December 2013 . . . By this time, all three contracts to which Full Play Group is a signatory with CONMEBOL had been executed."); Tr. 5040:25–5041:12.)

24

I will now define wire fraud, which is alleged to be the object of the conspiracies charged in Counts One, Three, and Five of the Indictment. The federal wire fraud statute, Title 18, United States Code, Section 1343 provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signals, pictures or sounds for the purpose of executing such scheme or artifice shall be [guilty of a crime].

The term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services. Honest services fraud is limited to schemes involving bribes or kickbacks. These laws were passed by Congress to protect against the various fraudulent schemes that could be devised by individuals through the use of interstate wires.

. . . .

I will now explain further each element of wire fraud.

First Element: Scheme or Artifice to Defraud

The first element of wire fraud is that the Defendant knowingly devised or participated in a scheme or artifice to defraud FIFA, CONCACAF, CONMEBOL, or their constituent organizations, as specified in the relevant charge, of their intangible right of honest services by means of false or fraudulent pretenses, representations, or promises. A "scheme" is any plan or course of action formed with the intent to accomplish some purpose. Thus, to find each Defendant guilty of this offense, you must find that the Defendant was involved in a fraudulent scheme to deprive the victim soccer organization of honest services through bribes or kickbacks. *In this case, the Government has alleged that the various soccer organizations, including FIFA, CONMEBOL, and CONCACAF, and their constituent organizations, were deprived of their intangible right to the honest services of their officials through bribes or kickbacks.* Therefore, the Government must prove that a defendant was involved in a fraudulent scheme to deprive these organizations of honest services through bribes or kickbacks.

"Fraud" is a general term that embraces all the various means that human ingenuity can devise and that are resorted to by an individual to gain an advantage over another by false pretenses, suggestions, or suppression of the truth. *Such a scheme includes one to defraud the soccer organization by an officer, employee, or person in a relationship that gives rise to a fiduciary duty, that is, where the person owes a duty of honest and loyal service to the soccer organization; in other words, where there is a trusting relationship in which the person acts for the benefit of the soccer organization and the organization relied on the individual to carry out his or her job duties for the benefit of the organization. Whether each soccer official had a fiduciary duty to a soccer organization, the source of that fiduciary duty, and what*

25

*that fiduciary duty required or prohibited, is a question of fact for you to determine. In determining the source and scope of a fiduciary duty, you may take into consideration codes of conduct, if any, that would have applied to the relationship. In determining the source and scope of a fiduciary duty, you may not take into consideration general moral or ethical beliefs.*

The Government argues that the Defendants in this case knowingly and intentionally engaged in schemes to have soccer officials breach their fiduciary duties to FIFA and other specified soccer organizations through the distribution and payment (by Defendants) and the receipt (by the soccer officials) of bribes or kickbacks. Bribery and kickbacks involve the exchange of a thing or things of value for official action by an official, in other words, a quid pro quo (a Latin phrase meaning "this for that" or "these for those"). Bribery and kickbacks also include offers and solicitations of things of value in exchange for official action. Bribery and kickbacks also include the official's acceptance, solicitation, or agreement to accept a thing of value in exchange for official action, regardless of whether or not the payor actually provides the thing of value, and regardless of whether or not the official ultimately performs the official action or intends to do so.

. . . .

Second Element: Participation in Scheme with Intent

The second element of wire fraud is that the Defendant devised or participated in the scheme knowingly and with specific intent to defraud. The definitions of knowingly and intentionally here are the same as the definitions that I gave you earlier. As I said before, the terms "knowingly" and "intentionally" are distinct and essential elements under the law.

*"Intent to defraud" means to act knowingly and with the specific intent to deceive, for the purpose of depriving the soccer organization or organizations of their right to the honest services of their officials—i.e., their right to the official's faithful performance of his or her fiduciary duties to the organization, including the duty to not accept personal payments in exchange for official acts on behalf of the organization.* The Government need not prove that the Defendant intended to cause economic or pecuniary harm or that any such harm actually resulted from the fraud. Whether a person acted knowingly, intentionally, and with intent to defraud is a question of fact for you to determine, like any other fact question. The question involves one's state of mind.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he or she committed an act with fraudulent intent. Such direct proof is not required.

. . . .

(Dkt. 1963, at 36–38, 41 (emphases added).)

## V.      Verdict

At the close of the trial, the jury deliberated for four days, returning a verdict on March 9, 2023, that convicted Full Play and Lopez on all counts and acquitted Martinez on all counts. (3/9/2023 Minute Entry; Verdict Sheet, Dkt. 1964.)  Specifically, the jury found Full Play guilty of wire fraud conspiracy and money laundering conspiracy related to the Copa Libertadores, Copa América, and World Cup Qualifiers/Friendlies Schemes, and Lopez guilty of wire fraud conspiracy and money laundering conspiracy related to the Copa Libertadores #2 Scheme. (Verdict Sheet, Dkt. 1964.)

## VI.     Full Play's and Lopez's Rule 29 Motions

On February 23, 2023, Full Play moved for a judgment of acquittal pursuant to Rule 29. (Full Play Mot. for Acquittal ("Full Play Mot.")., Dkt. 1946.)  On April 21, 2023, Lopez filed his Rule 29 motion for acquittal.  (Def. Hernan Lopez Mot. for J. of Acquittal ("Lopez Mot."), Dkt. 1987.)  In addition to a judgment of acquittal, Lopez requests a "conditional" grant of a new trial in the event the Court grants his Rule 29 motion and the acquittal is later vacated or reversed. (Lopez Mot., Dkt. 1987-1, at 18.)  The Government filed an omnibus memorandum in opposition to both Defendants' Rule 29 motions on June 2, 2023.  (Govt.'s Mem. Opp'n to Defs.' Mots. for J. of Acquittal ("Govt. Opp'n"), Dkt. 1999.)  Defendants filed their reply briefs on June 16, 2023. (Def. Hernan Lopez's Reply ("Lopez Reply"), Dkt. 2002; Reply Mem. on Behalf of Def. Full Play Group ("Full Play Reply"), Dkt. 2003.)

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged."  *Eppolito*, 543 F.3d at 45 (quotation

27

omitted).   The Court must make this determination viewing "the evidence against a particular defendant . . . . in a light that is most favorable to the government . . . and with all reasonable inferences . . . resolved in favor of the government." *Id.*

Defendants challenging the sufficiency of the evidence after they were convicted "face a heavy burden, as the standard of review is exceedingly deferential to the jury's apparent determinations." *United States v. Khalupsky*, 5 F.4th 279, 287 (2d Cir. 2021) (quoting *United States v. Flores*, 945 F.3d 687, 710 (2d Cir. 2019). "It is well established that the government is entitled to prove its case solely through circumstantial evidence; and when the offense at issue is conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *Flores*, 945 F.3d at 710 (internal citations and quotations omitted). Still, a court reviewing a Rule 29 motion "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each] element . . . is established beyond a reasonable doubt." *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008). "[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

"It is also well established that it is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely *credible in the essentials* of his testimony." *Flores*, 945 F.3d at 710–11 (internal citation and quotation omitted) (emphasis in original). "A jury is entitled to believe part and disbelieve part of the testimony of any given witness." *Id.* (collecting cases). "All issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict." *Riggi*, 541 F.3d at 108. Ultimately, the Court must "uphold the challenged

convictions if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Khalupsky*, 5 F.4th at 287–88 (quoting *Flores*, 945 F.3d at 710).

## DISCUSSION

**I.  There Was Insufficient Evidence to Convict Defendants Because § 1346 Does Not Encompass Foreign Commercial Bribery**

Lopez argues that after the Supreme Court's decisions in *Percoco* and *Ciminelli*,[14] this Court must hold that § 1346's scope does not extend to foreign commercial bribery.[15] (*See* Lopez Reply, Dkt. 2002, at 2–6.)  After extensive consideration, the Court agrees.  The Supreme Court's latest wire fraud decisions—especially *Percoco*—and the absence of precedent applying honest services wire fraud to foreign commercial bribery, requires this Court to find that § 1346 does not criminalize the conduct alleged in this case and that therefore the evidence at trial was insufficient to sustain Defendants' convictions under that statute.

---

[14] *Percoco v. United States*, 598 U.S. 319 (2023); *Ciminelli v. United States*, 598 U.S. 306 (2023).

[15] Importantly, the Court does not construe this argument as a "vagueness" challenge, which as the Government correctly points out is not procedurally proper in a Rule 29 motion. (Govt. Opp'n, Dkt. 1999, at 38 (citing *United States v. Kelly*, 609 F. Supp. 3d 85, 138 (E.D.N.Y. 2022)).)  Although Lopez framed this argument in his opening Rule 29 brief as such (*see* Lopez Mot., Dkt. 1987-1, at 10 ("At a minimum, interpreting § 1346 to encompass commercial bribery of foreign residents employed by foreign organizations would render the statute unconstitutionally vague.")), Defendants' opening briefs were filed before the Supreme Court's decisions in *Percoco* and *Ciminelli*.  (*See* Dkts. 1987-1 (filed April 21, 2023), 1946-1 (filed February 23, 2023); *Percoco*, 598 U.S. 319 (issued May 11, 2023); *Ciminelli*, 598 U.S. 306 (issued May 11, 2023)).)  Indeed, Lopez predicted that the *Percoco* decision would likely affect the outcome of his motion. (*See* Lopez Mot., Dkt. 1987-1, at 11.)  The Court does find that *Percoco* and *Ciminelli* create the basis for sufficiency-of-the-evidence challenges that are properly addressed in a Rule 29 motion. *See United States v. Nordlicht*, No. 16-CR-640 (BMC), 2023 WL 4490615, at *6 (E.D.N.Y. July 12, 2023) ("The Court grants this motion under Rule 29 rather than Rule 33 because it concludes, in light of *Ciminelli*, that the evidence at [the trial] was insufficient to sustain [the defendants'] convictions for conspiracy to commit wire fraud.").

**A.      The History of § 1346 is Devoid of Foreign Commercial Bribery**

1.      Pre-*McNally* (pre-1987)

"Before 1987, 'all Courts of Appeals had embraced' the view that" [the federal wire and mail fraud statutes] proscribe what came to be known as 'honest services fraud.'" *Percoco*, 598 U.S. at 326 (quoting *Skilling v. United States*, 561 U.S. 358, 401 (2010)).  The majority of these pre-1987 honest services cases involved public employees who "had accepted a bribe or kickback in exchange for dishonest conduct that did not necessarily cause . . . a financial loss[,]" but "was found to constitute mail or wire fraud because it deprived the relevant government unit (and thus, by extension, the public) of the right to receive honest services." *Id.*

2.      *McNally* (1987) and § 1346's Enactment (1988)

But in 1987, the Supreme Court "rejected the entire concept of honest-services fraud" in *McNally v. United States* and held that the mail fraud statute was "limited in scope to the protection of property rights." *Id.* at 327 (citing *McNally v. United States*, 483 U.S. 350 (1987)).[16]  "Congress

---

[16] In *McNally*, a state public official, Howard P. "Sonny" Hunt, who exercised *de facto* control over selecting the state's insurance agent, devised a scheme with an insurance agent whereby the agent shared its commissions with insurance agencies selected by Hunt, including one company which was owned partially by Hunt.  483 U.S. at 352–53.  As a result of this self-dealing scheme, Hunt, along with the other co-conspirators, were convicted of substantive mail fraud, based on the theory that § 1341, the "mail fraud statute[,] proscribes schemes to defraud citizens of their intangible rights to honest and impartial government." *Id*. at 355.  The Sixth Circuit affirmed the conviction, holding "that Hunt [had a] fiduciary [duty as a public official to the public] because he 'substantially participated in governmental affairs and exercised significant, if not exclusive, control over awarding the workmen's compensation insurance contract to [the insurance agent] and the payment of monetary kickbacks to [Hunt and McNally's company].'" *Id.* at 355–56 (citation omitted).  The Supreme Court reversed, reasoning, in part, that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* at 356.  Ultimately, the Court concluded, "[r]ather than construe the [mail fraud] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights.  If Congress desires to go further, it must speak more clearly than it has." *Id.* at 360.

responded swiftly" by passing 18 U.S.C. § 1346, clarifying that the term "scheme or artifice to defraud" in the mail fraud statute, 18 U.S.C. § 1341, and wire fraud statute, 18 U.S.C. § 1343, *did* include "a scheme or artifice to deprive another of the intangible right of honest services." *Skilling*, 561 U.S. at 402 (citing 18 U.S.C. § 1346).  However, Congress did not define or elaborate on what the "intangible right of honest services" encompassed and thus the doctrine's scope remained ambiguous.  *See Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (explaining that "the vagueness of th[e] language" in § 1346 compelled the Supreme Court to adopt a subsequent "limiting construction" to preserve its constitutionality); *Percoco*, 598 U.S. at 333 ("Honest-services fraud and this Court's vagueness jurisprudence are old friends.") (Gorsuch, J., concurring).

3.  *Skilling* (2010)

In *Skilling*, the Supreme Court addressed whether § 1346 was unconstitutionally vague.  A six-Justice majority held that the statute could be "salvaged" by limiting its scope to "criminalize[] *only* the bribe-and-kickback core of the pre-*McNally* case law."  561 U.S. at 408–09.[17]  In doing so, the Court specifically rejected the government's proposal to include "undisclosed self-dealing by a public official or private employee" in the honest services doctrine—despite the existence of

---

[17]  *Skilling* involved an alleged honest services wire fraud conspiracy by Enron Corporation's ("Enron") chief executive officer Jeffrey Skilling and others to prop up Enron's stock prices by overstating the company's financial health via public reports.  The indictment in *Skilling* alleged, *inter alia*, that the defendants had "'engaged in a wide-ranging scheme to deceive the investing public, including Enron's shareholders, . . . about the true performance of Enron's businesses by: (a) manipulating Enron's publicly reported financial results; [] (b) making public statements and representations about Enron's financial performance and results that were false and misleading'"; and (c) that "Skilling and his co-conspirators, . . . [had] 'enriched themselves as a result of the scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige'"; and lastly, (d) that "Skilling had sought to 'depriv[e] Enron and its shareholders of the intangible right of [his] honest services.'"  561 U.S. at 369 (internal citations omitted).  The Supreme Court held that "[b]ecause Skilling's alleged misconduct entailed no bribe or kickback, it does not fall within § 1346's proscription."  *Id*. at 368.

pre-*McNally* cases upholding the theory.  *Skilling*, 561 U.S. at 409–10; *see also id.* (noting that "the Government asserts, 'the pre-*McNally* cases involving undisclosed self-dealing were abundant'" (citing Br. for United States 2930–31)).  The Court reasoned that to meet the constitutional requirements of due process, § 1346 could not include the "amorphous category" of non-disclosure cases because the lower courts "had reached no consensus on which [non-disclosure] schemes qualified." *Id.* at 410.  Moreover, "the familiar principle" in which "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" reinforced excluding the non-disclosure schemes from § 1346's scope.  *Id.* at 410–11 (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)).  The majority then famously pronounced: "As to fair notice, whatever the school of thought concerning the scope and meaning of § 1346, it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud[.]" *Id*. at 412 (citation and quotation marks omitted).

Justice Scalia, writing for three Justices in a concurrence, forcefully disagreed that limiting § 1346 to only bribery and kickback schemes would cure the statute of vagueness.  *See id.* at 415–25 (Scalia, J., concurring).  Specifically, he cautioned that merely clarifying "what *acts* constitute a breach of the 'honest services' obligation under the pre-*McNally* law" did not "solve the most fundamental indeterminacy: the *character* of the 'fiduciary capacity' to which the bribery and kickback restriction applies." *Id.* at 421 (Scalia, J., concurring) (emphasis added).  The majority rejected his concerns, explaining that "[t]he existence of a fiduciary relationship [in pre-*McNally* bribery and kickback cases] . . . was usually beyond dispute" and further, provided the following examples of such relationships: public officials to the public, employees to employers, and union officials to union members. *Id.* at 407, n.41.

32

4.      *Bahel* (2011)

Immediately after *Skilling*, the Second Circuit addressed a challenge to § 1346 determining whether "honest services fraud is effectively limited to the identity of the actors prosecuted in the pre-*McNally* caselaw." *Bahel*, 662 F.3d at 632.  As previously discussed, in *Bahel*, the defendant-appellant, Sanjaya Bahel, argued that "Section 1346 c[ould] not apply to foreign employees of the U.N. . . . [because in pre-*McNally* jurisprudence,] Section 1346 ha[d] only been applied to government or private sector employees, not employees of international organizations . . . [and] th[erefore] he, as a foreign national, c[ould] not be prosecuted for honest services fraud under Section 1346." *Id.* at 632.  The Second Circuit rejected this argument, ruling that § 1346 is limited by "the *nature of the offenses* prosecuted in the pre-*McNally* cases (i.e., bribery and kickback schemes)—not the *identity of the actors* involved in those cases." *Id.* (emphasis added).  Thus, "on the facts of th[e] case," § 1346 covered Bahel's conduct because his kickback scheme "f[ell] firmly within the ambit of the *type of conduct* that violates the right to honest services[.]" *Id.* at 633 (emphasis added).

Bahel also pointed to *United States v. Giffen*, in which a U.S. citizen was charged with honest services fraud for bribing a Kazakhstani government official and thus depriving Kazakh citizens of their government's honest services. *Id.* at 632 (citing *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004)).  In *Giffen*, the district court dismissed the honest service charges because there was a "total absence of . . . precedent supporting the Government's *overseas* application of the intangible rights theory." *Id.* (emphasis added) (quoting *Giffen*, 326 F. Supp. 2d at 506).  But the *Bahel* panel distinguished *Giffen*'s holding, explaining that unlike in *Giffen*, "the conduct at issue in [*Bahel*] took place within the territorial United States, and the victim was—not a foreign government's citizen—but the United Nations, an organization headquartered in the

33

United States, entitled to defendant's honest services in the United States, and [that] receiv[ed] its largest financial contributions from the United States." *Id.*

     5.     *Napout* (2020)

Closer to home and more recently, the defendants in the 2017 trial in this case challenged their honest services wire fraud convictions before the Second Circuit, arguing that (1) § 1346 could not be applied extraterritorially; and (2) that the statute was unconstitutionally vague as applied to them. *See Napout*, 963 F.3d at 178 ("On appeal, the appellants principally contend that their convictions for conspiracy to commit honest services wire fraud were based upon impermissible extraterritorial applications of the wire fraud conspiracy statute."); *id.* at 181 ("The appellants next contend that § 1346 is unconstitutionally vague as applied to them."). Regarding the first question, the Second Circuit, in affirming this Court, held that § 1346's extraterritorial application was permissible as long as the appellant-defendants used the domestic wires "*in furtherance of a scheme to defraud*," and moreover, that the wire usage was "essential, rather than merely incidental" to the scheme. *Id.* at 180 (citing *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019)). Accordingly, the *Napout* panel determined that § 1346 was appropriately applied to appellant-defendants' scheme because the "use of wires in the United States . . . was integral to the transmission of the bribes [at] issue" based on sufficient trial evidence showing the bribe payments were "generated by wire transfers originating in the United States" and received in U.S. bank accounts. *Id.* at 181.

The Second Circuit then turned to the question of whether § 1346 was unconstitutionally vague as applied to the appellant-defendants, who contended that there was a lack of "'fair notice' that the fiduciary duty they, as foreign employees, owed to their foreign employers, FIFA and CONMEBOL, could qualify as a '*source* of the fiduciary obligation,' whose breach . . . would constitute honest services wire fraud." *Id.* at 181 (internal citation omitted). The Circuit did not

34

resolve the question on the merits, but rather only reviewed the issue for plain error because the appellants had not presented their vagueness challenge below. *Id.* at 181–83.

To analyze clear error, the Circuit had to determine if appellants-defendant' operative legal question was "settled" enough for an erroneous application of the law to be "clear." *See id.* at 183 ("Our decision here is determined by application of plain error's second requirement: that 'for an error to be plain, it must, at a minimum, be clear under current law,' which means that 'we typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court.'") (brackets omitted) (quoting *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004)).  That is, the Circuit had to determine if there was any Supreme Court or Second Circuit precedent that clearly answered the question: does § 1346 encompass foreign commercial bribery?  The Second Circuit concluded that there was not. Indeed, the panel expressly found that "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that *remains unsettled, at best.*" *Id.* at 184 (emphasis added); *see also id.* at 183 ("There are undoubtedly 'lingering ambiguities in § 1346,' . . . including questions as to what may serve as 'the *source* of the fiduciary obligation' that can sustain a conviction under the statute." (quoting *Skilling*, 561 U.S. at 417 (Scalia, J., concurring))); *id.* at 184 (explaining that neither the panel nor the appellants had found any "authority directly supporting their position").[18]  Accordingly, the *Napout* panel held that "because

---

[18] Although not relevant to the Court's analysis of Defendants' Rule 29 motions, the Court notes the paradoxical outcome when plain error review is applied to previously unraised vagueness challenges.  The practical effect appears to be that courts of appeals can avoid analyzing whether a law is unconstitutionally vague precisely because that law is too vague to review for clear error.

it is not 'clear under current law,' that § 1346 is unconstitutionally vague as applied to the appellants, the district court did not commit plain error in concluding that it is not."[19]  *Id.* at 184.

The late Second Circuit Judge Peter W. Hall, who was on the *Napout* panel, concurred to add that he would "hold that § 1346 encompasses the duty that existed between the [appellant-defendants] and their employers, FIFA and CONMEBOL" because "'the heart of the fiduciary relationship [is] reliance, and de facto control and dominance[,]'" *id*. at 191 (quoting *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016)), and such "characteristics are obviously inherent in employer-employee relationships—including the relationships in this case."  *Id*. (Hall, J., concurring).  In response, the majority explicitly noted that "[t]he filing of the concurrence should not be construed as disagreement by the other panel members with the analysis contained therein, but rather reflects their view that the issue need not be addressed under the plain error review in which we engage." *Id.* at 184 n.19.  Thus, the Second Circuit did not address the merits of whether § 1346 encompasses foreign commercial bribery in *Napout*.

6.     *Ciminelli* and *Percoco* (2023)

On May 11, 2023, after Defendants' opening Rule 29 briefs had been filed—but before the Government's opposition—the Supreme Court issued *Ciminelli* and *Percoco*, both stemming from Second Circuit affirmances of wire fraud convictions and both addressing the scope of the federal wire fraud statutes.  The Supreme Court reversed and remanded in both cases.  *See Ciminelli*, 598 U.S. at 317; *Percoco*, 598 U.S. at 333.

---

[19] The Court notes that the panel's reference to the Court "concluding" that § 1346 was not unconstitutionally vague is a bit of a misnomer, since that issue was not before the Court in the trial proceedings below.  *See Napout*, 963 F.3d at 182 (panel agreeing with Government that "Napout did not raise his vagueness challenge in the district court").

36

> a.   *Ciminelli* rejects the longstanding "right-to-control" theory under § 1343.

In *Ciminelli*, the Supreme Court struck down "the Second Circuit's longstanding 'right to control' theory of fraud," in which "'a defendant is guilty of wire fraud if he schemes to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" 598 U.S. at 308–09 (quoting *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021)).  In the underlying case, the defendant, Louis Ciminelli ("Ciminelli"), paid an associate of former New York Governor Andrew Cuomo hundreds of thousands of dollars annually to obtain state-funded contracts for Ciminelli's construction company, LPCiminelli.  *Id.* at 309–10.  As a result of the scheme, the nonprofit that was administering Cuomo's "Buffalo Billions" initiative, Fort Schuyler Management Corporation, awarded LPCiminelli "the marquee $750 million 'Riverbend project' in Buffalo."  *Id.* at 310.  Ultimately, Ciminelli and several others were indicted by a federal grand jury on 18 counts, including wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  *Id.*  The district court instructed the jury, pursuant to the right-to-control theory, that "the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets.'"  *Id.* at 311 (internal citation omitted).  That is, the "jury could . . . find that [Ciminelli] harmed Fort Schuyler's right to control its assets if Fort Schuyler was 'deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets.'"  *Id.* (citation omitted).  The jury found Ciminelli guilty of wire fraud and conspiracy to commit wire fraud, and the Second Circuit affirmed relying solely on the right-to-control theory.  *Id.*

On review, the Supreme Court reversed the conviction, holding that "[the] so-called 'right to control' is not an interest that has 'long been recognized as property' when the wire fraud statute [§ 1343] was enacted."  *Id.* at 314 (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

37

The Court further criticized the theory for "vastly expand[ing] federal jurisdiction without statutory authorization." *Id.* at 315. In its rebuke, the Court repeatedly underscored its previous "admonition that '[f]ederal prosecutors may not use property fraud statutes to set standards of disclosure and good government for state and local officials" and further cautioned against "criminaliz[ing] traditionally civil matters and federaliz[ing] traditionally state matters." *Id.* at 316 (quoting *Kelly*, 140 S. Ct. at 1574); *see also id.* at 315–16 ("The theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law— in flat contradiction with our caution that, 'absent a clear statement by Congress,' courts should 'not read the mail and wire fraud statutes to place under federal superintendence a vast array of conduct traditionally policed by the States.'" (brackets omitted) (quoting *Cleveland*, 531 U.S. at 27)); *id.* at 312 ("[T]he fraud statutes do not vest a general power in 'the Federal Government . . . to enforce (its view of) integrity in broad swaths of state and local policymaking.'" (quoting *Kelly*, 140 S. Ct. at 1574)).

b. *Percoco* instructs that a "smattering" of pre-*McNally* cases is insufficient to validate an honest services fraud theory.

On the same day, the Supreme Court issued its decision in *Percoco*, addressing "whether a private citizen with influence over government decision-making can be convicted for [honest services] wire fraud on the theory that he or she deprived the public of its 'intangible right of honest services.'" 598 U.S. at 322 (citing 18 U.S.C. §§ 1343, 1346). In the underlying case, Joseph Percoco ("Percoco"), former-Governor Cuomo's longtime Executive Deputy Secretary, was charged with, *inter alia*, two counts of conspiring to commit honest services wire fraud in connection with actions he took during an eight-month "hiatus" from his government position. *See id.* at 322–23. The scheme began in July 2014, when Empire State Development ("ESD"), a state agency, informed Steven Aiello that his real-estate company was required to enter an expensive

38

"Labor Peace Agreement" with local unions in order to receive state funding for a lucrative project. *Id.* at 323. "Aiello reached out to Percoco through an intermediary so that Percoco could 'help [him] with th[e] issue[.]'" *Id.* (citation omitted). Percoco agreed to help and Aiello's company paid him $35,000 between August and October 2014. *Id.* On December 3, 2014, "mere days" before rejoining Governor Cuomo's office, Percoco "called a senior official at ESD and urged him to drop the labor-peace requirement." *Id.* The very next day, ESD dropped the requirement and informed Aiello that the labor-peace agreement was no longer necessary. *Id.*

At Percoco's trial, the jury was instructed that Percoco could be found guilty of depriving the public of the honest services of its officials if the jury concluded that Percoco "dominated and controlled any governmental business" and that "people working in the government actually relied on him because of a special relationship he had with the government." *Id.* at 324–25 (citation omitted). The jury convicted Percoco of the honest services wire fraud charges and the Second Circuit affirmed on appeal, explaining that "the 'fiduciary-duty [jury] instruction' given by the trial judge 'fi[t] comfortably' with, and in fact restated, the understanding of honest-services fraud that the Second Circuit had adopted many years earlier in *United States v. Margiotta*, 688 F.2d 108 (1982)"—a pre-*McNally* case. *Id.* at 325 (citing *Percoco*, 13 F.4th at 194).

In Percoco's petition to the Supreme Court, he argued that "a private citizen cannot be convicted of depriving the public of honest services." *Id.* at 329. But the Supreme Court declined to adopt such a broad, *per se* rule, reasoning that a private individual *can* "enter into agreements that make them agents of the government," who would then "owe[] a fiduciary obligation to the principal[.]" *Id.* at 329–30. Nevertheless, the Court reversed Percoco's conviction, finding that the *Margiotta* standard and thus the trial court's jury instructions were unconstitutionally vague. *See id.* at 330 ("Percoco challenges the *Margiotta* theory that underlay the jury instructions in this

case, and we must therefore decide whether those instructions are correct.  We hold that they are not.").  As discussed, *Margiotta*, and consequently the *Percoco* jury instructions, defined the test for when a private individual owes a fiduciary duty to the public as follows: Percoco "owed a duty of honest services to the public if (1) he 'dominated and controlled any governmental business' and (2) 'people working in the government actually relied on him because of a special relationship he had with the government.'"  *Id.* (citing 2 App. 511; *Margiotta*, 688 F.2d at 122).

To reach this conclusion, the Court analyzed whether the Second Circuit was correct in finding that Congress had "effectively reinstated" *Margiotta* when enacting § 1346.  *See id.* at 328.  The Supreme Court relied on *Skilling* to guide that analysis:

> *Skilling*'s teaching is clear.  "[T]he intangible right of honest services" must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a *smattering* of pre-*McNally* cases.  With this lesson in mind, we turn to the question whether the [*Margiotta*] theory endorsed by the lower courts in this case gave § 1346 an uncertain breadth that raises "the due process concerns underlying the vagueness doctrine."

*Id.* at 328–29 (emphasis added) (citing *Skilling*, 561 U.S. at 408).  Applying *Skilling*, the Supreme Court ruled that "*Margiotta*'s standard is too vague" and that the Second Circuit had erred in concluding *Margiotta* was still good law after *McNally*.  *Id.* at 330; *see also id.* at 328 ("*Skilling*'s approach informs our decision in this case.  Here, the Second Circuit concluded that 'Congress effectively reinstated the *Margiotta*-theory cases . . .' [b]ut *Skilling* was careful to avoid giving § 1346 an indeterminate breadth that would sweep in any conception of 'intangible rights of honest services' recognized by *some* courts prior to *McNally*." (emphasis added) (citation omitted)).  Indeed, the Court pointed out that *Skilling* itself was a case rejecting § 1346's application to "undisclosed self-dealing" schemes because "the pre-*McNally* lower court decisions involving such conduct were 'inconsisten[t][.]'"  *Id.* (quoting *Skilling*, 561 U.S. at 410).  Therefore, the lower courts could not anchor their endorsement of the *Margiotta* theory on the basis that *Margiotta* was

40

in the safe harbor of pre-*McNally*, honest services cases.[20]   Rather, the Court cautioned, "'the

intangible right of honest services' must be defined with the clarity typical of criminal statutes and

should not be held to reach an ill-defined category of circumstances simply because of a *smattering*

*of pre*-McNally *decisions*."   *Id*. at 328–29 (emphasis added).   Applying this standard, the Court

held that "*Margiotta* does not (and thus the jury instructions did not) define 'the intangible right

of honest services' 'with sufficient definiteness that ordinary people can understand what conduct

is prohibited,' or 'in a manner that does not encourage arbitrary and discriminatory enforcement.'"

*Id.* at 331 (internal quotation marks omitted) (ultimately quoting *Skilling*, 561 U.S. at 402–03).

In his concurrence, Justice Gorsuch agreed with the majority's finding that the *Percoco*

jury instructions were too vague to pass constitutional muster, but wrote separately to caution that

"the problem runs deeper than that because no set of instructions could have made things any

better[,]" and "[t]o this day, no one knows what 'honest-services fraud' encompasses."   *Id.* at 333

(Gorsuch, J., concurring); *see also id.* at 337 ("80 years after lower courts began experimenting

with the honest-services-fraud theory no one can say what sort of fiduciary relationship is enough

to sustain a federal felony conviction and decades in federal prison." (Gorsuch, J., concurring)).

He blamed Congress for the uncertainty, but also criticized the courts and prosecutors for

exacerbating the statute's uneven application:

> Under our system of separated powers, the Legislative Branch must do the hard
> work of writing federal criminal laws.   Congress cannot give the Judiciary uncut
> marble with instructions to chip away all that does not resemble David. . . . The
> Legislature must identify the conduct it wishes to prohibit.   And its prohibition must
> be knowable in advance—not a lesson to be learned by individuals only when the
> prosecutor comes calling or the judge debuts a novel charging instruction.   Perhaps

[20] *See Percoco*, 13 F.4th at 195–96 (noting Second Circuit's approval of *Margiotta* and reasoning that because "*McNally* directly overruled a Sixth Circuit case . . . that leaned heavily on *Margiotta*'s reliance-and-control theory . . ., it stands to reason that Congress effectively reinstated the *Margiotta*-theory cases by adopting statutory language that covered the theory" when it enacted § 1346).

> Congress will someday set things right by revising § 1346 to provide the clarity it desperately needs.  Until then, this Court should decline further invitations to invent rather than interpret this law.

*Id.* at 337–38 (Gorsuch, J., concurring) (citations omitted).  Reminiscent of Justice Scalia's concurrence in *Skilling*,[21] Justice Gorsuch lamented the Supreme Court's efforts to define honest services wire fraud, including the majority's decision in *Percoco*:

> In the end, we may now know a little bit more about when a duty of honest services *does not* arise, but we still have no idea when it *does*.  It's a situation that leaves prosecutors and lower courts in a bind.  They must continue guessing what kind of fiduciary relationships this Supreme Court will find sufficient to give rise to a duty of honest services.

*Id.* at 336 (Gorsuch, J., concurring).

Today, this Court finds itself in just such a bind.

**B.  After *Ciminelli* and *Percoco*, § 1346 Cannot Be Construed to Encompass Foreign Commercial Bribery**

1.  <u>The Court's Parsing of the § 1346 Jurisprudence</u>

The Court pauses to explain its understanding of the landscape of § 1346 case law from pre-*McNally* through *Percoco*.  As reflected in the earlier discussion (*see supra* Discussion Section I.A), decisions interpreting § 1346 have variously, and sometimes confusingly, parsed honest services fraud with respect to four different issues: (1) the *defendant's identity*, *see Bahel*, 662 F.3d at 632 (rejecting defense argument that honest services fraud "is effectively limited to the identity of the actors prosecuted in the pre-*McNally* caselaw," and finding that "fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases (i.e., bribery and kickback schemes)—not the identity of the actors involved in those cases."); (2) the

---

[21] *See Skilling*, 561 U.S. at 421 (cautioning that merely clarifying "what *acts* constitute a breach of the 'honest services' obligation under the pre-*McNally* law" does not "solve the most fundamental indeterminacy: the *character* of the 'fiduciary capacity' to which the bribery and kickback restriction applies" (Scalia, J., concurring) (emphasis added)).

*type of conduct* that can give rise to honest services fraud, *see Skilling*, 561 U.S. at 409–12 (rejecting government's theory that "undisclosed self-dealing by a public official or private employee" constituted honest services fraud under § 1346, and finding that bribes and kickbacks are at the "core" of honest services fraud); (3) the *source of the fiduciary duty* that was breached (or sought to be breached) by the fraud scheme, *see Percoco*, 598 U.S. at 330 ("'[T]he intangible right of honest services' codified in § 1346 plainly does not extend a duty to the public to *all* private persons[.]"); and (4) the *location of the bribery scheme*, *see Giffen*, 326 F. Supp. 2d at 506 (finding that "Congress did not intend that the intangible right to honest services encompass bribery of foreign officials in foreign countries"); *Bahel*, 662 F.3d at 632 (rejecting defense's reliance on *Giffen* because the fraud in *Bahel* was perpetrated against the United Nations, located in New York).

The Court finds these distinctions useful to explain why *Skilling*'s proclamation, that "it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud," 561 U.S. at 412 (citation omitted), does not save the § 1346 prosecution in this case. Although *Skilling* clarified the *type of conduct* that can give rise to a § 1346 prosecution (category two above), it did not address the *source of the fiduciary duty* that, if breached, gives rise to such prosecution (category three above).  That is what *Percoco* has now done.[22]

---

[22] The Court makes a related note with respect to these distinctions.  Defendants previously argued in their motions to dismiss, relying on *Giffen*, that § 1346 did not extend to bribery of "foreign officials in foreign countries," *Giffen*, 326 F. Supp. 2d at 506—which the Court construed as an argument about the location of the alleged wire fraud conspiracy (category four above).  The Court rejected that argument, to the extent that it challenged § 1346 as being applied extraterritorially, *Full Play Grp., S.A.*, 2021 WL 5038765, at *8 n.5, and still does so now.  However, *Percoco* would seem to support *Giffen*'s finding that the "absence of . . . precedent supporting the Government's overseas application of the intangible rights theory," *Giffen*, 326 F. Supp. 2d. at 505, doomed the § 1346 prosecution because a foreign official's duty to his government cannot be the source of the fiduciary duty for an honest services wire fraud prosecution.

The Court notes that earlier this week, the Second Circuit considered for the first time, in *United States v. Avenatti*, whether *Ciminelli* and *Percoco* required the vacating of a Section 1346 conviction. 2023 WL 5597835, at *18 n.27. In that case, the defendant, Michael Avenatti, argued that (1) "*Ciminelli* rejected a theory of liability that, like the one pursued here, 'criminalizes traditionally civil matters and federalizes traditionally state matters[;]'" and that (2) "*Percoco* . . . reaffirm[ed] that § 1346 cannot reach what was alleged here—'undisclosed self-dealing by . . . a private employee[.]'" Appellant's May 16, 2023 28(j) Letter at 2, *United States v. Avenatti*, No. 21-1778, 2023 WL 5597835 (2d Cir. Aug. 30, 2023) (internal citations omitted). Finding *Ciminelli* and *Percoco* distinguishable, the Second Circuit rejected both arguments. As to *Ciminelli*, the panel found that the case had "no bearing on Avenatti's sufficiency challenge to his conviction for honest-services fraud" because *Ciminelli* was a "rejection of a 'right-to-control theory' of 'property' for purposes of satisfying the loss-of-property element of *traditional fraud*[.]" *Avenatti*, 2023 WL 5597835, at *18 n.27 (emphasis added).[23]

As to *Percoco*, the panel distinguished it on two grounds: first, that the defendant "*does not*—and cannot—argue that he lacked notice that . . . he owed a fiduciary duty to his client [as an attorney,]" *see supra* pp. 42–43 (source of fiduciary duty)[24]; and second, that the defendant was

---

[23] As discussed, despite Defendants having been convicted of honest services fraud rather than traditional fraud, the Court finds *Ciminelli* to be relevant—albeit not controlling—to the Court's analysis of the issues for the reasons explained above. *See supra* note 3 (noting that the Government charges Defendants under § 1343, not § 1346; *see infra* note 27 ("Although *Ciminelli* did not involve honest services wire fraud under § 1346, the Court finds the decision relevant because of its criticisms of prosecutions under § 1343 (which § 1346 augments)[.]").

[24] Although the panel did not rely on pre-*McNally* precedent or cite to any honest services cases involving a fiduciary duty between a lawyer and his client, *see Avenatti*, 2023 WL 5597835, at *18 n.27 (citing *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (finding that a husband did not have a fiduciary duty to his wife in the context of a securities fraud prosecution— which relied in part on language from *Margiotta*, which *Percoco* expressly overruled)), such pre-*McNally* authority exists, albeit not specifically in the context of wire fraud prosecutions. *See, e.g.*, *Chestman*, 947 F.2d at 568 (securities fraud decision noting that "[t]he common law has

44

charged and convicted under a bribery scheme—not an "undisclosed self-dealing" scheme, *see id.* (type of conduct). *Avenatti*, 2023 WL 5597835, at *18 n.27 (emphasis added) (internal citations omitted). The *Avenatti* panel then went on to analyze the defendant's sufficiency challenge, which focused on whether the *type of conduct* (category two) that Avenatti had engaged in satisfied the quid pro quo and "intent to defraud" elements of honest services wire fraud. *See id.* at *18–21. Thus, in *Avenatti*, the defendant argued that the *type of conduct* he engaged in did not constitute honest services wire fraud under *Percoco*, and the panel rejected his argument because "solicit[ing] a bribe from Nike" clearly fell within the type of conduct proscribed by *Percoco* and *Skilling*, i.e., bribery and/or kickback schemes. *Id.* at *17, 18 n.27, 21.

Here, by contrast, Defendants have specifically argued that the *source of the fiduciary duty*, *see supra* pp. 42–43 (category three), that they were convicted of conspiring to breach cannot give rise to honest services wire fraud. (Full Play Mot., Dkt. 1946-1, at 8; Lopez Mot., Dkt. 1987-1, at 9.) Moreover, in contrast to the Circuit's conclusion in *Avenatti* that an attorney-client relationship is a "hornbook" fiduciary duty under § 1346, *see* 2023 WL 5597835, at *18 n.27,[25] as discussed,

recognized that some associations are inherently fiduciary" including "those existing between attorney and client, executor and heir . . . ."), *Hafter v. Farkas*, 498 F.2d 587, 589 (2d Cir. 1974) (in an attorney disciplinary matter, noting that "[w]e start with a few basic premises. In New York, as elsewhere, in addition to his other duties and obligations, a lawyer is bound to conduct himself as a fiduciary or trustee occupying the highest position of trust and confidence . . . ."), *Spector v. Mermelstein*, 485 F.2d 474, 479 (2d Cir. 1973) (in a negligence and violation of fiduciary duty case, upholding judgment that the defendant attorney breached his fiduciary duty to his client because it is a "basic principle" that such a breach occurs when an attorney "negligently or willfully withholds from his[/her] client information material to the client's decision"); *cf. United States v. Scanlon*, 753 F. Supp. 2d 23, 28 (D.D.C. 2010) (post-*Skilling* case finding "support for the existence of a fiduciary relationship between [the attorney defendant] and his clients in both the facts and the law" in an honest services wire fraud prosecution).

[25] The *Avenatti* panel noted that in *Skilling*, the Supreme Court "concluded that persons engaged in [fraudulent] schemes [to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived] had sufficient notice of the unlawfulness of their conduct to avoid constitutional vagueness concerns." 2023 WL 5597835, at *17 n.26. To the extent this observation suggests a view that whenever bribery or kickbacks are involved, a

the Circuit has expressly held that whether a foreign employer-employee relationship is a source for a fiduciary duty under § 1346 "is a question that remains unsettled, at best[,]" *Napout*, 963 F.3d at 184.[26] Thus, the Court finds that the *Avenatti* panel did not address the issues raised in this case, and like *Ciminelli*, is relevant—but not authoritative in guiding its analysis of the present issues.

    2.    <u>Application</u>

In light of the Supreme Court's guidance in *Ciminelli*[27] and *Percoco*, this Court is

---

fiduciary duty is necessarily breached, this Court believes that *Percoco* rebuts that reading. Instead, *Percoco* requires that the fiduciary duty's existence (source of the duty) be established separately from the bribery or kickbacks scheme (type of conduct); and moreover, that the existence of the fiduciary duty must be established by more than a "smattering" of pre-*McNally* cases. *Percoco*, 598 U.S. at 328–29; *see also id.* at 330 ("'[T]he intangible right of honest services' codified in § 1346 plainly does not extend a duty to the public to *all* private persons, and whether the correct test was applied in this case returns us to *Margiotta*.").

[26] Based on *Avenatti*, the Court anticipates that the Second Circuit may view *Percoco* as merely clarifying who qualifies as a *public* official (and thus owes a duty to the *public*) for the purposes of § 1346. *See Avenatti*, 2023 WL 5597835, at *18 n.27 (describing *Percoco* as ruling that trial court's § 1346 jury instruction "was unconstitutionally vague in stating the standard for determining when a private person owes a fiduciary duty to the *public*" and distinguishing Avenatti's case because "[n]o fiduciary duty to the *public* is at issue in this case") (emphasis added). But this Court views *Percoco* as holding more broadly that whether a fiduciary duty exists, regardless of it being to the public or a private entity, depends on whether the duty was recognized pre-*McNally*—which is not the case with foreign commercial bribery. *See Napout*, 963 F.3d at 184 (opining that "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that remains unsettled, at best").

[27] Although Ciminelli did not involve honest services wire fraud under § 1346, the Court finds the decision relevant because of its criticisms of prosecutions under § 1343 (which § 1346 augments), that "vastly expand[] federal jurisdiction without statutory authorization," 598 U.S. at 315; and which "use property fraud statutes to set standards of disclosure and good government for state and local officials," *id.* at 316 (quoting *Kelly*, 140 S. Ct. at 1574); and cautions against applying § 1343 to "criminaliz[e] traditionally civil matters and federaliz[e] traditionally state matters[,]" *id. See also id.* at 315–16 ("The theory makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction with our caution that, absent a clear statement by Congress,' courts should 'not read the mail and wire fraud statutes to place under federal superintendence a vast array of conduct traditionally policed by the States.'" (brackets omitted) (quoting *Cleveland*, 531 U.S. at 27)); *id.* at 312 ("[T]he fraud statutes do not vest a general power in 'the Federal Government . . . to enforce (its view of) integrity in broad swaths of state and local policymaking.'" (quoting *Kelly*, 140 S. Ct. at 1574)). This Court also finds that the Supreme Court's issuance of *Ciminelli* in tandem with *Percoco*

compelled to reverse its previous ruling regarding § 1346's scope,[28] and find that the honest services wire fraud statute does not encompass foreign commercial bribery as charged against Defendants. While the Court recognizes that, in creating § 1346, Congress may have intended to criminalize conduct that deprives foreign organizations of their employees' honest services, the question before this Court is whether such conduct violates § 1346 as interpreted by the Supreme Court in *Skilling* and now as further clarified in *Percoco*.

In *Percoco*, the Supreme Court was focused on the nature and source of the fiduciary duty that could—or could not—give rise to a § 1346 honest services wire fraud charge. The Court held that the Second Circuit had erroneously affirmed a jury instruction advising that the defendant could be found to have a duty to provide honest services to the public while not serving as a public official, if he had "dominated and controlled any government business" and if "the government actually relied on him because of a special relationship he had with the government." *Percoco*, 598 U.S. at 324–25. In rejecting the Second Circuit's reasoning that "'Congress effectively reinstated the *Margiotta*-theory cases by adopting statutory language [in § 1346] that covered the theory[,]'" *id*. at 328, the Court issued an emphatic directive:

> *Skilling*'s teaching is clear. "[T]he intangible right of honest services" must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions.

strongly suggests the Court's view that the scope of wire fraud offenses under both statutes must be narrowed and more clearly defined to avoid unconstitutional vagueness.

[28] *See Full Play Grp., S.A.*, 2021 WL 5038765, at *7 ("[T]he Court rejects the argument that the alleged breaches of fiduciary duties in this case are as a matter of law incognizable under § 1346, even if the alleged duties may arise from relationships between foreign private employees and their foreign private employers.").

*Id.* at 328–29.[29]

Here, there is not even a "smattering of pre-*McNally* decisions" (nor post-*McNally* decisions, for that matter) that support the application of § 1346 to foreign commercial bribery. Neither the parties nor the Court have been able to identify a single pre-*McNally* case applying honest services wire fraud to foreign commercial bribery, i.e., bribery of foreign employees of foreign non-government employers. (*See* Lopez Reply, Dkt. 2002, at 3 ("We are not aware of any prior prosecution, either pre- or post-*McNally* . . . for honest services fraud in which the scheme to defraud involved depriving a foreign non-government employer of the honest services of its foreign employee(s)."); Govt. Opp'n, Dkt. 1999, at 44 n.6 (noting that, "[t]o date, no Court of Appeals or Supreme Court opinion has suggested that the fraudulent scheme as opposed to the wire use must be domestic").)  Indeed, as discussed, the Second Circuit in reviewing the *Napout* convictions concluded that "whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that remains unsettled, at best."  *See Napout*, 963 F.3d at 184; *see also id.* (acknowledging that neither the appellants nor the Circuit could find any "authority directly supporting" the idea that foreign commercial bribery fell outside the scope of § 1346).  This absence of authority, when viewed in light of the Supreme Court's strongly worded rebukes in *Percoco* and *Ciminelli* against expanding the federal wire fraud statutes, compels this Court to find that § 1346 does not apply to foreign commercial bribery.  *See Skilling*,

---

[29] The Court further cautioned that "the pre-*McNally* record . . . is clearest when the Government seeks to prosecute actual public officials."  *Id*. at 329; *see also id*. ("Most of the pre-*McNally* honest-services prosecutions, including what appears to be the first case to adopt that theory, involved actual public officials."); *cf. United States v. McGeehan*, 584 F.3d 560, 569 (3d Cir. 2009) ("Although the literal language of § 1346 extends to private sector schemes, enforcement of an intangible right to honest services in the private sector arguably has a weaker justification because relationships in the private sector generally rest upon concerns and expectations less ethereal and more economic than the abstract satisfaction of receiving 'honest services' for their own sake." (internal citations and quotation marks omitted)).

561 U.S. at 410 ("Further dispelling doubt on this point is the familiar principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" (citing *Cleveland*, 531 U.S. at 25)).   Indeed, Defendants' convictions are the casualties of the "'fundamental indeterminacy' in honest-services-fraud theory," despite decades of jurisprudence that has struggled to "explain[] what kinds of fiduciary relationships are sufficient to trigger a duty of honest services in the first place." *Percoco*, 598 U.S. at 335 (Gorsuch, J., concurring); *see also id.* at 334 ("Nothing in [§ 1346] attempted to resolve when the duty of honest services arises, what sources of law create that duty, or what amounts to a breach of it." (Gorsuch, J., concurring)).

      **C.**      **The Government's Objections Fail to Address *Percoco*, *Ciminelli*, and the Absence of Pre-*McNally* Cases**

The Government's opposition is largely grounded in arguments about why § 1346 is not unconstitutionally vague as applied to Defendants (*see generally* Govt. Opp'n, Dkt. 1999, at 38–53), which the Court will not analyze here because the issue is procedurally improper at this stage. *See Kelly*, 609 F. Supp. at 138.  Nonetheless, the Court addresses the Government's anti-vagueness arguments as they relate to the issue of § 1346's scope and explain why they do not overcome the Supreme Court's directives in *Percoco* and *Ciminelli*, and the Second Circuit's holding in *Napout*.

First, the Government erroneously claims that Defendants are trying to relitigate the extraterritorial reach of the wire fraud statutes.  (*See* Govt. Opp'n, Dkt. 1999, at 44 ("Vagueness claims are not a device by which [] Defendants may relitigate their unsuccessful arguments about the extraterritorial reach of wire fraud statutes.").)  But the Government appears to conflate the issue of *where* the conduct occurred with *what* fiduciary duty existed.  Indeed, in *Napout*, the Second Circuit analyzed the two questions separately—ruling that where the scheme occurred was not an issue as long as the use of the *domestic* wires was "essential" and "integral" to the scheme, *Napout*, 963 F.3d at 180–81, and separately examining and finding that "whether a foreign

49

employee's duty to his foreign employer qualifies as an actionable element under § 1346 [was] a question that [was] unsettled, at best" (*id.* at 184). *See also id.* at 184 n.19 (explaining the majority's "view that the issue [of § 1346's application to foreign commercial bribery] need not be addressed under . . . plain error review").

Second, the Government argues that the Court should reject any distinction between foreign and domestic commercial bribery, claiming that "the wrongfulness of commercial bribery is self-evident" (Gov't Opp'n, Dkt. 1999, at 49), and relies on various bodies of law supporting an employer-employee fiduciary relationship. (*See, e.g.*, *id.* at 49 n.10 ("Private-sector bribery is obviously fraudulent as a civil matter. . . . Separately, criminal private-sector bribery bans exist around the world." (citations omitted)); *id.* at 50 (citing common law sources regarding an agent's fiduciary duty to his/her principal); *id.* at 52 ("Any common-sense, common-law understanding of corporate structures and governance leads to the conclusion that a president shall not take bribes."); *id.* ("Leaving aside the common-law authorities, a reasonable person in the Defendants' position could glean the relevant duties from the ethical codes promulgated by the soccer organizations.").) However, none of the Government's appeals to common law, state law, civil law, foreign law, or codes of conduct, overcome the basic fact that there is no precedential authority to support the application of *this* federal criminal statute, § 1346, to foreign commercial bribery, which the Supreme Court has now made clear in *Percoco* is required. *See Percoco*, 598 U.S. at 328–29 ("'[T]he intangible right of honest services' . . . should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions." (citation omitted)); *Ciminelli*, 398 U.S. at 316 (striking down the Second Circuit's "right-to-control theory," in part, because it "criminalizes traditionally civil matters and federalizes traditionally state matters"); *id.* at 315–16 ("The theory thus makes a federal crime of an almost limitless variety of deceptive

50

actions traditionally left to state contract and tort law . . . .'" (quoting *Cleveland*, 531 U.S. at 27));

*cf. Kelly*, 140 S. Ct. at 1571 (finding that defendants did not commit property fraud because "[t]he

upshot" of *Skilling*'s limit of § 1346 to bribery and kickback schemes "is that federal fraud law

leaves much public corruption to the States (or their electorates) to rectify").[30]   Absent this

precedent, the Court interprets *Percoco* as precluding the application of § 1346 to foreign

commercial bribery.

Lastly, the Government's repeated appeals to the late Judge Hall's *Napout* concurrence[31]

are unavailing for several reasons.  First and foremost, this Court cannot rely on Judge Hall's

concurrence as guiding precedent for the scope of § 1346 when the *Napout* majority expressly

chose not to rule on the issue.  *See Napout*, 963 F.3d at 184; *see also id.* at 183–84 (explaining that

*Rybicki*'s holding regarding § 1346's application to domestic employer-employee fiduciary duties

"[a]lthough not necessarily dispositive of the appellants' argument . . . provides *possible* guidance"

(emphasis added) (citing *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003))).  Furthermore,

Judge Hall's concurrence was written before the Supreme Court's *Percoco* opinion.   Judge Hall

principally based his finding that § 1346 encompassed foreign commercial bribery on the

assumption that foreign employment relationships, like domestic employment relationships, must

---

[30] The Court notes that the Government's opposition brief does not address *Ciminelli*'s application to Defendants' motions.

[31] *See, e.g.*, Gov't Opp'n, Dkt. 1999, at 45 ("Whatever concerns a different prosecution may present, fiduciary duties protected by 18 U.S.C. § 1346 are 'obviously inherent in employer-employee relationships—including the relationships in this case.'" (citing Judge Hall's concurrence)); *id.* at 51 ("As Judge Hall noted, a heartland example of such a source is the 'employment relationship' set forth between the soccer presidents, [sic] 'FIFA and CONMEBOL.'").

include "reliance, and de facto control and dominance."  *Id.* at 191 (Hall, J., concurring).

Specifically, he reasoned:

> Defendants-Appellants' argument that the statute does not apply to foreign employment relationships fares no better under our more recent precedent. "*At the heart of the fiduciary relationship lies reliance, and de facto control and dominance.*" . . . . These characteristics are obviously inherent in employer-employee relationships—including the relationships in this case.

*Id.* (Hall, J., concurring) (emphasis added) (quoting *Halloran*, 821 F.3d at 338).  However, the

Supreme Court rejected the *Percoco* jury instructions precisely because a fiduciary-duty test rooted

in "dominance", "control", and "reliance" is "too vague."  *See Percoco*, 598 U.S. at 330 ("[T]he

[*Percoco*] trial judge told the jury that Percoco owed a duty of honest services to the public if (1)

he '*dominated and controlled* any governmental business' and (2) 'people working in the

government *actually relied on him* because of a special relationship he had with the government.'

. . . . But [this] standard is too vague." (emphasis added)).  Thus, although the Second Circuit *may*

choose to adopt Judge Hall's reasoning when it reaches the merits of this issue, their analysis will

possibly be impacted by *Percoco*.  Moreover, regardless of the Second Circuit's eventual ruling,

at this moment, the Court has no precedential authority to rely on to hold that § 1346 covers foreign

employment relationships.[32]

---

[32] To the extent the Court relied heavily on *Bahel* in denying Defendants' motions to dismiss, the Court does not believe that *Bahel* is implicitly overruled by *Percoco*, because the facts of *Bahel* are distinguishable.  In *Bahel,* the defendant had a fiduciary duty to his U.S.-headquartered employer, the United Nations.  662 F.3d at 632.  Even assuming that the United Nations is a commercial (versus public) entity, "more than a smattering" of pre-*McNally* precedent supports the application of § 1346 to the "domestic" bribery scheme charged in that case.  *See, e.g.*, *id.* at 633 (citing *United States v. Hasenstab*, 575 F.2d 1035 (2d Cir. 1978), to support the conclusion that "Bahel's conduct falls firmly within the ambit of the type of conduct that violates the right to honest services").

***

In sum, the Court concludes that in light of *Percoco*, the evidence at trial was insufficient to sustain Defendants' honest services wire fraud convictions under § 1346 because the statute does not apply to foreign commercial bribery schemes.  As a result, Defendants' convictions for money laundering, predicated on their honest services wire fraud convictions, also cannot be sustained.  The Court therefore grants Defendants' motions to acquit on all counts of conviction.[33]

## II.     Lopez's Conditional Request for New Trial is Denied

In the event that the Court's judgment of acquittal is later vacated or reversed, Lopez asks the Court to conditionally grant his motion for a new trial pursuant to Rule 29(d)(1).  (Lopez Mot., Dkt. 1987-1, at 18.)  Rule 29(d)(1) provides, in relevant part:

> (1) Motion for a New Trial.  If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination.

Fed. R. Crim. P. 29(d)(1).  Rule 29(d)(3) additionally provides:

> (A) Grant of a Motion for a New Trial.  If the court conditionally grants a motion for a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise.
>
> (B) Denial of a Motion for a New Trial.  If the court conditionally denies a motion for a new trial, an appellee may assert that the denial was erroneous.  If the appellate court later reverses the judgment of acquittal, the trial court must proceed as the appellate court directs.

Fed. R. Crim. P. 29(d)(3).

---

[33] The Court notes that it is premature to opine on this Memorandum and Order's effect on the convictions of defendants in this case who have previously pled guilty or been convicted under § 1346.  However, the Court stays all upcoming sentencings in this case until appellate review, if any, is concluded.

The same standard that governs whether to grant a new trial under Rule 33 applies to determining whether to conditionally grant a new trial under Rule 29(d).  *See, e.g.*, *United States v. Finnerty*, 474 F. Supp. 2d 530, 545 (S.D.N.Y. 2007) (applying Rule 33 standard in conditional granting of new trial under Rule 29(d)(1)); *United States v. Davis*, No. 13-CR-923 (LAP), 2017 WL 3328240, at *24 (S.D.N.Y. Aug. 3, 2017) (same).  Under Rule 33, the Court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).

Here, if the Court's judgment of acquittal is reversed or vacated by the Second Circuit, it would presumably be on the ground that § 1346 *does* encompass foreign commercial bribery, at which point, the Circuit would either review *de novo* Lopez's other arguments in support of his Rule 29 motion, or remand to this Court to do so.  If the Circuit rejects on *de novo* review all of Lopez's other Rule 29 arguments—thereby affirming his conviction—no new trial would be warranted.  If, on the other hand, the Circuit were to remand to this Court to review Lopez's other arguments and the Court were to find the evidence sufficient, no new trial would occur.  Conversely, if the Court were to find the evidence insufficient (and Lopez thereby acquitted) on remand, it would be the Government, not Lopez, who would potentially seek a new trial.  Thus, at this stage, the Court will not conditionally grant a new trial because there is no circumstance under which it would be in Lopez's interest, or in the interest of justice, for a new trial to automatically occur in the event that the Circuit reverses or vacate the Court's acquittal of Defendants' convictions.

**CONCLUSION**

For the above reasons, Full Play's and Lopez's motion for a judgment of acquittal is granted but Lopez's request for a new trial, in the event this judgment is vacated or reversed, is denied.

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 1, 2023
        Brooklyn, New York