ATTACHMENT B

STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Eastern District of New York (the "Office") and the defendant MARIANO JINKIS. MARIANO JINKIS hereby agrees and stipulates that the following information is true and accurate. Certain of the facts stated herein are based on information obtained from third parties by the Office through their investigation and described to MARIANO JINKIS. Should the Office pursue the prosecution that is deferred by the Agreement, MARIANO JINKIS agrees that he will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The Office's evidence establishes the following facts and proves beyond a reasonable doubt the charges set forth in the Superseding Information filed in the United States District Court for the Eastern District of New York pursuant to the Agreement. Unless otherwise stated, the following facts were true at various times relevant to the Superseding Information, a copy of which is attached to the Agreement:

BACKGROUND

1. The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer. FIFA comprised over 200 nation-members, each representing organized soccer in a particular nation or territory, including the United States. Each of FIFA's national soccer federations was a member of one of the six continental confederations, including the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), of which the United States is a member, and the Confederación Sudamericana de Fútbol ("CONMEBOL").

2. FIFA's code of ethics prohibited soccer executives from accepting bribes and abusing their positions for personal gain. The code of ethics also provided that soccer

executives owed duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. The FIFA code of ethics applied to CONCACAF and CONMEBOL, which also adopted their own codes of ethics prohibiting bribery.

3. From approximately 1990 to present day, CONCACAF's headquarters were in the United States: first in New York, and, beginning in 2012, Miami. CONCACAF conducted business throughout the United States.

4. CONMEBOL was headquartered in Paraguay. CONMEBOL organized several valuable tournaments including the Copa América and Copa Libertadores. From approximately 2013 to 2014, Eugenio Figueredo, a U.S. citizen, served as president of CONMEBOL.

5. FIFA, CONCACAF, and CONMEBOL often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events. The revenue generated from these contracts constituted an essential source of revenue for FIFA, other governing bodies, and the sports marketing companies. Over time, the United States became an increasingly important and lucrative market for the commercialization of these rights.

THE DEFENDANTS

6. The defendants HUGO JINKIS and MARIANO JINKIS were citizens of Argentina. HUGO JINKIS was the father of MARIANO JINKIS. HUGO JINKIS and MARIANO JINKIS were co-owners and controlling principals of Full Play Group S.A. ("Full Play"), a sports media and marketing business with a principal office in Buenos Aires, Argentina.

RELEVANT INDIVIDUALS AND ENTITIES

7. Datisa S.A. ("Datisa") was a company formed in 2013 by a subsidiary of Full Play, Torneos (defined below), and Traffic (defined below) that held the exclusive worldwide commercial rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario.

8. Torneos y Competencias ("Torneos") was a sports media and marketing business headquartered in Argentina with a number of subsidiaries and affiliates, including, among others, T&T Sports Marketing Ltd. ("T&T").

9. Traffic Group ("Traffic") was a multinational sports marketing company based in São Paulo, Brazil. Traffic comprised, among other entities, Traffic Sports USA, Inc., which was a sports marketing company based in Miami.

10. Broadcasting Company Affiliate A, whose identity is known to the Office and the defendants HUGO JINKIS and MARIANO JINKIS, was an affiliate of a major broadcasting company headquartered in New York, New York.

THE SCHEME

A. Overview

11. Beginning in or about the 1990s and continuing until in or about May 2015, the defendants HUGO JINKIS and MARIANO JINKIS and their co-conspirators, including soccer executives, devised a scheme and artifice to deprive FIFA, CONCACAF, CONMEBOL, and certain federations (collectively, the "Soccer Organizations") of money and property by means of materially false and fraudulent pretenses, representations, and promises. Specifically, HUGO JINKIS and MARIANO JINKIS agreed to pay and did pay tens of millions of dollars in commercial bribes to certain executives of the Soccer Organizations, in exchange

for their support of HUGO JINKIS and MARIANO JINKIS in their efforts to obtain lucrative media and marketing rights to various soccer tournaments.

12. The bribed soccer executives acceded to, and were bound by, the above-described codes of ethics. They made misrepresentations to their respective Soccer Organizations that they would not solicit or accept bribes, and they would act in the best interest of their respective Soccer Organizations. In accepting bribes from the defendants HUGO JINKIS and MARIANO JINKIS and their co-conspirators, in contravention of express agreements not to as executives of the Soccer Organizations, these soccer executives made and caused others to make materially false and misleading statements and representations to the Soccer Organizations, and to make omissions of one or more material facts which made what was represented under the circumstances misleading.

13. The defendants HUGO JINKIS and MARIANO JINKIS, along with the bribed soccer executives and other co-conspirators, concealed the commercial bribes. The media and marketing rights to various soccer tournaments were the valuable property of the Soccer Organizations, and the commercial bribes resulted in the Soccer Organizations receiving less-than-full value for the sale of such media and marketing rights to HUGO JINKIS and MARIANO JINKIS constituted a deprivation of money and property to the Soccer Organizations, as described further below.

14. The soccer tournaments and matches that the defendants HUGO JINKIS and MARIANO JINKIS procured the media and marketing rights through commercial bribery, and for which the Soccer Organizations received less-than-full value, included the CONMEBOL Copa América, and CONMEBOL/CONCACAF Copa América Centenario. In addition, HUGO JINKIS and MARIANO JINKIS assisted T&T with paying commercial bribes to soccer

executives to obtain the media and marketing rights at below-market value to the CONMEBOL Copa Libertadores and other tournaments. Through commercial bribes, HUGO JINKIS and MARIANO JINKIS also secured broadcasting rights for certain World Cup qualifiers and international friendly matches.

48. Much of the conduct of the defendants HUGO JINKIS and MARIANO JINKIS's conduct took place in, and affected, the United States. HUGO JINKIS and MARIANO JINKIS and their co-conspirators used the wire facilities of the United States to facilitate and effect certain payments in furtherance of the criminal scheme, including in connection with each of the tournaments referenced below, and to communicate with co-conspirators and others in furtherance of the criminal scheme. Many of these wires traveled through the Eastern District of New York. Such use of United States wire facilities included, among other things, the use of the bank accounts of Full Play's affiliates held at United States financial institutions to transfer tens of millions of dollars in payments related to contracts for which the Soccer Organizations received less-than-full value on account of commercial bribery, as well as the use of the bank accounts of co-conspirators, held at United States financial institutions to transfer millions of dollars in commercial bribe payments. HUGO JINKIS and MARIANO JINKIS and their co-conspirators also relied, in part, on the growing market for soccer in the United States to generate profits from the scheme, and conducted meetings in furtherance of the scheme in the United States.

B. <u>Conduct in Furtherance of the Scheme</u>

49. By way of example, set forth below are further details regarding certain conduct undertaken by the defendants HUGO JINKIS and MARIANO JINKIS and their co-conspirators in furtherance of the scheme and to effect its objects.

i. <u>CONMEBOL Copa América and CONMEBOL/CONCACAF Copa América Centenario Rights</u>

50. For many years leading up to and through 2011, Traffic held the media and marketing rights to each edition of the Copa América. At various times during that period, Traffic bribed high-ranking CONMEBOL executives to maintain those exclusive rights.

51. In or about 2010, CONMEBOL and Full Play entered into an agreement designating Full Play as CONMEBOL's exclusive agent for the commercialization of the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América. The defendants HUGO JINKIS and MARIANO JINKIS agreed to pay commercial bribes to various CONMEBOL officials in exchange for this contract.

52. Traffic reacted by filing a lawsuit in Florida against CONMEBOL, Full Play, and others. To settle that lawsuit, Full Play (through the defendants HUGO JINKIS and MARIANO JINKIS) and its market competitors Traffic and Torneos all agreed that they would jointly acquire commercial rights to the Copa América. To this end, a new company, Datisa, was formed. This agreement eliminated competition for the Copa América rights among the three companies.

53. The defendants HUGO JINKIS and MARIANO JINKIS and their Datisa co-conspirators paid tens of millions of dollars in commercial bribes to certain soccer executives to obtain the commercial rights to the Copa América. Datisa thus obtained the exclusive worldwide media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América and to the Copa América Centenario, which was played in the United States in 2016, for a price of $317.5 million. As a result of these commercial bribes, the Soccer Organizations received substantially less than the full value of the media and marketing rights. The CONMEBOL executives who agreed to receive commercial bribes in connection with the Copa América rights

included Luis Bedoya, Carlos Chávez, Luís Chiriboga, Rafael Esquivel, Eugenio Figueredo (a U.S. citizen), Sergio Jadue, José Maria Marin, and Juan Ángel Napout.

54. Following negotiations between CONMEBOL and CONCACAF, it was determined that the men's national teams of six CONCACAF member associations, including the U.S. national team, would also participate in the Copa América Centenario, and that the tournament would be hosted by the United States. The defendants HUGO JINKIS and MARIANO JINKIS and their co-conspirators agreed to pay Jeffrey Webb, then president of CONCACAF, a commercial bribe in exchange for Webb's agreement to cause CONCACAF to sell its tournament-related rights to Datisa. Datisa entered into a $35 million contract with CONCACAF to acquire CONCACAF's media rights to the tournament. There was no competition for these rights; they were substantially undervalued; and this resulted in a deprivation of money to CONCACAF.

55. The defendants HUGO JINKIS and MARIANO JINKIS and their Datisa partners relied on off-the-books companies and intermediaries to facilitate the payment of commercial bribes from and through accounts controlled by the Datisa shareholders in connection with the Copa América and Copa América Centenario tournaments. Many of those payments were transferred by wire through the United States.

56. As a result of the commercial bribes paid or promised to CONCACAF's and CONMEBOL's disloyal soccer executives as described above, CONCACAF and CONMEBOL were deprived of the valuable media and marketing rights of the Copa América and the opportunity to receive the full value of those rights. The years of corruption resulted in artificially depressed prices and a market that failed to reflect the full value of the rights.

ii. CONMEBOL World Cup Qualifiers/Friendlies Scheme

47. From approximately 2007 to 2015, the defendants HUGO JINKIS and MARIANO JINKIS engaged in a scheme to pay commercial bribes and kickbacks in connection with certain World Cup qualifying and friendly matches to the presidents of various soccer federations within CONMEBOL, in exchange for the officials' support of Full Play as holder of the media rights to broadcast those and other soccer events. The scheme included the payment of commercial bribes and kickbacks to, among other soccer executives, Luis Bedoya, Carlos Chávez, Luís Chiriboga, Rafael Esquivel, Sergio Jadue, and Juan Ángel Napout.

iii. CONMEBOL Copa Libertadores Scheme

57. Beginning from approximately 1999 to 2015, T&T, which began as a joint venture between Torneos and Traffic and ultimately included other partners, acquired the exclusive worldwide broadcasting rights for each edition of the Copa Libertadores to be played through 2018 through a series of contracts between T&T and CONMEBOL. At various times during that period, T&T was owned in part by Broadcasting Company Affiliate A. Broadcasting Company Affiliate A came to own 75% of T&T in or about 2011.

58. Beginning at least as early as approximately 2000 and continuing through approximately May 2015, T&T paid annual six-figure and, in some instances, seven-figure commercial bribe payments to certain high-ranking CONMEBOL executives, including Luis Bedoya, Carlos Chávez, Luís Chiriboga, Rafael Esquivel, Eugenio Figueredo (a U.S. citizen), Sergio Jadue, José Maria Marin, and Juan Ángel Napout, in exchange for their support of T&T as rights holder of the Copa Libertadores.

59. Although Full Play owned no rights to the Copa Libertadores, T&T relied on the defendants HUGO JINKIS and MARIANO JINKIS to facilitate the payment of commercial bribes to certain co-conspirator soccer executives with whom HUGO JINKIS and

MARIANO JINKIS had separate commercial bribe-paying relationships. Those soccer executives were known as the "Group of Six," later the "Group of Seven," and included Luis Bedoya, Carlos Chávez, Rafael Esquivel, Juan Ángel Napout, Luís Chiriboga, and Sergio Jadue.

60. As a result of these commercial bribes paid to CONMEBOL's disloyal soccer executives, CONMEBOL was deprived of the valuable media and marketing rights of the Copa Libertadores and the opportunity to sell those rights at fair market value. The years of corruption resulted in artificially depressed prices and a market that failed to reflect the full value of the rights.